# Exhibit A

## 2021 CA 002836 B KASAY, HELEN A. Vs. THE DISTRICT OF COLUMBIA et al JML

- Case Type:
- Civil II
- Case Status:
- Open
- File Date:
- 08/13/2021
- Action:
- Complaint for Wrongful Death Filed
- Status Date:
- 08/13/2021
- Next Event:
- 11/12/2021

**All Information** | **Party** | **Event** | **Docket** | **Receipt** | **Disposition**

### Party Information

**KASAY, HELEN A.**
- Plaintiff

| | |
|---|---|
| - Disposition | **Alias** |
| ○ Disp Date | BEHALF OF     ESTATE OF YAFET SOLOMEN, DECEASED |
| ○ | **Party Attorney** |
| | - Attorney |
| | - ANTISHIN, JOHN E |
| | - Attorney |
| | - GRENIER, PETER C |

**THE DISTRICT OF COLUMBIA**
- Defendant

| | |
|---|---|
| - Disposition | **Alias** |
| ○ Disp Date | **Party Attorney** |

**WALKER, JAMES**
- Defendant

| | |
|---|---|
| - Disposition | **Alias** |
| ○ Disp Date | **Party Attorney** |
| ○ | - Attorney |
| | - LONG, JR, LEONARD L |

**SAKI-TAY, INEZ**
- Defendant

| | |
|---|---|
| - Disposition | **Alias** |
| ○ Disp Date | **Party Attorney** |
| ○ | |

**PETERSON, LOUISE**
- Defendant

| | |
|---|---|
| - Disposition | **Alias** |
| ○ Disp Date | **Party Attorney** |
| ○ | |

**BROADIE, HARRIETT A.**
- Defendant

| | |
|---|---|
| - Disposition | **Alias** |
| ○ Disp Date | **Party Attorney** |

**PRATHER, ANTHONY**
- Defendant

- Disposition
  - ○
  - ○ Disp Date
  - ○

| Alias |
| --- |

| Party Attorney |
| --- |

**GAMBOA, FERDINAND**
- Defendant

- Disposition
  - ○
  - ○ Disp Date
  - ○

| Alias |
| --- |

| Party Attorney |
| --- |

**TIBBS, ANETTE**
- Defendant

- Disposition
  - ○
  - ○ Disp Date
  - ○

| Alias |
| --- |

| Party Attorney |
| --- |

**BROOKS, DEREK**
- Defendant

- Disposition
  - ○
  - ○ Disp Date
  - ○

| Alias |
| --- |

| Party Attorney |
| --- |

**HANDY, TIMOTHY**
- Defendant

- Disposition
  - ○
  - ○ Disp Date
  - ○

| Alias |
| --- |

| Party Attorney |
| --- |

**ALLEN, STEVEN**
- Defendant

- Disposition
  - ○
  - ○ Disp Date
  - ○

| Alias |
| --- |

| Party Attorney |
| --- |

**BARNES, JR, JOHN**
- Defendant

- Disposition
  - ○
  - ○ Disp Date
  - ○

| Alias |
| --- |

| Party Attorney |
| --- |

**WILLIAMS, SHAWNTE**
- Defendant

- Disposition
  - ○
  - ○ Disp Date
  - ○

| Alias |
| --- |

| Party Attorney |
| --- |

## Events

| Date/Time | Location | Type | Result | Event Judge |
| --- | --- | --- | --- | --- |
| 11/12/2021 09:30 AM | Courtroom 212 | Initial Scheduling Conference-60 | | |

## Docket Information

| Date | Docket Text | | Image Avail. |
| --- | --- | --- | --- |
| 08/13/2021 | Complaint for Wrongful Death Filed  Receipt: 477614  Date: 08/16/2021 | | |

| Date | Docket Text | Image Avail. |
|---|---|---|
| 08/13/2021 | eComplaint Filed. Submitted 08/13/2021 13:03. mq    (SUMMONS FOR DISTRICT OF COLUMBIA DOES NOT MATCH COMPLAINT)<br>Attorney: GRENIER, Mr PETER C (418570)<br>HELEN A. KASAY (Plaintiff); | Image |
| 08/16/2021 | Event Scheduled<br>Event: Initial Scheduling Conference-60<br>Date: 11/12/2021   Time: 9:30 am<br>Judge: LOPEZ, JOSE M   Location: Courtroom 212 | |

| Date | Docket Text | Image Avail. |
|------|-------------|--------------|
| 08/16/2021 | Issue Date: 08/16/2021<br>Service: Summons Issued<br>Method: Service Issued<br>Cost Per: $<br><br>BROOKS, DEREK<br>1100 4th Street, S.W.<br>WASHINGTON, DC 20024<br>Tracking No: 5000235690<br><br>HANDY, TIMOTHY<br>1100 4th Street, S.W.<br>WASHINGTON, DC 20024<br>Tracking No: 5000235691<br><br>ALLEN, STEVEN<br>1100 4th Street, S.W.<br>WASHINGTON, DC 20024<br>Tracking No: 5000235692<br><br>BARNES JR, JOHN<br>2000 14th Street, N.W., 5th Floor<br>WASHINGTON, DC 20009<br>Tracking No: 5000235693<br><br>WILLIAMS, SHAWNTE<br>2000 14th Street, N.W., 5th Floor<br>WASHINGTON, DC 20009<br>Tracking No: 5000235694<br><br>WALKER, JAMES<br>1412 Whittier Place, N.W.<br>WASHINGTON, DC 20012<br>Tracking No: 5000235695<br><br>SAKI-TAY, INEZ<br>1100 4th Street, S.W.<br>WASHINGTON, DC 20024<br>Tracking No: 5000235696<br><br>PETERSON, LOUISE<br>1100 4th Street, S.W.<br>WASHINGTON, DC 20024<br>Tracking No: 5000235697<br><br>BROADIE, HARRIETT A.<br>1100 4th Street, S.W.<br>WASHINGTON, DC 20024<br>Tracking No: 5000235698<br><br>PRATHER, ANTHONY<br>1100 4th Street, S.W.<br>WASHINGTON, DC 20024<br>Tracking No: 5000235699<br><br>GAMBOA, FERDINAND<br>1100 4th Street, S.W.<br>WASHINGTON, DC 20024<br>Tracking No: 5000235700<br><br>TIBBS, ANETTE<br>1100 4th Street, S.W.<br>WASHINGTON, DC 20024<br>Tracking No: 5000235701 | |

| Date | Docket Text | Image Avail. |
|------|-------------|--------------|
| 08/16/2021 | Complaint Package eServed to Filer | Image |
| 09/10/2021 | Initial Summons Requested as to Filed. Submitted 09/10/2021 17:17. AV Attorney: GRENIER, Mr PETER C (418570) THE DISTRICT OF COLUMBIA (Defendant); | Image |
| 09/24/2021 | Affidavit of Service of Summons & Complaint on JAMES WALKER (Defendant); | Image |
| 09/24/2021 | Proof of Service<br>   Method    : Service Issued<br>   Issued     : 08/16/2021<br>   Service    : Summons Issued<br>   Served     : 09/18/2021<br>   Return    : 09/24/2021<br>   On        : WALKER, JAMES<br>   Signed By :<br><br>   Reason    : Proof of Service<br>   Comment   :<br><br>   Tracking #: 5000235695 | |
| 10/07/2021 | Affidavit of Service Filed. Submitted 10/07/2021 14:30.ts. THE DISTRICT OF COLUMBIA (Defendant); | Image |
| 10/07/2021 | Additional eFiling Document to Affidavit of Service Filed. Submitted 10/07/2021 14:30.ts. | Image |
| 10/08/2021 | Certificate Regarding Discovery Filed. Submitted 10/08/2021 15:46. ts. Attorney: GRENIER, Mr PETER C (418570) Attorney: ANTISHIN, JOHN E (1725116) HELEN A. KASAY (Plaintiff); | Image |
| 10/08/2021 | Defendant James Walker's Motion to Quash Due to Insufficiency of Service of Process Filed. Submitted 10/08/2021 18:22. AV Attorney: LONG JR, Mr LEONARD L (385311) JAMES WALKER (Defendant); Receipt: 480892 Date: 10/12/2021 | Image |
| 10/08/2021 | Affidavit of Service Filed. Submitted 10/08/2021 13:20. ts. TIMOTHY HANDY (Defendant); | Image |

## Receipts

| Receipt Number | Receipt Date | Received From | | Payment Amount |
|----------------|--------------|---------------|--|----------------|
| 477614 | 08/16/2021 | GRENIER, Mr PETER C, Attorney | | $120.00 |
| 480892 | 10/12/2021 | LONG JR, Mr LEONARD L, Attorney | | $20.00 |
| Total | Total | Total | Total | |
| | | | | $140.00 |

## Case Disposition

| Disposition | Date | Case Judge |
|-------------|------|------------|
| Undisposed | | |

Filed
D.C. Superior Court
08/13/2021 13:03PM
Clerk of the Court

# THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
## Civil Division

| | |
|---|---|
| HELEN A. KASAY, as Personal Representative ) <br> of the Estate of Yafet Solomen, deceased ) <br> 1414 Upshur Street, N.W. ) <br> Apt #304 ) <br> Washington, D.C. 20011 ) <br> ) <br>       **Plaintiff,** ) <br> ) <br> ) <br> **v.** ) <br> ) <br> **JAMES WALKER** ) <br> 1412 Whittier Place, N.W. ) <br> Washington, D.C. 20012 ) <br> ) <br> -and- ) <br> ) <br> **THE DISTRICT OF COLUMBIA** ) <br> ) <br>     **SERVE:** ) <br> ) <br>     Muriel Bowser ) <br>     Mayor of the District of Columbia ) <br>     John A. Wilson Building ) <br>     1350 Pennsylvania Avenue, N.W. ) <br>     Washington, D.C. 20004, ) <br> ) <br>     -and- ) <br> ) <br>     Karl A. Racine ) <br>     Attorney General of the District of ) <br>     Columbia ) <br>     400 6th Street, N.W. ) <br>     Washington, D.C. 20001 ) <br> ) <br> -and- ) <br> ) ) ) ) ) ) ) |     Civil Action No. _____ |

**INEZ SAKI-TAY, LOUISE PETERSON,**                  )
**HARRIETT A. BROADIE,**                             )
**ANTHONY PRATHER, FERDINAND**                       )
**GAMBOA, ANETTE TIBBS,**                            )
**DEREK BROOKS, TIMOTHY HANDY, AND**                 )
**STEVEN ALLEN,**                                    )
**1100 4th Street, S.W.**                            )
**Washington, D.C. 20024**                           )
    **Individually, and as employees/agents of**  )
    **Defendant District of Columbia**         )
                                                     )
**-and-**                                            )
                                                     )
**JOHN BARNES JR., SHAWNTE WILLIAMS,**               )
**AND FIRE AND EMERGENCY MEDICAL**                   )
**SERVICES JOHN DOE EMPLOYEES #s 1 & 2**             )
**2000 14th Street, N.W., 5th Floor**                )
**Washington, D.C. 20009**                           )
    **Individually, and as employees/agents of**  )
    **Defendant District of Columbia**         )
                                                     )
**-and-**                                            )
                                                     )
**DISTRICT OF COLUMBIA JOHN DOE**                    )
**EMPLOYEES #1-10**                                  )
**c/o Karl A. Racine**                               )
**Attorney General of the District of**              )
**Columbia**                                         )
**400 6th Street, N.W.**                             )
**Washington, D.C. 20001**                           )
    **Individually, and as employees/agents of**  )
    **Defendant District of Columbia**         )
                                                     )
      **Defendants.**                       )

## COMPLAINT AND JURY DEMAND

COMES NOW, Helen A. Kasay ("Ms. Kasay," "Plaintiff"), as personal representative of

the Estate of Yafet Solomen, her deceased nine-year-old-son, by and through the undersigned

counsel, and files this Complaint and Jury Demand against Defendants James Walker, the

District of Columbia, Inez Saki-Tay, Louise Peterson, Broadie A. Harriet, Anthony Prather,

Ferdinand Gamboa, John Barnes Jr., Shawnte Williams, Fire and Emergency Medical Services

2

John Doe Employees #s 1 & 2, Anette Tibbs, Derek Brooks, Timothy Handy, Steven Allen, and District of Columbia John Doe Employees #1–10  (collectively, "Defendants") based on the following:

## OVERVIEW

This action, alleging negligence and a violation of 42 U.S.C. § 1983, arises out of the tragic, horrific, and extraordinarily premature death of Yafet Solomen ("Yafet"), a nine-year-old resident of the District of Columbia ("the District"). On August 18, 2019, Yafet burned alive in a house fire (the "fire") at 708 Kennedy Street, N.W., Washington, D.C. 20011 ("708 Kennedy"). While emergency physicians were able to resuscitate Yafet, his brain had sustained irreparable damage, and he died two days later in the hospital. Prior to his death, Yafet suffered first and second-degree burns, which covered approximately 50% of his body, and extensive upper airway burns (*i.e.*, burns *inside* his body). Examination of his lungs and airways revealed black and soot-like secretions and evidence of Grade III smoke inhalation injuries. Clearly, Yafet's experience in the house fire was horrifying, terrifying and excruciating. The fire and Yafet's inability to escape were proximately caused by the egregious, illegal, and negligent (and negligent *per se*) actions of Defendants.

Defendant James Walker, the owner and landlord of 708 Kennedy, made dangerous and illegal modifications to the property, creating a substantial fire hazard. To expand the capacity of 708 Kennedy and thus obtain additional rent from impoverished and desperate tenants, Defendant Walker split several rooms within 708 Kennedy with makeshift drywall and 2x4 partitions. He rented out a windowless room to Plaintiff and Yafet in the basement of the property. There was one additional tenant who resided in the basement at the time of the fire. Much of the property, including Plaintiff and Yafets' room, lacked required smoke detectors.

With Defendant Walker's authorization, his girlfriend ran a seamstress shop on the main level of 708 Kennedy. To keep the tenants in the basement separated from his girlfriend's business on the main level of 708 Kennedy, Defendant Walker installed a door with a metal security gate. This door prevented access to the front door exit of the house from the basement. Consequently, when a fire broke out near the rear exit of the basement of 708 Kennedy, Yafet was unable to escape the property. During the fire, emergency responders broke through the door separating the basement of 708 Kennedy from the main level. On the other side of that door, they found Yafet's unconscious and horrifically burned body.

In a shocking example of negligence and incompetence, the District had every opportunity (and legal obligation) to prevent the tragic scenario which led to Yafet's death, but simply did not do so. ***Five months prior to the fire***, Officer Ernie Davis ("Officer Davis") of the Metropolitan Police Department ("MPD") directly observed the dangerous and illegal conditions at 708 Kennedy. The very next day, Officer Davis (who was trained to spot code violations) promptly notified ***six*** District employees within the Department of Consumer and Regulatory Affairs ("DCRA") and Fire and Emergency Medical Services ("FEMS") of his observations and strongly emphasized the need for an inspector. Prior to the fire, Officer Davis followed up with DCRA employees ***four*** additional times, determined to see the deplorable conditions at 708 Kennedy abated.

Despite Officer Davis' detailed warnings and persistence, the only action the District took in the months preceding the fire was sending a single employee to the property to inquire about proper permitting. Following Officer Davis' report, no District employee ever inspected the interior of 708 Kennedy. FEMS never even opened a file concerning 708 Kennedy. DCRA closed its file on 708 Kennedy two days before the fire. The District's actions (or, more

4

accurately put, lack thereof) can be described as nothing less than disgraceful neglect and a clear violation of its non-discretionary, statutory duties, which directly resulted in Yafet's untimely death.

Given the horrific circumstances of Yafet's death, and the sickening knowledge that it was entirely preventable, one would assume that the District would have promptly reformed how it responds to complaints concerning dangerous buildings and illegal housing. However, upon learning of the fire, DCRA Director Ernest Chrappah made a public plea to **_tenants_**, stating, "[p]lease reach out to us . . . so that we can hold your landlord responsible and ensure that you are living in a safe environment." Such a deflecting statement is akin to putting the onus on victims of assault to identify the perpetrators before the assault ever occurs. What is worse, a **_District Police Officer_** did "reach out" to DCRA **_four times_** and DCRA did **_nothing_**.

Indeed, the District's neglect of its duty to address complaints of dangerous structures persists to this day. Just recently, on July 1, 2021, a five-story building collapsed on **_Kennedy Street, N.W._**, following a resident's complaints to DCRA regarding the structure months prior to its collapse.[1] As Officer Davis' months of persistence demonstrate, however, no complaint seems significant enough to motivate the District to fulfill its duties to residents such as Yafet.

## JURISDICTION, VENUE, AND PARTIES

1.      Plaintiff is an adult citizen of the District of Columbia, currently residing at 1414 Upshur Street, N.W., Apt #304, Washington, D.C. 20011.

2.      Plaintiff brings this action as the personal representative of the Estate of Yafet Solomen, her deceased son. On July 23, 2020, Plaintiff was appointed as the personal

---

[1] https://www.washingtonpost.com/opinions/2021/07/02/building-collapse-northwest-dc-highlights-agency-flaws/

representative of the Estate of Yafet Solomen, for lawsuit purposes, by the Superior Court of the District of Columbia, Probate Division.

3.      At all times relevant to this Complaint, Yafet was a nine-year-old citizen of the District of Columbia residing at 708 Kennedy Street, N.W., Washington, D.C. 20011. Yafet is survived by Plaintiff and, upon information and belief, by his father, Petyas Solomen.

4.      Defendant James Walker is a citizen of the District of Columbia, with a last known address of 1412 Whittier Place, N.W., Washington, D.C. 20012.

5.      Defendant the District of Columbia is a municipal corporation which may be sued consistent with the Constitution and laws of the United States and the provisions of the D.C. Code.

6.      At all times relevant to this Complaint, Ms. Inez Saki-Tay ("Ms. Saki-Tay," "Defendant Saki-Tay") was a DCRA Office of Communications Community Outreach Specialist and an employee/agent of the District of Columbia.

7.      At all times relevant to this Complaint, Ms. Louise Peterson ("Ms. Peterson," "Defendant Peterson") worked within DCRA and was an employee/agent of the District of Columbia.

8.      At all times relevant to this Complaint, Ms. Harriett A. Broadie ("Ms. Broadie," "Defendant Broadie") worked within DCRA and was an employee/agent of the District of Columbia.

9.       At all times relevant to this Complaint, Mr. Anthony Prather ("Mr. Prater," "Defendant Prater") worked within DCRA and was an employee/agent of the District of Columbia.

10.     At all times relevant to this Complaint, Mr. Ferdinand Gamboa ("Mr. Gamboa," "Defendant Gamboa") was a DCRA Duty Officer and an employee/agent of the District of Columbia.

11.     At all times relevant to this Complaint, Ms. Anette Tibbs ("Ms. Tibbs," "Defendant Tibbs") was a DCRA Program Analyst within the Regulatory Investigations Section and an employee/agent of the District of Columbia.

12.     At all times relevant to this Complaint, Mr. Derek Brooks ("Mr. Brooks," "Defendant Brooks") was a Program Officer and/or acting Program Manager working within DCRA and an employee/agent of the District of Columbia.

13.     At all times relevant to this Complaint, Mr. Timothy R. Handy ("Mr. Handy," "Defendant Handy") was a Program Manager and/or the Chief of Compliance at DCRA and an employee/agent of the District of Columbia.

14.     At all times relevant to this Complaint, Mr. Steven Allen ("Mr. Allen," "Defendant Allen") was a DCRA Investigator and an employee/agent of the District of Columbia.

15.     At all times relevant to this Complaint, Mr. John Barnes Jr. ("Mr. Barnes," "Defendant Barnes") was an FEMS Technical Section Lieutenant and an employee/agent of the District of Columbia.

16.     At all times relevant to this Complaint, Ms. Shawnte Williams ("Ms. Williams," "Defendant Williams") worked within FEMS and was an employee/agent of the District of Columbia.

17.     At all times relevant to this Complaint, FEMS John Doe Employee #1 was, upon information and belief, an FEMS Division Inspections Supervisor and an employee/agent of the District of Columbia who took the actions described herein.

18.     At all times relevant to this Complaint FEMS John Doe Employee #2 was, upon information and belief, an FEMS Fire Inspector and an employee/agent of the District of Columbia who took the actions described herein.

19.     At all times relevant to this Complaint, D.C. John Doe Employees #1–10 were employees/agents of the District of Columbia whose negligent actions and inactions within the scope of said employment/agency resulted in Yafet's death.

20.     Ms. Saki-Tay, Ms. Peterson, Ms. Broadie, Mr. Prather, Mr. Gamboa, Ms. Tibbs, Mr. Brooks, Mr. Handy, Mr. Allen, Mr. Barnes, Ms. Williams, FEMS John Doe Employees #s 1 & 2, and D.C. John Doe Employees #1–10 are collectively referred to herein as the "District Defendants."

21.     This Court has personal jurisdiction over all Defendants pursuant to D.C. Code §§ 13–422, and/or 13–423(a)(3).

22.     This Court has subject matter jurisdiction over this action pursuant to D.C. Code § 11–921(a)(6).

23.     Pursuant to D.C. Code § 12–309 on or about February 6, 2020, Plaintiff gave lawful notice to the District through a properly served notice of claim to Mayor Muriel Bowser.

8

## FACTS

### The Property

24.     At all relevant times herein, Defendant Walker owned the real estate and improvements located at the property known as 708 Kennedy Street, N.W., Washington, D.C. 20011 (sometimes referred to herein as the "Property").

25.     From January 1, 2015, through August 18, 2019, Plaintiff and Yafet resided at 708 Kennedy Street, N.W., Washington, D.C. 20011, pursuant to a series of lease agreements they maintained with Defendant Walker.

26.     Along with Plaintiff and Yafet, at least five other tenants resided at the Property on August 18, 2019.

27.     In addition to using the Property for residential rental purposes, Defendant Walker authorized his girlfriend to operate a seamstress business out of the main floor of the Property.

28.     In order to pack as many paying tenants as possible into the Property, Defendant Walker made significant and dangerous modifications to the Property. Upon information and belief, Defendant Walker undertook these modifications to increase his profits without regard for the safety of the individuals residing in the house.

29.     On the top floor of the Property, Defendant Walker erected multiple makeshift partitions constructed of drywall and 2x4s. This created several small rooms, rather than the few larger rooms that originally existed.

30.     To provide electricity to these additional smaller rooms, Defendant Walker weaved extension cords through holes punched in the partitions and stapled the excess slack in the cords to the walls.

31.     On August 18, 2019, Plaintiff and Yafet shared a small windowless room in the basement of the Property.

32.     Fitsum Kebede ("Mr. Kebede"), another tenant at the Property, lived in a separate room in the basement along with Plaintiff and Yafet.

33.     Between the basement and the main-level exit of the Property, Defendant Walker installed a door with a metal security gate that prevented Plaintiff, Yafet, and Mr. Kebede from accessing the front exit of the Property.

34.     The only direct exit from the basement on August 18, 2019, was through a door exiting to the rear of the Property.

35.     At the time of the fire, the home also had metal bars over its windows, preventing any emergency exit from the windows.

36.     At the time of the fire, there were two Certificates of Occupancy posted within the Property. The first was granted to Defendant Walker on February 17, 1993 for the purpose of using the second floor of the property for office space. The second was granted to Walker Pharmacy, Inc. (a corporation organized by Defendant Walker) on March 1, 1995, for the purpose operating a pharmacy and delicatessen on the first floor of the Property.

37.     Pursuant to D.C. law, Defendant Walker was obligated to obtain a new Certificate of Occupancy for any change in the type of business, ownership of business, or part of the premises used therefor because such a change voids a previously issued Certificate of Occupancy.

38.     Defendant Walker failed to obtain a new Certificate of Occupancy when he began using the Property for the purpose of renting rooms out to tenants at and/or authorizing his girlfriend to operate a seamstress business out of the Property.

39.     At all times relevant herein, there was only one active basic business license associated with the Property: a general business/patent medicine license issued to Flowers Medical Care L.L.C., d/b/a 24 Dispensary.

40.     At all times relevant herein, there was no basic business license associated with the seamstress shop or Defendant Walker's rental housing business at the Property, making the use of the Property for such purposes unlawful.

### MPD Officer Davis Recognizes Dangerous Conditions at the Property

41.     On Thursday, March 21, 2019, at or around 6:47 p.m., Officer Ernie Davis of the Metropolitan Police Department responded to a tenant issue on the 700 block of Kennedy Street N.W.

42.     Upon information and belief, the "tenant issue" was a noise complaint concerning the Property.

43.     Officer Davis was cross agency trained to identify and report code violations.

44.     Upon his arrival at the Property, Officer Davis identified multiple code violations.

45.     Defendant Walker, who was present at the scene, told Officer Davis that the Property was a rooming house, but Officer Davis recognized that Walker was using part of the Property as a seamstress shop.

46.     Officer Davis recorded his findings in a Public Incident Report ("the PIR").

47.     In addition to listing the code violations he observed, Officer Davis included within the PIR that, "[t]here are too many make shift doors with locks which would make it difficult to exit in an emergency."

11

48.     Regarding the sanctioned uses of the property, Officer Davis further stated in the PIR that, "[t]here are two Certificates of Occupancy Permits . . . . Neither permit allows for the use of rental property or seamstress space."

49.     Officer Davis concluded the PIR with the statement, "[s]*trongly recommend both DCRA & DCFD Code Inspectors respond to the listed location*."

### Officer Davis Informs DCRA and FEMS of Walker's Violations at 708 Kennedy

50.     On Friday, March 22, 2019, the day after he personally observed dangerous and illegal conditions at 708 Kennedy, Officer Davis sent an email with the subject, "Serious Code Violations," to four individuals at DCRA and two individuals at FEMS. Officer Davis included the PIR, which strongly recommended that inspectors respond to 708 Kennedy, as an attachment to this email.

51.     Upon information and belief, the individuals at DCRA to whom Officer Davis sent his March 22nd email included:

    a.  DCRA Office of Communications Community Outreach Specialist, Ms. Inez Saki-Tay ("Ms. Saki-Tay");

    b.  Ms. Louise Peterson;

    c.  Ms. Harriett A. Broadie; and,

    d.  Mr. Anthony Prather.

52.     To make it clear that there were two separate locations for which Officer Davis was requesting inspections, in the body of the above-described email, Officer Davis stated, "I *also* need an inspection of a dwelling residence located at 5410 14th Street . . ." (emphasis included).

53.     Upon information and belief, the only response Officer Davis received to this email was from Ms. Saki-Tay.

12

54.     Upon information and belief, by "replying all" to Officer Davis' email, Ms. Saki-Tay notified Officer Davis that his request had been forwarded to the on-duty DCRA Duty Officer, Mr. Ferdinand Gamboa ("Mr. Gamboa").

55.     Upon information and belief, the DCRA Duty Officer is DCRA's primary agency contact responsible for responding to after-hours and weekend urgent incidents.

56.     Upon information and belief, it was contrary to DCRA standard operating procedures ("SOPs") to forward reports of dangerous housing conditions to the DCRA Housing Duty Officer via email.

57.     Ms. Saki-Tay should have routed Officer Davis' email through the Homeland Security and Emergency Management Agency 24-hour Operations Center.

58.     Upon information and belief, Mr. Gamboa failed to see Officer Davis' email in his inbox after Ms. Saki-Tay forwarded it to him. Thus, Mr. Gamboa never took any action regarding Officer Davis' report of illegal and dangerous conditions at 708 Kennedy.

59.     Upon information and belief, at the time Officer Davis sent his March 22nd email, DCRA utilized a Pilot Customer Relationship Management database ("Pilot CRM") to help DCRA streamline the way it responded to customer inquiries to and ensure that such responses were carried out in a timely manner.

60.     Upon information and belief, contrary to internal DCRA policies and procedures, none of the four DCRA employees Officer Davis included on his March 22 email, entered his complaint into the Pilot CRM or otherwise recorded the need for action in any system or log, which was a non-discretionary, ministerial mandate. Instead, the District employees/agents completely disregarded the report of "Serious Code Violations" from a District Police Officer

who observed such violations first-hand and made his concerns in relation to these violations explicitly known.

61.    Upon information and belief, the individuals at FEMS to whom Officer Davis sent his March 22nd email included:

      a.   an FEMS Technical Section Lieutenant, Mr. John Barnes Jr. ("Mr. Barnes"); and,

      b.   Ms. Shawnte Williams.

62.    Upon information and belief, Ms. Shawnte Williams never acted upon Officer Davis' email.

63.    Upon information and belief, on the morning of March 23, 2019, Mr. Barnes forwarded Ms. Saki-Tay's **_reply_** email to an FEMS Division Inspections Supervisor ("FEMS John Doe Employee #1") responsible for assigning Fire Inspectors.

64.    Because Mr. Barnes only forwarded Ms. Saki-Tay's **_reply_** (as opposed to Officer Davis' original email), he failed to include the PIR relating to 708 Kennedy as an attachment. Accordingly, FEMS John Doe Employee #1 never received the PIR detailing violations at 708 Kennedy.

65.    Upon information and belief, on a date between March 23, 2019, and August 18, 2019, FEMS John Doe Employee #1, recognizing his obligations, assigned an FEMS Fire Inspector ("FEMS John Doe Employee #2") to investigate the address included in the body of Officer Davis' email, 5410 14th Street.

66.    Upon information and belief, on a date between March 23, 2019, and August 18, 2019, FEMS John Doe Employee #2 reported that the address 5410 14th Street did not exist.[2]

---

[2] Officer Davis' reference to 5410 14th Street was in error; upon information and belief, he meant to reference 5310 14th Street, N.W.

67.     Despite realizing that 5410 14th Street did not exist, not a single FEMS employee followed up with Officer Davis regarding his report of "Serious Code Violations" at either of the properties identified in his March 22nd email, including 708 Kennedy.

68.     When asked, during a D.C. Council Joint Oversight Hearing on November 18, 2019, why no FEMS employee/official followed up with Officer Davis, Fire and EMS Chief Gregory M. Dean admitted, "**our previous practices…um…left holes…a lot of holes that we needed to correct . . . .**"

**Officer Davis' Follow-ups with DCRA Requesting Assignment of an Investigator**

69.     Upon information and belief, between March 22, 2019, and April 24, 2019, no individual from DCRA or FEMS contacted Officer Davis regarding his concerns of violations and dangerous conditions at 708 Kennedy.

70.     Upon information and belief, between March 22, 2019, and April 24, 2019, no individual from DCRA or FEMS took any action to investigate or abate the reported code violations and dangerous conditions at 708 Kennedy.

71.     On April 24, 2019, over one month after his initial email, Officer Davis emailed Ms. Annette Tibbs ("Ms. Tibbs"), a DCRA Program Analyst within the Regulatory Investigations Section ("RIS"), with the following explicit request: "[i]s it possible to have an investigator check out the business at 708 Kennedy Street NW. It needs to be checked for zoning and the proper Certificate of Occupancy. It was zoned as a business and now he has turned it into apartments."

72.     The same day, Ms. Tibbs forwarded Officer Davis' email to Derek Brooks ("Mr. Brooks"), a Program Officer at DCRA, and Timothy R. Handy ("Mr. Handy"), a Program Manager and/or the Chief of Compliance at DCRA. Ms. Tibbs requested an investigation of 708

Kennedy Street, N.W. Additionally, Ms. Tibbs communicated that there were no open investigations pending for 708 Kennedy in the RIS QuickBase System ("QuickBase"), a module used by DCRA to record the status of investigations.

73.     On May 21, 2019, after hearing nothing for nearly another full month, Officer Davis again emailed Ms. Tibbs requesting a follow-up on his request for an investigation into 708 Kennedy.

74.     The same day, at or around 10:41 a.m., Ms. Tibbs forwarded Officer Davis' **_second_** follow-up email to Mr. Handy, and additionally stated, "[w]e have to fix this. I sent this to Brooks (and a cc: to you) on April 24, 2019 and still haven't received a response. [Officer] Ernie Davis is following up on a response."

75.     After receiving Ms. Tibbs' May 21st email, Mr. Handy replied to her April 24th email, which included Officer Davis' request for an investigator, and stated, "[j]ust caught this." He also indicated that he did not see an investigation for 708 Kennedy listed in QuickBase and instructed Mr. Brooks to assign an investigator.

76.     By the end of the day, on May 21, 2019, a DCRA Investigator was assigned to 708 Kennedy.

77.     Upon information and belief, the assigned investigator was Mr. Steven Allen ("Mr. Allen").

78.     Upon information and belief, Mr. Allen was not trained to recognize code violations, and he was only tasked with checking to see whether the owner of 708 Kennedy had proper permits.

79.     Indeed, following the fire, during an interview with a local new station, Mr. Allen himself confirmed that he was not trained to look at a building and recognize housing code

violations, and that a housing code inspector, trained to identify violations, should have been dispatched to the Property.[3]

80.     On May 24, 2019, Ms. Tibbs emailed Officer Davis and informed him that an investigation had been opened into 708 Kennedy and provided him with a case number.

**DCRA's Failure to Inspect 708 Kennedy**

81.     On May 22, 2019, Mr. Allen visited the Property.

82.     Mr. Allen did not enter the Property and simply took photographs of the front of the building.

83.     Upon information and belief, DCRA best practices mandated that Investigators take photos of all publicly accessible portions of a property.

84.     Upon information and belief, Mr. Allen alleges that he attempted to visit the Property twice more on May 23 and May 24, 2019.

85.     Upon information and belief, Mr. Allen did not create a digital record of his visits to the Property in the Pilot CRM or QuickBase systems, despite clear instructions from DCRA to record investigations in this manner beginning February 2019.

86.     Upon information and belief, Mr. Allen alleges he sent a letter to Defendant Walker and left a business card on the door of the Property. There is no evidence corroborating Mr. Allen took these actions.

87.     Upon information and belief, Mr. Allen further alleges he maintained a physical file concerning the Property, but that the file was lost during an office move in August 2019.

---

[3] https://www.wusa9.com/article/news/investigations/dcra-investigator-speaks-out-for-the-first-time-since-tragic-fire-that-killed-a-9-year-old-boy-and-40-year-old-man/65-7bd595d7-acca-48ab-aaaa-83076b5f2155

88.     Upon information and belief, at all times relevant herein, Mr. Allen and other DCRA employees had access to the Accela records system, which documented a history of maintenance, safety, and unlicensed rooming house complaints at the Property dating back to 2003. These violations included, *inter alia*, reports of trash and weeds on the Property, a report that the shed/garage in the rear of the Property was unsafe and dilapidated, and complaints of running a rooming house without a certificate of occupancy.

89.     Despite the information contained in Officer Davis' PIR and the Accela records system, and despite Mr. Allen's failure to gain entry to the Property, no DCRA employee attempted to obtain an administrative search warrant to access the Property.

90.     On June 3, 2019, Officer Davis sent an email to Ms. Tibbs and Mr. Allen requesting that someone contact him following the inspection "so that [he] may stay on top of them." Presumably, by "them," Officer Davis was referring to Defendant Walker.

91.     On June 11, 2019, Ms. Tibbs reminded Mr. Allen to "follow up with Officer Ernie Davis."

92.     Upon information and belief, Mr. Allen never followed up with Officer Davis and no further action was taken by any DCRA employee to investigate, inspect, or abate the dangerous conditions at the Property before the fire.

**DCRA Closes Investigation**

93.     Upon information and belief, in June of 2019, Mr. Brooks, the DCRA Program Officer, began acting as a DCRA Program Manager.

94.     Upon information and belief, on June 12, 2019, Mr. Brooks made an entry for the Property in the DCRA Investigations Module.

95.     Upon information and belief, Mr. Brooks promoted Mr. Allen to "lead investigator" and requested that he assist Mr. Brooks with managing investigations.

96.     Upon information and belief, at all relevant times, Mr. Brooks and Mr. Allen kept track of investigations on an offline spreadsheet.

97.     Upon information and belief, without any oversight, Mr. Brooks and Mr. Allen agreed to suspend the investigation into the Property on July 26, 2019.

98.     Upon information and belief, on August 2, 2019, Mr. Brooks indicated that 708 Kennedy should not be included in a DCRA report of open complaints.

99.     Upon information and belief, Mr. Allen and Mr. Brooks verbally agreed to move the Property investigation from a suspended status to a closed status on or before August 16, 2019.

100.     Upon information and belief, Mr. Brooks and/or Mr. Allen officially closed the investigation into the Property on August 16, 2018.

101.     While testifying before a D.C. Joint Oversight Committee on November 18, 2019, regarding the fire at the Property, DCRA Director Ernest Chrappah admitted that DCRA's failure to act was "**a failure of people.**" He additionally stated that DCRA's neglect constituted "**a failure of not taking ownership and ensuring that grave issues get the attention they need [and n]o amount of technology is going to do the work that human beings <u>are supposed to do</u>.**"

### The Fire

102.     On August 18, at or around 5:30 a.m., Plaintiff departed the Property for her custodial job at George Washington University.

103.    As she had done many times previously, Plaintiff left Yafet in the care of fellow basement-tenant Mr. Kebede.

104.    At some time before 9:36 a.m., a fire started in the basement of the Property.

105.    Upon information and belief, the fire started in Mr. Kebede's room near the rear basement-exit of the Property.

106.    Upon information and belief, the fire grew to a degree that prevented Mr. Kebede and Yafet from escaping the Property through the rear basement-exit.

107.    A nearby MPD Officer noticed the fire.

108.    At or around 9:36 a.m., the MPD Officer immediately radioed a Dispatcher at the Office of Unified Communications ("OUC"). After an exchange with the MPD Officer, the OUC Dispatcher sent FEMS personnel to the Property.

109.    When FEMS personnel arrived and gained access to the Property, they encountered an interior door with bars behind it leading from the main level to the basement. Upon information and belief, this was the door that Defendant Walker illegally installed to separate the basement tenants from his girlfriend's seamstress shop on the first floor.

110.    FEMS personnel requested a metal saw to gain access beyond the door with bars behind it.

111.    Once FEMS personnel were able to force the interior door open, they encountered Yafet and Mr. Kebede.

112.    Yafet was lying on top of Mr. Kebede's body. Both individuals were unconscious.

113.    FEMS determined, subsequent to the fire, that Mr. Kebede was attempting to escape the building at the time of his injury.

114.    FEMS also determined, subsequent to the fire, that the contributing factors to Yafet's injuries were a "[l]ocked exit or other problem with exit," and a "[b]urglar or security bar, intrusion barrier."

115.    After locating Yafet, FEMS personnel removed him from the building and placed him into an ambulance for transport to Children's National Hospital at 111 Michigan Avenue, N.W., Washington, D.C. 20010.

116.    Plaintiff did not learn of the fire until at or around 10:00 a.m. when Defendant Walker called her to inform her of the fire.

117.    Upon learning of the fire, Plaintiff immediately left George Washington University and headed back to the Property.

118.    While en route to the Property, Plaintiff called Defendant Walker multiple times, seeking information regarding Yafet's status.

119.    When Plaintiff finally reached Defendant Walker by telephone, he informed her that Yafet had been taken to Children's National Hospital.

120.    Accordingly, Plaintiff changed her route and headed straight to Children's National Hospital.

**Yafet's Injuries**

121.    Emergency Medical Services ("EMS") personnel, who initially treated Yafet, noted that his body was covered in burns and he was experiencing cardiac arrest.

122.    EMS personnel began CPR and attempted to intubate Yafet. While attempting intubation, EMS personnel noted "heavy soot" within Yafet's airway.

123.    When intubation failed to produce positive results, EMS personnel removed the intubation tube, and attempted bag-valve-mask ventilation.

124.    Upon arrival at Children's National Hospital, Yafet still had no pulse.

125.    Emergency room physicians at Children's National Hospital continued CPR and successfully reintubated Yafet.

126.    While reintubating Yafet, Emergency Room physicians noted the presence of extensive upper airway burns and soot.

127.    After approximately nine minutes of resuscitation efforts, Yafet achieved a return of spontaneous circulation.

128.    Upon information and belief, around 30 minutes elapsed between the time when Yafet went into cardiac flatline until Emergency Room physicians resuscitated him.

129.    Once resuscitated, physicians evaluated Yafet's injuries from the fire.

130.    Approximately 50% of Yafet's body was covered in burns ranging from partial to full-thickness.

131.    A bronchoscopy revealed Grade III smoke inhalation injuries and soot within Yafet's trachea.

132.    A CT scan of Yafet's brain indicated anoxic brain injury.

133.    Physicians conducted two separate brain death examinations of Yafet on August 19 and 20, 2021. During both examinations, their findings were consistent with cessation of function of the brain and brainstem. Yafet was declared brain dead at or around 10:30 a.m., on August 20, 2019.

### Plaintiff Arrives at Hospital

134.    Upon her arrival at the hospital, Plaintiff was met by a female MPD Officer.

135.    After speaking for around 30 minutes with the MPD Officer and the nurse, Plaintiff was allowed to see her son.

136.    The first time Plaintiff saw Yafet after the fire, Yafet was lying alone in a hospital room, covered in burns, and on life support.

137.    Doctors explained Yafet's lack of brain function and his low likelihood of recovery to Plaintiff.

138.    Plaintiff made the decision to take Yafet off life support.

139.    On August 20, 2019, Yafet succumbed to his injuries from the fire and died.

**Alvarez & Marsal's Independent Investigation
of the District's Actions Before the Fire**

140.    Subsequent to the fire, the District of Columbia Office of the City Administrator engaged a business management consulting firm, Alvarez & Marsal ("A&M"), to conduct an independent investigation into the actions of various District of Columbia employees and agencies leading up to the fire.  These agencies included DCRA, FEMS, and MPD. Upon information and belief, A&M's investigation also included the actions of the District Defendants with respect to the events preceding the fire at the Property.

141.    In conducting its investigation, A&M reviewed code enforcement policies and procedures, email communications, systems data, and activity logs. Additionally, A&M researched best practices and conducted over 25 interviews with key staff.

142.    On October 25, 2019, following its five-week investigation, A&M released a report (the "A&M Report") detailing its findings. The A&M Report is attached hereto as **Exhibit 1**.

143.    In the A&M Report, A&M identified seven "critical missteps" within DCRA and two "critical missteps" within FEMS concerning their actions leading up to the fire.

144.     Although the A&M Report omitted the names of the DCRA and FEMS employees involved in these critical missteps, upon information and belief, at least one District Defendant participated in each critical misstep.

145.     DCRA's first critical misstep concerned the handling of Officer Davis' initial March 22nd email with the PIR attached to four DCRA employees. As stated in the A&M Report, "the DCRA Community Outreach Specialist forwarded the email to the DCRA Duty Officer with the Public Incident Report ('PIR') attached and then immediately replied via email to all individuals on the initial email indicating that the email was forwarded to the DCRA Duty Officer. However, the Community Outreach Specialist communicated with the DCRA Duty Officer using non-standard communication protocol, having emailed the MPD Officer's communication, which included the information of urgent and unsafe conditions rather than following standard operating procedures ('SOPs'), which required contact via the Homeland Security and Emergency Management Agency ('HSEMA') by telephone. **The DCRA Community Outreach Specialist followed improper protocol by communicating an urgent complaint to the DCRA Duty Officer via email**." In other words, this was a non-discretionary, ministerial function that was violated.

146.     Upon information and belief, the MPD Officer referenced in the A&M Report is Officer Ernie Davis, the DCRA Community Outreach Specialist is Defendant Saki-Tay, and the DCRA Duty Officer is Defendant Gamboa.

147.     DCRA's second critical misstep concerned the DRCA Duty Officer's (Defendant Gamboa's) handling of Officer Davis' complaint concerning the Property once the DCRA Community Outreach Specialist (Defendant Saki-Tay) sent it to him. As stated in the A&M Report, "[t]he DCRA Duty Officer (a trained inspector and the Inspections Program Manager)

24

did not respond to the initial 708 Kennedy Complaint forwarded by the DCRA Community

Outreach Specialist via email and did not ensure that the complaint was assigned to the

appropriate individual(s). **The DCRA Duty Officer did not address the 708 Complaint**

**immediately as an unsafe building or route the complaint appropriately for inspection or**

**investigation.**" This was yet another non-discretionary, ministerial directive that was not carried

out.

148.    With respect to this second critical misstep, A&M stated in its report, "[a]ny

DCRA inspector, including the Housing Inspection Program Manager, has a duty under

DCMR[4] to respond to any building reported as dangerous . . . . A&M's review found [Officer

Davis' complaint] to meet the criteria outlined by DCMR requiring inspection by DCRA."

149.    DCRA's third critical misstep concerned its handling of Officer Davis' April 24th

email explicitly requesting that DCRA send and an investigator to the Property. As stated in the

A&M Report, "[t]he MPD Officer emailed the DCRA Investigations Intake Analyst on April 24,

requesting that a DCRA investigator be sent to 708 Kennedy. The DCRA Intake Analyst

followed the normal intake process of first routing the complaint to the DCRA Investigations

Program Officer and DCRA Investigations Program Manager for assignment. **Neither the**

**DCRA Investigations Program Officer nor the DCRA Investigations Program Manager**

**assigned the 708 Kennedy Complaint to an investigator.**" This exemplifies further violations

of non-discretionary, ministerial duties.

150.    Upon information and belief, the DCRA Investigations Intake Analyst referenced

in the A&M Report is Defendant Tibbs, the DCRA Investigations Program Officer is Defendant

Brooks, and the DCRA Investigations Program Manager is Defendant Handy.

---

[4] For this proposition, A&M cited D.C. Mun. Regs. tit. 12A § 115.2 & 115.3.

151.     DCRA's fourth critical misstep concerned its limited investigation into Officer Davis' report of dangerous and illegal conditions at the Property after his third follow up with DCRA inquiring whether it had investigated his report.. As stated in the A&M Report, "[a]fter a third follow-up email from the MPD Officer on May 21 regarding the 708 Kennedy Complaint, the DCRA Program Manager assigned the investigation of 708 Kennedy ('708 Kennedy Investigation') to the DCRA 708 Investigator. The DCRA Investigations Intake Analyst notified the MPD Officer of the assignment. **The DCRA 708 Investigator performed a limited investigation (reporting that the DCRA 708 Investigator visited, but did not enter the property, on three occasions - May 22, May 23, and May 24 - and did not evaluate the rear of the property) and failed to adequately document investigations activities and findings.**" These actions (and/or inactions) constituted violations of his non-discretionary, ministerial duties.

152.     Upon information and belief, the DCRA 708 Investigator referred to in the A&M Report is Defendant Allen.

153.     DCRA's fifth critical misstep concerned its failure to further investigate 708 Kennedy after a fourth follow up email from Officer Davis and the improper suspension of the investigation. As stated in the A&M Report, "[a]fter a fourth email from the MPD Officer on June 3, this one sent directly to the DCRA 708 Investigator and the DCRA Investigations Intake Analyst, and a reminder to the DCRA 708 Investigator from the DCRA Investigations Intake Analyst on June 11, the DCRA 708 Investigator took no further action on the property in June or July. **Due, in part, to the reassignment of the DCRA 708 Investigator**[5]**, the DCRA**

---

[5] Upon information and belief, this is a reference to Defendant Allen's "promotion" to "lead investigator" as laid out above.

26

**Investigations Program Officer marked the case as 'suspended' in the Program Officer's log by July 26 without any case file or record of activities.**"

154.    DCRA's sixth critical misstep concerned its failures in communicating with Officer Davis, recording the (extremely limited) investigation into the Property, and the closing of the investigation without proper approval. As stated in the A&M Report, "[t]he DCRA 708 Investigator never reached out to the MPD Officer, DCRA maintained no case file, and the closure of the case was not evidenced by a signature of approval. **The DCRA Investigations Program Officer closed the 708 Kennedy case without any further investigation nearly three months after the DCRA 708 Investigator's reported attempted visits in May.**" This action was a clear violation of his non-discretionary, ministerial duties.

155.    DCRA's seventh critical misstep concerned its employees' failures to enter Officer Davis' report of dangerous and illegal conditions into DCRA's Pilot CRM, which was explicitly created for the purpose of streamlining DCRA's responses to complaints and ensuring that such complaints were handled in a timely manner. As stated in the A&M Report, "[o]ver the 5 months that transpired and the multiple follow-up emails sent to DCRA by the MPD Officer between the initial report of the 708 Kennedy Complaint and the date of the 708 Kennedy Fire, **none of the nine DCRA employee** [sic] **that were aware of the 708 Kennedy Complaint or included on related communications, entered it into the pilot Customer Relationship Management database ('Pilot CRM'), a tool launched by DCRA in February 2019 and utilized to track customer requests and complaints,**" in violation of their non-discretionary, ministerial duties.

156.     Upon information and belief, the "nine DCRA employee[s] that were aware of the 708 Kennedy Complaint" referenced in the A&M Report were Defendants Saki-Tay, Gamboa, Tibbs, Brooks, Handy, Allen, Peterson, Broadie, and Prather.

157.     FEMS' first critical misstep concerned the failure to ensure that, when forwarding Officer Davis' initial March 22nd email within FEMS, the PIR was attached. As stated in the A&M Report, "[t]he FEMS Technical Section Lieutenant received the MPD Officer's initial March 22 email and then forwarded the DCRA Community Outreach Specialist's Response to the MPD Officer's email without the PIR attachment to the FEMS Inspections Lieutenant. **By forwarding the DCRA response rather than the MPD Officer's original email with the PIR attachment, the FEMS Technical Section Lieutenant did not include the attached PIR including pertinent information regarding 708 Kennedy.**"

158.     Upon information and belief, the FEMS Technical Section Lieutenant referenced in the A&M Report is Defendant Barnes and the FEMS Inspections Lieutenant is FEMS John Doe Employee #1.

159.     FEMS' second critical misstep concerned FEMS' failure to follow up with Officer Davis concerning his March 22nd email. As stated in the A&M Report, "**[t]he FEMS Inspection Lieutenant in receipt of the MPD Officer's March 22 email (without the PIR attachment) made no attempt to follow-up with FEMS or MPD staff to verify complaints included in the email and did not effectively address the MPD Officer's complaints.**"

160.     Within the A&M Report, A&M stated that these nine aforementioned critical missteps within DCRA and FEMS "prevented remediation of the unsafe conditions at 708 Kennedy prior to the fire."

161.    In addition to the specific failings outlined above, A&M "**observed underlying issues which have contributed to or could contribute to failure to remedy unsafe buildings and unlicensed rentals**."

162.    The first of these "underlying issues," outlined in the A&M Report, concerned DCRA's, FEMS', and MPD's lack of "clear communications channels and processes for reporting, collaborating and following-up on reported code violations."

163.    Specifically, A&M found that "DCRA systems and policies in place at the time of the initial reporting and follow up on 708 Kennedy included no functionality or clear requirement to communicate with complainants to either verify the details of the complaint or inform complainants of status or resolution of their complaints."

164.    A&M stated that "[t]he channels through which information flows between the District Agencies [were] generally informal. Collaboration between officials across agencies [were] consistently relationship-based, no clear protocol existed to govern this communication, and centralized systems offered by [the Office of Unified Communications] were not consistently utilized."

165.    As stated in the A&M report, these communications failures "factored into DCRA's and FEMS's insufficient response to reports of unsafe conditions at 708 Kennedy."

166.    Additionally, A&M found a "[l]ack of responsibility and ownership of building safety issues across multiple agencies."

167.    A&M stated, "[t]he violations at 708 Kennedy which were identified in [Officer Davis'] PIR included issues in the jurisdiction of both DCRA Investigators and Fire Inspectors . . . . DC government [had] no specific code or authority which [provided] directions

or guidance on expectations for inspection of properties and mitigation of multi-jurisdictional violations, or ownership of responsibility for these issues."

168.    Ultimately, A&M indicated that the District's unclear statutory/regulatory directives concerning responsibilities among its agencies for unlawful and/or dangerous housing conditions caused Officer Davis' concerns regarding 708 Kennedy to "go unremedied."

169.    Further, the A&M report details how DCRA management permitted a culture of misuse of its internal records keeping systems concerning housing complaints.

170.    For example, the A&M Report describes how "DCRA staff continually used informal methods outside the system of record to track the progress of investigations activities."

171.    Moreover, A&M found that although "only a few individuals were authorized to close cases," DCRA opted to not implement "user roles configured to reflect these permissions" in its Investigations Module.

172.    Compounding the disorganization and the utter lack of oversight at DCRA, A&M discovered that "DCRA relied on personal inboxes for communications . . . ."

173.    Concerning FEMS, A&M found that inspectors would only enter complaints into their internal tracking database "after they [had] visited the property." The procedures in place at the time of the fire required "no record of the assignment [of an inspector] until after an inspector [had] visited the property."

174.    A&M observed, "[t]his lack of a formal system for handling incoming complaints and documenting decisions not to pursue complaints [at FEMS] reduced the accountability of staff and limited visibility into the history of complaints and their handling."

175.    A&M additionally found that, at DCRA, the District failed to train its employees in investigating code violations and even explicitly prohibited certain employees from

30

"attempting to inspect or investigate issues related to Housing Code." Specifically, A&M stated, "DCRA roles are compartmentalized between groups, so not all investigators have knowledge of Housing Code requirements or the systems used to track and assess adherence to these requirements."

176.    Moreover, A&M discovered that, although the "position of investigator within DCRA [was] critical to verifying that District businesses [were] operating within the specifications of their permits[, a] team of 12 investigators [was] tasked with monitoring compliance for the entire district."

177.    Additionally, A&M found that in lieu of formal training for these investigators, DCRA mandated that its inspectors take "an external training course through a third-party provider and learn through 'shadowing' and on-the-job training during as little as one investigation."

178.    Further, A&M found that DCRA lacked a "formal SOP [(standard operating procedure]) stating specific requirements for what steps [were] required for an investigator to appropriately follow-up on a complaint, or even mark a case as closed." Instead, it was the practice at DCRA to rely upon "the experience of the investigator and the trust and oversight of one program manager."

179.    A&M stated that, with respect to 708 Kennedy, DCRA's policy of not training its employees and/or limiting their roles led to (upon information and belief) Defendant Allen's investigating 708 Kennedy "without first accessing and reviewing the long history of property complaints against the property."

180.     A&M also found that "prior to the 708 Kenney Fire DCRA had no formal standards for escalating property investigations as urgent unless they [had] a clear reason to believe that the structure [posed] an immediate threat of collapse."

181.     In general, A&M found that missteps at DCRA "arose not only from individual failures, but from an overall lack of personal and organizational accountability within DCRA's Investigations Division. The work of investigators throughout the timeline of events leading up to the 708 Kennedy Fire was not consistently overseen by Program Managers, and in the course of managerial transitions, several opportunities to intervene in the case were missed. DCRA's Investigations required no standardized mandatory reporting of activities during investigations, and DCRA leadership had established no process for auditing, or even verifying completion of work associated with cases which have been marked as suspended or closed. The DCRA Program Officer (who had been in-position for less than six months when the 708 Kennedy Complaint was received) relied on personal trust of investigators to perform appropriate follow-up, rather than any enforcement standards, review of work product, or auditing of work performed. The DCRA Investigations Program Officer trusted that the DCRA 708 Investigator had appropriately attempted to contact the property owner, documented the investigation, and closed the case due to an inability to verify the complaint after taking reasonable steps to investigate . . . . Not only had the DCRA Investigations Program Officer not verified the completion of this investigation, but no program of sampling or review had been established at the time of the fire. Additionally, DCRA had no internal audit function as an organization. Without holding investigators to standards for due diligence and documentation, DCRA had no way of knowing whether properties like 708 Kennedy or other similar properties across the District had been appropriately investigated."

32

182.     In its investigation, A&M further uncovered serious issues concerning DCRA's policies for licensing rental units. Specifically, "[n]o Certificate of Occupancy or housing inspection [was] required for single family rental units. Under DCRA's [then] processes for receiving a BBL [(Basic Business License)] application, a landlord [could] receive a BBL by self-certifying compliance using the One Family Dwelling Basic Business License Self Certification Form . . . . DCRA's [then] process for inspecting or investigating properties for use outside of their CofO's [(Certificate of Occupancy's)] stated use [was] holly reliant on self-reporting by landlords, or complaints by tenants and members of the community. DCRA [did] not take active preventive measures to identify unlicensed rental units offered for lease [were] compliant with building code or other consumer protections."

183.     A&M additionally stated in its report that "[l]ike the CofO process for rental units . . . the business license process for commercial properties [placed] the onus on business owners to request an inspection when the use of their business change[d]. A business owner operating one business (for example, a pharmacy) [could] maintain a CofO for that business indefinitely with no recurring inspections . . . . DCRA relie[d] on complaints from neighbors, tenants, and members of the public as the primary check on the safety of small business establishments. Deterrents to the inappropriate use of buildings [were] clearly limited in their effectiveness, as the 'Walker Pharmacy' at 708 Kennedy was twice identified as an unlicensed rooming house prior to the 2019 sequence of events, and DCRA never shut down the business."

**The District's History of Failing to Address Dangerous Housing Conditions**

184.     Prior to the fire, the District had consistently failed to address dangerous hosing conditions within the District of Columbia.

185.    For example, in 2017, after reporting in The Washington Post and Washington City Paper of deplorable housing conditions at apartments managed by Sanford Capital, and various complaints from residents of rodent infestations and a lack of heat in the buildings, Mayor Muriel E. Bowser ordered DCRA to inspect various Sanford Capital apartments in the District of Columbia. Only after this public pressure, DCRA uncovered over 1,000 housing-code violations at the properties. At the time, District of Columbia council members criticized DCRA for failing to enforce housing code requirements and allowing violations to slip through the cracks.[6]

186.    Further, under circumstances strikingly similar to those discussed herein, two District of Columbia residents perished in a rowhouse fire near Dupont Circle on June 3, 2015. Hazards which contributed to this fire were not uncovered by District housing inspectors because the units were rented out illegally, and the District relied on complaints and self-reporting to ensure properties were properly inspected.[7]

187.    Following the Dupont Circle rowhouse fire in 2015, then DCRA Director Melinda Bolling said that the detection of illegal apartments depended upon reports from tenants, their

---

[6] https://www.washingtonpost.com/local/dc-politics/sanford-capital-faces-539500-in-fines-after-dc-inspects-its-buildings/2017/03/31/10237796-0f21-11e7-9d5a-a83e627dc120_story.html; https://www.washingtonpost.com/local/dc-politics/bowser-orders-review-of-all-properties-operated-by-controversial-dc-landlord/2017/03/01/8d86b4dc-fe00-11e6-99b4-9e613afeb09f_story.html.

[7] https://www.nbcwashington.com/news/local/illegal-apartments-can-go-unnoticed-dc-officials-say-after-2-deaths/1996722/.

neighbors, and the District's Advisory Neighborhood Commissions. She stated "We [(DCRA)] get information from those parties and we do compliance checks."[8]

188.    Additionally, on a date prior to the fire at the Property, a tenant lodged a complaint to DCRA regarding his landlord who the tenant believed was trying to force him out of his apartment via the use of housing code violations so that the tenant would leave and the landlord could redevelop the property. Upon investigating the tenant's report **DCRA ordered the tenant to vacate the property**, rather than remedying the unlawful conditions.[9]

189.    Over a year prior to the fire at the Property, during a D.C. Council Performance Oversight Hearing on March 8, 2018, witnesses testified to issues within DCRA, many of which persisted until the fire. Such issues included:

   a.   a lack of inspectors at DCRA (then, 14 or 15);

   b.   a lack of a robust code enforcement arm at DCRA;

   c.   a lack of follow-up with reinspections of properties;

   d.   a failure to ensure the removal of a dangerous structure, over two years after the structure was brought to the attention of DCRA and after the structure was deemed dangerous by DCRA; and,

   e.   a practice at DCRA wherein, when tenants complained of code violations, DCRA would encourage said tenants to pursue their claims in court, rather than DCRA enforcing the housing code.

190.    At the same March 3, 2018 D.C. Council Joint Oversight Hearing, a former DCRA employee, who had worked at the agency from 2010 to 2016, including in housing

---

[8] https://www.nbcwashington.com/news/local/dc-landlord-owes-families-15m-after-fire-killed-nina-brekelmans-michael-mcloughlin/48540/.

[9] https://www.wusa9.com/article/news/local/dc/head-of-troubled-dc-agency-out-after-wusa9-investigation/65-616096691.

inspections, testified that DCRA staff did not have the support of management and did not get the attention, education, and training that they needed.

191.    Moreover, during the D.C. Council Joint Oversight Hearing on November 18, 2019, DCRA Director Ernest Chrappah stated that, following the fire at the Property, DCRA **reopened 20 cases** which were improperly closed without proper documentation.

**Statutes, Housing Regulations, and Fire Code Provisions in Effect at The Time of The Fire**

192.    At all times relevant herein, the following statutes, regulations, and provisions of the 2013 District of Columbia Construction Codes ("the Construction Codes"), having the force of law, were in effect in the District of Columbia and enacted to prevent the type of harm suffered by Yafet.

193.    D.C. Code § 6–641.09, "Building permits; certificates of occupancy," subsection (a), provided, in pertinent part, "[i]t shall be unlawful to erect, construct, reconstruct, convert, or alter any building or structure or part thereof within the District of Columbia without obtaining a building permit from the Inspector of Buildings, and said Inspector shall not issue any permit for the erection, construction, reconstruction, conversion, or alteration of any building or structure, or any part thereof, unless the plans of and for the proposed erection, construction, reconstruction, conversion, or alteration fully conform to the provisions of this subchapter and of the regulations adopted under said sections. In the event that said regulations provide for the issuance of certificates of occupancy or other form of permit to use, it shall be unlawful to use any building, structure, or land until such certificate or permit be first obtained. It shall be unlawful to erect, construct, reconstruct, alter, convert, or maintain or to use any building, structure, or part thereof or any land within the District of Columbia in violation of the provisions of said sections or of any of the provisions of the regulations adopted under said sections."

36

194.    D.C. Code § 6–751.02, "Duty of owner to install smoke detectors," provided, "[t]he owner of each new and existing occupied dwelling unit shall be responsible for installing smoke detectors and carbon monoxide detectors in accordance with the Construction Codes."

195.    D.C. Mun. Regs. tit. 11 § 3202.1, provided, in pertinent part, "no person shall use any structure, land, or part of any structure or land for any purpose until a certificate of occupancy has been issued to that person stating that the use complies with the provisions of this title and the D.C. Construction Code, Title 12 DCMR."

196.    D.C. Mun. Regs. tit. 12A § 110.1, "General Requirement for Certificate of Occupancy," provided, in pertinent part, "no *person* shall use any *structure*, land, or part thereof for any purpose, and no change in use or load shall be made, until a Certificate of Occupancy has been issued stating that the use complies with the applicable *Zoning Regulations* and the *Construction Codes*, including related building, electrical, plumbing, mechanical and fire protection requirements."

197.    D.C. Mun. Regs. tit. 12A § 110.1.3, "Change in Use, Load, or Floor Layout," provided, in pertinent part, "[f]or changes in use, occupancy load or tenant floor layout, a new Certificate of Occupancy shall be required."

198.    D.C. Mun. Regs. tit. 14 § 200.3, "General Licensing Requirements," provided, in pertinent part, "[n]o person shall operate a housing business in any premises in the District of Columbia without first receiving a basic business license for the premises by the Department of Consumer and Regulatory Affairs (Department)."

199.    D.C Min. Regs. tit. 14 § 301.1, provided, "[t]here shall be deemed to be included in the terms of any lease or rental agreement covering a habitation an implied warranty that the owner will maintain the premises in compliance with this subtitle."

37

200.    D.C. Mun. Regs. tit. 14 § 400.3, provided, in pertinent part, "[n]o person shall rent or offer to rent any habitation . . .unless the habitation [is] in a . . . safe . . . condition."

201.    D.C. Mun. Regs. tit. 14 § 902.1, "Egress Facilities," provided, in pertinent part, "[i]t shall be the duty of the operator of each housing business to keep . . . stairways and other egress facilities in a good state of repair and free from obstruction."

202.    D.C. Mun. Regs. tit. 14 § 902.4, "Egress Facilities," provided, in pertinent part, "[t]he operator of each housing business shall keep all public and exit corridors free of obstructions."

203.    2013 District of Columbia Residential Code § R.310.1, "Emergency Escape and Rescue Required," provided, in pertinent part, "[b]asements . . . and every sleeping room shall have at least one operable emergency escape and rescue opening. Where basements contain one or more sleeping rooms, emergency egress and rescue openings shall be required in each sleeping room."

204.    2013 District of Columbia Residential Code § R.311.1, "Means of Egress," provided, in pertinent part, that the means of egress in all dwellings "shall provide a continuous and unobstructed path of vertical and horizontal egress travel from all portions of the dwelling to the exterior of the dwelling at the required egress door."

205.    2013 District of Columbia Residential Code § R.311.2, "Egress Door," provided, in pertinent part, "[e]gress doors shall be readily openable from inside the dwelling without the use of a key or special knowledge or effort."

206.    2013 District of Columbia Residential Code § R.314.3, provided, "[s]moke alarms shall be installed in the following locations: 1. In each sleeping room. 2. Outside each separate

sleeping area in the immediate vicinity of the bedrooms. 3. On each additional story of the dwelling, including basements."

### Statutory Duties Applicable to the District of Columbia and its Employees/Agents

207.    At all relevant times, the following statutes and regulations were in effect, applicable to the District and its employees/agents, and prescribed mandatory acts clearly for the protection of a particular class of persons (namely, the occupants of dangerous buildings or structures) rather than the public as a whole.

208.    D.C. Code § 6–801, "Unsafe structure or excavation – public safety," subsection (a), provided, in pertinent part, "[i]f any building or part of a building . . . is reported to the District government as unsafe, from any cause, the Mayor **_shall_** examine the structure or excavation" (emphasis added). In other words, this is a non-discretionary obligation.

209.    D.C. Code § 6–1405.01, "Administration of construction regulations," subsection (a)(3), provided, in pertinent part, "[t]he Building Code Official[10] shall seek to assure that all buildings, structures, and premises in the District are in full compliance with the Construction Codes adopted pursuant to this chapter . . . and regulations issued pursuant to the Construction Codes . . . ." This too, was non-discretionary.

210.    D.C. Mun. Regs. tit. 12A § 115.1, stated, "All _buildings_ or other _structures_ or existing equipment that are or hereafter become abandoned, deteriorated, unsafe, unsanitary, or deficient because of inadequate means of egress facilities, inadequate light and ventilation, or which constitute a fire hazard, or are otherwise dangerous to human life or the public welfare, or that involve illegal or improper use, or occupancy or inadequate maintenance, shall be deemed

---

[10] The term "Building Code Official" refers to "the Director of the Department of Consumer and Regulatory Affairs, or the Director's designee." D.C. Code § 6–1401.

an unsafe condition. Unsafe *structures* shall be taken down and removed or made safe and secure, as the *code official* deems necessary pursuant to this section or pursuant to other laws, including, but not limited to, D.C. Official Code §§ 42-3131.01 *et seq.* (2012 Repl.) or 42-3171.01 *et seq.* (2012 Repl.) and D.C. Official Code §§ 6-801 *et seq.* (2012 Repl.)." Again, these directives were non-discretionary.

211.    D.C. Mun. Regs. tit. 12A § 115.2, "Examination and Record of Damaged Structure," provided, in pertinent part, "The *code official*[11] ***shall*** examine every *premises* including any *building* or other *structure*, reported as dangerous, unsafe structurally, or constituting a fire hazard, and shall maintain a record of unsafe *premises*, including any *buildings* or other *structures*, stating the use of the *structure* and the nature and estimated amount of damages, if any, caused by collapse or failure" (emphasis added). This too, was non-discretionary.

212.    D.C. Mun. Regs. tit. 12A § 115.3, "Notice of Unsafe Structure or Equipment," provided, in pertinent part, "If any unsafe condition is found, the code official shall serve a written notice that describes the condition, identifies the structure or equipment deemed unsafe, and specifies the required repairs or improvements to be made to abate the unsafe condition or requires the unsafe structure to be taken down and removed within a stipulated time." This too, was non-discretionary.

---

[11] The term "code official" as used in the Construction Codes and Building Code Supplement generally refers to the Director of the Department of Consumer and Regulatory Affairs. *See* D.C. Mun. Regs. tit. 12A § 103.1. An exception to the foregoing is that, within the Fire Code, the term "code official" may also refer to the Chief of the Fire Department, depending on the specific Fire Code provision. *See id.* § 103.2

## COUNT I
### Wrongful Death – Negligence and Negligence *per se*
### Brought by Plaintiff as Personal Representative of the Estate of Yafet Solomen
### <u>Against Defendant Walker</u>

213.    All paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

214.    Plaintiff brings this claim for wrongful death against Defendant Walker as personal representative of decedent, Yafet Solomen, pursuant to D.C. Code § 16–2701 *et seq*.

215.    At all relevant times herein, Yafet was lawfully upon the premises of the Property.

216.    At all relevant times herein, Defendant Walker owned, controlled, and managed the Property, including the physical space where Plaintiff and Yafet resided at the time of the fire.

217.    At all relevant times herein, as the owner of the Property, Defendant Walker owed a duty to those lawfully upon the Property, including Yafet, to exercise reasonable care under the circumstances, including by exercising ordinary care under the circumstances to keep the premises reasonably safe and to avoid injuring those lawfully upon the Property.

218.    At all relevant times herein, Defendant Walker knew or should have known of dangerous conditions at the Property, including, but not limited to, conditions which created and/or exacerbated the danger to its occupants, including Yafet, in the event of a fire.

219.    Defendant Walker breached the aforesaid duties by, *inter alia*:

  a.  Creating and/or failing to identify dangerous conditions at the Property, including, but not limited to:

      i.  the obstruction of the means of egress between the basement and main level of the improvements,

41

      ii.  the keeping of an egress door which could not be opened without the use of a key or special knowledge or effort,

      iii.  the renting of a room to Yafet and Plaintiff with no means of emergency escape or rescue opening,

      iv.  the absence of a smoke alarm/detector anywhere in the basement level of the improvements Kennedy;

  b.  failing to rectify the aforesaid dangerous conditions at the Property when he knew or should have known of their existence; and,

  c.  failing to warn of such dangerous conditions at the Property.

220.    At all relevant times herein, Defendant Walker owed a duty to Yafet to comply with all statutes, regulations, and code provisions, which pertained to the maintenance of a residential property and the keeping of tenants.

221.    Defendant Walker breached the aforesaid duties through the following acts and violations of, *inter alia*, the following statutes, regulations, and code provisions:

  a.  altering the interior of the Property without obtaining a building permit (a violation of D.C. Code § 6–641.09);

  b.  failing to obtain an up-to-date Certificate of Occupancy for the Property (a violation of, *inter alia*, D.C. Code § 6–641.09, D.C. Mun. Regs. tit. 11 § 3202.1, D.C. Mun. Regs. tit. 12A § 110.1, and D.C. Mun. Regs. tit. 12A § 110.1.3);

  c.  failing to install smoke detectors in the basement level of the Property (a violation of D.C. Code § 6–751.02);

  d.  operating a seamstress shop out of the Property without first receiving a basic business license from DCRA (a violation of D.C. Mun. Regs. tit. 14 § 200.3);

  e.  operating a rental housing business out of the Property without first receiving a basic business license from DCRA (a violation of D.C. Mun. Regs. tit. 14 § 200.3);

  f.  renting the Property to tenants in an unsafe condition (a violation of D.C. Mun. Regs. tit. 14 § 400.3);

  g.  failing to keep egress facilities at the Property in a good state of repair and free from obstruction (a violation of D.C. Mun. Regs. tit. 14 § 902.1);

h.   failing to keep exit corridors at the Property free from obstruction (a violation of D.C. Mun. Regs. tit. 14 § 902.4);

i.   failing to provide an emergency escape, egress, and/or rescue opening in Plaintiff and Yafets' room (a violation of 2013 District of Columbia Residential Code § R.310.1);

j.   failing to provide a continuous and unobstructed path of vertical and horizontal egress travel from all portions of the improvements to the exterior of the improvements at the required egress door (a violation of 2013 District of Columbia Residential Code § R.311.1);

k.   failing to keep an egress door readily openable from the inside of the Property without the use of a key or special knowledge or effort (a violation of 2013 District of Columbia Residential Code § R.311.2);

l.   failing to install a smoke alarm in Plaintiff and Yafets' room (a violation of 2013 District of Columbia Residential Code § R.314.3);

m.   failing to install a smoke alarm outside the vicinity of Plaintiff and Yafets' room (a violation of 2013 District of Columbia Residential Code § R.314.3);

n.   failing to install a smoke alarm in the basement level of the Property (a violation of 2013 District of Columbia Residential Code § R.314.3); and,

o.   failing to maintain the premises of the Property in compliance with D.C. Mun. Regs. tit 14 (a violation of D.C Min. Regs. tit. 14 § 301.1).

222.   The aforesaid statutes, regulations, and code provisions were enacted to prevent the type of incident that occurred (and to protect persons such Yafet), and Defendant Walker cannot offer an explanation as to the violations of such statutes, regulations, and code provisions, thereby rendering Defendant Walker negligent *per se* (*i.e.*, as a matter of law).

223.   As a direct, foreseeable, and proximate result of Defendant Walker's aforesaid negligent acts and omissions, including his violations of the aforesaid statutes, regulations, and code provisions, Yafet died and, resultingly, his statutory beneficiaries have suffered, *inter alia*, financial loss, the loss of gifts, contributions, services, care, and support of Yafet, and expenses and other losses and damages, which shall be proven at trial.

224.    In carrying out the aforesaid negligent acts and omissions, including his violations

of the aforesaid statutes, regulations, and code provisions, Defendant Walker acted in willful

disregard for the rights of Yafet and his conduct was outrageous and/or reckless toward the

safety of Yafet, thereby entitling Plaintiff to an award of punitive damages.

225.    Yafet acted properly in all respects and was free from negligence in connection

with this incident.

**WHEREFORE**, Plaintiff, as personal and legal representative of decedent, Yafet

Solomen, demands judgment against Defendant Walker, as follows: (1) for compensatory

damages in the amount of not less than $50,000,000.00, which amount will be proven at trial; (2)

for all costs associated with this action; (3) for punitive damages in the amount of

$100,000,000.00; (4) for pre- and post-judgment interest as permitted by law; and (5) for such

other and further relief as this Court may deem just and proper.

**COUNT II**
**Survival Action – Negligence and Negligence *per se***
**Brought by Plaintiff, as Personal Representative, on Behalf of the Estate of Yafet Solomen**
**Against Defendant Walker**

226.    All paragraphs of this Complaint are hereby incorporated by reference as if fully

set forth herein.

227.    Plaintiff brings this survival action as personal representative of the decedent,

Yafet Solomen, against Defendant Walker, pursuant to D.C. Code § 12–101, and on behalf of the

decedent's estate. On, July 23, 2020, Plaintiff was appointed as the personal representative of the

Estate of Yafet Solomen, for lawsuit purposes, by the Superior Court of the District of Columbia,

Probate Division.

228.    At all relevant times herein, Yafet was lawfully upon the premises of the

Property.

44

229.    At all relevant times herein, Defendant Walker owned, controlled, and managed the Property, including the physical space where Plaintiff and Yafet resided at the time of the fire.

230.    At all relevant times herein, as the owner of the Property, Defendant Walker owed a duty to those lawfully upon the Property, including Yafet, to exercise reasonable care under the circumstances, including by exercising ordinary care under the circumstances to keep the premises reasonably safe and to avoid injuring those lawfully upon the Property.

231.    At all relevant times herein, Defendant Walker knew or should have known of dangerous conditions at the Property, including, but not limited to, conditions which created and/or exacerbated the danger to its occupants, including Yafet, in the event of a fire.

232.    Defendant Walker breached the aforesaid duties by, *inter alia*:

  a.   Creating and/or failing to identify dangerous conditions at the Property, including, but not limited to:

      i.   the obstruction of the means of egress between the basement and main level of the improvements,

      ii.  the keeping of an egress door which could not be opened without the use of a key or special knowledge or effort,

      iii. the renting of a room to Yafet and Plaintiff with no means of emergency escape or rescue opening,

      iv.  the absence of a smoke alarm/detector anywhere in the basement level of the improvements;

  b.   failing to rectify the aforesaid dangerous conditions at the Property when he knew or should have known of their existence; and,

  c.   failing to warn of such dangerous conditions at the Property.

233.    At all relevant times herein, Defendant Walker owed duty to Yafet to comply with all statutes, regulations, and code provisions, which pertained to the maintenance of a residential property and the keeping of tenants.

234.    Defendant Walker breached the aforesaid duties through the following acts and violations of, *inter alia*, the following statutes, regulations, and code provisions:

a.  altering the interior of the Property without obtaining a building permit (a violation of D.C. Code § 6–641.09);

b.  failing to obtain an up-to-date Certificate of Occupancy for the Property (a violation of, *inter alia*, D.C. Code § 6–641.09, D.C. Mun. Regs. tit. 11 § 3202.1, D.C. Mun. Regs. tit. 12A § 110.1, and D.C. Mun. Regs. tit. 12A § 110.1.3);

c.  failing to install smoke detectors in the basement level of the Property (a violation of D.C. Code § 6–751.02);

d.  operating a seamstress shop out of the Property without first receiving a basic business license from DCRA (a violation of D.C. Mun. Regs. tit. 14 § 200.3);

e.  operating a rental housing business out of the Property without first receiving a basic business license from DCRA (a violation of D.C. Mun. Regs. tit. 14 § 200.3);

f.  renting the Property to tenants in an unsafe condition (a violation of D.C. Mun. Regs. tit. 14 § 400.3);

g.  failing to keep egress facilities at the Property in a good state of repair and free from obstruction (a violation of D.C. Mun. Regs. tit. 14 § 902.1);

h.  failing to keep exit corridors at the Property free from obstruction (a violation of D.C. Mun. Regs. tit. 14 § 902.4);

i.  failing to provide an emergency escape, egress, and/or rescue opening in Plaintiff and Yafets' room (a violation of 2013 District of Columbia Residential Code § R.310.1);

j.  failing to provide a continuous and unobstructed path of vertical and horizontal egress travel from all portions of the improvements to the exterior of the improvements at the required egress door (a violation of 2013 District of Columbia Residential Code § R.311.1);

k.  failing to keep an egress door readily openable from the inside of the Property without the use of a key or special knowledge or effort (a violation of 2013 District of Columbia Residential Code § R.311.2);

l.  failing to install a smoke alarm in Plaintiff and Yafets' room (a violation of 2013 District of Columbia Residential Code § R.314.3);

m.  failing to install a smoke alarm outside the vicinity of Plaintiff and Yafets' room (a violation of 2013 District of Columbia Residential Code § R.314.3);

n.  failing to install a smoke alarm in the basement level of the Property (a violation of 2013 District of Columbia Residential Code § R.314.3); and,

o.  failing to maintain the premises of the Property in compliance with D.C. Mun. Regs. tit 14 (a violation of D.C Min. Regs. tit. 14 § 301.1).

235.    The aforesaid statutes, regulations, and code provisions were enacted to prevent the type of incident that occurred (and to protect persons such Yafet), and Defendant Walker cannot offer an explanation as to the violations of such statutes, regulations, and code provisions, thereby rendering Defendant Walker negligent *per se* (*i.e.*, as a matter of law).

236.    As a direct, foreseeable, and proximate result of Defendant Walker's aforesaid negligent acts and omissions, including his violations of the aforesaid statutes, regulations, and code provisions, Yafet Solomen suffered extreme conscious physical pain and bodily injury, disfigurement and/or deformity, physical and emotional suffering, inconvenience and discomfort, and mental anguish, and incurred medical and hospital expenses prior to his untimely and horrific death.

237.    As a further direct, foreseeable, and proximate result of Defendant Walker's aforesaid negligent acts and omissions, including his violations of the aforesaid statutes, regulations, and code provisions, Yafet Solomen, suffered future lost income, lost earnings, and loss of earning capacity.

238.     In carrying out the aforesaid negligent acts and omissions, including his violations of the aforesaid statutes, regulations, and code provisions, Defendant Walker acted in willful disregard for the rights of Yafet and his conduct was outrageous and/or reckless toward the safety of Yafet, thereby entitling Plaintiff to an award of punitive damages.

239.     Yafet acted properly in all respects and was free from negligence in connection with this incident.

**WHEREFORE**, Plaintiff, as personal and legal representative of decedent, Yafet Solomen, demands judgment against Defendant Walker, as follows: (1) for compensatory damages in the amount of not less than $50,000,000.00, which amount will be proven at trial; (2) for all costs associated with this action; (3) for punitive damages in the amount of $100,000,000.00; (4) for pre- and post-judgment interest as permitted by law; and (5) for such other and further relief as this Court may deem just and proper.

**COUNT III**
**Wrongful Death – Negligence and Negligence *per se***
**Brought by Plaintiff as Personal Representative of the Estate of Yafet Solomen**
**Against the District Defendants and the District of Columbia**

240.     All paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

241.     Plaintiff brings this claim for wrongful death in her capacity as the personal representative of the decedent, Yafet, pursuant to D.C. Code § 16–2701 *et seq.*, against each of the District Defendants individually, against the District individually, and against the District on a theory of vicarious liability.

242.     At all relevant times, the following statutes and regulations were in effect, applicable to the District and its employees/agents, and prescribed mandatory (and non-discretionary) acts clearly for the protection of a particular class of persons (namely, the

occupants of dangerous buildings or structures) rather than the public as a whole: D.C. Code §§ 6–801 & 6–1405.01 and D.C. Mun. Regs. tit. 12A §§ 115.1, 115.2 & 115.3.

243.    Upon Officer Davis' finding unsafe conditions and code violations at the Property, and his reporting of such unsafe conditions and code violations to DCRA and FEMS via the District Defendants, a special relationship existed between Yafet, the District, and the District Defendants by virtue of the aforementioned statutes and regulations.

244.    Due to the special relationship, the District and the District Defendants owed Yafet a duty to: (1) examine the Property; (2) assure that the Property was in full compliance with the Construction Codes and the regulations issued pursuant to the Construction Codes; (3) deem the Property in an unsafe condition and either take down the improvements or make the Property safe and secure; (4) maintain a record of the Property stating its use and the nature and estimated amount of damages, if any, caused by collapse or failure; and/or (5) serve a written notice upon Defendant Walker, Plaintiff, and/or Yafet, describing the condition of the Property, that it was deemed unsafe, and specifying the required repairs or improvements to be made to abate the unsafe conditions or requiring the improvements to be taken down and removed within a stipulated time.

245.    At all relevant times herein, Yafet justifiably relied on the District and the District Defendants to fulfill the aforementioned duties owed to him by virtue of the special relationship.

246.    Additionally, at all relevant times herein, the District and the District Defendants had a duty and were legally obligated to abide by all applicable statutes and regulations, *inter alia*, D.C. Code §§ 6–801 & 6–1405.01 and D.C. Mun. Regs. tit. 12A §§ 115.1, 115.2 & 115.3.

247.    The District Defendants breached the aforesaid duties of care and were negligent and/or negligent *per se* in the following ways, by, *inter alia*:

a. Ms. Saki-Tay's forwarding Officer Davis' March 22nd email with the PIR to the DCRA Duty Officer, Mr. Gamboa, instead of sending it through the proper emergency channels, a mandatory and non-discretionary requirement;

b. Mr. Gamboa's failure to read and take the mandatory required (and non-discretionary) action on Officer Davis' March 22nd email that Ms. Saki-Tay forwarded to him, including by failing to inspect or cause the inspection of the Property;

c. Ms. Peterson's, Ms. Broadie's, Mr. Prather's and Ms. Saki-Tays' failure to enter Officer Davis' complaint from his March 22nd email into the DCRA Pilot CRM or any other DCRA system or log, in violation of their mandatory and non-discretionary duties;

d. Ms. Williams's failure to take any action on Officer Davis' March 22nd email, including by failing to inspect the Property or causing the Property to be inspected, in violation of his/her mandatory and non-discretionary duties;

e. Mr. Barnes' failure to ensure that the PIR detailing the dangerous conditions and code violations at the Property was attached when he forwarded Ms. Saki-Tay's reply to Officer Davis' March 22nd email to FEMS John Doe Employee #1;

f. Mr. Barnes', Ms. Williams's, FEMS John Doe Employee #1's, and/or FEMS John Doe Employee #2's failure to follow up with Officer Davis on his report of "Serious Code Violations" when they discovered 5410 14th Street did not exist;

g. Ms. Tibbs', Mr. Handy's, and Mr. Allen's failure to enter Officer Davis' complaint into the DCRA Pilot CRM, QuickBase or any other DCRA system or log, in violation of their mandatory and non-discretionary duties;

h. Mr. Brooks' failure to record any investigation into the Property until his entry in the DCRA Investigations Module on June 12, 2019, in violation of his mandatory and non-discretionary duties;

i. Mr. Allen's failure to attempt to obtain an administrative search warrant despite Officer Davis' report, the history of maintenance, safety, and unlicensed rooming house complaints at the Property documented in the Accela records system, and his inability to gain entry to the Property after three purported visits;

j. Mr. Allen's failure to follow-up with Officer Davis, despite a specific request from Officer Davis;

k. Mr. Books and Mr. Allens' tracking of the status of their investigation into the Property in an offline spreadsheet;

l. Mr. Brooks and Mr. Allens' suspending and closing of the investigation into the Property without ever having an inspector examine the Property or even having gained entry into the interior of the Property, in violation of their mandatory and non-discretionary duties;

m. all District Defendants' failure to assure that the Property was in full compliance with the Construction Codes and regulations issued pursuant to the Construction Codes, despite Officer Davis' report that the Property was not in compliance with the Construction Codes, in violation of their mandatory and non-discretionary duties;

n. all District Defendants' failure to examine, inspect, or thoroughly investigate the Property, despite Officer Davis' reporting the Property as unsafe, dangerous, lacking adequate means of egress, a fire hazard, and out of compliance with the Construction Codes, nearly five months before the fire at the Property, in violation of their mandatory and non-discretionary duties;

o. all District Defendants' failure to deem the Property unsafe due to it being unsafe, having inadequate means of egress, constituting a fire hazard, and/or otherwise being dangerous to human life after learning of the Property's dangerous conditions and code violations, in violation of their mandatory and non-discretionary duties;

p. all District Defendants' failure to take down and remove the improvements, or make them safe and secure, due to the Property's dangerous conditions and code violations, in violation of their mandatory and non-discretionary duties; and,

q. all District Defendants' failure to serve a written notice upon Defendant Walker, Plaintiff, and/or Yafet describing the condition of the Property, that it was deemed unsafe, and specifying the required repairs or improvements to be made to abate the unsafe conditions or requiring the improvements to be taken down and removed within a stipulated time, in violation of their mandatory and non-discretionary duties.

248.    Through the aforesaid acts and omissions of its employees (the District Defendants), the District breached its duties of care owed to Yafet.

249.    The aforesaid breaches constituted violations of *inter alia*, D.C. Code §§ 6–801 & 6–1405.01 and/or D.C. Mun. Regs. tit. 12A §§ 115.1, 115.2 & 115.3.

250.    D.C. Code §§ 6–801 & 6–1405.01 and D.C. Mun. Regs. tit. 12A §§ 115.1, 115.2 & 115.3. were enacted to prevent the type of incident that occurred (and to protect persons such

as Yafet), and neither the District nor the District Defendants can offer an explanation as to the violations of such statutes and regulations, thereby rendering the District and the District Defendants negligent *per se* (*i.e.*, as a matter of law).

251. As a direct, foreseeable, and proximate result of the District's and each of the District Defendants' aforesaid negligent/negligent *per se* acts and omissions, Yafet died and, resultingly, his statutory beneficiaries have suffered, *inter alia*, financial loss, the loss of gifts, contributions, services, care, and support of Yafet, and expenses and other losses and damages, which shall be proven at trial.

252. At all times relevant herein the District Defendants were each employees/agents of the District of Columbia.

253. Each of the aforesaid negligent/negligent *per se* acts and/or omissions of the District Defendants were at least partially motivated by a desire to further the District's interests, thereby rendering the District vicariously liable for their negligent acts and/or omissions.

254. Yafet acted properly in all respects and was free from negligence in connection with this incident.

255. The negligent/negligent *per se* acts and omissions of the District and the District Defendants which constitute the basis of this Count were ministerial, involving the execution of policy.

**WHEREFORE**, Plaintiff, as personal and legal representative of decedent, Yafet Solomen, demands judgment against the District Defendants and the District, jointly and severally, as follows: (1) for compensatory damages in the amount of not less than $50,000,000.00, which amount will be proven at trial; (2) for all costs associated with this action;

(3) for pre- and post-judgment interest as permitted by law; and (4) for such other and further relief as this Court may deem just and proper.

**COUNT IV**
**Survival Action – Negligence**
**Brought by Plaintiff, as Personal Representative, on Behalf of the Estate of Yafet Solomen**
<u>**Against the District Defendants and the District**</u>

256.    All paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

257.    Plaintiff brings this survival action as personal representative of the decedent, Yafet Solomen, on behalf of the decedent's estate, pursuant to D.C. Code § 12–101. Plaintiff was appointed decedent's personal and legal representative on July 23, 2020. Plaintiff brings this count against each of the District Defendants individually, against the District individually, and against the District on a theory of vicarious liability.

258.    At all relevant times, the following statutes and regulations were in effect, applicable to the District and its employees/agents, and prescribed mandatory (and non-discretionary) acts clearly for the protection of a particular class of persons (namely, the occupants of dangerous buildings or structures) rather than the public as a whole: D.C. Code §§ 6–801 & 6–1405.01 and D.C. Mun. Regs. tit. 12A §§ 115.1, 115.2 & 115.3.

259.    Upon Officer Davis' finding unsafe conditions and code violations at the Property, and his reporting of such unsafe conditions and code violations to DCRA and FEMS via the District Defendants, a special relationship existed between Yafet, the District, and the District Defendants by virtue of the aforementioned statutes and regulations.

260.    Due to the special relationship, the District and the District Defendants owed Yafet a duty to: (1) examine the Property; (2) assure that the Property was in full compliance with the Construction Codes and the regulations issued pursuant to the Construction Codes; (3)

53

deem the Property in an unsafe condition and either take down the improvements or make the Property safe and secure; (4) maintain a record of the Property stating its use and the nature and estimated amount of damages, if any, caused by collapse or failure; and/or (5) serve a written notice upon Defendant Walker, Plaintiff, and/or Yafet, describing the condition of the Property, that it was deemed unsafe, and specifying the required repairs or improvements to be made to abate the unsafe conditions or requiring the improvements to be taken down and removed within a stipulated time.

261.    At all relevant times herein, Yafet justifiably relied on the District and the District Defendants to fulfill the aforementioned duties owed to him by virtue of the special relationship.

262.    Additionally, at all relevant times herein, the District and the District Defendants had a duty and were legally obligated to abide by all applicable statutes and regulations, *inter alia*, D.C. Code §§ 6–801 & 6–1405.01 and D.C. Mun. Regs. tit. 12A §§ 115.1, 115.2 & 115.3.

263.    The District Defendants breached the aforesaid duties of care and were negligent and/or negligent *per se* in the following ways, by, *inter alia*:

   a.  Ms. Saki-Tay's forwarding Officer Davis' March 22nd email with the PIR to the DCRA Duty Officer, Mr. Gamboa, instead of sending it through the proper emergency channels, a mandatory and non-discretionary requirement;

   b.  Mr. Gamboa's failure to read and take the mandatory required (and non-discretionary) action on Officer Davis' March 22nd email that Ms. Saki-Tay forwarded to him, including by failing to inspect or cause the inspection of the Property;

   c.  Ms. Peterson's, Ms. Broadie's, Mr. Prather's and Ms. Saki-Tays' failure to enter Officer Davis' complaint from his March 22nd email into the DCRA Pilot CRM or any other DCRA system or log, in violation of their mandatory and non-discretionary duties;

   d.  Ms. Williams's failure to take any action on Officer Davis' March 22nd email, including by failing to inspect the Property or causing the Property to be inspected, in violation of his/her mandatory and non-discretionary duties;

e.  Mr. Barnes' failure to ensure that the PIR detailing the dangerous conditions and code violations at the Property was attached when he forwarded Ms. Saki-Tay's reply to Officer Davis' March 22nd email to FEMS John Doe Employee #1;

f.  Mr. Barnes', Ms. Williams's, FEMS John Doe Employee #1's, and/or FEMS John Doe Employee #2's failure to follow up with Officer Davis on his report of "Serious Code Violations" when they discovered 5410 14th Street did not exist;

g.  Ms. Tibbs', Mr. Handy's, and Mr. Allen's failure to enter Officer Davis' complaint into the DCRA Pilot CRM, QuickBase or any other DCRA system or log, in violation of their mandatory and non-discretionary duties;

h.  Mr. Brooks' failure to record any investigation into the Property until his entry in the DCRA Investigations Module on June 12, 2019, in violation of his mandatory and non-discretionary duties;

i.  Mr. Allen's failure to attempt to obtain an administrative search warrant despite Officer Davis' report, the history of maintenance, safety, and unlicensed rooming house complaints at the Property documented in the Accela records system, and his inability to gain entry to the Property after three purported visits;

j.  Mr. Allen's failure to follow-up with Officer Davis, despite a specific request from Officer Davis;

k.  Mr. Books and Mr. Allens' tracking of the status of their investigation into the Property in an offline spreadsheet;

l.  Mr. Brooks and Mr. Allens' suspending and closing of the investigation into the Property without ever having an inspector examine the Property or even having gained entry into the interior of the Property, in violation of their mandatory and non-discretionary duties;

m.  all District Defendants' failure to assure that the Property was in full compliance with the Construction Codes and regulations issued pursuant to the Construction Codes, despite Officer Davis' report that the Property was not in compliance with the Construction Codes, in violation of their mandatory and non-discretionary duties;

n.  all District Defendants' failure to examine, inspect, or thoroughly investigate the Property, despite Officer Davis' reporting the Property as unsafe, dangerous, lacking adequate means of egress, a fire hazard, and out of compliance with the Construction Codes, nearly five months before the fire at the Property, in violation of their mandatory and non-discretionary duties;

o.  all District Defendants' failure to deem the Property unsafe due to it being unsafe, having inadequate means of egress, constituting a fire hazard, and/or otherwise

55

being dangerous to human life after learning of the Property's dangerous conditions and code violations, in violation of their mandatory and non-discretionary duties;

p.   all District Defendants' failure to take down and remove the improvements, or make them safe and secure, due to the Property's dangerous conditions and code violations, in violation of their mandatory and non-discretionary duties; and,

q.   all District Defendants' failure to serve a written notice upon Defendant Walker, Plaintiff, and/or Yafet describing the condition of the Property, that it was deemed unsafe, and specifying the required repairs or improvements to be made to abate the unsafe conditions or requiring the improvements to be taken down and removed within a stipulated time, in violation of their mandatory and non-discretionary duties.

264.   Through the aforesaid acts and omissions of its employees (the District Defendants), the District breached its duties of care owed to Yafet.

265.   The aforesaid breaches constituted violations of *inter alia*, D.C. Code §§ 6–801 & 6–1405.01 and/or D.C. Mun. Regs. tit. 12A §§ 115.1, 115.2 & 115.3.

266.   D.C. Code §§ 6–801 & 6–1405.01 and D.C. Mun. Regs. tit. 12A §§ 115.1, 115.2 & 115.3. were enacted to prevent the type of incident that occurred (and to protect persons such as Yafet), and neither the District nor the District Defendants can offer an explanation as to the violations of such statutes and regulations, thereby rendering the District and the District Defendants negligent *per se* (*i.e.*, as a matter of law).

267.   As a direct, foreseeable, and proximate result of the District's and each of the District Defendants' aforesaid negligent/negligent *per se* acts and omissions, Yafet Solomen suffered extreme conscious physical pain and bodily injury, disfigurement and/or deformity, physical and emotional suffering, inconvenience and discomfort, and mental anguish, and incurred medical and hospital expenses prior to his untimely and horrific death.

268.     As a further direct, foreseeable, and proximate result of the District's and each of the District Defendants' aforesaid negligent/negligent *per se* acts and/or omissions, Yafet Solomen suffered future lost income, lost earnings, and loss of earning capacity.

269.     At all times relevant herein the District Defendants were each employees/agents of the District of Columbia.

270.     Each of the aforesaid negligent/negligent *per se* acts and/or omissions of the District Defendants were at least partially motivated by a desire to further the District's interests, thereby rendering the District vicariously liable for their negligent acts and/or omissions.

271.     Yafet acted properly in all respects and was free from negligence in connection with this incident.

272.     The negligent/negligent *per se* acts and omissions of the District and the District Defendants which constitute the basis of this Count were ministerial, involving the execution of policy.

**WHEREFORE**, Plaintiff, as personal and legal representative of decedent, Yafet Solomen, demands judgment against the District Defendants and the District, jointly and severally, as follows: (1) for compensatory damages in the amount of not less than $50,000,000.00, which amount will be proven at trial; (2) for all costs associated with this action; (3) for pre- and post-judgment interest as permitted by law; and (4) for such other and further relief as this Court may deem just and proper.

**COUNT V**
**Violation of 42 U.S.C. § 1983**
**Brought by Plaintiff, as Personal Representative, on Behalf of the Estate of Yafet Solomen**
**<u>Against the District</u>**

273.     All paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

274.     This Count arises under 42 U.S.C. § 1983 and the Fifth and Fourteenth Amendments to the United States Constitution and is alleged against the District. The basis for the claim asserted in this Count is the District's unconstitutional customs, policies, and/or practices with respect to, among other things, addressing complaints of dangerous and/or unlawful conditions at rental properties and its failure to train its employees to properly investigate said complaints.

275.     The District's unconstitutional customs, policies, and/or practices, and its failure to train its employees, as described above and below, were implemented, mandated, and/or maintained by the District's policymakers and/or by those whose edicts or acts may fairly be said to represent official policy.

276.     As evinced by A&M's findings in the A&M Report, media reporting, the public statements of District employees, policymakers, and residents, and the actions of the District Defendants (as laid out above and incorporated herein), the District, through the edicts or acts of its policymakers, maintained (explicitly and/or implicitly) the following customs, policies, and/or practices:

    a.   failing to implement clear channels of communication between its agencies, including, DCRA, FEMS, and MPD, and processes for reporting complaints of unlawful and/or dangerous conditions at rental properties;

    b.   maintaining unclear statutory and/or regulatory directives concerning the responsibilities and jurisdiction of DCRA and FEMS in addressing unlawful and/or dangerous conditions at rental properties;

    c.   failing to provide internal records keeping and investigations tracking systems at DCRA with the ability limit user access so that only authorized individuals had the ability to close investigations;

    d.   permitting the use of informal methods of communication, records keeping, and investigations tracking at DCRA, such as offline spreadsheets and personal email inboxes, in lieu of the formal systems available at the time of the fire;

e.  failing to implement procedures at FEMS that required FEMS employees to create a record of a complaint regarding unlawful and/or dangerous conditions at rental properties upon their receipt of such a complaint;

f.  failing to train DCRA employees who were tasked with handling and/or investigating complaints of unlawful and/or dangerous conditions at rental properties in District Construction Code requirements and the systems used to track property complaints and Code noncompliance;

g.  failing to train its essential DCRA investigators, and/or offering insufficient training via the use of external, third-party training courses and extremely brief on-the-job shadowing sessions;

h.  failing to implement formal standard operating procedures at DCRA which stated the specific requirements for following-up on complaints of unlawful and/or dangerous conditions at rental properties and/or marking such complaints as closed;

i.  failing to implement a process at DCRA by which urgent complaints of unlawful and/or dangerous conditions at rental properties were elevated among DCRA staff;

j.  relying on the oversight of DCRA Program Managers in investigating unlawful and/or dangerous conditions at rental properties, in lieu of requiring investigators to formally report their investigatory activities;

k.  maintaining procedures at DCRA for grating Basic Business Licenses and/or Certificates of Occupancy that relied upon property owners' self-certification of compliance with Construction Code requirements and/or that clearly and obviously created the opportunity for property owners/landlords to circumvent Construction Code requirements at their rental properties; and,

l.  relying on self-reporting by landlords', and/or district residents' and tenants' complaints, to identify dangerous, unlawful, and/or unlicensed buildings and rental units.

277.  Based on the findings of the A&M Report, media reports, and the public statements of District employees, policymakers, and residents, Plaintiff is informed and believes, and therefore alleges, that prior to the fire, the District, maintained similar customs, policies, and/or practices as described in the foregoing paragraph which caused depravations of other

District of Columbia resident's constitutionally protected rights who were similarly situated as Yafet.

278.    Based on the findings of the A&M Report, media reports, and the public statements of District employees, policymakers, and residents, Plaintiff is informed and believes, and therefore alleges, that prior to the fire, the District, by and through its policymakers, was deliberately indifferent to, or in the exercise of reasonable care, should have known of, this pattern or practice of unconstitutional violations, or the existence of facts which created the potential for unconstitutional acts, and the District had a duty to train and instruct its employees to prevent similar acts against other District of Columbia residents, but failed to take steps to properly train its employees to investigate reports of unlawful and/or dangerous conditions at rental properties, and implement procedures to ensure such reports were properly addressed.

279.    Through its unconstitutional customs, policies, and/or practices, and its failure in training its employees, the District foreseeably created and/or amplified the risk to occupants of dangerous and/or unlawful rental properties, including Yafet, evincing its deliberate indifference to Yafet's rights protected by virtue of the Fifth and Fourteenth Amendments to the United States Constitution, including his rights to life, safety, and personal security. In this way, the District's actions were shocking and outrageous.

280.    The District's customs, policies, and/or practices, were a moving force and legal cause of Yafet's injuries, including, but not limited to his death and immense pain and suffering, and deprived Yafet of his rights, privileges, and immunities secured by the Fifth and Fourteenth Amendments of the United States Constitution, including the rights to life, safety, and personal security.

281.    By virtue of the District's awareness of dangerous and unlawful conditions at the Property, and/or statutes and regulations which laid out mandatory, non-discretionary actions for the District with respect to addressing such conditions upon the District's notice of same (*e.g.*, D.C. Code §§ 6–801 & 6–1405.01 and D.C. Mun. Regs. tit. 12A §§ 115.1, 115.2 & 115.3), a special relationship existed between the District and the tenants of the Property, including Yafet.

**WHEREFORE**, Plaintiff, as personal and legal representative of decedent, Yafet Solomen, demands judgment against the District as follows: (1) for compensatory damages in the amount of not less than $50,000,000.00, which amount will be proven at trial; (2) for reasonable costs of this suit and attorney's fees pursuant to 42 U.S.C. § 1988; (3) for pre- and post-judgment interest as permitted by law; and (4) for such other and further relief as this Court may deem just and proper.

## JURY TRIAL REQUESTED

Plaintiff respectfully requests a jury trial in this action to the maximum extent permitted by law.

Respectfully submitted,

HELEN A. KASAY

By:

Peter C. Grenier, D.C. Bar #418570
GRENIER LAW GROUP PLLC
1920 L Street, N.W., Suite 750
Washington, D.C. 20036
pgrenier@grenierlawgroup.com
Tel: (202) 768-9600
Fax: (202) 768-9604

John E. Antishin, D.C. Bar #1725116
GRENIER LAW GROUP PLLC
1920 L Street, N.W., Suite 750
Washington, D.C. 20036
jantishin@grenierlawgroup.com
Tel: (202) 768-9600
Fax: (202) 768-9604

Dated:  August 13, 2021

# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH
INFORMATION SHEET

Helen A. Kasay, as Personal Representative
of the Estate of Yafet Solomen, deceased

Case Number: _____

Date: __8/13/2021__

vs

James Walker, et al.

☐ One of the defendants is being sued
in their official capacity.

| | |
|---|---|
| Name: *(Please Print)* <br> Peter C. Grenier <br> Firm Name: <br> Grenier Law Group, PLLC <br> Telephone No.:          Six digit Unified Bar No.: <br> 202-768-9600               418570 | Relationship to Lawsuit <br> ☑ Attorney for Plaintiff <br> ☐ Self (Pro Se) <br> ☐ Other: _____ |

TYPE OF CASE: ☐ Non-Jury      ☑ 6 Person Jury      ☐ 12 Person Jury
Demand: $_150,000,000.00_          Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____   Judge: _____   Calendar #:_____

Case No.:_____   Judge: _____   Calendar#:_____

---

NATURE OF SUIT:     *(Check One Box Only)*

**A. CONTRACTS**                    **COLLECTION CASES**

☐ 01 Breach of Contract          ☐ 14 Under $25,000 Pltf. Grants Consent   ☐ 16 Under $25,000 Consent Denied
☐ 02 Breach of Warranty          ☐ 17 OVER $25,000 Pltf. Grants Consent   ☐ 18 OVER $25,000 Consent Denied
☐ 06 Negotiable Instrument       ☐ 27 Insurance/Subrogation              ☐ 26 Insurance/Subrogation
☐ 07 Personal Property              Over $25,000 Pltf. Grants Consent        Over $25,000 Consent Denied
☐ 13 Employment Discrimination   ☐ 07 Insurance/Subrogation              ☐ 34 Insurance/Subrogation
☐ 15 Special Education Fees          Under $25,000 Pltf. Grants Consent       Under $25,000 Consent Denied
                                 ☐ 28 Motion to Confirm Arbitration
                                    Award (Collection Cases Only)

**B. PROPERTY TORTS**

☐ 01 Automobile          ☐ 03 Destruction of Private Property   ☐ 05 Trespass
☐ 02 Conversion          ☐ 04 Property Damage
☐ 07 Shoplifting, D.C. Code § 27-102 (a)

**C. PERSONAL TORTS**

☐ 01 Abuse of Process          ☐ 10 Invasion of Privacy           ☐ 17 Personal Injury- (Not Automobile,
☐ 02 Alienation of Affection    ☐ 11 Libel and Slander                  Not Malpractice)
☐ 03 Assault and Battery       ☐ 12 Malicious Interference        ☑ 18 Wrongful Death (Not Malpractice)
☐ 04 Automobile- Personal Injury ☐ 13 Malicious Prosecution        ☐ 19 Wrongful Eviction
☐ 05 Deceit (Misrepresentation) ☐ 14 Malpractice Legal            ☐ 20 Friendly Suit
☐ 06 False Accusation          ☐ 15 Malpractice Medical (Including Wrongful Death) ☐ 21 Asbestos
☐ 07 False Arrest              ☐ 16 Negligence- (Not Automobile,  ☐ 22 Toxic/Mass Torts
☐ 08 Fraud                         Not Malpractice)                ☐ 23 Tobacco
                                                                  ☐ 24 Lead Paint

SEE REVERSE SIDE AND CHECK HERE          IF USED

CV-496/June 2015

# Information Sheet, Continued

## C. OTHERS

- ☐ 01 Accounting
- ☐ 02 Att. Before Judgment
- ☐ 05 Ejectment
- ☐ 09 Special Writ/Warrants
    (DC Code § 11-941)
- ☐ 10 Traffic Adjudication
- ☐ 11 Writ of Replevin
- ☐ 12 Enforce Mechanics Lien
- ☐ 16 Declaratory Judgment

- ☐ 17 Merit Personnel Act (OEA)
    (D.C. Code Title 1, Chapter 6)
- ☐ 18 Product Liability

- ☐ 24 Application to Confirm, Modify,
    Vacate Arbitration Award (DC Code § 16-4401)
- ☐ 29 Merit Personnel Act (OHR)
- ☐ 31 Housing Code Regulations
- ☐ 32 Qui Tam
- ☐ 33 Whistleblower

## II.

- ☐ 03 Change of Name
- ☐ 06 Foreign Judgment/Domestic
- ☐ 08 Foreign Judgment/International
- ☐ 13 Correction of Birth Certificate
- ☐ 14 Correction of Marriage
    Certificate
- ☐ 26 Petition for Civil Asset Forfeiture (Vehicle)
- ☐ 27 Petition for Civil Asset Forfeiture (Currency)
- ☐ 28 Petition for Civil Asset Forfeiture (Other)

- ☐ 15 Libel of Information
- ☐ 19 Enter Administrative Order as
    Judgment [ D.C. Code §
    2-1802.03 (h) or 32-151 9 (a)]
- ☐ 20 Master Meter (D.C. Code §
    42-3301, et seq.)

- ☐ 21 Petition for Subpoena
    [Rule 28-I (b)]
- ☐ 22 Release Mechanics Lien
- ☐ 23 Rule 27(a)(1)
    (Perpetuate Testimony)
- ☐ 24 Petition for Structured Settlement
- ☐ 25 Petition for Liquidation

## D. REAL PROPERTY

- ☐ 09 Real Property-Real Estate
- ☐ 12 Specific Performance
- ☐ 04 Condemnation (Eminent Domain)
- ☐ 10 Mortgage Foreclosure/Judicial Sale
- ☐ 11 Petition for Civil Asset Forfeiture (RP)

- ☐ 08 Quiet Title
- ☐ 25 Liens: Tax / Water Consent Granted
- ☐ 30 Liens: Tax / Water Consent Denied
- ☐ 31 Tax Lien Bid Off Certificate Consent Granted

_____
Attorney's Signature

8/13/2021
_____
Date

# EXHIBIT 1



# Review and Investigation of Code Enforcement Policies, Procedures, and Inter-Agency Communications Between DCRA, FEMS, and MPD

## October 25, 2019

PRIVILEGED AND CONFIDENTIAL

ATTORNEY WORK PRODUCT

Submitted To:

Rashad M. Young

City Administrator

Office of the City Administrator

1350 Pennsylvania Ave, Suite 513

Washington, DC  20004

Submitted By:

Alvarez & Marsal Disputes & Investigations, LLC

655 15th St, NW, Suite 600

Washington, DC 20005

© 2019 Alvarez & Marsal.  All rights reserved.

BETWEEN DCRA, FEMS, AND MPD

# Table of Contents

I.   Executive Summary ................................................................................................. 2

   A.   Key Roles ...................................................................................................... 2

   B.   Findings ......................................................................................................... 4

   C.   Observations ................................................................................................. 6

II.   Background ............................................................................................................. 8

   A.   Parties and Roles .......................................................................................... 9

   B.   Scope ........................................................................................................... 11

III.   Approach .............................................................................................................. 13

   A.   Introduction ................................................................................................ 13

   B.   Policies and Procedures .............................................................................. 13

   C.   Interviews .................................................................................................... 23

   D.   Communications and Document Review .................................................... 27

IV.   Findings & Observations ...................................................................................... 30

   A.   Introduction ................................................................................................ 30

   B.   Key Findings ............................................................................................... 30

   C.   Observations ............................................................................................... 39

V.   Recommendations ................................................................................................. 50

   A.   Introduction ................................................................................................ 50

   B.   Relevant Improvements Made by District Agencies To-Date .................... 50

   C.   Recommendations to Address Key Findings .............................................. 51

   D.   Recommendations to Address Observations .............................................. 59

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

Page | 1

BETWEEN DCRA, FEMS, AND MPD

# I.     EXECUTIVE SUMMARY

In March 2019, an officer with District of Columbia Metropolitan Police Department ("MPD") reported code violations to both the Department of Consumer and Regulatory Affairs ("DCRA") and District of Columbia Fire and Emergency Medical Services ("FEMS") regarding unsafe conditions in an unlicensed rooming house located at 708 Kennedy Street NW ("708 Kennedy"). Nearly five months after the reporting officer ("MPD Officer") initially reported this unsafe property to DCRA and FEMS, a fire occurred at the property causing the deaths of two tenants.

In the aftermath of the fire at 708 Kennedy ("708 Kennedy Fire"), the Office of the City Administrator ("OCA") engaged Alvarez & Marsal ("A&M") to conduct an independent review and investigation into the code enforcement process and communication procedures between DCRA, FEMS, and MPD (collectively, "District Agencies").

Over a period of five weeks, A&M reviewed code enforcement policies and procedures, email communications, systems data, and activity logs.  A&M researched best practices and conducted over 25 interviews of key staff to present a report detailing findings and observations regarding:

> (1)  actions taken by District Agencies to address reported violations at 708 Kennedy ("708 Kennedy Complaint") prior to the fire,
> (2)  identification of gaps in code, policies, and procedures related to the handling of reported violations at 708 Kennedy in advance of the fire,
> (3)  recommendations to improve policies and procedures and communications within and across the agencies.

As a result of this review and investigation, A&M has identified key findings ("Findings") which constitute the most critical missteps which, if handled differently, could have reduced the likelihood of loss in the case of the 708 Kennedy Fire. In this report, A&M has also outlined several observations which reflect underlying issues which have contributed to or could contribute to failure by the District Agencies to remedy unsafe buildings ("Observations").

## A.     Key Roles

The Findings reference many roles across DCRA, FEMS, and MPD.  For ease of reading the below Findings, A&M has included the following table which lists the key individuals and responsibilities relative to Findings.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

Between DCRA, FEMS, and MPD

## Table 1 - Key Roles

| Agency | Position | Description of Role | As Referenced Within Report |
|---|---|---|---|
| MPD | MPD Police Officer | Officer who reported the 708 Kennedy Complaint | MPD Officer |
| DCRA | Community Outreach Specialist, Office of Communications | Part of an account management team tasked with handling escalated customer servicer issues for strategic accounts | DCRA Community Outreach Specialist |
| DCRA | Program Manager, Housing Inspections / Duty Officer | Program Manager - manages housing inspection assignments; Duty Officer - available for emergency response on a 24-hour basis as the primary agency contact for after hour emergency incidents | DCRA Duty Officer |
| DCRA | Program Analyst, Regulatory Investigation Section | Processes investigations intake after Program Manager or Program Officer assign investigator to a case | DCRA Investigations Intake Analyst |
| DCRA | Program Manager, Regulatory Investigation Section | Also referred to as Chief Compliance Officer. Oversees the activities of the Regulatory Investigation Section | DCRA Investigations Program Manager |
| DCRA | Program Officer, Regulatory Investigation Section | Supervises caseload of investigators.  When the Investigations Program Manager left DCRA approx. June 2019, the Investigations Program Officer took over the Program Manager's responsibilities on an interim basis | DCRA Investigations Program Officer |
| DCRA | Investigator, Regulatory Investigation Section | Investigator assigned to 708 Kennedy Complaint | DCRA 708 Investigator |
| FEMS | Lieutenant - Technical Section | Lieutenant in FEMS Technical Section | FEMS Technical Section Lieutenant |
| FEMS | Lieutenant - Administrative Officer | Administrative Officer at FEMS responsible for assignment of Fire Inspectors | FEMS Inspections Lieutenant |

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

B.   Findings

The findings below are organized by Agency, for a chronological series of events, please review the *Key Findings* section of this report.

**Table 2 - Key Findings**

| Finding | Description |
|---|---|
| **Seven Critical Missteps within DCRA** | 1) March 22, 2019 – The DCRA Community Outreach Specialist was one of four DCRA employees who received the initial email from the MPD Officer that reported the violations at 708 Kennedy. Within 15 minutes of receipt of the email, the DCRA Community Outreach Specialist forwarded the email to the DCRA Duty Officer with the Public Incident Report ("PIR") attached and then immediately replied via email to all individuals on the initial email indicating that the email was forwarded to the DCRA Duty Officer. However, the Community Outreach Specialist communicated with the DCRA Duty Officer using non-standard communication protocol, having emailed the MPD Officer's communication, which included the information of urgent and unsafe conditions rather than following standard operating procedures ("SOPs"), which required contact via the Homeland Security and Emergency Management Agency ("HSEMA") by telephone. **The DCRA Community Outreach Specialist followed improper protocol by communicating an urgent complaint to the DCRA Duty Officer via email.** 2) March 22, 2019 - The DCRA Duty Officer (a trained inspector and the Inspections Program Manager) did not respond to the initial 708 Kennedy Complaint forwarded by the DCRA Community Outreach Specialist via email and did not ensure that the complaint was assigned to the appropriate individual(s). **The DCRA Duty Officer did not address the 708 Complaint immediately as an unsafe building or route the complaint appropriately for inspection or investigation.** 3) April 24, 2019 – The MPD Officer emailed the DCRA Investigations Intake Analyst on April 24, requesting that a DCRA investigator be sent to 708 Kennedy. The DCRA Intake Analyst followed the normal intake process of first routing the complaint to the DCRA Investigations Program Officer and DCRA Investigations Program Manager for assignment. **Neither the DCRA Investigations Program Officer nor the DCRA Investigations Program Manager assigned the 708 Kennedy Complaint to an investigator.** |

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

| | |
|---|---|
| | 4) May 21-24, 2019 – After a third follow-up email from the MPD Officer on May 21 regarding the 708 Kennedy Complaint, the DCRA Program Manager assigned the investigation of 708 Kennedy ("708 Kennedy Investigation") to the DCRA 708 Investigator. The DCRA Investigations Intake Analyst notified the MPD Officer of the assignment. **The DCRA 708 Investigator performed a limited investigation (reporting that the DCRA 708 Investigator visited, but did not enter the property, on three occasions - May 22, May 23, and May 24 - and did not evaluate the rear of the property) and failed to adequately document investigations activities and findings.** |
| | 5) June – July 2019 – After a fourth email from the MPD Officer on June 3, this one sent directly to the DCRA 708 Investigator and the DCRA Investigations Intake Analyst, and a reminder to the DCRA 708 Investigator from the DCRA Investigations Intake Analyst on June 11, the DCRA 708 Investigator took no further action on the property in June or July. **Due, in part, to the reassignment of the DCRA 708 Investigator, the DCRA Investigations Program Officer marked the case as "suspended" in the Program Officer's log by July 26[1] without any case file or record of activities.** |
| | 6) August 16, 2019 –The DCRA 708 Investigator never reached out to the MPD Officer, DCRA maintained no case file, and the closure of the case was not evidenced by a signature of approval. **The DCRA Investigations Program Officer closed the 708 Kennedy case without any further investigation nearly three months after the DCRA 708 Investigator's reported attempted visits in May.** |
| | 7) March 22 – August 18, 2019 – Over the 5 months that transpired and the multiple follow-up emails sent to DCRA by the MPD Officer between the initial report of the 708 Kennedy Complaint and the date of the 708 Kennedy Fire, **none of the nine DCRA employee that were aware of the 708 Kennedy Complaint or included on related communications, entered it into the pilot Customer Relationship Management database[2] ("Pilot CRM"), a tool launched by DCRA in February 2019 and utilized to track customer requests and complaints.** |

---

[1]   The Program Officer maintained an offline version of the QuickBase Investigations log, because of this, the exact dates of actions such as suspension or closure of cases are not consistently recorded in QuickBase.

[2]   DCRA communicated to A&M that the CRM was a pilot at this time pending replacement by an enterprise CRM system.  The Pilot CRM system, rolled out by DCRA in February 2019, was launched to help DCRA streamline the way it responded to customer inquiries and to ensure that such responses were done in a timely manner.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

| **Two Critical Missteps within FEMS** | 1) March 23, 2019 – The FEMS Technical Section Lieutenant received the MPD Officer's initial March 22 email and then forwarded the DCRA Community Outreach Specialist's Response to the MPD Officer's email without the PIR attachment to the FEMS Inspections Lieutenant. **By forwarding the DCRA response rather than the MPD Officer's original email with the PIR attachment, the FEMS Technical Section Lieutenant did not include the attached PIR including pertinent information regarding 708 Kennedy.** |
| | 2) March 23, 2019 -**The FEMS Inspection Lieutenant in receipt of the MPD Officer's March 22 email (without the PIR attachment) made no attempt to follow-up with FEMS or MPD staff to verify complaints included in the email and did not effectively address the MPD Officer's complaints.** |
| **No Critical Missteps within MPD** | 1) The MPD Officer's initial email on March 22 did not include the exact address for 708 Kennedy – the property address was not referenced in the body of the email and the attached PIR referenced the 700 Block of Kennedy Street NW.  However, had either agency followed-up with the MPD Officer, DCRA or FEMS could have easily overcome any information gaps left by the MPD Officer's initial report. |
| | The MPD Officer's diligence, evidenced through repeated follow-ups with DCRA, provided DCRA with multiple opportunities to address the unsafe building conditions at 708 Kennedy. **The findings related to DCRA and FEMS outlined above prevented remediation of the unsafe conditions at 708 Kennedy prior to the fire.** |

The findings outlined above identify **nine critical missteps by DCRA and FEMS which contributed to the lack of action to remediate the violations reported at 708 Kennedy.** Each of these points, if repeated, could contribute to future events like the 708 Kennedy Fire.

### C.    Observations

Many factors contributed to the failure of DC agencies to remedy the concerns identified by the MPD Officer. **In addition to the agency-specific findings outlined above, A&M observed underlying issues which have contributed to or could contribute to failure to remedy unsafe buildings.** Note that the Observations identified below are based on DCRA systems and processes as they existed prior to the 708 Kennedy Fire.

These eleven observations are outlined below across four categories: Communications and Coordination Across Agencies, Systems Maturity and Utilization, DCRA Investigations Management, and Unlicensed Property Oversight.

---

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

## Communications and Coordination Across Agencies

1. **DCRA, FEMS, and MPD lack clear and well understood communication channels and processes for reporting, collaborating, and following-up on reported code violations**

2. **Lack of responsibility for and ownership of building safety issues across multiple agencies**

## Systems Maturity and Utilization

3. **DCRA's Pilot CRM and Investigations Module are inconsistently used and lack functionality to enhance accountability**

4. **FEMS use of the Zoll system does not support transparency and accountability for the handling of complaints**

5. **Systems access is limited within and across District Agencies**

6. **Audit log unavailable for DCRA complaint and investigations tracking applications**

## DCRA Investigations Management

7. **Lack of continuity of DCRA Investigations management personnel allowed the 708 Kennedy case to remain unresolved**

8. **Limited formal training or job requirements for investigators**

9. **No process for prioritizing properties for investigation**

10. **Oversight and accountability over investigations is limited**

## Unlicensed Property Oversight

11. **District Agencies have limited resources and authority to investigate unlicensed rental properties**

The District Agencies have introduced significant reforms in response to the 708 Kennedy Fire. A&M also notes that DCRA leadership recognized and understood many of the underlying issues prior to the Kennedy Fire and, as a result, is in the process of taking steps to change the culture, systems, and policies and procedures of the agency.

To mitigate the risk of future incidents like the Kennedy Fire, we recommend that **District Agencies take immediate action to remedy these identified issues**. Our recommendations for corrective action and relevant improvements made by the District Agencies to-date are outlined in the *Recommendations* section of the report.

---

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

Between DCRA, FEMS, and MPD

## II.    Background

On August 18, 2019, a fire occurred in the basement of the building at 708 Kennedy Street in Northwest DC. The property was being used as an unlicensed rooming house and did not meet the District's building or fire codes. The unlicensed rooming house had no working smoke detectors, no lighted exit signs or fire exit, one fire extinguisher that was not tagged, and makeshift doors with padlocks that would not allow occupants to exit in an emergency. The 708 Kennedy Fire caused the death of two residents, including a 9-year-old boy, who were trapped inside the building during the fire.

Five months earlier, an MPD Officer reported to FEMS and DCRA several apparent code violations and observed that 708 Kennedy was being used as an unlicensed rooming house. In the MPD Officer's PIR dated March 22, 2019, serious code violations were outlined in detail, emphasizing that both DCRA and FEMS should send inspectors to the location. The report was sent via email to two FEMS employees and four DCRA employees. Neither FEMS nor DCRA followed-up appropriately on the initial inquiry.

Over the next three months, the MPD Officer followed-up regarding the status of the request for investigation of 708 Kennedy with three different DCRA employees on four separate occasions. It was only after the MPD Officer's third follow-up request in May 2019 – two months after the initial complaint – that DCRA assigned an investigator to follow up.

The DCRA 708 Investigator reported attempting to gain access to the interior of the building and speak to the tenants on three separate occasions in May 2019 in order to investigate the reported code violations. The DCRA 708 Investigator documented only the first attempt with photos of the front of the building. The DCRA 708 Investigator never spoke with the property owner or any tenants, never visited the rear of the property, and never gained access to the interior of the building. Ultimately, no action was taken by DCRA or FEMS to abate the potential code violations. The case was suspended and later closed just two days before the fire at 708 Kennedy.

Figure 1 below provides a visual representation of the timeline of events from the date of the initial report by the MPD Officer to the date of the 708 Kennedy Fire.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

**Figure 1: Critical Events Related to 708 Kennedy Fire**



A.      Parties and Roles

A&M's review and investigation of the District's code enforcement process and inter-agency communications focused on three governmental agencies: DCRA, FEMS, and MPD. Each of the three District Agencies played a key role in the events leading up to the 708 Kennedy Fire.

*1.      DCRA*

DCRA is responsible for the regulation of construction and business activity in the District of Columbia. DCRA provides a multitude of services to the District, including issuance of business & professional licenses, inspection and abatement of housing code violations related to construction activity, buildings, and rental housing, operation of the permit intake center, and review of construction compliance with building codes and zoning regulations. DCRA consists of the following divisions:

- Business and Professional Licensing Administration (BPLA) – comprises eight divisions including Business Licensing, Corporations, Consumer Protection, Professional Licensing, Regulatory Investigations Section ("RIS")[3], Small Business Resource Center, Vending & Special Events, and Weights & Measures.

---

[3] RIS was merged into the Consumer Protection Unit ("CPU") in 2019.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

- o RIS investigates complaints and proactively reviews business license applications to ensure businesses are operating in compliance with applicable licensing, zoning and corporation regulations and statutes.

- Inspection and Compliance – conducts construction inspections, house code inspections, illegal construction investigations, and certifies third party inspection agencies.

- Permit Operations Division – reviews applications for and issue Building Permits, Postcard Permits, Supplemental Permits, Certificates of Occupancy, and Home Occupation Permits.

- Regulatory Enforcement Administration – identifies and accounts for unoccupied property, conducts inspections of residential housing complaints that violate DC Housing code regulations.

- Surveyors – maintains records of all land plats and subdivisions of private and District government property.

- Zoning Administration – reviews applications for conformance with DC Zoning Regulations.

DCRA investigators within RIS investigate complaints against businesses providing services in and/or to the District of Columbia and issue Notices of Infraction for violations.  DCRA Housing inspectors inspect buildings to ensure that they are in safe, habitable condition in compliance with the DC Housing Code.

### 2.    FEMS

FEMS is responsible for the health and safety of the public through pre-hospital treatment and transportation, fire prevention, fire suppression and rescue activities, and homeland security awareness. FEMS is responsible for Fire Code enforcement in residential apartment buildings and commercial properties. The Property Maintenance Code has fire safety requirements for residential properties that are enforced by DCRA. FEMS and DCRA communicate to determine jurisdiction and coordinate response efforts. Within FEMS, the Assistant Fire Chief of Technical Services supervises the Fire Prevention Division. The Fire Prevention Division ("FPD") is divided into four major branches:

- Administrative Support Services Branch – provides administrative support to FPD such as procurement, accounting of user fees, processing of fines issued, and compilation of monthly reports.

- Code Enforcement Branch – assigns Fire inspectors at all eight wards of the District. Fire inspectors' responsibilities include routine maintenance inspections, investigation of fire code complaints, annual license renewal inspections, inspection of DC public schools, fire security for the President, fire safety inspection at large public gatherings, and public assembly inspections at nightclubs.

---

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

- Technical Inspections Plans and Permits Branch – performs specialized inspections required by operational permits specified in the ICC International Fire Code, as amended by the DC Municipal Regulations Fire Code ("DCMR").

- Fire Investigations Branch – performs fire origin and cause investigations, arson investigations, and the juvenile fire setter's intervention program.

### 3.    MPD

MPD is the primary law enforcement agency for the District of Columbia. MPD is divided into seven districts determined by geographic location. MPD officers have a duty to report any violation of housing, building, or health codes that is encountered[4] on the job to the appropriate District Agency. MPD officers also assist DCRA with contacting home and business owners to obtain information necessary to the code enforcement process.

### B.    Scope

A&M conducted a comprehensive review and investigation of the District's code enforcement process – specifically focusing on the licensing and inspections process – and communications between DCRA, FEMS, and MPD related to the code enforcement process. Under the Statement of Work ("SOW"), the goal of A&M's investigation is to determine what District Agencies did in the time leading up to the fire; what they should have done pursuant to the relevant District law or policy; and what policies and protocols need to be implemented to prevent future incidents similar to the 708 Kennedy Fire. Key activities performed by A&M included:

- Reviewing protocols, authorities, and practices for licensing homes, inspecting, and investigating properties for code enforcement compliance including communications between District Agencies.

- Recommending procedures to be implemented to improve the communications between District Agencies for reporting the violations and follow-up procedures.

- Reviewing the processes and communications that transpired between District Agencies in relationship to the Kennedy Fire.

- Documenting the procedures utilized regarding 708 Kennedy including the reporting of the violations by MPD to FEMS and DCRA and the follow-up procedures as they relate to the violations reported.

---

[4] Section V, Article 22 of General Order 201.26

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

- Determining the breakdown in communications between MPD, FEMS, and DCRA when reporting and enforcing code violations and making recommendations for improvement.

- Interviewing agency directors at DCRA and FEMS including staff that are involved with processing license, code violation inspection, as well as those individuals who were responsible for investigating the code violation inspection at 708 Kennedy.

A&M's approach, findings and observations, and recommendations are described in detail within the report below.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

## III.   APPROACH

### A.   Introduction

In order to appropriately assess the actions taken by DCRA and FEMS in response to the violations reported by the MPD Officer at 708 Kennedy and to provide comprehensive recommendations regarding the policies and procedures for each of the District Agencies related to the licensing, inspection, and investigation of properties for code enforcement compliance, A&M did the following:

- Obtained and reviewed all relevant policies and procedures, including SOPs that were effective as of March 22, 2019, when the violations at 708 Kennedy were first reported to DCRA and FEMS, and any subsequent updates

- Reviewed email communications regarding the violations identified at 708 Kennedy and the actions taken leading up to the 708 Kennedy Fire

- Conducted fact-finding and investigative interviews of personnel at DCRA, FEMS, and MPD including agency leaders, staff involved with code violation inspections and regulatory investigations, as well as those individuals who had knowledge of and/or were specifically responsible for investigating the code violations reported at 708 Kennedy

- Researched practices in corresponding agencies in other metropolitan areas to inform recommendations

A&M then analyzed the information sources described above to 1) assess the actions taken by DCRA and FEMS in response to the reported violations, 2) identify gaps in the relevant policies and procedures that could leave the District and its residents vulnerable to future incidents similar to the 708 Kennedy Fire, and 3) provide recommendations to address the gaps identified.

### B.   Policies and Procedures

Given the focus of the SOW on how District Agencies respond to reported code violations, A&M's priority was to obtain and review guidance available under general District law as well as District Agencies' policies and procedures regarding reported code violations. While District of Columbia Code ("DC Code") and the District of Columbia Municipal Regulations ("DCMR") establish the relevant laws and regulations of the District, each agency establishes its own policies and procedures that enable it to carry out its mission in compliance with those laws and regulations.

The policies and procedures reflected in the tables below are listed chronologically. All policies and procedures issued subsequent to the 708 Kennedy Fire have been shaded grey. Please note that the policies and procedures are those that were provided by District Agencies in response to our data requests.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

### 1.    FEMS

FEMS issues General Orders affecting the permanent policy of the agency. The table below reflects those FEMS policies that are relevant to the identification and reporting of code violations.

**Table 3 - FEMS Policies and Procedures Re: Code Violations**

| Ref. | Agency | Title | Summary | Date of Issue |
|---|---|---|---|---|
| 1 | FEMS | Administrative Search Warrant Handout | DC officials may apply for Administrative Search Warrant upon tenant refusal or after reasonable efforts to gain access on at least two documented occasions. Reference to D.C. SCR-Civil Rule 204 (2008). | 4/2/1990 |
| 2 | FEMS | GO 501 - Right to Entry | General Order - Members shall request permission to enter non-public areas and contact supervisor to seek an administrative search warrant upon refusal. A non-public area may be entered without consent or warrant when the member reasonably believes that exigent circumstances exist - life threatening conditions requiring immediate attention to prevent harm or death. Exigent conditions are those that are highly likely to cause fire or serious injury within minutes or hours. | 10/1/2009 |
| 3 | FEMS | GO 505 - Referral Procedures | General Order - Inspector shall determine the issue, document the issue (pictures, notes, reports, etc.), complete referral form (FEMS Form 29) and submit to supervisor, and send referral to appropriate agency after review. All referrals must have documentation to the fact that they have been transmitted and received by the other agency (fax confirmation, email confirmation). | 10/1/2009 |
| 4 | FEMS | GO 503 - Fire Inspection Procedures | General Order - Fire inspectors shall schedule all fire inspections in Zoll system within 72 hours of issuance from supervisor (complaint inspections shall be scheduled and completed on same date of receipt from supervisor) and complete a minimum of 6 fire inspections daily. Provides entry procedures, inspection and documentation procedures, and violation documentation and reporting procedures. All notices and orders are sent by certified mail. | 4/1/2018 |

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

| Ref. | Agency | Title | Summary | Date of Issue |
|---|---|---|---|---|
| 5 | FEMS | GO 506 - Administrative Search Warrant Procedures | General Order - Administrative Search Warrant can be obtained if consent to inspect is refused after two attempts to gain access or if the information provided is enough to believe that an offense has been committed and proof is documented. Affidavit for administrative search warrant must be reviewed by the Fire Prevention Division Supervisor and signed by an Office of the Attorney General ("OAG") attorney. | 6/24/2018 |
| 6 | FEMS | GO 503 - Fire Inspection Procedures | General Order – States that Fire inspectors shall schedule all fire inspections in the Zoll system within 72 hours of issuance from supervisor (complaint inspections shall be scheduled and completed on same date of receipt from supervisor). Provides entry procedures, inspection and documentation procedures, and violation documentation and reporting procedures. All notices and orders must be sent by certified mail. For all building inspections, Fire inspectors shall note in the comment section of the record that they have reviewed the building's fire protection records. | 10/1/2018 |
| 7 | FEMS | GO 505 - Referral Procedures | General Order - Inspector shall determine the issue, document the issue (pictures, notes, reports, etc.), complete referral form (FEMS Form 29) and submit to Inspections Supervisor for review and signature of approval, send referral to appropriate agency after review. All referrals must have documentation to the fact that they have been transmitted and received by the other agency (fax confirmation, email confirmation). The Inspection Supervisor will follow-up with the receiving agency within 2 hours to identify actions and findings and ensure the referral information is entered into Fire Records Management System. If there is immediate need for a representative from DCRA, Fire inspectors shall contact HSEMA. | 8/23/2019 |

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

| Ref. | Agency | Title | Summary | Date of Issue |
|------|--------|-------|---------|---------------|
| 8 | FEMS | GO 502 - Complaint Procedures | General Order - Complaints will be forwarded to Administrative Assistant for logging/assignment and copied to Fire Marshal and Assistant Fire Marshal. The Administrative Assistant logs the complaint, assigns a tracking number, and forwards to Division Inspections Supervisor for inspector assignment. inspector must speak with complainant or inspect location within 24 hours or the next business day. Administrative assistant shall log completed report and forward copy to Fire Marshal / Assistant Fire Marshal. | 8/23/2019 |
| 9 | FEMS | GO 501 - Right of Entry | General Order - Members shall request permission to enter non-public areas and contact supervisor to seek an administrative search warrant upon refusal (GO 506). A non-public area may be entered without consent or warrant when the member reasonably believes that exigent circumstances exist - life threatening conditions requiring immediate attention to prevent harm or death. Exigent conditions are highly likely to cause fire or serious injury within minutes or hours. The Inspections Supervisor shall be notified of unsafe conditions. | 9/22/2019 |

Prior to the Kennedy Fire, FEMS had several General Orders in effect that addressed the handling and referral of code violations including the right of entry to a property, fire inspection procedures, referral procedures, and administrative search warrant procedures. However, there were no General Orders that outlined how code violations should be managed by the agency.

In the weeks subsequent to the Kennedy Fire, FEMS revised three of its General Orders to provide more clarity and created a new General Order to address procedures around complaint processing.

### 2.     MPD

The MPD issues written directives referred to as General Orders which include statements of policy and interpretations of policy. The table below reflects those MPD policies and procedures relevant to the identification and reporting of code violations. The MPD only has two policies that address the identification and reporting of code violations. The first is a General Order with an issue date of April 5, 2011, and the second is an Executive Order issued on September 3, 2019 (i.e., subsequent to the Kennedy Fire).

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

**Table 4 - MPD Policies and Procedures Re: Code Violations**

| Ref. | Agency | Title | Summary | Date of Issue |
|------|--------|-------|---------|---------------|
| 1 | MPD | GO 201.26 Article 22 | General Order - MPD members must report to the appropriate government agency any violations of plumbing, building, or health codes encountered. | 4/5/2011 |
| 2 | MPD | EO 19-005 | Executive Order - Effective immediately, when a member observes a serious fire code violation, immediately notify a supervisor who shall respond to the scene. The on-scene supervisor will notify FEMS Fire Liaison Officer through the Office of Unified Communications ("OUC") of the location and threat. Member shall send email to dcra@dc.gov, copying mpdcic@dc.gov, prior to end of shift and complete the appropriate field report. | 9/3/2019 |

Prior to the Kennedy Fire, MPD's policies and procedures around the identification and reporting of code violations were vague. The guidance in effect on March 22, 2018, when MPD reported the violations to DCRA and FEMS, was General Order 201.26 (Duties, Responsibilities and Conduct of Members of the Department) issued on April 25, 2011.

Section V, Article 22 of General Order 201.26 outlines the roles of responsibilities of officers and states that MPD officers are to:

> *Report to the appropriate government agency any incidentals such as street lights out, traffic signs down, broken fire hydrants or dangerous roadway or sidewalk conditions.*
>
> *a. Report any violations of plumbing, building or health codes to the appropriate agency.*
>
> *b. Should the member be unable to identify the correct agency, he/she shall request that a notification be made to the Mayor's Command Center through the Command Information Center (CIC) or the OUC.*

On September 3, 2019, in an effort to clarify the actions that an MPD officer should take when violations are identified, the MPD issued Executive Order 19-005 (Fire Code Violations) which also notes that the MPD is currently working with FEMS and DCRA on a new protocol for reporting and responding to potential fire code violations. The Executive Order further notes that, in the interim, members shall adhere to the new procedures contained in the order.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

Executive Order 19-005 notes the following:

> *Effective immediately, when a member observes what appears to be a serious fire code violation (i.e., conditions that appear to present a serious hazard or possible life-safety threat), he or she shall notify a supervisor who shall respond to the scene.*
>
> A.   *The on-scene supervisor shall notify the FEMS Fire Liaison Officer (FLO) through the OUC of the location and potential life-safety threat.*
>
> B.   *The member shall send an email to dcra@dc.gov, copying mpdcic@dc.gov, prior to the end of his or her shift that includes the location's address, an explanation of the alleged violation, and the associated CCN.*
>
> C.   *In all cases, the member shall complete the appropriate field report and document notifications made in the internal narrative.*

FEMS leadership has noted to A&M that it has asked MPD to add the Fire Prevention Department inbox (fems.fireprevention@dc.gov) as a location to which MPD officers should also send complaints.

### 3.   DCRA

A&M requested and received formalized policies and procedures from DCRA related to investigation and inspection of property code violations.  The materials provided by DCRA also included informal procedures related to regulatory investigations that were communicated via emails to investigators. The table below reflects those DCRA policies and procedures (both formal and informal) relevant to the identification and reporting of code violations.

**Table 5 - DCRA Polices & Procedures Re: Code Violations**

| Ref. | Agency | Title | Summary | Date of Issue |
|---|---|---|---|---|
| 1 | DCRA | Standard Operating Procedures: Generating Property Maintenance NOV and NOI | SOP establishes standards for generating Notice of Violation ("NOV") and Notice of Infraction ("NOI") for housing code violations, including NOV preparation by administrative staff, documentation, and approval. | 10/25/2018 |
| 2 | DCRA | Title 11, DCMR Zoning Regulations, Subtitle U-251 | Provides a listing of uses permitted as home occupations. A Home Occupancy Permit (HOP) shall be required prior to the practice of a home occupation and shall comply with | 10/26/2018 |

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

| Ref. | Agency | Title | Summary | Date of Issue |
|------|--------|-------|---------|---------------|
| | | | conditions and requirements. Provides a listing of uses prohibited as home occupations. | |
| 3 | DCRA | OCI FY2019 | DCRA performance goals for FY2019 including benchmarks related to NOI reviewer efficiency, NOI service & record keeping, collections, FOIA, and professional development. | 11/14/2018 |
| 4 | DCRA | Investigative Report Submission Process | The report submission process will be streamlined via computer. All reports, photographs, complaints, etc. are uploaded to the computer and submitted for review via email. All reports will be reviewed within an hour of submission. The printing, signing, and submission of the final report should be done COB of the day the report was initially submitted for review. | 12/17/2018 |
| 5 | DCRA | New Forms | New forms related to witness statements for cases that involve an NOI and tenant statements related to rent paid for illegal rentals. | 12/28/2018 |
| 6 | DCRA | Email for Report Submission | The report submission process will be streamlined via computer. All reports, photographs, complaints, etc. are uploaded to the computer and submitted for review via email. All reports will be reviewed within an hour of submission. The printing, signing, and submission of the final report should be done by close of business of the day the report was initially submitted for review. | 1/8/2019 |
| 7 | DCRA | Habitability Customer Service Emergency Process | All correspondence involving emergencies (no heat, no utilities, flooding) must be assigned in the CRM to the appropriate email address. Emergency cases should be assigned to inspectors in time for inspectors to conduct inspection and return to office by 6pm. All after hours calls will be given to the DCRA Duty Officer to triage. Process provides criteria to determine if call qualifies as an emergency. | 3/7/2019 |

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

| Ref. | Agency | Title | Summary | Date of Issue |
|------|--------|-------|---------|---------------|
| 8 | DCRA | Standard Operating Procedures: Scheduling and Conducting Inspections | SOP for scheduling property maintenance inspections, preparing and conducting property maintenance inspections, processing property maintenance NOVs, and preparation and movement of NOIs. | 4/29/2019 |
| 9 | DCRA | Standard Operating Procedures: Property Maintenance Unit Scheduling Initial Inspection v1 | SOP providing detailed instructions for scheduling initial inspections as it relates to customer service and administrative staff receiving and triaging complaints. Inspections should be scheduled within 15 days, but no later than 30 business days. | 5/1/2019 |
| 10 | DCRA | Standard Operating Procedures: Property Maintenance Unit Scheduling Initial Inspection v2 | SOP providing detailed instructions for scheduling initial inspections as it relates to customer service and administrative staff receiving and triaging complaints, as well as closing CRM tickets. Inspections should be scheduled within 15 days, but no later than 30 business days. Establishes procedures on evidentiary packet and closing CRMs. | 8/13/2019 |
| 11 | DCRA | Office of Consumer Protection Closure Letters | Prior to closure letters for Office of Consumer Protection ("OCP") cases, notify the complainant that the case is being closed, send an email to the complainant with the formal closure letter and place correspondence in file, place a sticky note on the case file to inform the DCRA Investigations Intake Analyst that the letter is enclosed, and the DCRA Investigations Intake Analyst will mail the letter to the complainant. | 8/16/2019 |
| 12 | DCRA | Rental Property Complaints | Complaints are entered by the complainant in QuickBase or received by DCRA and immediately logged into QuickBase Consumer Complaints System. Once complaint is assigned to investigator, the investigator must gather all pertinent information about location, owner, and tenants prior to visiting the property. investigator should document the visit, front and rear, speak with neighbors, attempt to get a signed statement from the tenant, and leave business card. Upon the | 8/26/2019 |

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

| Ref. | Agency | Title | Summary | Date of Issue |
|---|---|---|---|---|
| | | | determination that the unit is being rented, the case should be referred to DCRA Inspections and Compliance Division for an inspection of the premises. | |
| 13 | DCRA | Rental Property Complaints | Complaints are entered by the complainant in QuickBase or received by DCRA and immediately logged into QuickBase Consumer Complaints System. Once complaint is assigned to investigator, the investigator must gather all pertinent information about location, owner, and tenants prior to visiting the property. investigator should document the visit, front and rear, speak with neighbors, attempt to get a signed statement from the tenant, and leave business card. Upon the determination that the unit is being rented, the case should be referred to DCRA Inspections and Compliance Division for an inspection of the premises. | 8/26/2019 |
| 14 | DCRA | Standard Operating Procedures: Office of Civil Infractions | SOP establishing standards for reviewing NOIs, ensuring proper retention of records, filing NOIs, billing of special assessments, placement of liens for fines, and payment processing of fines and special assessments. | 8/29/2019 |
| 15 | DCRA | Standard Operating Procedures: Property Maintenance Unit Scheduling Initial Inspection v3 | SOP providing detailed instructions for scheduling initial inspections as it relates to customer service and administrative staff receiving and triaging complaints, as well as closing CRMs. Inspections should be scheduled within 15 days, but no later than 30 business days. SOP has been updated to include a step requiring processing team member to search ACCELA records to determine if property is a licensed rental property. | 9/3/2019 |
| 16 | DCRA | Process | All IR ("Investigations Request") complaints must be submitted through QuickBase, with attachments included. Once the documents have been uploaded to QuickBase, the status should be updated to "ready for review" and an email | 9/10/2019 |

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

| Ref. | Agency | Title | Summary | Date of Issue |
|------|--------|-------|---------|---------------|
| | | | should be sent to the Program Officer notifying him that the IR is in QB. | |
| 17 | DCRA | Closing Cases in QB | Once the investigation report has been submitted for review, the case should NOT be closed in QuickBase. Only DCRA Intake Investigations Intake Analyst and DCRA Intake Investigator have the authority to close cases in QuickBase. | 9/10/2019 |
| 18 | DCRA | Standard Operating Procedures: Consumer Protection Unit | SOP for complaint intake, case assignment, investigation and case closure, pre-license and license referrals, residential property complaints, and quality control. | 9/13/2019 |
| 19 | DCRA | Duty Officer: Closing Units/Displacing Tenants | After a unit/building is closed and tenants are displaced due to DCRA actions, the Administrative Officer is responsible for sending an after-action report to the director informing of actions taken, justification of actions, and the outcome. | 9/16/2019 |
| 20 | DCRA | Update to Scheduling Process | When scheduling an inspection where a tenant is involved, all administrators must first search ACCELA, DCRA's permitting and licensing system for an active BBL to confirm that an inspection has occurred. If there are no inspections under the address, that is an indication that the property is not licensed. | 9/17/2019 |
| 21 | DCRA | Standard Operating Procedures: Regulatory Investigations Section | SOP providing detailed instructions for receiving complaints about licensed, unlicensed businesses, investigating complaints about businesses, conducting background investigations, surveys, personal service, and enforcing the rules and regulations of the District. | Not Formally Distributed |
| 22 | DCRA | Standard Operating Procedures: Inspections and Compliance Administration/Duty Officer | SOP establishing consistent process for DCRA Duty Officers when responding, detailing that DCRA Duty Officers should be contacted through HSEMA 24-hour operations center, but may be dispatched by DCRA senior management. Duty Officers should notify Deputy Chief Building Officer ("CBO") that they are responding to the incident, fully document the conditions found, and have abatement occur as early as 24 | Not Formally Distributed |

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

| Ref. | Agency | Title | Summary | Date of Issue |
|---|---|---|---|---|
| | | | hours or at a maximum of 72 hours. The DCRA Duty Officer is responsible to ensure that appropriate follow up actions occur. | |

DCRA began formalizing the inspection and investigation procedures around code violations in late 2018. Over the course of the following year, DCRA attempted to standardize many of its processes through formal SOPs and informal memos.  Many of the documents provided by DCRA were not drafted or distributed until after the Kennedy Fire.

## C.   Interviews

In accordance with the SOW, A&M interviewed agency leaders at DCRA, FEMS, and MPD.  In addition, A&M identified individuals at each of the agencies that could speak to the policies and procedures in place as of the date of the 708 Kennedy Complaint through the date of the 708 Kennedy Fire.  A&M also interviewed DCRA, FEMS, and MPD personnel who were directly involved with the response to the reported violations at 708 Kennedy. In total, A&M interviewed 26 DCRA, FEMS, and MPD personnel.

### 1.   FEMS

The table below reflects the positions of the FEMS personnel interviewed by A&M.

**Table 6 - FEMS Interview List**

| Ref | Agency | Title |
|---|---|---|
| 1 | FEMS | Chief |
| 2 | FEMS | Chief of Staff |
| 3 | FEMS | Deputy Fire Chief/ Fire Marshal |
| 4 | FEMS | Assistant Fire Chief, Technical Services |
| 5 | FEMS | Lieutenant - Technical Section |
| 6 | FEMS | Lieutenant - Administrative Officer |

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

A&M interviewed the relevant individuals, as identified by FEMS, who could speak to FEMS policies and procedures regarding reported code violations. A&M discussed policies and procedures utilized by FEMS in tracking and responding to complaints received as well as communications with other agencies.

A&M also interviewed two individuals currently placed on administrative leave who were directly involved in the handing of the reported violations at 708 Kennedy – a Lieutenant in FEMS Technical Section who was included on the original March 22 email sent by the MPD Officer and the FEMS Inspections Lieutenant to whom the email was forwarded for assignment to a Fire inspector. A&M utilized these interviews to gain further understanding of the policies and procedures as understood by these employees and to gain further understanding of FEMS' response to the violations reported at 708 Kennedy.

### 2.   MPD

The table below reflects the positions of the MPD personnel interviewed by A&M.

**Table 7 - MPD Interview List**

| Ref | Agency | Title |
|-----|--------|-------|
| 1 | MPD | Chief of Staff |
| 2 | MPD | MPD Director of Strategic Change |
| 3 | MPD | Fourth District Commander |
| 4 | MPD | MPD Officer - 4th District |

Given that MPD does not have responsibility for responding to code violations, A&M interviewed MPD personnel to gain an understanding of the role of the MPD in the identification of code violations and communications with the respective District agencies and to understand MPD's expectations regarding follow-up from those agencies.

A&M also interviewed the MPD Officer who reported the violations to various personnel within DCRA and FEMS to gain a further understanding of the events that resulted in responding to 708 Kennedy, how the individuals at DCRA and FEMS to whom the March 22, 2019 email was sent were identified, and any subsequent follow-up made to or received from the agencies.

### 3.   DCRA

Given the nature of the violations and the several attempts by the MPD Officer to interface with DCRA that went unanswered, A&M interviewed many more personal at DCRA than other District Agencies.  The table below reflects the DCRA personnel interviewed by A&M.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

**Table 8 - DCRA Interview List**

| Ref | Agency | Title |
|-----|--------|-------|
| 1 | DCRA | DCRA Director |
| 2 | DCRA | DCRA Deputy Director |
| 3 | DCRA | Chief Administrative Officer |
| 4 | DCRA | Senior Policy Advisor |
| 5 | DCRA | Interim Chief Building Official |
| 6 | DCRA | Program Officer, Regulatory Investigations Section |
| 7 | DCRA | Administrative Officer, Chief Building Official |
| 8 | DCRA | Program Manager, Civil Infractions |
| 9 | DCRA | Program Analyst, Regulatory Investigations Section |
| 10 | DCRA | Program Manager - Inspections |
| 11 | DCRA | Investigator, Regulatory Investigations Section |
| 12 | DCRA | Deputy Zoning Administrator |
| 13 | DCRA | Chief Information Officer |
| 14 | DCRA | Community Outreach Specialist |
| 15 | DCRA | Investigator, Regulatory Investigations Section |
| 16 | DCRA | Investigator, Regulatory Investigations Section |

We conducted these interviews to gain an understanding of the policies and procedures in place at the time the incident was first reported on March 22, 2019 and any changes made subsequent to that date including changes made as a result of the 708 Kennedy Fire. Many on the DCRA leadership team including the Director, Deputy Director, and Chief Administrative Officer have been with DCRA less than one year

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

Page | 25

BETWEEN DCRA, FEMS, AND MPD

and were in the process of making significant changes to the way DCRA operated prior to the 708 Kennedy Fire.

A&M spoke to individuals who were included on the March 22, 2019 email from the reporting MPD Officer, the DCRA Duty Officer to whom that email was forwarded (currently on administrative leave), and the individuals with whom the MPD Officer followed up on multiple occasions over the course of three months including the DCRA 708 Investigator (currently on administrative leave). A&M's goal was to gain further understanding of the reason for the actions taken/not taken by each of these employees as well as to gain an understanding of the official and unofficial policies and procedures in use by DCRA.

A&M also interviewed individuals at DCRA who could speak about the systems used by licensing, investigations, and inspections teams and received a walkthrough of each of these systems including the ACCELA[5] database and two QuickBase applications - the Pilot CRM and the Consumer Complaints Database ("Investigations Module"). [6]  Finally, given the fact that many of the procedures followed by investigators prior to the 708 Kennedy Fire were distributed through informal means, A&M interviewed two additional investigators to verify and confirm the understanding of the investigations process described by the DCRA 708 Investigator who was assigned to the 708 Kennedy complaint.

### 4.    OCTO

In addition to the District Agency interviews outlined above, A&M met with Office of the Chief Technology Officer ("OCTO") personnel to gain access to information about systems and communications.

**Table 9 - OCTO Interview List**

| Ref | Agency | Title |
|-----|--------|-------|
| 1 | OCTO | Citywide Messaging Architect |
| 2 | OCTO | Director |
| 3 | OCTO | OCTO General Counsel |
| 4 | OCTO | OCTO Telecommunications Governance Manager |
| 5 | OCTO | Messaging Specialist |

---

[5]    DCRA's permitting and licensing system.

[6]    The Investigations Module is utilized by the Investigations team to track investigation progress.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

### D.      Communications and Document Review

In addition to performing interviews of key personnel, A&M obtained and reviewed documents and communications from each of the District Agencies related to the code enforcement process and the events leading up to the 708 Kennedy Fire. Additionally, some of the requests to the District Agencies were satisfied by documents provided to A&M via the OCA and OCTO.

#### 1.      Email Communications

A&M obtained emails related to 708 Kennedy from the District Agencies with assistance from OCTO. OCTO is the central technology organization of the DC Government, responsible for establishing technology polices for the District and providing technology services and support for the District Agencies.

A&M received multiple email productions based on targeted searches across DCRA, FEMS and MPD email accounts initiated by various parties within the District Agencies and other DC Government agencies attempting to gain an understanding of the events leading up to the 708 Kennedy Fire.

#### 2.      FEMS

A&M requested the following documents and communications from FEMS:

- All versions (originals and updates/modifications) of relevant FEMS policies, procedures, rules, and regulations in place related to the fire incident at 708 Kennedy Street in place from March 2019 to present day.
- Communications to FEMS staff regarding new policies and/or required trainings
- All investigation reports prepared by and supporting data collected by FEMS related to 708 Kennedy.
- All communications regarding 708 Kennedy from March 1, 2019, to August 22, 2019, sent or received by all FEMS employees.
- All communications regarding code violations from March 1, 2019, to August 22, 2019, sent or received by key FEMS personnel associated with 708 Kennedy.
- Any "lessons learned" documentation or investigation reports related to 708 Kennedy.

#### 3.      MPD

A&M requested the following documents and communications from MPD:

- All versions (originals and updates/modifications) of relevant MPD policies, procedures, rules, and regulations in place related to the fire incident at 708 Kennedy Street in place from March 2019 to present day.
- Communications to MPD staff regarding new policies and/or required trainings.

---

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

Between DCRA, FEMS, and MPD

- All investigation reports prepared by and supporting data collected by MPD related to 708 Kennedy.
- All communications regarding 708 Kennedy from March 1, 2019, to August 22, 2019, sent or received by all MPD employees.
- All communications from March 1, 2019, to August 22, 2019, sent or received by the reporting officer.
- Any "lessons learned" documentation or investigation reports related to 708 Kennedy.
- MPD data related to the initial request for service on March 22, 2019.
- 708 Kennedy PIR dated March 22, 2019.
- Body-worn camera (BWC) footage from the reporting officer's initial visit to 708 Kennedy on March 21, 2019.

### 4.    DCRA

A&M requested the following documents and communications from DCRA:

- All versions (originals and updates/modifications) of relevant DCRA policies, procedures, rules, and regulations in place related to the fire incident at 708 Kennedy Street in place from March 2019 to present day.
- Communications to DCRA staff regarding new policies and/or required trainings.
- All investigation reports prepared by and supporting data collected by DCRA related to 708 Kennedy.
- All communications regarding 708 Kennedy from March 1, 2019, to August 22, 2019, sent or received by all DCRA employees.
- All communications regarding code violations from March 1, 2019, to August 22, 2019, sent or received by key DCRA personnel associated with 708 Kennedy.
- Any "lessons learned" documentation or investigation reports related to 708 Kennedy.
- DCRA data, documents, communications, photos, memos, and records related to property inspections at 708 Kennedy.
- Job descriptions for all personnel who should have had a role in the handling of violations at 708 Kennedy.
- DCRA timeline that demonstrates the order of operations for emergency and standard inspection requests.
- Data regarding the number of new inspections and investigations reported to and addressed by DCRA on a monthly basis.
- Data regarding the number of inspections vs. investigations completed by DCRA, including the resulting outcome.
- Any Inspector General reports on the operations of DCRA within the previous five years.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

- Statistics on the number of housing units and businesses within DCRA's jurisdiction.
- Any performance improvement initiatives/reports completed over the previous five years.
- All photos of 708 Kennedy taken by the assigned DCRA 708 Investigator.
- The audit log of activities associated with 708 Kennedy within the 3 IT systems (Pilot CRM, Investigations module, and ACCELA).
- Text Messages of DCRA 708 Investigator.

### 5.   *Missing or Unavailable Documents*

The District Agencies were not able to produce all documents requested by A&M related to A&M's review and investigation of the code enforcement process and events leading up to the 708 Kennedy Fire. Based on discussions with employees of the District Agencies, the documents were not produced because they either do not exist or reportedly existed but cannot be located. A&M was not able to obtain and review the following documents as part of our review and investigation of the District's Code Enforcement Process:

- *DCRA data, documents, communications, memos, and records related to property inspections at 708 Kennedy* - DCRA reported to A&M that these records do not exist as an inspector never visited 708 Kennedy in response to the 708 Kennedy Complaint.
- *The audit log of activities associated with 708 Kennedy within DCRA's Pilot CRM and Investigations module* - This item does not exist as DCRA's Pilot CRM and Investigations Modules do not have the functionality to provide an audit log.  OCTO provided data reflecting the first and last changes made in these systems regarding the 708 Kennedy property.
- *All investigation reports prepared by and supporting data collected by DCRA related to the fire at 708 Kennedy* - DCRA reported to A&M that these items do not exist.
- *Body-worn camera (BWC) footage from the MPD Officer's initial visit to 708 Kennedy on March 21, 2019* – OCA and MPD were unable to provide the BWC footage as it is part of an ongoing criminal investigation.
- *Text Messages of DCRA 708 Investigator* - DCRA reported to A&M that it attempted to, but was unable to retrieve, these messages from the DCRA 708 Investigator's government-issued cell phone.

DCRA has only been able to provide limited documentation related to the investigation of reported code violations at 708 Kennedy (including photos of the front of the property taken on May 22). **A&M has not received any communications, reports, memos, or other documentation corroborating the investigation performed by the DCRA 708 Investigator into the reported code violations at 708 Kennedy.** DCRA reported to A&M that all available information has been provided. The DCRA 708 Investigator reported to A&M that some of these items did exist in hardcopy form but were lost during an office move.

---

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

## IV.    FINDINGS & OBSERVATIONS

### A.  Introduction

The following section outlines A&M's Key Findings and Observations related to the series of events and communications leading up to the 708 Kennedy Fire. The *Key Findings* section highlights nine instances in which District Agencies did not properly execute the responsibilities, procedures, or policies associated with key roles. These Key Findings constitute the most critical violations, that, if handled differently, could have impacted the likelihood of the 708 Kennedy Fire. The *Observations* section details underlying issues which have contributed to or could contribute to failure to remedy unsafe buildings. A&M has identified recommended actions to address the listed Key Findings and Observations later in the *Recommendations* section.

### B.  Key Findings

A&M has identified Key Findings related to the 708 Kennedy Fire, and integrated the identified failure points in chronological order on the timeline of events below.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

Page | 30

BETWEEN DCRA, FEMS, AND MPD



**Figure 2: Critical Events Related to 708 Kennedy Fire with Key Findings**

*1. March 22, 2019 – DCRA Community Outreach Specialist uses improper communication channel to contact the DCRA Duty Officer. As a result, the DCRA Duty Officer never responds to the scene. DCRA does not enter reported code violations into the Pilot CRM.*

On the night of March 22, 2019, the MPD Officer sent an email with subject line "Serious Code Violations" to two employees of FEMS and four employees of DCRA. The MPD Officer attached to the email the PIR related to 708 Kennedy which was completed the previous night on March 21, 2019. Upon receipt of the email, the DCRA Community Outreach Specialist forwarded the message to the on-duty DCRA Duty Officer and replied to the MPD Officer's email, with all other recipients copied, stating that the request had been forwarded to the Duty Officer. The Duty Officer is DCRA's primary agency contact responsible for responding to after hour and weekend urgent incidents.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

Between DCRA, FEMS, and MPD

According to interviews with the CBO and review of the SOP for the Duty Officer, it is outside of the SOP for a Duty Officer to receive emergency requests via written requests. This expectation is found in Section III, Policy B of the SOP for the Duty Officer which states that, "All emergency requests for after-hours DCRA assistance should be routed through the Homeland Security and Emergency Management Agency 24-hour Operations Center." DCRA protocol requires that all Duty Officer schedules and phone numbers are shared with the HSEMA team and Duty Officers are not provided a separate email account to monitor.

The DCRA Duty Officer at the time was therefore not monitoring the email traffic associated with normal work email when the DCRA Duty Officer received the request from the DCRA Community Outreach Specialist close to midnight on March 22, 2019. As described further in Finding 9, the DCRA Community Outreach Specialist and three other DCRA employees included on the initial email from the MPD Officer failed to enter the complaint into DCRA's Pilot CRM or record the need for action in any system or log.

**The DCRA Community Outreach Specialist's failure to route the information via HSEMA for an urgent request was DCRA's first failure to properly report, respond to, and address the unlicensed rooming house and unsafe conditions reported at 708 Kennedy.**

### *2. Post-March 22, 2019 – DCRA Duty Officer never responds to request for investigation of 708 Kennedy.*

As described above, the DCRA Duty Officer on call on the evening of March 22, 2019 did not see the email that was forwarded by the DCRA Community Outreach Specialist. Per the SOP, the Duty Officer is expected to respond to phone call requests from HSEMA and is not expected to monitor email traffic for emergencies.

Although in accordance with Duty Officer SOPs, the DCRA Duty Officer was not expected to respond to emails outside of normal working hours, the DCRA Duty Officer (also the DCRA Housing Inspection Program Manager) failed to react to the request on Monday, March 25, 2019, or any date after that, when the DCRA Duty Officer resumed the regular duties of DCRA Housing Inspection Program Manager. Any DCRA inspector, including the Housing Inspection Program Manager, has a duty under DCMR[7] to respond

---

[7]   12A DCMR § 115.2: Examination and Record of Damaged Structure.  The code official shall examine every premises, including any building or other structure, reported as dangerous, unsafe structurally, or constituting a fire hazard, and shall maintain a record of unsafe premises, including any buildings or other structures, stating the use of the structure, and the nature and estimated amount of damages, if any, caused by collapse or failure.

12A DCMR § 115.3: Notice of Unsafe Structure or Equipment.  If any unsafe condition is found, the code official shall serve a written notice that describes the condition, identifies the structure or equipment deemed unsafe, and specifies the required repairs or improvements to be made to abate the unsafe condition or requires the unsafe structure to be taken down and removed within a stipulated time.

---

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

to any building reported as dangerous. In an interview with A&M, the DCRA Duty Officer did not recall receiving the email from the DCRA Community Outreach Specialist, seeing it for the first time after the fire occurred. According to the DCRA Duty Officer, the high volume of email requests received prevented response to the request made by the MPD Officer.  The DCRA Duty Officer also stated that the email that was forwarded did not indicate that there was an urgent issue to respond to and was outside of the realm of responsibilities because it dealt with the business licenses associated with that property, which is an Investigations issue. A&M's review found the complaint to meet the criteria outlined by DCMR requiring inspection by DCRA.

**The DCRA Duty Officer's failure to act on a report that indicated 708 Kennedy was unsafe, and failure to route the provided information into DCRA's system for review was DCRA's second failure to properly report, respond to, and address the unlicensed rooming house and unsafe conditions reported at 708 Kennedy.**

3. *March 23, 2019 – FEMS Technical Section Lieutenant fails to include the attachment from reporting MPD Officer when forwarding to FEMS Inspection Lieutenant*

On the night of March 22, 2019, the FEMS Technical Section Lieutenant received the initial outreach request from the MPD Officer. On the morning of March 23, 2019, the FEMS Technical Section Lieutenant forwarded the email reply from the DCRA Community Outreach Specialist to the FEMS Inspection Lieutenant. Because the FEMS Technical Section Lieutenant forwarded the reply from the DCRA Community Outreach Specialist, rather than forwarding the original email from the MPD Officer, the PIR was not included in the forwarded email to the FEMS Inspection Lieutenant.

As a result, the forwarded email received by the FEMS Inspection Lieutenant only referenced information regarding the potential of an unlicensed rooming house at "5410 14th Street."[8] The FEMS Inspection Lieutenant then assigned only the "5410 14th Street" property referenced in the body of the email to an inspector.

---

[8]   Note: MPD Officer's initial report to DCRA and FEMS was communicated via email, which identified "Serious Code Violations" as the subject – the body of the email identified the address "5410 14th Street" and included an attached MPD incident Report which included details of violations in the 700 block of Kennedy, including: "violations by Fire Code and DCRA housing code violations"… "No Lighted Exited Signs; Fire Exit and the one Fire extinguisher was not tagged; no working smoke detectors. There are too many make shift doors with locks which would make it difficult to exit in an emergency." This email included a typo on the address of 5410 14th Street, this address was later determined to have been 5310 14th Street, NW.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

Between DCRA, FEMS, and MPD

**The FEMS Technical Section Lieutenant's failure to forward the original email with PIR attached was FEMS' first failure to properly report, respond to, and address the unlicensed rooming house and unsafe conditions reported at 708 Kennedy.**

> *4. Post March 23, 2019– FEMS Inspection Lieutenant fails to follow-up with FEMS Technical Section Lieutenant or MPD Officer on complaint. Ultimately takes no action to resolve complaint until after the 708 Kennedy Fire.*

When the FEMS Inspection Lieutenant received the forwarded email from the FEMS Technical Section Lieutenant, the only information included (due to the omission of the attachment) referenced a reported rooming house with no Certificate of Occupancy ("CofO") at "5410 14th Street." The FEMS Inspection Lieutenant could not recall whether or not a FEMS inspector reported to the property. Neither the FEMS Inspection Lieutenant nor any FEMS inspector took further action on the matter. FEMS did not contact the complainant (the MPD Officer) or the FEMS Technical Section Lieutenant who forwarded the complaint to verify details of the complaint. FEMS was unable to demonstrate any further action taken until after the 708 Kennedy Fire.

Though the forwarded email received by the FEMS Inspection Lieutenant did not have the PIR attached, the text of the email implied that there were multiple locations that required attention. The subject of the email reads "Serious Code Violations" and the text of the email reads "I also need an inspection of a dwelling residence located at 5410 14th Street…", implying that there was at least one other property needing the attention of FEMS.

In the aftermath of the 708 Kennedy Fire, the FEMS Inspection Lieutenant acknowledged that if FEMS had followed up with the MPD Officer regarding the "5410 14th Street" report, they may have identified and appropriately addressed fire safety concerns at 708 Kennedy.

An additional consideration related to this finding: The FEMS requirement for documentation of inspection activity stipulates that inspection activity is logged upon inspection completion. Because 708 Kennedy and 5410 14th Street were never inspected, the FEMS Inspection Lieutenant could provide no documentation demonstrating the complaint was assigned to a FEMS inspector or any inspection files, or evidence that an inspection was ever conducted or completed. Therefore, A&M was unable to determine whether an FEMS inspector had been assigned.

**The FEMS Inspection Lieutenant's failure to follow-up with either the reporting MPD Officer or the FEMS Technical Section Lieutenant was FEMS' second failure to properly report, respond to, and address the unlicensed rooming house and unsafe conditions reported at 708 Kennedy.**

---

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

### 5. April 24, 2019 – DCRA fails to assign case to a DCRA Investigator or enter the investigation into QuickBase

On April 24, 2019, the MPD Officer sent a second request to the DCRA Program Analyst asking for an investigation of the properties located at 708 Kennedy and 5410 14th Street. In the email with subject: "Investigator", the MPD Officer indicated that both properties had issues related to Certificates of Occupancy. The MPD Officer also requested an update on the two properties once the investigations were concluded. Upon receipt of the email, the DCRA Investigations Intake Analyst conducted a search of the Investigation Module and found that there were no open investigations for either address.

Shortly after receiving the request from the MPD Officer, the DCRA Investigations Intake Analyst forwarded the request to the DCRA Investigations Program Officer and DCRA Investigations Program Manager[9] so that the cases could be assigned to an investigator. At this time, there is no evidence that either the DCRA Investigations Program Manager or DCRA Investigations Program Officer replied to this information and no investigator was assigned. Between April 24, 2019 and May 22, 2019 there was no action taken on 708 Kennedy.

**The DCRA Investigations Program Officer's and DCRA Investigations Program Manager's failure to monitor and respond to the April 24, 2019 investigation request was DCRA's third failure to properly report, respond to, and address the unlicensed rooming house and unsafe conditions reported at 708 Kennedy.**

### 6. May 22 – 24, 2019 – DCRA 708 Investigator performs limited investigation of 708 Kennedy with inadequate documentation of work performed

On May 21, 2019, the DCRA Investigations Program Manager assigned the DCRA 708 Investigator via email to investigate 708 Kennedy after the MPD Officer followed up for a third time. The DCRA 708 Investigator failed to adequately investigate or document the case in line with DCRA best practices:

- The DCRA 708 Investigator stated that the DCRA 708 Investigator attempted to traveled to 708 Kennedy on three consecutive days (May 22, May 23, and May 24, 2019) and failed to gain access to the property. The DCRA 708 Investigator took pictures during the first visit on May 22, 2019 but could not provide documentation demonstrating that the attempts access the property on the other stated dates.
- The pictures taken of 708 Kennedy on May 22, 2019 depict the front of the house. Conversations with other DCRA investigators indicated that it is a best practice to take photos of all publicly-

---

[9]   When forwarding this request, the Program Analyst communicated the corrected address of 5310 14th street NW.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

> accessible portions of a property including the rear facing side of a property and of any specific evidence that would indicate a violation of any kind.

- At no point prior to, during, or after the investigation did the DCRA 708 Investigator attempt to contact the MPD Officer who generated the PIR. The DCRA 708 Investigator failed to follow up with the MPD Officer despite a specific request from the MPD Officer on June 3, 2019, and a follow-up email on June 11, 2019 from the DCRA Investigations Intake Analyst reminding him to follow up with the MPD Officer.
- The DCRA 708 Investigator stated that the DCRA 708 Investigator created a case file for 708 Kennedy but that the case file was lost when parts of DCRA physically moved office spaces in August of 2019.
- The DCRA 708 Investigator failed to create a record of 708 Kennedy in the Pilot CRM or QuickBase System despite clear instructions to use the system beginning in February 2019.
- The DCRA 708 Investigator failed to note any observations regarding 708 Kennedy in the QuickBase System and the property was not tracked in the Investigations Module until June 12th when it was entered into the system by the DCRA Investigations Program Officer.
- The DCRA 708 Investigator made no attempt to obtain an administrative search warrant for 708 Kennedy despite the firsthand account provided by the MPD Officer in the PIR and history of maintenance, safety, and unlicensed rooming house complaints at 708 Kennedy provided in ACCELA.[10]
- In an interview with A&M, the DCRA 708 Investigator stated that the DCRA 708 Investigator sent a letter to the owner and left a business card on the door of 708 Kennedy. However, there is no evidence that the DCRA 708 Investigator made these attempts in DCRA's systems of record and no evidence that the DCRA 708 Investigator was able to contact the tenants living on the property or nearby neighbors.

**The DCRA 708 Investigator's failure to properly conduct and document the investigation into the unlicensed housing complaint related to 708 Kennedy was DCRA's fourth failure to properly report, respond to, and address the unlicensed rooming house and unsafe conditions reported at 708 Kennedy.**

*7. July 26, 2019 – DCRA suspends the investigation into 708 Kennedy by July 26, 2019, without appropriate documentation and approval. DCRA does not consider the investigation into 708 Kennedy an active investigation as of August 2, 2019*

In June 2019, the DCRA Investigations Program Officer was promoted to act as DCRA Investigations Program Manager. According to the DCRA Investigations Program Officer, the workload of the new position was so overwhelming that the DCRA Investigations Program Officer asked the DCRA 708

---

[10]   A&M has included a summary of the ACCELA event history for 708 Kennedy in *Appendix A.*

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

Between DCRA, FEMS, and MPD

Investigator to assist with the administration of investigations, promoting the DCRA 708 Investigator to "Lead Investigator." The created Lead Investigator position is not an official position within DCRA and did not have an SOP at the time of the 708 Kennedy Fire. There is not an SOP for the Lead Investigator position in DCRA's new Consumer Protection Agency SOP released on September 24, 2019. As a result of the new duties associated with the Lead Investigator role, the DCRA 708 Investigator was not actively investigating 708 Kennedy. During this time, the DCRA Investigations Program Officer and DCRA 708 Investigator tracked investigations in an offline spreadsheet, allowing the DCRA Investigations Program Officer and DCRA 708 Investigator to suspend and close cases without oversight.

On July 26, 2019, the DCRA Investigations Program Officer and DCRA 708 Investigator agreed to suspend the investigation into 708 Kennedy without any documentation of approval or the reason for suspension. One week later, on August 2, 2019, the DCRA Investigations Program Officer identified the investigation of 708 Kennedy as an investigation that should not be included in the count of open investigations for DCRA's report of open consumer complaints, effectively counting the investigation as closed in performance metrics without authorization or documentation.

**DCRA's actions to mark an open case as suspended without meeting any criteria for documentation or approval allowed the 708 Kennedy issue to go unaddressed from at least July 26 until August 16, 2019. The suspension of the investigation into 708 Kennedy was DCRA's fifth failure to properly report, respond to, and address the unlicensed rooming house and unsafe conditions reported at 708 Kennedy.**

### 8. *August 16, 2019 – DCRA closes investigation case into 708 Kennedy without a case file and without a signature of approval*

According to the DCRA Investigations Program Officer, on August 16, 2019 the 708 Kennedy Investigation was closed by the DCRA 708 Investigator overseeing the case, despite the issues highlighted in *Finding 6*. The DCRA 708 Investigator, and the DCRA Investigations Program Officer overseeing the case at the time, agreed (verbally) to close the case despite a lack of a case file and any supporting evidence gathered during the investigation, as required by internal documents.[11]

**The DCRA 708 Investigator's failure to properly document the investigation of 708 Kennedy, and the DCRA Investigations Program Officer's failure to appropriately review and validate completion of the investigation was DCRA's sixth failure to properly report, respond to, and address the unlicensed rooming house located at 708 Kennedy.**

---

[11]   Per DCRA memo dated December 17, 2018 titled "Investigative Report Submission Process" outlined a detailed process for documenting all reports.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

### 9. *Despite the MPD Officer's persistence, contacting six different DCRA employees on five occasions over the course of three months, no DCRA employee ever entered the case into the Pilot CRM*

On February 14, 2019, DCRA rolled out its new Pilot CRM system. With the rollout of the new system, DCRA communicated the expectation that all customer inquiries and complaints would be tracked through the centralized system to ensure expedient response and accountability throughout the agency. DCRA did not instruct employees to use redundant recording/communications methods to ensure continuity and, as such, designated the Pilot CRM as the system of record. Prior to the 708 Kennedy Fire, DCRA staff were unclear on the expectations or requirements associated with using the Pilot CRM. As a reflection of this lack of clarity, even the Community Outreach Specialist (who was named in rollout communications as a member of the "account management team" responsible for routing inquiries through the system) failed use the system to log the complaint related to 708 Kennedy.

Between March 22, 2019, and June 3, 2019, the MPD Officer communicated via email five times with six different members of DCRA requesting that investigators be sent to 708 Kennedy. Please see the details of those calls below:

- March 22, 2019: MPD Officer emails DCRA staff with email subject: "Serious Code Violations." DCRA Staff recipients include: a DCRA Business Licensing Specialist, a DCRA Program Manager, a DCRA Business License Manager, and the DCRA Community Outreach Specialist. None of the emailed DCRA staff member enters the request for an investigation at either property into the Pilot CRM.
- April 18, 2019: MPD Officer emails a DCRA investigator (not the DCRA 708 Investigator) requesting that investigators be sent to 708 Kennedy and 5410 14th Street. The MPD Officer makes this request after first requesting business license information related to multiple businesses in the District. Though the DCRA investigator states that the MPD Officer should direct this request to the intake officer, the DCRA investigator does not enter the request into the Pilot CRM.
- April 24, 2019: MPD Officer emails the DCRA Investigations Intake Analyst requesting that an investigator respond to 708 Kennedy and 5410 14th Street. Though the DCRA Investigations Intake Analyst checks to see if there are open cases at the two properties and forwards the request to the DCRA Investigations Program Officer and DCRA Investigations Program Manager, the DCRA Investigations Intake Analyst does not enter it into the Pilot CRM. The DCRA Investigations Program Manager and DCRA Investigations Program Officer also do not enter the request into the Pilot CRM.
- May 21, 2019: MPD Officer emails the DCRA Investigations Intake Analyst to follow up on the initial request for an investigation at 708 Kennedy and 5410 14th Street. Though the DCRA Investigations Intake Analyst follows up with the DCRA Investigations Program Officer and DCRA Investigations Program Manager, which leads to the case being assigned to the DCRA 708

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

Investigator, the DCRA Investigations Analyst does not enter it into the Pilot CRM. Neither the DCRA Investigations Program Manager, the DCRA Investigations Program Officer, or the assigned DCRA 708 Investigator enter the request into the Pilot CRM.

- June 3, 2019: After receiving confirmation that the 708 Kennedy case has been assigned, the MPD Officer requests that the DCRA 708 Investigator follow up once the case is closed. The DCRA 708 Investigator does not enter the case into the Pilot CRM. The DCRA Investigations Intake Analyst, who is also copied on this email, does not enter the case into the Pilot CRM.

In addition to these specific requests from the MPD Officer, there were multiple intra-agency communications. Ultimately nine DCRA employees were made aware of the request for an inspection/investigation at 708 Kennedy Street and 5410 14th Street between March 22, 2019 and June 3, 2019. Despite the DCRA requirement that all complaints be entered in the Pilot CRM, neither case was ever entered in the Pilot CRM. Failure to use the designated system for tracking customer complaints resulted in multiple opportunities for human error – in each of these opportunities for error in appropriately tasking and following-up on the complaint related to 708 Kennedy, human error prevented interventions.

The Pilot CRM system is pending replacement by a new enterprise CRM system, however, DCRA had communicated the expectation that it be used as the system of record for all incoming customer communications, including investigations. All nine employees failed to use the specified system of record to record customer inquiries or complaints about 708 Kennedy.

**The failure of nine individual DCRA employees to enter the request for investigation at 708 Kennedy into the Pilot CRM is the seventh DCRA failure to properly report, respond to, and address the unlicensed rooming house located at 708 Kennedy.**

### C.   Observations

Many factors contributed to the failure of the District Agencies to remedy the concerns identified by the MPD Officer. **In addition to the findings outlined above, A&M observed underlying issues which have contributed to or could contribute to failure to remedy unsafe buildings and unlicensed rentals.** These observations are outlined below across four categories: 1) Communications and Coordination Across Agencies, 2) Systems Maturity and Utilization, 3) DCRA Investigations Management, and 4) Unlicensed Property Oversight.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

## Communications and Coordination Across Agencies

### 1. DCRA, FEMS, and MPD lack clear communication channels and processes for reporting, collaborating and following-up on reported code violations

The channels through which information flows between the District Agencies are generally informal. Collaboration between officials across agencies is consistently relationship-based, no clear protocol existed to govern this communication, and centralized systems offered by the OUC were not consistently utilized. Specifically, in communications from the MPD Officer to DCRA and FEMS, the use of informal communications via email to individuals not directly responsible for responding to code violations contributed to several communication failures which factored into DCRA's and FEMS's insufficient response to reports of unsafe conditions at 708 Kennedy. For example:

- Initial communications from the MPD Officer on March 22, 2019 only addressed the findings at 708 Kennedy in the PIR attached to the email.  However, the PIR only referenced the 700 Block of Kennedy Street, so the specific address of 708 Kennedy was not mentioned in either the body of the email or the attachment.
- Follow-up email communications from the MPD Officer to DCRA employees did not communicate directly that unsafe conditions required immediate action.
- There is no evidence that the DCRA 708 Investigator communicated with the MPD Officer about the reported violations at 708 Kennedy to either clarify details of the PIR or to provide feedback regarding the findings.
- None of the communications from the MPD Officer to DCRA or FEMS mentioned the bodycam footage that the MPD Officer took of the interior of the property.

Recipients of the email from the MPD Officer were unaware as to why they were included on the March 22, 2019 email.  Many DCRA personnel interviewed consistently pointed to a failure of MPD to follow the appropriate channels as a contributing factor to DCRA's failure to recognize and address the severity of conditions at 708 Kennedy. However, MPD had no clear policies on how these issues should be communicated to sister agencies and DCRA was unable to point to any communications, memorandum, or policy which communicated the "appropriate channels" to outside agency partners. DCRA systems and policies in place at the time of the initial reporting and follow-up on 708 Kennedy included no functionality or clear requirement to communicate with complainants to either verify the details of the complaint or inform complainants of status or resolution of their complaints. This lack of "feedback loop" functionality provided insufficient information to key partner agencies and contributed to a lack of accountability regarding the appropriate conduct and finalization of investigations.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

Between DCRA, FEMS, and MPD

### 2. *Lack of responsibility and ownership of building safety issues across multiple agencies*

In interactions between DC government agencies related to building safety issues, protocols around task ownership are unclear and not well-understood by agency employees. As a result, inquiries and requests for investigation can go unaddressed, as in the case of 708 Kennedy. The 708 Kennedy response was an example of a complex situation with aspects that could be addressed by either FEMS or DCRA. However, DC code is not written to clearly outline what should happen in cases where jurisdiction over a matter is unclear.

Under 12A DCMR § 115.2 / 115.3 of the Building Code – DCRA is obligated to inspect the premises of any building reported as dangerous. In the case of 708 Kennedy, DCRA failed to verify that the premises had been inspected and the dangerous building remained occupied. FEMS is responsible for the administration of the Fire Protection Code (Under DCMR 12H), except approval, inspection, and testing of new and existing fire protection systems. The violations at 708 Kennedy which were identified in the MPD Officer's PIR included issues in the jurisdiction of both DCRA Investigators and Fire Inspectors. F-108.2 is the only section within the Fire Protection Code specifying coordination of inspections and stipulates that code enforcement officers must seek to minimize the number of visits by code officers:

> *If more than one code official is required to enforce any provision of the Fire Prevention Code or another code or ordinance, it shall be their collective duty to coordinate their inspections and administrative orders as fully practicable so the owners and occupants of the structure shall not be subjected to visits by numerous Inspectors nor multiple or conflicting orders.*

It goes on to stipulate that, "Whenever an Inspector from any agency or department observes an apparent or actual violation of a provision of a law, ordinance or code of the District of Columbia not within the Inspector's authority to enforce, the Inspector shall report the findings to the code official having jurisdiction." [12] DC government has no specific code or authority which provides directions or guidance on expectations for inspection of properties and mitigation of multi-jurisdictional violations, or ownership of responsibility for these issues.

The initial report of the serious code violations at 708 Kennedy sent by the MPD Officer via email to DCRA and FEMS employees included several findings of violations related to the safety of the building, in areas related to both building code and fire code. When the initial complaint from the MPD Officer was sent on March 22, 2019, it was received by both DCRA and FEMS, and recipients at each organization (DCRA

---

[12]   https://os.dc.gov/sites/default/files/dc/sites/os/publication/attachments/OS_DCMR_12H_Fire_Code _Supplement.pdf

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

Community Outreach Specialist and FEMS Technical Section Lieutenant) forwarded the email on and performed no additional follow-up. In both instances, the initial point of contact in receipt of the complaint assumed no further responsibility after forwarding the email. Neither DCRA nor FEMS took proactive steps to ensure that the complaint was appropriately registered, assigned, or resolved, nor did they receive confirmation of receipt of the forwarded request for investigation. In both examples, an unclear assignment of ownership over incoming complaints let the issue go unremedied. Had it not been for the MPD Officer's persistence, the issue would have never been reviewed any further by either FEMS or DCRA.

## Systems Maturity and Utilization

### 3. DCRA's Pilot CRM and Investigations Module are inconsistently used, and lack functionality to enhance accountability

Over the last year, DCRA has been developing a set of tools to support its staff, including the Investigations team, in the execution of their responsibilities.  These tools include a pilot CRM system through which all customer complaints are intended to be logged, routed, and tracked to completion and a module within the QuickBase system for investigators, the Investigations Module, which records the status of each case and serves as the system of record for cases like 708 Kennedy. DCRA has invested significantly in developing the Pilot CRM which is currently in place as a central source of communication for incoming customer interaction requiring follow-up. Treating the current system as a pilot program, soon to be replaced by a more robust system, DCRA has secured a vendor to build an Enterprise CRM which will have significant functionality beyond the pilot version currently utilized. This Enterprise System, when fully implemented, is intended to seamlessly integrate with the Investigations Module to convert leads into cases with minimum manual effort.

DCRA management has indicated that the Pilot CRM system was rolled out in early 2019, and shared documentation demonstrating DCRA-wide implementation in February 2019. This pilot system was implemented prior to the initial 708 Complaint; however, interviews with staff reflect their understanding that the Pilot CRM system was not fully-implemented at this time and was not used to track the case. With no central reporting system, reporting and assignments associated with 708 Kennedy were routed informally, via email, with no official log of the complaint or subsequent actions, and no process in place to require follow-up with the original complainant. This lack of systematized tracking contributed to DCRA's failure to act on the report of 708 Kennedy for over a month until the MPD Officer reached out to follow-up on the initial complaint. If not for the MPD Officer's continued outreach, the 708 Kennedy complaint would not have been reviewed or acted upon.

Despite the case assignment on May 21, 2019, the complaint was not entered into the Investigations module of QuickBase until June 12, 2019. DCRA's system for tracking the progress of investigations was

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

Page | 42

BETWEEN DCRA, FEMS, AND MPD

not kept up-to-date with the most recent activities, but rather, a copy of this log exported to the DCRA Investigation Program Officer's desktop known as the "Regulatory Investigation Database" was used to maintain status until the system was updated. Throughout the process of responding to the 708 Complaint, DCRA staff continually used informal methods outside the system of record to track the progress of investigations activities. Not only does this mean that at no time during the investigation could leaders within DCRA directly access the current status of the case, but it also means that important points of documentation such as the dates of visits and communications were not included in the systems of record for communications (Pilot CRM) or investigations (Investigations Module).

DCRA staff indicated that though only a few individuals were authorized to close cases, the Investigations Module does not have user roles configured to reflect these permissions. In its current configuration, the QuickBase system allows any user with access to the Investigations Module to update case status to any status, including "suspended" or "closed." This lack of user controls over systems weakens DCRA's ability to oversee investigations and appropriately control case status.

In addition to the limitations associated with the use of the Pilot CRM and Investigations Module, DCRA's practices in use of common workplace tools like email are not best aligned to supporting responsiveness and accountability. At the time of the initial 708 Complaint, DCRA relied on personal inboxes for communications which could be better served by a shared in-box with "around the clock" monitoring responsibilities. Designating a shared method of contact for inter-agency and external referrals can increase visibility and accountability.

### 4. FEMS use of the Zoll system does not support transparency and accountability for the handling of complaints

Like DCRA, the Fire Inspection Service of FEMS receives many incoming calls and emails which require coordination between multiple personnel and leaders, and which often reflect urgent and potentially life-threatening conditions in buildings across the District. To track these reported violations, FEMS uses its Zoll inspection tracking system.  However, interviews with FEMS employees reveal that the inspections are only updated in the system by the FEMS inspectors after they have visited the property.  Once a complaint is received by a FEMS employee, it is typically forwarded to the Administrative Officer in charge of Fire inspector assignments, who then assigns cases to FEMS inspectors. However, current procedures require no record of the assignment until after an inspector has visited the property.  FEMS leadership communicated a clear expectation throughout the organization that complaints related to building safety need to be evaluated, in-person within 24 hours of receipt, but without clear and centralized documentation of intake, there is no way to verify that this metric is being met. In the case of 708 Kennedy, upon initial receipt of the complaint on March 22, 2019, two FEMS recipients forwarded the email without the attachment to the FEMS Inspections Lieutenant. Given that 708 Kennedy was only referenced in the attachment, the FEMS Inspection Lieutenant did not have necessary information to be aware of or to

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

Page | 43

BETWEEN DCRA, FEMS, AND MPD

assign an inspector to visit that property. Prior to the fire, FEMS only logged complaints once a FEMS inspector visited the site related to the complaint. An immediate decision not to follow-up on a complaint resulted in no record of the complaint being recorded and led to no further action being taken on the complaint. This lack of a formal system for handling incoming complaints and documenting decisions not to pursue complaints reduced the accountability of staff and limited visibility into the history of complaints and their handling. Without a process to track all complaints received, and the action in response to those complaints, FEMS Fire Inspection Service leaders had limited visibility or oversight into decision-making of individual complaint recipients. Note: Effective August 23, 2019, FEMS' implemented GO 502 (Complaint Procedures), establishing level of review and approval required for complaints and referrals, documentation required, follow-up protocol with appropriate agency, and emergency procedures.

### 5. Systems access is limited within and across District Agencies

During A&M's interviews at DCRA, employees maintained a strong awareness of the narrow scope of control ascribed to their role within DCRA and the organization's role in the code enforcement process. Particularly, DCRA investigators communicated that they were explicitly prohibited from attempting to inspect or investigate issues related to Housing Code, which would need to be addressed by DCRA inspectors. DCRA roles are compartmentalized between groups, so not all investigators have knowledge of Housing Code requirements or the systems used to track and assess adherence to these requirements.

Although specialization in these roles can support the development of expertise in a domain of knowledge, the division between roles at DCRA has contributed to a lack of communication, ownership over responding to and referring complaints, and resource sharing between inspectors and investigators. The systems of record for inspections (ACCELA) and investigations (Investigations Module) both could serve as resources to all inspectors and investigators at DCRA, however, inspectors have no access to investigative systems and not all investigators, as a matter of procedure, access DCRA inspections records.

In the case of 708 Kennedy, the DCRA 708 Investigation performed an investigation at 708 Kennedy without first accessing and reviewing the long history of property complaints against the property. Additionally, despite a wealth of data in ACCELA which could be useful to public safety officers, neither FEMS nor MPD has access to the system.

External to DCRA no formal cross-training on issues of zoning and building code exists for the staff of other agencies who regularly access the District's residences and businesses. As a result, many MPD and FEMS first responders are not empowered to assist DCRA. In the case of 708 Kennedy, the MPD Officer who identified and reported the code violations had been enrolled in a discontinued 2003 cross-enforcement training program that trained the officer to identify and report code violations. This training is not common among MPD and FEMS first responders in the District.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

Additionally, several DCRA staff and leaders suggested that the lack of adherence by internal staff and external agency partners (MPD Officer) to the DCRA Duty Officer SOP contributed to DCRA's lack of appropriate response to complaints and inquiries. However, on review of communications documentation, DCRA leaders were unable to identify widespread distribution or communication of these procedures or related expectations.

### 6. Audit log unavailable for DCRA complaint and investigations tracking applications

A&M reviewed records of complaints, inspections, and investigations throughout DCRA's systems. Using ACCELA, A&M was able to clearly understand the permitting and inspection history for the property at 708 Kennedy and view a detailed list of activities and status changes as recorded in the system dating back over 25 years. This detailed log, which included timestamps and user identification for each entry and status change was easily accessed and shared by DCRA staff in response to A&M's initial data request. The level of detail of these records, and ease of access reflects a mature IT system which supports accountability and auditability and allows DCRA employees to readily access relevant information in line with best practices for IT systems. The A&M team requested similar logs for all events and activities in the QuickBase system, which includes both the Customer Relationship Management and Investigations Modules. Despite several requests over the course of our investigation, DCRA was unable to produce any activity log or other serviceable record of either Pilot CRM or investigations activity in QuickBase. The absence of detailed, auditable logs of activity can hinder the ability of an organization like DCRA to manage employee workloads and impedes the ability of internal or external auditors to evaluate organizational effectiveness. Without this timestamped log, A&M had to rely upon unofficial offline versions of the logs which were exported and emailed between DCRA staff as a record of status changes. Not only does this lack of auditable log limit backward-looking transparency, but it makes it impossible to verify that employees are only taking actions that they are appropriately authorized to make.

In interviews, the A&M team learned that not only does the Investigations Module lack an accessible audit log, but it includes no user-role based controls, which are used in IT systems to permit only appropriately authorized individuals to take certain actions.

### DCRA Investigations Management

### 7. Lack of continuity of DCRA Investigations management personnel allowed the 708 Kennedy case to remain unresolved

DCRA's Investigations unit's management team was in transition during the events leading up to the 708 Kennedy Fire. When the DCRA Investigations Program Manager was removed from the role in June 2019, the DCRA Investigations Program Officer was promoted to act as the program manager. The DCRA

---

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

Investigations Program Officer made a concerted effort to improve systems and processes, but the workload assumed by DCRA Investigations Program Officer responsibilities was overwhelming, so much so that the DCRA Investigations Program Officer asked the DCRA 708 Investigator to step into a new role supporting him as Lead Investigator. Through this interim assignment of assisting the DCRA Investigations Program Officer with the administration of investigations, the DCRA 708 Investigator was pulled off field work and the DCRA 708 Investigator's open investigations were put in a "suspended" status, meaning they were not being actively worked by an investigator.

During this transition, both the DCRA Investigations Program Officer and DCRA 708 Investigator acknowledged being too busy with administrative duties to invest any additional time in the 708 Kennedy Investigation. Further, no specific leadership training or support was offered to either employee as they took on additional responsibilities without transitioning out of old responsibilities. DCRA did not proactively plan to ensure continuity through leadership changes and did not provide the additional resources or oversight necessary to aid the transition of the leadership of the Investigations Division or ensure that the workload of the new group leaders was sufficiently addressed before pulling them away from the line. Additionally, this difficult transition was exacerbated by the absence of the DCRA Investigations Program Officer due to pre-planned vacation shortly after assuming the new role. A lack of continuity in the leadership of the Investigations Division contributed to several shortfalls in accountability, oversight, and follow-up on the 708 Kennedy case in the months leading up to the fire.

### 8. Limited formal training or job requirements for investigators

The position of investigator within DCRA is critical to verifying that District businesses are operating within the specifications of their permits. A small team of 12 investigators is tasked with monitoring compliance for the entire District. However, during interviews and document review, A&M learned that, at the time of the 708 Kennedy Fire, no formal training specific to the requirements of the District or inspections background was required for investigators. New hires take an external training course through a third-party provider and learn through "shadowing" and on-the-job training during as little as one investigation.

Not only does this this lack of formal, DC-specific training significantly increase the risk for error in day-to-day work, it leaves investigators with varying expectations on the extent of their responsibility and authority. This limited training period does not empower investigators to support other DCRA missions, such as verifying code compliance or identifying illegal construction.  In addition to a lack of formal training, DCRA Investigations had no formal SOP stating specific requirements for what steps are required for an investigator to appropriately follow-up on a complaint, or even mark as case as closed. This process relies on the experience of the investigator and the trust and oversight of one program manager. Without formal expectations, investigators may err on the side of leniency in areas where they are unclear on legal requirements, they may fail to perform activities consistently due to the lack of clear requirements, and

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

they may not perform and document all investigations to the level of service required to fulfill the agency's mandate.

### 9.  No process for prioritizing properties for investigation

At the time that DCRA received the 708 Complaint from the MPD Officer, DCRA had no clear process or approach for prioritizing properties for investigation or inspection. The 708 Complaint filed by the MPD Officer reflected that the building was being used outside of its authorized use, serving as a rooming house rather than a pharmacy, and noted violations of both DC Housing and Fire Codes. The details of this initial report were severe enough to necessitate inspection for both housing and fire code violations and investigation of building use. Additionally, a review of the history of issues at 708 Kennedy identified that the building had several past issues and reports, including:

- Several cases of unsafe conditions at the rear of the building related to:
  - Unsafe shed structure
  - Trash and debris
- Complaints that the building was being used as an unlicensed rooming house in 2003 and 2004, both of which were followed up with attempted enforcement action in 2008.

**For additional information on the history of issues at 708 Kennedy, refer to *Appendix A*.**

By the time that DCRA registered the most recent complaints from MPD (April 2019) the property had been the subject of several violations and infractions and had generated enough concern that an MPD Officer reached out several times on the property. Despite a history of problematic reports, and a police report and subsequent follow-up which communicated risks, this property was not prioritized by investigators. In interviews with DCRA employees, A&M confirmed that prior to the 708 Kennedy Fire DCRA had no formal standards for escalating property investigations as urgent unless they have a clear reason to believe that the structure poses an immediate threat of collapse.

### 10. Oversight and accountability over investigations is limited

The missteps outlined in the *Findings* section above arose not only from individual failures, but from an overall lack of personal and organizational accountability within DCRA's Investigations Division. The work of investigators throughout the timeline of events leading up to the 708 Kennedy Fire was not consistently overseen by Program Managers, and in the course of managerial transitions, several opportunities to intervene in the case were missed. DCRA's Investigations Division required no standardized mandatory reporting of activities during investigations, and DCRA leadership had established no process for auditing, or even verifying completion of work associated with cases which have been marked as suspended or closed. The DCRA Investigations Program Officer (who had been in-position for less than six months when the 708 Kennedy Complaint was received) relied on personal trust of investigators to perform appropriate follow-up, rather than any enforcement of standards, review of work product, or auditing of work

---

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

performed. In the case of 708 Kennedy, the DCRA Investigations Program Officer trusted that the DCRA 708 Investigator had appropriately attempted to contact the property owner, documented the investigation, and closed the case due to an inability to verify the complaint after taking reasonable steps to investigate. Upon later review, the DCRA 708 Investigator could provide only photos of the front of the building from one visit and had no record of visiting the property multiple times or checking at other points of entry. The DCRA 708 Investigator never visited the back side of the property and was unable to provide any record of the subsequent visits or attempts at communication. Not only had the DCRA Investigations Program Officer not verified completion of this investigation, but no program of sampling or review had been established at the time of the fire. Additionally, DCRA had no internal audit function as an organization. Without holding investigators to standards for due diligence and documentation, DCRA had no way of knowing whether properties like 708 Kennedy or other similar properties across the District had been appropriately investigated. The absence of an internal audit function within DCRA elevates the risk that process failures could go unchecked within the Investigations Division or elsewhere.

## Unlicensed Property Oversight

### 11. District Agencies have limited resources and authority related to unlicensed rental properties

DCRA has very limited ability to investigate or inspect commercial or residential properties which are suspected to be used outside of their licensure. No Certificate of Occupancy or housing inspection is required for single family rental units. Under DCRA's current processes for receiving a BBL application, a landlord can receive a BBL by self-certifying compliance using the One Family Dwelling Basic Business License Self Certification Form. The responsibility to ensure the safety of the property rests entirely on the owner. In instances where an owner is operating a rental unit which is not in compliance with DC Housing Code, owners may opt not to request an inspection. DCRA's process for inspecting or investigating properties for use outside of their CofO's stated use is wholly reliant on self-reporting by landlords, or complaints by tenants and members of the community. DCRA does not take active preventive measures to identify unlicensed rental units offered for lease are compliant with building code or other consumer protections.

Like the CofO process for rental units, which relies on owners of single-family rental units to ensure the safety of their property, the business license process for commercial properties places the onus on business owners to request an inspection when the use of their business changes. A business owner operating one business (for example, a pharmacy) can maintain a CofO for that business indefinitely with no recurring inspections. In the case of 708 Kennedy Street, the CofO for a Pharmacy, and later for Cigarette sales stood for over 25 years while the business was converted to serve as a seamstress shop and unlicensed rooming house. This system of self-reporting for businesses puts DC residents and customers at risk of unsafe properties and leaves a significant accountability gap for DC property owners

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

who seek to change their business offering and/or building configuration. DCRA relies on complaints from neighbors, tenants, and members of the public as the primary check on the safety of small business establishments. Deterrents to the inappropriate use of buildings are clearly limited in their effectiveness, as the "Walker Pharmacy" at 708 Kennedy was twice identified as an unlicensed rooming house prior to the 2019 sequence of events, and DCRA never shut down the business.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

## V. RECOMMENDATIONS

### A. Introduction

In accordance with the SOW, A&M has developed recommendations to address the underlying issues identified in Section IV (Findings and Observations) of this report. These recommendations have been informed by best practices utilized by corresponding agencies in other metropolitan cities.

A&M has also noted that the District Agencies have made a number of changes that should address, in part, many of A&M's recommendations provided below.  A&M has not reviewed the effectiveness of these changes but describes them in further detail in the following paragraphs.

### B. Relevant Improvements Made by District Agencies To-Date

Through changes to policies and procedures, training, and systems, the District Agencies have taken a number of steps which address, in part, many of the underlying issues noted in A&M's Observations.

The District Agencies will need to continuously assess the extent to which the steps taken to-date will address the accountability gaps.

#### 1. MPD

Subsequent to the Kennedy Fire, on September 3, 2019, the MPD issued the EO 19-005 to immediately standardize the MPD's process for communicating reports of code violations to FEMS and DCRA.  The Executive Order requires MPD Officers to immediately notify a supervisor who is then required to respond to the scene. The on-scene supervisor will notify the FEMS Fire Liaison Officer via OUC of the location and threat. The MPD Officer is also required to send an email to dcra@dc.gov, copying mpdcic@dc.gov, prior to end of shift and to complete the appropriate field report.

#### 2. FEMS

FEMS has updated its General Orders and, shortly after the Kennedy Fire, on August 23, 2019, FEMS issued a GO 502 (Complaint Procedures) which lays out a formal process for handling reported complaints, noting that that complaints will be forwarded to Administrative Assistant for logging/assignment and copied to Fire Marshal and Assistant Fire Marshal. The Administrative Assistant will log the complaint, assign a tracking number, and forward to Division Inspections Supervisor for inspector assignment. Inspector must speak with complainant or inspect location within 24 hours or the next business day. Administrative assistant shall log completed report and forward copy to Fire Marshal/Assistant Fire Marshal.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

### 3.    DCRA

A&M noted that, prior to the Kennedy Fire, DCRA had already taken steps to change its culture, including the way in which the agency communicates internally and with its customers.  Such changes include the following:

- Implementation of an eLearning system, launched in March 2019, to facilitate staff training and the socialization of SOPs
- Migration of the offline version of the Regulatory Investigation database into the Investigations Module.  This database provides reports on aging cases and a more centralized process for tracking investigations.
- Issuance of an RFP in July 2019 for the Enterprise CRM making it easier to find information across the agency.  The Enterprise CRM contract has been awarded to a vendor and systems development has begun.
- Issuance of an RFP in February 2018 aimed at changing the culture at DCRA ("Culture Change RFP").  The RFP was recently awarded to a vendor with a contract start date of September 12, 2019.
- Establishment of an internal audit function. A contractor was hired in summer 2019 to set up an internal audit function for DCRA.  In December 2018 and October 2019, DCRA approved job descriptions for a Compliance Specialist and Program Manager, respectively, to support the Internal Audit function.

Though no Investigation SOPs were issued prior to the 708 Kennedy Fire, the RIS team created guidance in December 2018 regarding the investigative report submission and approval. This information was disseminated to investigators in January 2019.   Prior to the 708 Kennedy Fire, DCRA was also in the process of creating SOPs for various roles within the organization and has subsequently issued a number of them including the CPU SOP issued on September 13, 2019.

### C.    Recommendations to Address Key Findings

The following table lists A&M's recommendations to address the Key Findings identified. This section, combined with the District Agency Recommendations to Address Observations below, should be used as a foundation to create an action plan for the District Agencies. Please note, the findings above are organized by the agency in which critical missteps occurs, however the recommendations below are directed towards the all of the District Agencies which could benefit from implementation of the recommendation.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

**Table 10 - Recommendations to Address Key Findings**

| # | Applicable Agency | Category | Description | Recommendation |
|---|---|---|---|---|
| F.1 | District Agencies | Systems | Improper Communication Channel Used to Contact Duty Officer | a) Systemize circulation of SOPs and require signatures acknowledging receipt and understanding. b) Create single point of intake for customer inquiries for each agency |
| F.2 | District Agencies | Systems | DCRA Duty Officer does not respond to request for investigation | a) System must support CRM case generation from email b) Update SOPs to provide guidance on expectations around receipt of emails c) Single inbox per agency |
| F.3 | District Agencies | Training | FEMS does not include PIR in forwarded email | a) Train employees to be more diligent in the forwarding of complaints to ensure that key information is not lost b) Require that relevant employees attempt to follow up with complainants to ensure that they have obtained a full understanding of the issue reported prior to acting |
| F.4 | FEMS | Systems | FEMS does not act or follow up on complaint | a) Configure FEMS tracking system to start tracking at complaint intake to increase accountability b) Refine SOP to clarify that follow up with complainant is required c) Systemize circulation of SOPs and require signatures acknowledging receipt and understanding. |
| F.5 | DCRA | Systems | DCRA fails to assign case to DCRA investigator or log case into QuickBase | a) System must support CRM case generation from email (note: repeated from F.2a above) b) Case Assignment should occur via the Pilot CRM, not via email |
| F.6 | DCRA | Systems | DCRA 708 Investigator performs limited investigation | a) Create required field in Investigations Module in QuickBase |

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

| # | Applicable Agency | Category | Description | Recommendation |
|---|---|---|---|---|
| | | | | b) Update DCRA Investigator SOP to establish higher standards of minimum required evidence/work per case<br>c) Require investigator, manager, and program analyst e-signature prior to suspension or closure of case |
| F.7 | DCRA | Systems | DCRA suspends case without documentation or approval | a) Require investigator, manager, and program analyst e-signature prior to suspension or closure of case<br>b) Institute user-role based permissions which allow only the appropriate supervisors to close cases |
| F.8 | DCRA | Systems | DCRA closes case without case file or signature of approval | a) Require investigator, manager, and program analyst e-signature prior to suspension or closure of case<br>b) Institute user-role based permissions which allow only the appropriate supervisors to close cases |
| F.9 | DCRA | Systems | DCRA Employees fail to enter case into Pilot CRM despite multiple outreach attempts from MPD Officer | a) Configure CRM system to support automated generation of CRM inquiries via email (note: repeated from F.2a and F.5a above)<br>b) Evaluate Training provided to DCRA employees around expectations of use of CRM |

### *F.1 District Agencies should establish a process to share and train staff on policies and procedures to ensure agency-wide adherence to policies.*

During the 708 Kennedy response, DCRA lacked the formal channels necessary to ensure understanding of essential policies and procedures by all agency staff. The lack of internal controls regarding the dissemination of the Duty Officer SOP prevented DCRA staff from utilizing the requisite reporting channels in the case of 708 Kennedy. A&M recommends:

a.   DCRA should implement a clear process for drafting, reviewing, and publishing SOPs, and training staff on those SOPs. DCRA should also require that staff receive training on long-standing SOPS that do not require updates. In addition to receiving training on current and new SOPs, DCRA

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

should require signatures from staff acknowledging receipt and understanding of new policies and procedures. In addition to the SOPs that DCRA is currently revising or creating, the agency should ensure that all current SOPs dealing with emergency situations are shared within the agency. Where appropriate, as in the case of the Duty Officer SOP, DCRA should consider sharing the SOP with partner organizations such as MPD and FEMS.

**Note:** DCRA has updated its SOP template and formalized the SOP approval process in January 2019, prior to the fire. All SOPs are currently available to staff members on DCRA's intranet site. DCRA has also indicated that staff members are trained on SOPs via the third-party eLearning platform.

b. District Agencies should develop a single point of intake for customer inquiries to prevent emergency requests going unaddressed. In addition to creating this system, agencies should collaborate to ensure that the single points of intake are clear across organizations to allow for referrals, requests for support, and support coordination efforts. To support this system, District Agencies should discourage employees from relying upon informal relationships to make requests to ensure that information is funneled through a single source.

**Note:** DCRA has established a customer referral phone line and online on-demand customer relationship management form (via the Pilot CRM System) which the public can use to directly submit complaints. However, A&M discovered in interviews that many DCRA employees receive a high volume of informal and formal requests via email. Prior to October 2019, DCRA's current Pilot CRM system did not support the automated creation of CRM records from an email. DCRA has improved the Pilot CRM system to address this system and indicated that the new Enterprise CRM system is in development and will eventually be able to automatically convert an email to a CRM record without human intervention.

### F.2 District Agencies should automate the creation of customer inquiry/complaint intake through designated shared resources to reduce the potential for human error.

DCRA does not have sufficient internal controls to ensure that every request made via email to DCRA employees is seen, triaged, replied to, and acted upon. This lack of controls creates possible scenarios where emergency requests sent via email could go unaddressed. A&M recommends:

a. DCRA should adopt a system that can automatically generate CRM records from email records. Currently, DCRA employees read emails and then manually enter case information into the Pilot CRM. A&M learned from various administrators in interviews that between high workloads and high volume of communications, that it is possible to overlook urgent requests. DCRA has recently awarded a contract for the implementation of a new Enterprise CRM. A&M recommends that the new enterprise system has the capability to automatically generate CRM records from emails.

---

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

b. DCRA should update SOPs for all its employees to provide guidance on the minimum level of service expectation regarding all forms of communication (i.e., expectations regarding responding to phone calls, referring information to internal and external parties, receiving case information, and email communication).

**Note:** In September 2019, DCRA published a new CPU SOP that provides in-depth expectations and timelines for DCRA employees around case intake, communication with the complainant, receiving and sending referrals to other agencies, and general processes for case investigations.

c. District Agencies and other DC Government Agencies should adopt a single intake inbox to ensure that all received requests are appropriately responded to, triaged, and acted upon in a timely manner. In addition, District Agencies should inform the general public and other DC Government Agencies on the most efficient way to route complaints – through a central email or direct entry into an online tracking system – in order to reduce the reliance upon informal communication (email) within DCRA.

**Note:** Currently, all District Agencies have single intake inboxes established. However, A&M found during its email review and interview process that employees were not aware of that a single inbox for each agency existed. There was also no evidence that employees were referring requests through the single inbox for each Agency to control the flow of information and request.

### F.3 District Agencies should train employees on best practices regarding information sharing and complainant follow up to ensure that all case information is made available.

Prior to the 708 Kennedy Fire, DCRA and FEMS did not require that employees responsible for intake, triage, assignment, investigation, or inspection of cases to follow up with the complainant. In the case of 708 Kennedy, the lack of follow up with the complainant delayed the investigation of the case. In addition, this issue created an information gap where the DCRA 708 Investigator performed an investigation without all available information.  A&M recommends:

a. District Agencies and other DC Government Agencies should implement training for all employees to ensure that key information is not lost in the intake, referral, or case assignment process.

b. District Agencies should edit SOPs to require that employees follow up with complainants in every case within specific time requirements to ensure that all information is available during the follow up District Agency action and to create accountability to the customer.

**Note:** DCRA published a new CPU SOP in September 2019 that provides in-depth expectations and timelines for DCRA employees around case intake and communication, follow-up, and close out processes with the complainant.

---

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

### F.4 FEMS should implement a new CRM system that begins tracking a new case as soon as a complaint is received.

Prior to the 708 Kennedy Fire, FEMS did not start tracking cases at the time a complaint was received. Instead, FEMS employees were instructed to start tracking cases once inspectors conducted an action at a property site. This system creates risk due to a lack of case oversight between the time a complaint is received and the first time an action is taken by an FEMS employee to address that complaint. A&M recommends:

a.  FEMs should configure its internal systems to begin tracking complaints when they are reported. In addition, the complaint intake system should integrate fully with the FEMS scheduling and case tracking systems.

    **Note:** Effective August 23, 2019, FEMS' implemented GO 502 (Complaint Procedures), establishing level of review and approval required for complaints and referrals, documentation required, follow-up protocol with appropriate agency, and emergency procedures. GO 502 lays out a formal process for handling complaints which includes recording the complaint prior to assignment to an inspector.

b.  FEMS should write and incorporate SOPs to require that FEMS employees follow up with complainants in every case within specific time requirements.

c.  FEMS should implement a clear process for drafting, reviewing, and publishing SOPs, and training staff on those SOPs. In addition to receiving training on new SOPs, FEMS should require signatures from staff acknowledging receipt and understanding of new policies and procedures. Where appropriate, FEMS should consider sharing the SOP with partner organizations such as MPD and DCRA.

### F.5 DCRA systems should automate the creation of CRM records to reduce the potential for human error.

Between March and August 2019, DCRA employees failed to either log the 708 Kennedy case in the Pilot CRM or into the Investigations Module despite multiple communications with the MPD Officer. The failure to input the case into the systems prevented DCRA managers from tracking the formal progress of 708 Kennedy. In addition, the DCRA 708 Investigator never received a systems-based notification stating that a case had been assigned. Without systems guiding case workflow, further room for human error is created. A&M recommends:

a.  DCRA should adopt a system that can automatically generate CRM records from email records. Currently, DCRA employees who receive written requests are required to manually enter cases into the CRM. Due to the volume of email traffic received by DCRA employees, this additional step

---

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

creates room for human error. DCRA has indicated that, in October 2019, the Pilot CRM was configured to generate a CRM record with the touch of a button.  DCRA has recently awarded a contract for the implementation of a new Enterprise CRM. A&M recommends that Enterprise CRM system have the capability to automatically generate CRM records from emails. (**note**: this recommendation is repeated from F.2a)

b.  DCRA Case Assignments should occur via CRM notifications that are prompted after a case has been created in CRM. DCRA Case Assignments should not be communicated via email.

### F.6 DCRA systems should be updated to provide additional levels of accountability over and visibility into case management.

DCRA systems lack oversight capabilities over the case investigation process. This lack of oversight can lead to improper or incomplete investigations being conducted, such as the case at 708 Kennedy. A&M recommends:

a.  DCRA should create required fields in the Consumer Complaints module in QuickBase to ensure that a minimum level of documentation, notes, and other evidence (photos, research, etc.) are provided for each case.

b.  DCRA should update the DCRA Investigator SOP to define the baseline requirements of a DCRA investigator for every case that she/he is assigned. These baseline requirements should inform the established required fields in QuickBase.

c.  DCRA should configure its systems to require e-signatures from the investigator, program manager or officer, and program analyst in the case file prior to the suspension or closure of an investigation.

### F.7 DCRA should require appropriate signatures and proper documentation prior to the suspension of an investigation.

DCRA lacks formal policies and procedures to govern the process by which an investigation can be suspended. For example, there are not clear criteria to define the situation in which a case suspension should be permitted or what type of evidence is necessary to finalize a suspension. A&M recommends:

a.  DCRA should configure its systems to require e-signatures from the investigator, program manager or officer, and program analyst in the case file prior to the suspension or closure of an investigation.

b.  DCRA should implement user-based permissions in the Investigations Module of QuickBase to ensure that cases are being closed appropriately in accordance with the designed workflow (i.e., Program Analyst closes all cases after receiving signature from Program Manager and

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

Page | 57

BETWEEN DCRA, FEMS, AND MPD

investigator.) The user-based permissions should limit the type of role that can close a case (i.e., DCRA investigators should be not permitted to close their own case in the Investigations Module).

### F.8 DCRA should require various signatures and proper documentation prior to the closure of an investigation.

DCRA lacks formal policies and procedures to govern the process by which an investigation can be closed. For example, there are not clear criteria to define the situation in which a case closure should be permitted or what type of evidence is necessary to finalize a closure. A&M recommends:

a. DCRA should configure its systems to require e-signatures from the investigator, program manager or officer, and program analyst in the case file prior to the suspension or closure of an investigation.

b. DCRA should implement user-based permissions in the Investigations Module to ensure that cases are being closed appropriately in accordance with the designed workflow (i.e., program analyst closes all cases after receiving signature from program manager and investigator.) The user-based permissions should limit the type of role that can close a case (i.e., DCRA investigators should be not permitted to close their own case in QuickBase).

### F.9 DCRA systems should automate the creation of CRM records to reduce the potential for human error.

Despite various announcements, memos, and in-person trainings, the Pilot CRM was not properly used by multiple DCRA employees after various communications with the MPD Officer. To eliminate the potential for human error, DCRA should implement a system that maximizes the automation of CRM cases from written complaints while also evaluating the training provided to DCRA employees around expectations of the use of the CRM. A&M recommends:

a. DCRA should adopt a system that can automatically generate CRM records from email records. Currently, DCRA employees who receive written requests are required to manually enter cases into the CRM. Due to the volume of email traffic received by DCRA employees, this additional step creates room for human error. DCRA has recently awarded a contract for the implementation of a new Enterprise CRM. A&M recommends that the new enterprise system have the capability to automatically generate CRM records from emails. (**note**: this recommendation is repeated from F.2a and F.5a)

**Note:** Based on discussions with the DCRA Director, it is evident that this is a long-term goal of the Enterprise CRM being implemented but that, in the short-term, the Pilot CRM will not have this capability.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

b. DCRA should review and evaluate the training and messaging provided to DCRA employees around the expectations of using the CRM. If DCRA determines that there are gaps in the training provided, DCRA should develop an action plan to ensure that all DCRA employees are familiar with and comfortable executing the necessary steps to maintain an agency-wide CRM.

## D.     Recommendations to Address Observations

The following table lists A&M's recommendations to address the Observations identified in Section IV.C of this report.  This section combined with the Agency Recommendations to Address Key Findings above can be used as a foundation to create an action plan for District Agencies (DCRA, FEMS, MPD). Additionally, broader reforms which may require District-wide collaboration, or legislative reform have been identified as recommendations to "DC Government".

**Table 11 - Recommendations to Address Observations**

| # | Applicable Agency | Category | Description | Recommendation |
|---|---|---|---|---|
| O.1 | District Agencies | Communications and Coordination | DCRA, FEMS and MPD lack clear communication channels and processes for reporting, collaborating and following-up on reported code violation | a) Establish policies which require consistent communications <br> b) Implement basic housing and fire code training at FEMS and DCRA <br> c) Implement basic code training at MPD <br> d) Establish a complainant feedback loop at DCRA and FEMS |
| O.2 | District Agencies | Communications and Coordination | Lack of responsibility and ownership of building safety issues across multiple agencies | a) Provide MPD and FEMS access to the central online database <br> b) Generate a cross-agency reference guide of common violations in the District <br> c) Consider implementing a policy requiring the initial complaint recipient immediately register the complaint. |
| O.3 | DCRA | Systems Maturity and Utilization | DCRA's Pilot CRM and Investigations Module are inconsistently used and lack | a) Establish reporting protocol within DCRA related to receipt of complaints <br> b) Inform the public and other agencies regarding most |

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

Page | 59

BETWEEN DCRA, FEMS, AND MPD

| # | Applicable Agency | Category | Description | Recommendation |
|---|---|---|---|---|
| | | | functionality to enhance accountability | efficient communication methods for complaints |
| O.4 | FEMS | Systems Maturity and Utilization | FEMS use of the Zoll system does not support transparency and accountability for the handling of complaints | a) Establish reporting protocol within FEMS related to receipt of complaints b) Inform the public and other agencies regarding most efficient communication methods |
| O.5 | District Agencies | Systems Maturity and Utilization | Systems access is limited within and across agencies | a) Develop a central online database accessible by DCRA investigators and inspectors b) Provide MPD and FEMS access to DCRA's central online database c) Explore the use of combination inspectors/investigators within DCRA d) Implement basic code training and establish reporting protocol for MPD and FEMS employees |
| O.6 | DCRA | Systems Maturity and Utilization | Audit log unavailable for DCRA complaint and investigations tracking applications | a) Ensure that an audit log capability is available and easily-accessible for all systems used b) Implement user-based controls for all systems used |
| O.7 | DCRA | DCRA Investigations Management | Poor continuity of DCRA Investigations management personnel allowed the 708 Kennedy case to remain unresolved | a) Consider performing a benchmark analysis against other metropolitan governments b) Mandate that all employees use the intended IT systems |
| O.8 | DCRA | DCRA Investigations Management | Limited formal training or job requirements for investigators | a) Develop and distribute SOP for investigators b) Implement a robust onboarding training and compliance program for investigators |

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

| # | Applicable Agency | Category | Description | Recommendation |
|---|---|---|---|---|
| | | | | c) Require above-the-minimum continuing education for all DCRA investigators |
| O.9 | DCRA | DCRA Investigations Management | No process for prioritizing properties for investigation | a) Establish policies and procedures for addressing high-priority issues in short time periods. <br> b) Require mandatory fields in CRM and QuickBase systems <br> c) Require inspectors and investigators to evaluate property history in case report <br> d) Develop the CRM/QuickBase systems to assign ownership of cases to multiple parties |
| O.10 | DCRA | DCRA Investigations Management | Oversight and accountability over investigations is limited | a) Create mandatory progress report updates in QuickBase modules <br> b) Require mandatory fields in investigation and inspection reports <br> c) Establish an internal audit function |
| O.11 | DC Government | Unlicensed Property Oversight | District agencies have limited resources related to unlicensed rental properties | a) Explore opportunities to improve building safety and use standards as a requirement to receive and maintain a BBL and/or CofO. <br> b) Consider pursuing legislative and administrative reforms to empower the District to require recurring inspections on all rental properties and licensed businesses to confirm compliance with building, zoning, and fire code |

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

| # | Applicable Agency | Category | Description | Recommendation |
|---|---|---|---|---|
| | | | | c) Consider improving proactive efforts to identify unlicensed rentals |

## Communications and Coordination

### O.1. District Agencies should collaborate to create formal, consistent, and effective communications.

DCRA, FEMS, and MPD lack formal policies and procedures to govern communications across agencies, leading to a lack of clear coordination channels among the District Agencies. A&M recommends:

a. District Agencies should collaborate to develop consistent policies and procedures regarding how District Agencies should communicate and follow-up on reported code violations. Specifically, the agencies should establish clear lines of communication based on the urgency and nature of the communication.

   **Note:** Related to the planning and coordination of emergency response efforts, the District does use OUC and HSEMA. Additionally, DCRA has created, but not yet distributed, an SOP for Duty Officers, establishing that DCRA employees contact the DCRA Duty Officer through HSEMA's 24-hour operations center. A&M recommends DCRA distribute the SOP to all DCRA employees.

b. FEMS and DCRA should implement basic housing and fire code training for all field employees to ensure investigators and inspectors are knowledgeable regarding common code violations.

c. Basic code training should be extended to other agencies, including MPD, that routinely access properties and can encounter, identify, and report obvious code violations to the appropriate District Agency.

d. FEMS and DCRA should develop/utilize a system that automatically provides feedback to complainants. At the time of the fire, FEMS did not have systems in place to update the complainants on the status of cases.

   **Note:** Effective August 23, 2019, FEMS implemented GO 502 (Complaint Procedures), establishing level of review and approval required for complaints and referrals, documentation required, follow-up protocol with appropriate agency, and emergency procedures. While DCRA has the Pilot CRM system which has this functionality, the Pilot CRM system is not consistently utilized. This feedback loop for complaints will allow for an additional level of oversight.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

Page | 62

BETWEEN DCRA, FEMS, AND MPD

### O.2. DCRA and FEMS should Establish cross-agency code enforcement policies and procedures to ensure coordinated response efforts and accountability across District Agencies.

Protocols and task ownership among District Agencies regarding response to code violations are unclear and not well understood by agency employees, resulting in inefficient processes and unaddressed complaints. The only document providing guidance on distribution of responsibilities between DCRA and FEMS is the MOA signed September 15, 2000. The primary concern of MOA "is to ensure that the necessary fire protection and inspection services crucial to public safety and welfare are provided to District residents and businesses." Although DCRA shared the MOA with A&M, interviews with DCRA and FEMS staff indicated a lack of awareness of the MOA and its requirements.[13]

Due to the lack of responsibility and ownership of issues across District Agencies, A&M provides the following recommendations:

a. DCRA should provide MPD and FEMS access to the central reporting system, allowing MPD and FEMS to verify if DCRA has received a complaint and performed an investigation.

b. District Agencies should collaborate to develop a cross-agency reference guide identifying the most common violations in the District and identifying the responsible agency. This guide could also establish the appropriate contact point within each District Agency, based on the urgency and nature of the violation.

   **Note:** A&M recognizes that the District Agencies have recently issued procedures that provide guidance on communication with other District Agencies. FEMS' implementation of GO 502 (Complaint Procedures), effective August 23, 2019, establishes procedures for complaint referral to the appropriate agency. MPD EO 19-005, effective September 3, 2019, establishes procedures for reporting serious fire code violations to FEMS through OUC and subsequently to DCRA via email.

c. The District Agencies and other DC Government agencies should consider implementing a policy requiring that the initial recipient of any compliant immediately register the complaint in the respective Agency's central tracking database, subsequently following up with the designated contact of the appropriate District Agency.

   **Note:** DCRA implemented the CPU SOP, effective September 13, 2019, requiring that the Program Analyst log the complaint in the QuickBase Investigations Module within one business

---

[13]  DCRA leadership has noted that the next update to the DC Building Code (currently in process) will make the MOA redundant.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

Between DCRA, FEMS, and MPD

day or allowing the complainant to directly enter the complaint into the CRM Module of the QuickBase System.

## Systems Maturity and Utilization

### *O.3. DCRA should ensure appropriate use of systems across the agency.*

DCRA employees rely on informal communications, via email, to route and track the process of investigation activities. DCRA has piloted a CRM system that is currently not being used effectively or to its full capabilities agency-wide. Due to the limited use and functionality of DCRA's systems, A&M recommends:

a. DCRA should establish reporting protocol requiring that all DCRA employees immediately enter complaints received into CRM upon receipt of the complaint, subsequently forwarding the complaints to a centralized mailbox for a second check by DCRA's customer service department.

b. DCRA should proactively inform the general public, FEMS, MPD, and other partner organizations on the most efficient way to route complaints – through a central email or direct entry into the CRM online tracking system – in order to reduce the reliance upon informal communication (email) within DCRA.

**Note:** DCRA has made effort to ensure the appropriate use of systems across the agency. DCRA provided documentation demonstrating a DCRA-wide implementation of the Pilot CRM system in February 2019. DCRA staff communicated their understanding that the CRM was not fully implemented at this time and was not consistently used to track cases.

### *O.4. FEMS should adopt procedures establishing appropriate systems use to support transparency and accountability.*

FEMS uses Zoll inspection tracking system to track and coordinate complaints of violations and the related inspections. Currently, the Zoll inspection tracking system is only updated after an inspector has visited the property and there is no process to track complaints received but not responded to or inspected, leading to limited visibility and oversight. A&M recommends:

a. FEMS should establish procedures requiring that all FEMS employees immediately enter complaints received into the Zoll tracking system upon receipt of the complaint (prior to inspector visiting the property), subsequently forwarding the complaints to a centralized email for a second check by the Administrative Officer for assignment.

**Note:** Effective August 23, 2019, FEMS' implemented GO 502 (Complaint Procedures), establishing level of review and approval required for complaints and referrals, documentation required, follow-up protocol with appropriate agency, and emergency procedures.

---

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

Page | 64

BETWEEN DCRA, FEMS, AND MPD

b. FEMS should inform the general public, DCRA, MPD, and other DC Government agencies of the most efficient way to route complaints – through a central email or direct entry into an online tracking system – in order to reduce the reliance upon informal communication (email) at FEMS.

### O.5. District Agencies should increase systems access and training within and across the agencies.

Communication, information, and systems access related to reported code violations are compartmentalized between groups within and across the District Agencies. Due to the lack of systems access, A&M recommends:

a. DCRA should develop a central reporting system that both DCRA investigators and DCRA inspectors can access, allowing the groups to track code violations, inspections, and investigations at each address. DCRA should establish policies requiring that all investigators and inspectors review DCRA records prior to traveling to an address for inspection or investigation.

**Note:** Effective September 3, 2019, DCRA implemented the Property Maintenance Inspection SOP, requiring processing team members to search ACCELA records to determine if the property is a licensed rental property.  It is also A&M's understanding that the Enterprise CRM, when fully implemented, will be able to pull information from all DCRA systems onto a single dashboard that would enable the user to view all information across the agency that is relevant to a particular property.

b. DCRA should provide MPD and FEMS viewing access to the central reporting system, allowing MPD and FEMS to determine whether DCRA has received a complaint and performed an investigation.

c. DCRA should explore the use of combination inspectors, inspectors that are trained in multiple disciplines and empowered to support inspections and investigations.

d. MPD and FEMS should implement basic code training for the employees that routinely access properties and can encounter, identify, and report obvious code violations to the respective District Agency. This basic code training should establish reporting policies and procedures based on the urgency and nature of the code violation, as well as the required follow-up procedures.

### O.6. DCRA should establish an audit log and user-based controls for CRM and QuickBase to increase transparency, oversight, and accountability.

DCRA's systems currently lack an audit log and user-based controls. The absence of an audit log inhibits DCRA's ability to evaluate organizational effectiveness, manage employees and their workloads, and identify actions previously taken. The absence of user-based controls within DCRA could allow DCRA

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

Page | 65

BETWEEN DCRA, FEMS, AND MPD

employees to circumvent policies, procedures, and lines of authority established by leadership. Due to the absence of key IT controls, A&M recommends:

a. DCRA should ensure that an audit log capability is available for all systems used to increase transparency and accountability within the organization.

b. DCRA should implement user-based controls within all systems used, establishing lines of authority and level of approval required for each task, increasing management's oversight of day-to-day operations.

**Note:** DCRA's new policies and procedures implemented on September 10, 2019 detail the documentation required to close cases and identify two DCRA employees with authority to close cases in the Investigations Module. A&M recommends DCRA implement automated user-based controls related to the two employees with authority to close cases in the Investigations Module.

## DCRA Investigations Management

### *O.7. DCRA should evaluate staffing needs at all levels and adopt policies establishing training requirements for all administrative and management personnel.*

Lack of continuity of DCRA investigations management personnel was a contributing factor that allowed 708 Kennedy to remain unresolved. Many personnel reported being overwhelmed with the workload or too busy with administrative tasks. Due to the lack of continuity of investigations personnel, A&M recommends:

a. DCRA should consider performing a benchmark analysis against other metropolitan government agencies to determine where DCRA is understaffed.

b. DCRA should mandate that all employees and investigators use the intended IT systems to open, track, manage, and close cases based on the appropriate level of authority.

### *O.8. DCRA should implement a robust formal training program for investigators.*

DCRA has stated that it provides required trainings to all investigators based upon best practices for investigations, standard operating procedures, and issues identified through Program Manager / Program Officer review of investigative reports. Interviews with multiple DCRA investigators indicated that, at the time of the 708 Kennedy Fire, DCRA investigators had not received this type of comprehensive training but that they have subsequently received additional training through DCRA's eLearning service provider. To build upon the progress that DCRA has made in training its investigators, A&M recommends:

a. DCRA should develop and distribute an SOP for investigators, documenting specific requirements and steps for performing investigations of code violations, reporting investigations of code

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

Page | 66

violations, documenting investigations of code violations, requirements & approval necessary for suspending investigations, and requirements & approval necessary for closing investigations.

b. DCRA should implement a robust onboarding training and compliance program for investigators in order to standardize the investigations process, including requiring sufficient code knowledge and training prior to provisional registration of inspectors.

**Note:** DCRA implemented new policies and procedures via the Rental Property Complaints SOP, effective August 26, 2019, which establishes required investigation procedures including contacting the complainant, researching the owner and address, documenting the investigation, reporting the investigation, and completing the investigative report.

c. DCRA should implement and require above-the-minimum continuing education for all DCRA investigators. DCRA should consider continuing education for all DCRA employees.

### O.9. DCRA should adopt a prioritization protocol for triaging and responding to complaints.

DCRA did not have clear processes in place for prioritizing properties for investigation or inspection. DCRA does not have formal standards for identifying high-priority complaints unless the structure poses immediate threat of collapse. Due to the informal processes related to the prioritization of complaints, A&M recommends:

a. DCRA should establish policies and procedures to address priority issues within short time periods, and then meet basic Service-Level Agreements ("SLAs") for all other low-priority cases.

b. DCRA should require mandatory fields in CRM and QuickBase systems to provide additional detail on the complainant of each case (e.g., MPD Officer, ANC Commission, Resident, etc.), allowing DCRA to leverage the additional information to establish case priority.

c. DCRA should establish procedures requiring investigators and inspectors to review and summarize the property history of complaints in case report templates to ensure that the pattern of complaints and inspections at the property is considered when investing the complaint.

d. DCRA should further develop CRM and QuickBase systems to assign ownership of high-priority cases and complaints to multiple parties (investigators, inspectors, Fire inspectors, etc.).

### O.10. DCRA should establish an internal audit function to track adherence to standardized mandatory reporting requirements.

DCRA has no internal audit function to oversee DCRA's Investigations Division and no standardized reporting requirements. The lack of oversight over DCRA's Investigations Division elevates the risk of

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

Page | 67

BETWEEN DCRA, FEMS, AND MPD

additional unresolved complaints. In order to track adherence to reporting requirements and increase management oversight, A&M recommends.

a. DCRA should implement procedures establishing mandatory progress report updates in the QuickBase module to ensure DCRA employees are investigating cases in a timely matter with the appropriate level of service and documentation. The mandatory progress reports provide additional oversight and monitoring for DCRA management.

**Note:** DCRA's RIS team established an Investigative Report Submission Process, effective December 17, 2018, requiring that DCRA investigators extensively document investigations performed and establishing various levels of review prior to final report submission, increasing accountability and oversight.  Though the establishment of this process was communicated to the DCRA investigators prior to the 708 Kennedy complaint, the DCRA 708 Investigator did not adhere to the outlined procedures.  A&M recommends that DCRA strengthen the monitoring and accountability functions of the DCRA Program Manager and DCRA Program Officer to support the requirements outlined in the Investigative Report Submission Process.

b. DCRA should establish mandatory fields in the investigation and inspection reports to ensure DCRA employees include consistent documentation in report submissions.

c. DCRA should establish an internal audit function to monitor DCRA's Investigations Division and randomly sample cases to ensure proper adherence to SOPs and SLAs. DCRA's internal audit function should verify all inspectors are appropriately performing and documenting cases. DCRA's internal audit function will provide another level of oversight to identify unaddressed cases.

## Unlicensed Property Oversight

### O.11. DC Government should explore implementing new licensing standards requiring recurring inspections to proactively assist the code enforcement process.

DCRA relies heavily on landlords, neighbors, tenants, and members of the public to report complaints related to small business establishments. The system of self-reporting businesses puts DC residents and customers at risk and allows business owners to change their business offering or building configuration without a DCRA certification or inspection. As a result of the risk associated with a self-reporting code enforcement environment, A&M recommendations:

a. DC Government should explore opportunities to improve the BBL process through a combination of improved internal controls and integrated systems. DC Government should consider requiring verification of a CofO prior to the approval of a BBL.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

b.  DC Government should consider pursuing legislative reform to empower DCRA to require mandatory inspections of any property issued a CofO or BBL every five-ten years. This process could be automatically triggered by DCRA's system of record.

c.  DCRA should consider improving its proactive efforts to identify unlicensed rentals, including community outreach, data mining, and analytics to generate leads for RIS investigations. Consider treating other licensing, investigations, or zoning activities as "triggers" for reinspection of business properties.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

REVIEW AND INVESTIGATION OF CODE ENFORCMENET
POLICIES, PROCEDURES, AND INTER-AGENCY COMMUNICATIONS
BETWEEN DCRA, FEMS, and MPD
*Exhibit A - 708 Kennedy ACCELA Records*

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT

**Compliance & Enforcement**

| CAP ID | ACCELA CAP Type | Description of Work / Request Comment | Date Filed | Inspection Action | Inspection Status | Case Status | Status Date | Comments |
|---|---|---|---|---|---|---|---|---|
| CFS1900028 | Enforce/Compliance/Construction/Fire Safety | Fire safety inspection | 9/18/2019 | Insp Cancelled | Issue Citation | Inspection Scheduled | 9/18/2019 | See Appended Inspection Report |
| 09-01344 | Enforce/Compliance/Infraction/NA | CASE RECEIVED 9-21-09, PROCESS BY [NAME REDACTED] ON 9-22-09, VIOLATIONS TRASH AND WEEDS IN REAR YEARD***FINE AMOUNT $1,000.00 | 9/22/2009 | n/a | n/a | Case Canceled | 4/1/2019 | Via Script. This NOI is also defective because no time of the infraction was stated on the NOI. The time of the infraction  must be entered on the NOI. |
| CTB0901546 | Enforce/Compliance/Housing/Trash and Debris | Excessive grass, trash and debris, front and/or rear years. Insp. Pick-up from Fix-It on 8/27/09 Insp [name redacted] | 8/31/2009 | Insp Completed | Not Abated | Case too old | 9/15/2010 | Inspection reveals the following. The weeds are greater than 10 inches in height along with trash and debris in the rear yard of this building that creates a harborage for rodents. Attached to this case is a photo of the existing violation. Attempt personal service at 1412 Whittier PL NW, no response. Recommend that this case be sent by certificate of mailing.

Reinspection reveals the following. Items (1) and (2) have not been abated. Attached to this case is a photo of the existing violation. Recommend that this case be forwarded for assessment. |
| CTB0900627 | Enforce/Compliance/Housing/Trash and Debris | Trash and debris - Occupants moved out, left backyard full of trash and debris | 3/24/2009 | Insp Completed | Cause | Cause for action | 3/27/2009 | An inspection of the premises revealed that the is an accummulation of trash and debris in the rear of this property a notice of violations has bee prepared for mailing. |
| CRM080923 | Enforce/Compliance/Housing/Routine Maintenance | MAYOR'S WALKTHROUGH - shed/garage in rear. Unsafe & dilapidated. Debris | 9/19/2008 | Insp Completed | Abated | NOV Served - Mail | 10/7/2008 | A reinspection of the premises was conducted on 11/25/08. It revealed the following: all items pending have been abated, no items remain. I recommend that this case is closed. |
| CRM080905 | Enforce/Compliance/Housing/Routine Maintenance | MAYOR'S WALKTHROUGH - DEFECTIVE SHED AND DEBRIS REAR | 9/18/2008 | Insp Completed | No Cause | No Cause | 9/26/2008 | duplicate inspection request. |
| CRM080683 | Enforce/Compliance/Housing/Routine Maintenance | MAYOR'S WALKTHROUGH - DEBRIS, SHED, ROUTING MAINTENANCE | 8/28/2008 | Insp Completed | No Cause | No Cause | 9/2/2008 | An inspection of the premises conducted on 8/29/08 reveals the following: no violations found at this time. No cause for action. |
| ECC147412 | Enforce/Compliance/Construction/Fire Safety | Gret Streets: Inspect for building code violations and violations within 360 degrees from property. Take pictures of code violations and forward to [name redacted] for downloading and return report to [name | 7/3/2006 | Insp Completed | Cause | Disapproved | | unlicense truck dilapidating shed trash in rear of bldg. *JH8 |
| ECC58246 | Enforce/Compliance/Construction/Zoning | Rooming w/o C of O | 3/12/2004 | Insp Completed | Failed to Inspect | Disapproved | | No one home. |
| ECC31321 | Enforce/Compliance/Construction/Zoning | rooming house | 6/25/2003 | Insp Completed | Cause | Approved | | c/n enter |

*Licensing*

| CAP ID | ACCELA CAP Type | Description | Date Filed | Inspection Action | Inspection Status | Case Status | Status Date | Comments |
|---|---|---|---|---|---|---|---|---|
| LAPP18003170 | Licenses/Business License Application/NA/NA | | 1/30/2018 | n/a | n/a | Approved | 1/30/2018 | |
| 400318000782 | Licenses/Business License/General Business/General Business Licenses | | 1/30/2018 | n/a | n/a | Active | 1/30/2018 | |
| HO1800336 | Building/Home Occupation/NA/NA | ONLINE SALES | 1/29/2018 | n/a | n/a | Permit Approved | | 1/29/2018 MU-4 ZONING DISTRICT. ZONING HOP APPROVAL FOR ONLINE SALES. |
| LAPP68003045 | Licenses/Business License Application/NA/NA | Cigarette Retail | 5/8/2008 | n/a | n/a | Approved | 9/26/2010 Updated by Script |
| 68003045 | Licenses/Business License/General Sales/Cigarette Retail | Cigarette Retail | 5/8/2008 | n/a | n/a | Expired | 9/26/2010 |
| 39501280 | Licenses/Business License /Public Health Food Establish | Delicatessen | 10/30/1999 | n/a | n/a | Expired | 9/24/2010 |
| LAPP39501280 | Licenses/Business License Application/NA/NA | Delicatessen | 10/30/1999 | n/a | n/a | Expired | 9/24/2010 Updated by Script |

| 39209304 | Licenses/Business License /Public Health Food Establish | Food Products | 3/31/1992 | n/a | n/a | Expired | 10/2/2010 |
| LAPP39209304 | Licenses/Business License Application/NA/NA | Food Products | 3/31/1992 | n/a | n/a | Approved | 10/2/2010 Updated by Script |
| LAPP39209305 | Licenses/Business License Application/NA/NA | Cigarette Retail | 1/1/1992 | n/a | n/a | Approved | 10/3/2010 Updated by Script |
| 39209305 | Licenses/Business License/General Sales/Cigarette Retail | Cigarette Retail | 1/1/1992 | n/a | n/a | Expired | 10/3/2010 |

*Note: A&M created this document using the ACCELA records for 708 Kennedy Street provided by DCRA. The ACCELA report was generated by DCRA on 9/23/2019. All name references have been removed.*



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Helen A. Kasay, as Personal Representative of the Estate of Yafet Solomen, deceased
_____
Plaintiff

vs.

Anette Tibbs                                                              Case Number _____
_____
Defendant

## SUMMONS

To the above named Defendant:

     You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

     You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Peter C. Grenier
_____                    _Clerk of the Court_
Name of Plaintiff's Attorney

1920 L Street NW, Suite 750
_____     By _____
Address                                                                          Deputy Clerk
Washington, DC 20036
_____

202-769-9600
_____     Date _____
Telephone
如需翻译,请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화해 주십시오      የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

    IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

    If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Helen A. Kasay, as Personal Representative of the Estate of Yafet Solomen, deceased
_____
Plaintiff

vs.                                                                 Case Number  _____

Anthony Prather
_____
Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Peter C. Grenier
_____
Name of Plaintiff's Attorney                                    _Clerk of the Court_

1920 L Street NW, Suite 750
_____        By  _____
Address                                                              Deputy Clerk
Washington, DC 20036
_____

202-769-9600
_____        Date  _____
Telephone
如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828로 전화주세요        የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                              Super. Ct. Civ. R. 4



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Helen A. Kasay, as Personal Representative of the Estate of Yafet Solomen, deceased
_____
Plaintiff

vs.                                                                Case Number  _____

District of Columbia
_____
Defendant

## SUMMONS

To the above named Defendant:

  You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

  You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Peter C. Grenier
_____               _Clerk of the Court_
Name of Plaintiff's Attorney

1920 L Street NW, Suite 750
_____          By  _____
Address                                                                                     Deputy Clerk
Washington, DC 20036

202-769-9600
_____          Date  _____
Telephone
如需翻译,请打电话 (202) 879-4828          Veuillez appeler au (202) 879-4828 pour une traduction          Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주십시오          የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

  IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

  If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                                Super. Ct. Civ. R. 4



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Helen A. Kasay, as Personal Representative of the Estate of Yafet Solomen, deceased
_____
Plaintiff

vs.

Case Number _____

Inez Saki-Tay
_____
Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Peter C. Grenier
_____
Name of Plaintiff's Attorney

1920 L Street NW, Suite 750
_____
Address

Washington, DC 20036
_____

202-769-9600
_____
Telephone

_Clerk of the Court_

By _____
Deputy Clerk

Date _____

如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주세요    የአማርኛ ትርጉም ለማግኘት፣ (202) 879-4828  ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                                 Super. Ct. Civ. R. 4



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Helen A. Kasay, as Personal Representative of the Estate of Yafet Solomen, deceased
_____
                                    Plaintiff

                    vs.

                                                    Case Number _____

        Louise Peterson
_____
                                    Defendant

## SUMMONS

To the above named Defendant:

        You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

        You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Peter C. Grenier
_____                    _Clerk of the Court_
Name of Plaintiff's Attorney

1920 L Street NW, Suite 750
_____     By _____
Address                                              Deputy Clerk
Washington, DC 20036
_____

202-769-9600
_____     Date _____
Telephone
如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828로 전화해 주십시오     የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

        IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

        If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Helen A. Kasay, as Personal Representative of the Estate of Yafet Solomen, deceased
_____
Plaintiff

vs.

Case Number _____

Ferdinand Gamboa
_____
Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Peter C. Grenier
_____
Name of Plaintiff's Attorney

1920 L Street NW, Suite 750
_____
Address
Washington, DC 20036
_____

202-769-9600
_____
Telephone

_Clerk of the Court_

By _____
Deputy Clerk

Date _____

如需翻译,请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주십시오       የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Helen A. Kasay, as Personal Representative of the Estate of Yafet Solomen, deceased
_____
Plaintiff

vs.                                                                                      Case Number  _____

Derek Brooks
_____
Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Peter C. Grenier
_____                    _Clerk of the Court_
Name of Plaintiff's Attorney

1920 L Street NW, Suite 750
_____        By  _____
Address                                                                                    Deputy Clerk
Washington, DC 20036
_____

202-769-9600
_____        Date  _____
Telephone
如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828로 전화주십시오        የአማርኛ ትርጉም ለማግኘት (202) 879-4828  ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Helen A. Kasay, as Personal Representative of the Estate of Yafet Solomen, deceased
_____
Plaintiff

vs.

Case Number _____

Timothy Handy
_____
Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Peter C. Grenier
_____
Name of Plaintiff's Attorney

1920 L Street NW, Suite 750
_____
Address
Washington, DC 20036

202-769-9600
_____
Telephone

_Clerk of the Court_

By _____
Deputy Clerk

Date _____

如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주세요     የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                                 Super. Ct. Civ. R. 4



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Helen A. Kasay, as Personal Representative of the Estate of Yafet Solomen, deceased
_____
Plaintiff

vs.                                                                    Case Number _____

Steven Allen
_____
Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Peter C. Grenier
_____                    _Clerk of the Court_
Name of Plaintiff's Attorney

1920 L Street NW, Suite 750
_____          By _____
Address                                                              Deputy Clerk
Washington, DC 20036
_____

202-769-9600
_____          Date _____
Telephone
如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828로 전화해주세요.     የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                    Super. Ct. Civ. R. 4



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Helen A. Kasay, as Personal Representative of the Estate of Yafet Solomen, deceased
_____
Plaintiff

vs.                                                          Case Number _____

John Barnes Jr.
_____
Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Peter C. Grenier
_____
Name of Plaintiff's Attorney                                    _Clerk of the Court_

1920 L Street NW, Suite 750
_____          By _____
Address                                                                      Deputy Clerk
Washington, DC 20036
_____

202-769-9600
_____          Date _____
Telephone
如需翻译,请打电话 (202) 879-4828          Veuillez appeler au (202) 879-4828 pour une traduction          Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202) 879-4828로 전화해 주십시오          የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Helen A. Kasay, as Personal Representative of the Estate of Yafet Solomen, deceased
_____
Plaintiff

vs.

Case Number _____

Shawnte Williams
_____
Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Peter C. Grenier
_____
Name of Plaintiff's Attorney

1920 L Street NW, Suite 750
_____
Address
Washington, DC 20036
_____

202-769-9600
_____
Telephone

_Clerk of the Court_

By _____
Deputy Clerk

Date _____

如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화해주십시오     የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Helen A. Kasay, as Personal Representative of the Estate of Yafet Solomen, deceased
_____
Plaintiff

vs.

James Walker                                                                Case Number _____
_____
Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Peter C. Grenier
_____                         _Clerk of the Court_
Name of Plaintiff's Attorney

1920 L Street NW, Suite 750
_____         By _____
Address                                                                  Deputy Clerk
Washington, DC 20036
_____

202-769-9600
_____         Date _____
Telephone

如需翻译,请打电话 (202) 879-4828        Veuillez appeler au (202) 879-4828 pour une traduction        Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주세요        የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                                Super. Ct. Civ. R. 4



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Helen A. Kasay, as Personal Representative of the Estate of Yafet Solomen, deceased
_____
Plaintiff

vs.

Case Number _____

Harriett A. Broadie
_____
Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Peter C. Grenier
_____
Name of Plaintiff's Attorney

1920 L Street NW, Suite 750
_____
Address
Washington, DC 20036
_____

202-769-9600
_____
Telephone

*Clerk of the Court*

By _____
Deputy Clerk

Date _____

如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주시길 바랍니다     የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                                                                    Super. Ct. Civ. R. 4

Filed
D.C. Superior Court
08/18/2021 15:03PM
Clerk of the Court

**THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA**
**Civil Division**

| | |
|---|---|
| **HELEN A. KASAY, as Personal Representative** ) <br> **of the Estate of Yafet Solomen, deceased** ) <br> **1414 Upshur Street, N.W.** ) <br> **Apt #304** ) <br> **Washington, D.C. 20011** ) <br> ) <br>       **Plaintiff,** ) <br> ) <br> ) <br> **v.** ) <br> ) <br> **JAMES WALKER** ) <br> **1412 Whittier Place, N.W.** ) <br> **Washington, D.C. 20012** ) <br> ) <br> **-and-** ) <br> ) <br> **THE DISTRICT OF COLUMBIA** ) <br> ) <br>     **SERVE:** ) <br> ) <br>     **Muriel Bowser** ) <br>     **Mayor of the District of Columbia** ) <br>     **John A. Wilson Building** ) <br>     **1350 Pennsylvania Avenue, N.W.** ) <br>     **Washington, D.C. 20004,** ) <br> ) <br>     **-and-** ) <br> ) <br>     **Karl A. Racine** ) <br>     **Attorney General of the District of** ) <br>     **Columbia** ) <br>     **400 6th Street, N.W.** ) <br>     **Washington, D.C. 20001** ) <br> ) <br> **-and-** ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | Civil Action No. <u>2021 CA 002836 B</u> |

| | |
|---|---|
| **INEZ SAKI-TAY, LOUISE PETERSON,** | ) |
| **HARRIETT A. BROADIE,** | ) |
| **ANTHONY PRATHER, FERDINAND** | ) |
| **GAMBOA, ANETTE TIBBS,** | ) |
| **DEREK BROOKS, TIMOTHY HANDY, AND** | ) |
| **STEVEN ALLEN,** | ) |
| **1100 4th Street, S.W.** | ) |
| **Washington, D.C. 20024** | ) |
|     **Individually, and as employees/agents of** | ) |
|     **Defendant District of Columbia** | ) |
| | ) |
| **-and-** | ) |
| | ) |
| **JOHN BARNES JR., SHAWNTE WILLIAMS,** | ) |
| **AND FIRE AND EMERGENCY MEDICAL** | ) |
| **SERVICES JOHN DOE EMPLOYEES #s 1 & 2** | ) |
| **2000 14th Street, N.W., 5th Floor** | ) |
| **Washington, D.C. 20009** | ) |
|     **Individually, and as employees/agents of** | ) |
|     **Defendant District of Columbia** | ) |
| | ) |
| **-and-** | ) |
| | ) |
| **DISTRICT OF COLUMBIA JOHN DOE** | ) |
| **EMPLOYEES #1-10** | ) |
| **c/o Karl A. Racine** | ) |
| **Attorney General of the District of** | ) |
| **Columbia** | ) |
| **400 6th Street, N.W.** | ) |
| **Washington, D.C. 20001** | ) |
|     **Individually, and as employees/agents of** | ) |
|     **Defendant District of Columbia** | ) |
| | ) |
|        **Defendants.** | ) |

## COMPLAINT AND JURY DEMAND

COMES NOW, Helen A. Kasay ("Ms. Kasay," "Plaintiff"), as personal representative of

the Estate of Yafet Solomen, her deceased nine-year-old-son, by and through the undersigned

counsel, and files this Complaint and Jury Demand against Defendants James Walker, the

District of Columbia, Inez Saki-Tay, Louise Peterson, Broadie A. Harriet, Anthony Prather,

Ferdinand Gamboa, John Barnes Jr., Shawnte Williams, Fire and Emergency Medical Services

2

John Doe Employees #s 1 & 2, Anette Tibbs, Derek Brooks, Timothy Handy, Steven Allen, and District of Columbia John Doe Employees #1–10  (collectively, "Defendants") based on the following:

## OVERVIEW

This action, alleging negligence and a violation of 42 U.S.C. § 1983, arises out of the tragic, horrific, and extraordinarily premature death of Yafet Solomen ("Yafet"), a nine-year-old resident of the District of Columbia ("the District"). On August 18, 2019, Yafet burned alive in a house fire (the "fire") at 708 Kennedy Street, N.W., Washington, D.C. 20011 ("708 Kennedy"). While emergency physicians were able to resuscitate Yafet, his brain had sustained irreparable damage, and he died two days later in the hospital. Prior to his death, Yafet suffered first and second-degree burns, which covered approximately 50% of his body, and extensive upper airway burns (*i.e.*, burns ***inside*** his body). Examination of his lungs and airways revealed black and soot-like secretions and evidence of Grade III smoke inhalation injuries. Clearly, Yafet's experience in the house fire was horrifying, terrifying and excruciating. The fire and Yafet's inability to escape were proximately caused by the egregious, illegal, and negligent (and negligent *per se*) actions of Defendants.

Defendant James Walker, the owner and landlord of 708 Kennedy, made dangerous and illegal modifications to the property, creating a substantial fire hazard. To expand the capacity of 708 Kennedy and thus obtain additional rent from impoverished and desperate tenants, Defendant Walker split several rooms within 708 Kennedy with makeshift drywall and 2x4 partitions. He rented out a windowless room to Plaintiff and Yafet in the basement of the property. There was one additional tenant who resided in the basement at the time of the fire. Much of the property, including Plaintiff and Yafets' room, lacked required smoke detectors.

With Defendant Walker's authorization, his girlfriend ran a seamstress shop on the main level of 708 Kennedy. To keep the tenants in the basement separated from his girlfriend's business on the main level of 708 Kennedy, Defendant Walker installed a door with a metal security gate. This door prevented access to the front door exit of the house from the basement. Consequently, when a fire broke out near the rear exit of the basement of 708 Kennedy, Yafet was unable to escape the property. During the fire, emergency responders broke through the door separating the basement of 708 Kennedy from the main level. On the other side of that door, they found Yafet's unconscious and horrifically burned body.

In a shocking example of negligence and incompetence, the District had every opportunity (and legal obligation) to prevent the tragic scenario which led to Yafet's death, but simply did not do so. ***Five months prior to the fire***, Officer Ernie Davis ("Officer Davis") of the Metropolitan Police Department ("MPD") directly observed the dangerous and illegal conditions at 708 Kennedy. The very next day, Officer Davis (who was trained to spot code violations) promptly notified ***six*** District employees within the Department of Consumer and Regulatory Affairs ("DCRA") and Fire and Emergency Medical Services ("FEMS") of his observations and strongly emphasized the need for an inspector. Prior to the fire, Officer Davis followed up with DCRA employees ***four*** additional times, determined to see the deplorable conditions at 708 Kennedy abated.

Despite Officer Davis' detailed warnings and persistence, the only action the District took in the months preceding the fire was sending a single employee to the property to inquire about proper permitting. Following Officer Davis' report, no District employee ever inspected the interior of 708 Kennedy. FEMS never even opened a file concerning 708 Kennedy. DCRA closed its file on 708 Kennedy two days before the fire. The District's actions (or, more

accurately put, lack thereof) can be described as nothing less than disgraceful neglect and a clear violation of its non-discretionary, statutory duties, which directly resulted in Yafet's untimely death.

Given the horrific circumstances of Yafet's death, and the sickening knowledge that it was entirely preventable, one would assume that the District would have promptly reformed how it responds to complaints concerning dangerous buildings and illegal housing. However, upon learning of the fire, DCRA Director Ernest Chrappah made a public plea to **tenants**, stating, "[p]lease reach out to us . . . so that we can hold your landlord responsible and ensure that you are living in a safe environment." Such a deflecting statement is akin to putting the onus on victims of assault to identify the perpetrators before the assault ever occurs. What is worse, a **_District Police Officer_** did "reach out" to DCRA **_four times_** and DCRA did **_nothing_**.

Indeed, the District's neglect of its duty to address complaints of dangerous structures persists to this day. Just recently, on July 1, 2021, a five-story building collapsed on **_Kennedy Street, N.W._**, following a resident's complaints to DCRA regarding the structure months prior to its collapse.[1] As Officer Davis' months of persistence demonstrate, however, no complaint seems significant enough to motivate the District to fulfill its duties to residents such as Yafet.

## JURISDICTION, VENUE, AND PARTIES

1.      Plaintiff is an adult citizen of the District of Columbia, currently residing at 1414 Upshur Street, N.W., Apt #304, Washington, D.C. 20011.

2.      Plaintiff brings this action as the personal representative of the Estate of Yafet Solomen, her deceased son. On July 23, 2020, Plaintiff was appointed as the personal

---

[1] https://www.washingtonpost.com/opinions/2021/07/02/building-collapse-northwest-dc-highlights-agency-flaws/

5

representative of the Estate of Yafet Solomen, for lawsuit purposes, by the Superior Court of the District of Columbia, Probate Division.

3.      At all times relevant to this Complaint, Yafet was a nine-year-old citizen of the District of Columbia residing at 708 Kennedy Street, N.W., Washington, D.C. 20011. Yafet is survived by Plaintiff and, upon information and belief, by his father, Petyas Solomen.

4.      Defendant James Walker is a citizen of the District of Columbia, with a last known address of 1412 Whittier Place, N.W., Washington, D.C. 20012.

5.      Defendant the District of Columbia is a municipal corporation which may be sued consistent with the Constitution and laws of the United States and the provisions of the D.C. Code.

6.      At all times relevant to this Complaint, Ms. Inez Saki-Tay ("Ms. Saki-Tay," "Defendant Saki-Tay") was a DCRA Office of Communications Community Outreach Specialist and an employee/agent of the District of Columbia.

7.      At all times relevant to this Complaint, Ms. Louise Peterson ("Ms. Peterson," "Defendant Peterson") worked within DCRA and was an employee/agent of the District of Columbia.

8.      At all times relevant to this Complaint, Ms. Harriett A. Broadie ("Ms. Broadie," "Defendant Broadie") worked within DCRA and was an employee/agent of the District of Columbia.

9.      At all times relevant to this Complaint, Mr. Anthony Prather ("Mr. Prater," "Defendant Prater") worked within DCRA and was an employee/agent of the District of Columbia.

10.     At all times relevant to this Complaint, Mr. Ferdinand Gamboa ("Mr. Gamboa," "Defendant Gamboa") was a DCRA Duty Officer and an employee/agent of the District of Columbia.

11.     At all times relevant to this Complaint, Ms. Anette Tibbs ("Ms. Tibbs," "Defendant Tibbs") was a DCRA Program Analyst within the Regulatory Investigations Section and an employee/agent of the District of Columbia.

12.     At all times relevant to this Complaint, Mr. Derek Brooks ("Mr. Brooks," "Defendant Brooks") was a Program Officer and/or acting Program Manager working within DCRA and an employee/agent of the District of Columbia.

13.     At all times relevant to this Complaint, Mr. Timothy R. Handy ("Mr. Handy," "Defendant Handy") was a Program Manager and/or the Chief of Compliance at DCRA and an employee/agent of the District of Columbia.

14.     At all times relevant to this Complaint, Mr. Steven Allen ("Mr. Allen," "Defendant Allen") was a DCRA Investigator and an employee/agent of the District of Columbia.

15.     At all times relevant to this Complaint, Mr. John Barnes Jr. ("Mr. Barnes," "Defendant Barnes") was an FEMS Technical Section Lieutenant and an employee/agent of the District of Columbia.

16.     At all times relevant to this Complaint, Ms. Shawnte Williams ("Ms. Williams," "Defendant Williams") worked within FEMS and was an employee/agent of the District of Columbia.

17.     At all times relevant to this Complaint, FEMS John Doe Employee #1 was, upon information and belief, an FEMS Division Inspections Supervisor and an employee/agent of the District of Columbia who took the actions described herein.

18.     At all times relevant to this Complaint FEMS John Doe Employee #2 was, upon information and belief, an FEMS Fire Inspector and an employee/agent of the District of Columbia who took the actions described herein.

19.     At all times relevant to this Complaint, D.C. John Doe Employees #1–10 were employees/agents of the District of Columbia whose negligent actions and inactions within the scope of said employment/agency resulted in Yafet's death.

20.     Ms. Saki-Tay, Ms. Peterson, Ms. Broadie, Mr. Prather, Mr. Gamboa, Ms. Tibbs, Mr. Brooks, Mr. Handy, Mr. Allen, Mr. Barnes, Ms. Williams, FEMS John Doe Employees #s 1 & 2, and D.C. John Doe Employees #1–10 are collectively referred to herein as the "District Defendants."

21.     This Court has personal jurisdiction over all Defendants pursuant to D.C. Code §§ 13–422, and/or 13–423(a)(3).

22.     This Court has subject matter jurisdiction over this action pursuant to D.C. Code § 11–921(a)(6).

23.     Pursuant to D.C. Code § 12–309 on or about February 6, 2020, Plaintiff gave lawful notice to the District through a properly served notice of claim to Mayor Muriel Bowser.

## FACTS

### The Property

24.     At all relevant times herein, Defendant Walker owned the real estate and improvements located at the property known as 708 Kennedy Street, N.W., Washington, D.C. 20011 (sometimes referred to herein as the "Property").

25.     From January 1, 2015, through August 18, 2019, Plaintiff and Yafet resided at 708 Kennedy Street, N.W., Washington, D.C. 20011, pursuant to a series of lease agreements they maintained with Defendant Walker.

26.     Along with Plaintiff and Yafet, at least five other tenants resided at the Property on August 18, 2019.

27.     In addition to using the Property for residential rental purposes, Defendant Walker authorized his girlfriend to operate a seamstress business out of the main floor of the Property.

28.     In order to pack as many paying tenants as possible into the Property, Defendant Walker made significant and dangerous modifications to the Property. Upon information and belief, Defendant Walker undertook these modifications to increase his profits without regard for the safety of the individuals residing in the house.

29.     On the top floor of the Property, Defendant Walker erected multiple makeshift partitions constructed of drywall and 2x4s. This created several small rooms, rather than the few larger rooms that originally existed.

30.     To provide electricity to these additional smaller rooms, Defendant Walker weaved extension cords through holes punched in the partitions and stapled the excess slack in the cords to the walls.

31.     On August 18, 2019, Plaintiff and Yafet shared a small windowless room in the basement of the Property.

32.     Fitsum Kebede ("Mr. Kebede"), another tenant at the Property, lived in a separate room in the basement along with Plaintiff and Yafet.

33.     Between the basement and the main-level exit of the Property, Defendant Walker installed a door with a metal security gate that prevented Plaintiff, Yafet, and Mr. Kebede from accessing the front exit of the Property.

34.     The only direct exit from the basement on August 18, 2019, was through a door exiting to the rear of the Property.

35.     At the time of the fire, the home also had metal bars over its windows, preventing any emergency exit from the windows.

36.     At the time of the fire, there were two Certificates of Occupancy posted within the Property. The first was granted to Defendant Walker on February 17, 1993 for the purpose of using the second floor of the property for office space. The second was granted to Walker Pharmacy, Inc. (a corporation organized by Defendant Walker) on March 1, 1995, for the purpose operating a pharmacy and delicatessen on the first floor of the Property.

37.     Pursuant to D.C. law, Defendant Walker was obligated to obtain a new Certificate of Occupancy for any change in the type of business, ownership of business, or part of the premises used therefor because such a change voids a previously issued Certificate of Occupancy.

38.     Defendant Walker failed to obtain a new Certificate of Occupancy when he began using the Property for the purpose of renting rooms out to tenants at and/or authorizing his girlfriend to operate a seamstress business out of the Property.

10

39.     At all times relevant herein, there was only one active basic business license associated with the Property: a general business/patent medicine license issued to Flowers Medical Care L.L.C., d/b/a 24 Dispensary.

40.     At all times relevant herein, there was no basic business license associated with the seamstress shop or Defendant Walker's rental housing business at the Property, making the use of the Property for such purposes unlawful.

### MPD Officer Davis Recognizes Dangerous Conditions at the Property

41.     On Thursday, March 21, 2019, at or around 6:47 p.m., Officer Ernie Davis of the Metropolitan Police Department responded to a tenant issue on the 700 block of Kennedy Street N.W.

42.     Upon information and belief, the "tenant issue" was a noise complaint concerning the Property.

43.     Officer Davis was cross agency trained to identify and report code violations.

44.     Upon his arrival at the Property, Officer Davis identified multiple code violations.

45.     Defendant Walker, who was present at the scene, told Officer Davis that the Property was a rooming house, but Officer Davis recognized that Walker was using part of the Property as a seamstress shop.

46.     Officer Davis recorded his findings in a Public Incident Report ("the PIR").

47.     In addition to listing the code violations he observed, Officer Davis included within the PIR that, "[t]here are too many make shift doors with locks which would make it difficult to exit in an emergency."

11

48.     Regarding the sanctioned uses of the property, Officer Davis further stated in the PIR that, "[t]here are two Certificates of Occupancy Permits . . . . Neither permit allows for the use of rental property or seamstress space."

49.     Officer Davis concluded the PIR with the statement, "[*s*]*trongly recommend both DCRA & DCFD Code Inspectors respond to the listed location*."

### Officer Davis Informs DCRA and FEMS of Walker's Violations at 708 Kennedy

50.     On Friday, March 22, 2019, the day after he personally observed dangerous and illegal conditions at 708 Kennedy, Officer Davis sent an email with the subject, "Serious Code Violations," to four individuals at DCRA and two individuals at FEMS. Officer Davis included the PIR, which strongly recommended that inspectors respond to 708 Kennedy, as an attachment to this email.

51.     Upon information and belief, the individuals at DCRA to whom Officer Davis sent his March 22nd email included:

     a.   DCRA Office of Communications Community Outreach Specialist, Ms. Inez Saki-Tay ("Ms. Saki-Tay");

     b.   Ms. Louise Peterson;

     c.   Ms. Harriett A. Broadie; and,

     d.   Mr. Anthony Prather.

52.     To make it clear that there were two separate locations for which Officer Davis was requesting inspections, in the body of the above-described email, Officer Davis stated, "I *also* need an inspection of a dwelling residence located at 5410 14th Street . . ." (emphasis included).

53.     Upon information and belief, the only response Officer Davis received to this email was from Ms. Saki-Tay.

54.     Upon information and belief, by "replying all" to Officer Davis' email, Ms. Saki-Tay notified Officer Davis that his request had been forwarded to the on-duty DCRA Duty Officer, Mr. Ferdinand Gamboa ("Mr. Gamboa").

55.     Upon information and belief, the DCRA Duty Officer is DCRA's primary agency contact responsible for responding to after-hours and weekend urgent incidents.

56.     Upon information and belief, it was contrary to DCRA standard operating procedures ("SOPs") to forward reports of dangerous housing conditions to the DCRA Housing Duty Officer via email.

57.     Ms. Saki-Tay should have routed Officer Davis' email through the Homeland Security and Emergency Management Agency 24-hour Operations Center.

58.     Upon information and belief, Mr. Gamboa failed to see Officer Davis' email in his inbox after Ms. Saki-Tay forwarded it to him. Thus, Mr. Gamboa never took any action regarding Officer Davis' report of illegal and dangerous conditions at 708 Kennedy.

59.     Upon information and belief, at the time Officer Davis sent his March 22nd email, DCRA utilized a Pilot Customer Relationship Management database ("Pilot CRM") to help DCRA streamline the way it responded to customer inquiries to and ensure that such responses were carried out in a timely manner.

60.     Upon information and belief, contrary to internal DCRA policies and procedures, none of the four DCRA employees Officer Davis included on his March 22 email, entered his complaint into the Pilot CRM or otherwise recorded the need for action in any system or log, which was a non-discretionary, ministerial mandate. Instead, the District employees/agents completely disregarded the report of "Serious Code Violations" from a District Police Officer

who observed such violations first-hand and made his concerns in relation to these violations explicitly known.

61.     Upon information and belief, the individuals at FEMS to whom Officer Davis sent his March 22nd email included:

      a.  an FEMS Technical Section Lieutenant, Mr. John Barnes Jr. ("Mr. Barnes"); and,

      b.  Ms. Shawnte Williams.

62.     Upon information and belief, Ms. Shawnte Williams never acted upon Officer Davis' email.

63.     Upon information and belief, on the morning of March 23, 2019, Mr. Barnes forwarded Ms. Saki-Tay's *__reply__* email to an FEMS Division Inspections Supervisor ("FEMS John Doe Employee #1") responsible for assigning Fire Inspectors.

64.     Because Mr. Barnes only forwarded Ms. Saki-Tay's *__reply__* (as opposed to Officer Davis' original email), he failed to include the PIR relating to 708 Kennedy as an attachment. Accordingly, FEMS John Doe Employee #1 never received the PIR detailing violations at 708 Kennedy.

65.     Upon information and belief, on a date between March 23, 2019, and August 18, 2019, FEMS John Doe Employee #1, recognizing his obligations, assigned an FEMS Fire Inspector ("FEMS John Doe Employee #2") to investigate the address included in the body of Officer Davis' email, 5410 14th Street.

66.     Upon information and belief, on a date between March 23, 2019, and August 18, 2019, FEMS John Doe Employee #2 reported that the address 5410 14th Street did not exist.[2]

---

[2] Officer Davis' reference to 5410 14th Street was in error; upon information and belief, he meant to reference 5310 14th Street, N.W.

67.     Despite realizing that 5410 14th Street did not exist, not a single FEMS employee followed up with Officer Davis regarding his report of "Serious Code Violations" at either of the properties identified in his March 22nd email, including 708 Kennedy.

68.     When asked, during a D.C. Council Joint Oversight Hearing on November 18, 2019, why no FEMS employee/official followed up with Officer Davis, Fire and EMS Chief Gregory M. Dean admitted, "**our previous practices…um…left holes…a lot of holes that we needed to correct . . . .**"

### Officer Davis' Follow-ups with DCRA Requesting Assignment of an Investigator

69.     Upon information and belief, between March 22, 2019, and April 24, 2019, no individual from DCRA or FEMS contacted Officer Davis regarding his concerns of violations and dangerous conditions at 708 Kennedy.

70.     Upon information and belief, between March 22, 2019, and April 24, 2019, no individual from DCRA or FEMS took any action to investigate or abate the reported code violations and dangerous conditions at 708 Kennedy.

71.     On April 24, 2019, over one month after his initial email, Officer Davis emailed Ms. Annette Tibbs ("Ms. Tibbs"), a DCRA Program Analyst within the Regulatory Investigations Section ("RIS"), with the following explicit request: "[i]s it possible to have an investigator check out the business at 708 Kennedy Street NW. It needs to be checked for zoning and the proper Certificate of Occupancy. It was zoned as a business and now he has turned it into apartments."

72.     The same day, Ms. Tibbs forwarded Officer Davis' email to Derek Brooks ("Mr. Brooks"), a Program Officer at DCRA, and Timothy R. Handy ("Mr. Handy"), a Program Manager and/or the Chief of Compliance at DCRA. Ms. Tibbs requested an investigation of 708

Kennedy Street, N.W. Additionally, Ms. Tibbs communicated that there were no open investigations pending for 708 Kennedy in the RIS QuickBase System ("QuickBase"), a module used by DCRA to record the status of investigations.

73.     On May 21, 2019, after hearing nothing for nearly another full month, Officer Davis again emailed Ms. Tibbs requesting a follow-up on his request for an investigation into 708 Kennedy.

74.     The same day, at or around 10:41 a.m., Ms. Tibbs forwarded Officer Davis' **_second_** follow-up email to Mr. Handy, and additionally stated, "[w]e have to fix this. I sent this to Brooks (and a cc: to you) on April 24, 2019 and still haven't received a response. [Officer] Ernie Davis is following up on a response."

75.     After receiving Ms. Tibbs' May 21st email, Mr. Handy replied to her April 24th email, which included Officer Davis' request for an investigator, and stated, "[j]ust caught this." He also indicated that he did not see an investigation for 708 Kennedy listed in QuickBase and instructed Mr. Brooks to assign an investigator.

76.     By the end of the day, on May 21, 2019, a DCRA Investigator was assigned to 708 Kennedy.

77.     Upon information and belief, the assigned investigator was Mr. Steven Allen ("Mr. Allen").

78.     Upon information and belief, Mr. Allen was not trained to recognize code violations, and he was only tasked with checking to see whether the owner of 708 Kennedy had proper permits.

79.     Indeed, following the fire, during an interview with a local new station, Mr. Allen himself confirmed that he was not trained to look at a building and recognize housing code

16

violations, and that a housing code inspector, trained to identify violations, should have been dispatched to the Property.[3]

80.     On May 24, 2019, Ms. Tibbs emailed Officer Davis and informed him that an investigation had been opened into 708 Kennedy and provided him with a case number.

### DCRA's Failure to Inspect 708 Kennedy

81.     On May 22, 2019, Mr. Allen visited the Property.

82.     Mr. Allen did not enter the Property and simply took photographs of the front of the building.

83.     Upon information and belief, DCRA best practices mandated that Investigators take photos of all publicly accessible portions of a property.

84.     Upon information and belief, Mr. Allen alleges that he attempted to visit the Property twice more on May 23 and May 24, 2019.

85.     Upon information and belief, Mr. Allen did not create a digital record of his visits to the Property in the Pilot CRM or QuickBase systems, despite clear instructions from DCRA to record investigations in this manner beginning February 2019.

86.     Upon information and belief, Mr. Allen alleges he sent a letter to Defendant Walker and left a business card on the door of the Property. There is no evidence corroborating Mr. Allen took these actions.

87.     Upon information and belief, Mr. Allen further alleges he maintained a physical file concerning the Property, but that the file was lost during an office move in August 2019.

---

[3] https://www.wusa9.com/article/news/investigations/dcra-investigator-speaks-out-for-the-first-time-since-tragic-fire-that-killed-a-9-year-old-boy-and-40-year-old-man/65-7bd595d7-acca-48ab-aaaa-83076b5f2155

88.     Upon information and belief, at all times relevant herein, Mr. Allen and other DCRA employees had access to the Accela records system, which documented a history of maintenance, safety, and unlicensed rooming house complaints at the Property dating back to 2003. These violations included, *inter alia*, reports of trash and weeds on the Property, a report that the shed/garage in the rear of the Property was unsafe and dilapidated, and complaints of running a rooming house without a certificate of occupancy.

89.     Despite the information contained in Officer Davis' PIR and the Accela records system, and despite Mr. Allen's failure to gain entry to the Property, no DCRA employee attempted to obtain an administrative search warrant to access the Property.

90.     On June 3, 2019, Officer Davis sent an email to Ms. Tibbs and Mr. Allen requesting that someone contact him following the inspection "so that [he] may stay on top of them." Presumably, by "them," Officer Davis was referring to Defendant Walker.

91.     On June 11, 2019, Ms. Tibbs reminded Mr. Allen to "follow up with Officer Ernie Davis."

92.     Upon information and belief, Mr. Allen never followed up with Officer Davis and no further action was taken by any DCRA employee to investigate, inspect, or abate the dangerous conditions at the Property before the fire.

### **DCRA Closes Investigation**

93.     Upon information and belief, in June of 2019, Mr. Brooks, the DCRA Program Officer, began acting as a DCRA Program Manager.

94.     Upon information and belief, on June 12, 2019, Mr. Brooks made an entry for the Property in the DCRA Investigations Module.

95.     Upon information and belief, Mr. Brooks promoted Mr. Allen to "lead investigator" and requested that he assist Mr. Brooks with managing investigations.

96.     Upon information and belief, at all relevant times, Mr. Brooks and Mr. Allen kept track of investigations on an offline spreadsheet.

97.     Upon information and belief, without any oversight, Mr. Brooks and Mr. Allen agreed to suspend the investigation into the Property on July 26, 2019.

98.     Upon information and belief, on August 2, 2019, Mr. Brooks indicated that 708 Kennedy should not be included in a DCRA report of open complaints.

99.     Upon information and belief, Mr. Allen and Mr. Brooks verbally agreed to move the Property investigation from a suspended status to a closed status on or before August 16, 2019.

100.    Upon information and belief, Mr. Brooks and/or Mr. Allen officially closed the investigation into the Property on August 16, 2018.

101.    While testifying before a D.C. Joint Oversight Committee on November 18, 2019, regarding the fire at the Property, DCRA Director Ernest Chrappah admitted that DCRA's failure to act was "**a failure of people.**" He additionally stated that DCRA's neglect constituted "**a failure of not taking ownership and ensuring that grave issues get the attention they need [and n]o amount of technology is going to do the work that human beings <u>are supposed to do</u>.**"

## The Fire

102.    On August 18, at or around 5:30 a.m., Plaintiff departed the Property for her custodial job at George Washington University.

19

103.    As she had done many times previously, Plaintiff left Yafet in the care of fellow basement-tenant Mr. Kebede.

104.    At some time before 9:36 a.m., a fire started in the basement of the Property.

105.    Upon information and belief, the fire started in Mr. Kebede's room near the rear basement-exit of the Property.

106.    Upon information and belief, the fire grew to a degree that prevented Mr. Kebede and Yafet from escaping the Property through the rear basement-exit.

107.    A nearby MPD Officer noticed the fire.

108.    At or around 9:36 a.m., the MPD Officer immediately radioed a Dispatcher at the Office of Unified Communications ("OUC"). After an exchange with the MPD Officer, the OUC Dispatcher sent FEMS personnel to the Property.

109.    When FEMS personnel arrived and gained access to the Property, they encountered an interior door with bars behind it leading from the main level to the basement. Upon information and belief, this was the door that Defendant Walker illegally installed to separate the basement tenants from his girlfriend's seamstress shop on the first floor.

110.    FEMS personnel requested a metal saw to gain access beyond the door with bars behind it.

111.    Once FEMS personnel were able to force the interior door open, they encountered Yafet and Mr. Kebede.

112.    Yafet was lying on top of Mr. Kebede's body. Both individuals were unconscious.

113.    FEMS determined, subsequent to the fire, that Mr. Kebede was attempting to escape the building at the time of his injury.

114.     FEMS also determined, subsequent to the fire, that the contributing factors to Yafet's injuries were a "[l]ocked exit or other problem with exit," and a "[b]urglar or security bar, intrusion barrier."

115.     After locating Yafet, FEMS personnel removed him from the building and placed him into an ambulance for transport to Children's National Hospital at 111 Michigan Avenue, N.W., Washington, D.C. 20010.

116.     Plaintiff did not learn of the fire until at or around 10:00 a.m. when Defendant Walker called her to inform her of the fire.

117.     Upon learning of the fire, Plaintiff immediately left George Washington University and headed back to the Property.

118.     While en route to the Property, Plaintiff called Defendant Walker multiple times, seeking information regarding Yafet's status.

119.     When Plaintiff finally reached Defendant Walker by telephone, he informed her that Yafet had been taken to Children's National Hospital.

120.     Accordingly, Plaintiff changed her route and headed straight to Children's National Hospital.

### Yafet's Injuries

121.     Emergency Medical Services ("EMS") personnel, who initially treated Yafet, noted that his body was covered in burns and he was experiencing cardiac arrest.

122.     EMS personnel began CPR and attempted to intubate Yafet. While attempting intubation, EMS personnel noted "heavy soot" within Yafet's airway.

123.     When intubation failed to produce positive results, EMS personnel removed the intubation tube, and attempted bag-valve-mask ventilation.

21

124. Upon arrival at Children's National Hospital, Yafet still had no pulse.

125. Emergency room physicians at Children's National Hospital continued CPR and successfully reintubated Yafet.

126. While reintubating Yafet, Emergency Room physicians noted the presence of extensive upper airway burns and soot.

127. After approximately nine minutes of resuscitation efforts, Yafet achieved a return of spontaneous circulation.

128. Upon information and belief, around 30 minutes elapsed between the time when Yafet went into cardiac flatline until Emergency Room physicians resuscitated him.

129. Once resuscitated, physicians evaluated Yafet's injuries from the fire.

130. Approximately 50% of Yafet's body was covered in burns ranging from partial to full-thickness.

131. A bronchoscopy revealed Grade III smoke inhalation injuries and soot within Yafet's trachea.

132. A CT scan of Yafet's brain indicated anoxic brain injury.

133. Physicians conducted two separate brain death examinations of Yafet on August 19 and 20, 2021. During both examinations, their findings were consistent with cessation of function of the brain and brainstem. Yafet was declared brain dead at or around 10:30 a.m., on August 20, 2019.

### Plaintiff Arrives at Hospital

134. Upon her arrival at the hospital, Plaintiff was met by a female MPD Officer.

135. After speaking for around 30 minutes with the MPD Officer and the nurse, Plaintiff was allowed to see her son.

136.     The first time Plaintiff saw Yafet after the fire, Yafet was lying alone in a hospital room, covered in burns, and on life support.

137.     Doctors explained Yafet's lack of brain function and his low likelihood of recovery to Plaintiff.

138.     Plaintiff made the decision to take Yafet off life support.

139.     On August 20, 2019, Yafet succumbed to his injuries from the fire and died.

**Alvarez & Marsal's Independent Investigation
of the District's Actions Before the Fire**

140.     Subsequent to the fire, the District of Columbia Office of the City Administrator engaged a business management consulting firm, Alvarez & Marsal ("A&M"), to conduct an independent investigation into the actions of various District of Columbia employees and agencies leading up to the fire.  These agencies included DCRA, FEMS, and MPD. Upon information and belief, A&M's investigation also included the actions of the District Defendants with respect to the events preceding the fire at the Property.

141.     In conducting its investigation, A&M reviewed code enforcement policies and procedures, email communications, systems data, and activity logs. Additionally, A&M researched best practices and conducted over 25 interviews with key staff.

142.     On October 25, 2019, following its five-week investigation, A&M released a report (the "A&M Report") detailing its findings. The A&M Report is attached hereto as **Exhibit 1**.

143.     In the A&M Report, A&M identified seven "critical missteps" within DCRA and two "critical missteps" within FEMS concerning their actions leading up to the fire.

144.     Although the A&M Report omitted the names of the DCRA and FEMS employees involved in these critical missteps, upon information and belief, at least one District Defendant participated in each critical misstep.

145.     DCRA's first critical misstep concerned the handling of Officer Davis' initial March 22nd email with the PIR attached to four DCRA employees. As stated in the A&M Report, "the DCRA Community Outreach Specialist forwarded the email to the DCRA Duty Officer with the Public Incident Report ('PIR') attached and then immediately replied via email to all individuals on the initial email indicating that the email was forwarded to the DCRA Duty Officer. However, the Community Outreach Specialist communicated with the DCRA Duty Officer using non-standard communication protocol, having emailed the MPD Officer's communication, which included the information of urgent and unsafe conditions rather than following standard operating procedures ('SOPs'), which required contact via the Homeland Security and Emergency Management Agency ('HSEMA') by telephone. **The DCRA Community Outreach Specialist followed improper protocol by communicating an urgent complaint to the DCRA Duty Officer via email**." In other words, this was a non-discretionary, ministerial function that was violated.

146.     Upon information and belief, the MPD Officer referenced in the A&M Report is Officer Ernie Davis, the DCRA Community Outreach Specialist is Defendant Saki-Tay, and the DCRA Duty Officer is Defendant Gamboa.

147.     DCRA's second critical misstep concerned the DRCA Duty Officer's (Defendant Gamboa's) handling of Officer Davis' complaint concerning the Property once the DCRA Community Outreach Specialist (Defendant Saki-Tay) sent it to him. As stated in the A&M Report, "[t]he DCRA Duty Officer (a trained inspector and the Inspections Program Manager)

did not respond to the initial 708 Kennedy Complaint forwarded by the DCRA Community

Outreach Specialist via email and did not ensure that the complaint was assigned to the

appropriate individual(s). **The DCRA Duty Officer did not address the 708 Complaint**

**immediately as an unsafe building or route the complaint appropriately for inspection or**

**investigation.**" This was yet another non-discretionary, ministerial directive that was not carried

out.

148.    With respect to this second critical misstep, A&M stated in its report, "[a]ny

DCRA inspector, including the Housing Inspection Program Manager, has a duty under

DCMR[4] to respond to any building reported as dangerous . . . . A&M's review found [Officer

Davis' complaint] to meet the criteria outlined by DCMR requiring inspection by DCRA."

149.    DCRA's third critical misstep concerned its handling of Officer Davis' April 24th

email explicitly requesting that DCRA send and an investigator to the Property. As stated in the

A&M Report, "[t]he MPD Officer emailed the DCRA Investigations Intake Analyst on April 24,

requesting that a DCRA investigator be sent to 708 Kennedy. The DCRA Intake Analyst

followed the normal intake process of first routing the complaint to the DCRA Investigations

Program Officer and DCRA Investigations Program Manager for assignment. **Neither the**

**DCRA Investigations Program Officer nor the DCRA Investigations Program Manager**

**assigned the 708 Kennedy Complaint to an investigator.**" This exemplifies further violations

of non-discretionary, ministerial duties.

150.    Upon information and belief, the DCRA Investigations Intake Analyst referenced

in the A&M Report is Defendant Tibbs, the DCRA Investigations Program Officer is Defendant

Brooks, and the DCRA Investigations Program Manager is Defendant Handy.

---

[4] For this proposition, A&M cited D.C. Mun. Regs. tit. 12A § 115.2 & 115.3.

151.    DCRA's fourth critical misstep concerned its limited investigation into Officer Davis' report of dangerous and illegal conditions at the Property after his third follow up with DCRA inquiring whether it had investigated his report.. As stated in the A&M Report, "[a]fter a third follow-up email from the MPD Officer on May 21 regarding the 708 Kennedy Complaint, the DCRA Program Manager assigned the investigation of 708 Kennedy ('708 Kennedy Investigation') to the DCRA 708 Investigator. The DCRA Investigations Intake Analyst notified the MPD Officer of the assignment. **The DCRA 708 Investigator performed a limited investigation (reporting that the DCRA 708 Investigator visited, but did not enter the property, on three occasions - May 22, May 23, and May 24 - and did not evaluate the rear of the property) and failed to adequately document investigations activities and findings.**" These actions (and/or inactions) constituted violations of his non-discretionary, ministerial duties.

152.    Upon information and belief, the DCRA 708 Investigator referred to in the A&M Report is Defendant Allen.

153.    DCRA's fifth critical misstep concerned its failure to further investigate 708 Kennedy after a fourth follow up email from Officer Davis and the improper suspension of the investigation. As stated in the A&M Report, "[a]fter a fourth email from the MPD Officer on June 3, this one sent directly to the DCRA 708 Investigator and the DCRA Investigations Intake Analyst, and a reminder to the DCRA 708 Investigator from the DCRA Investigations Intake Analyst on June 11, the DCRA 708 Investigator took no further action on the property in June or July. **Due, in part, to the reassignment of the DCRA 708 Investigator**[5]**, the DCRA**

---

[5] Upon information and belief, this is a reference to Defendant Allen's "promotion" to "lead investigator" as laid out above.

**Investigations Program Officer marked the case as 'suspended' in the Program Officer's log by July 26 without any case file or record of activities.**"

154.    DCRA's sixth critical misstep concerned its failures in communicating with Officer Davis, recording the (extremely limited) investigation into the Property, and the closing of the investigation without proper approval. As stated in the A&M Report, "[t]he DCRA 708 Investigator never reached out to the MPD Officer, DCRA maintained no case file, and the closure of the case was not evidenced by a signature of approval. **The DCRA Investigations Program Officer closed the 708 Kennedy case without any further investigation nearly three months after the DCRA 708 Investigator's reported attempted visits in May.**" This action was a clear violation of his non-discretionary, ministerial duties.

155.    DCRA's seventh critical misstep concerned its employees' failures to enter Officer Davis' report of dangerous and illegal conditions into DCRA's Pilot CRM, which was explicitly created for the purpose of streamlining DCRA's responses to complaints and ensuring that such complaints were handled in a timely manner. As stated in the A&M Report, "[o]ver the 5 months that transpired and the multiple follow-up emails sent to DCRA by the MPD Officer between the initial report of the 708 Kennedy Complaint and the date of the 708 Kennedy Fire, **none of the nine DCRA employee** [sic] **that were aware of the 708 Kennedy Complaint or included on related communications, entered it into the pilot Customer Relationship Management database ('Pilot CRM'), a tool launched by DCRA in February 2019 and utilized to track customer requests and complaints,**" in violation of their non-discretionary, ministerial duties.

156.    Upon information and belief, the "nine DCRA employee[s] that were aware of the 708 Kennedy Complaint" referenced in the A&M Report were Defendants Saki-Tay, Gamboa, Tibbs, Brooks, Handy, Allen, Peterson, Broadie, and Prather.

157.    FEMS' first critical misstep concerned the failure to ensure that, when forwarding Officer Davis' initial March 22nd email within FEMS, the PIR was attached. As stated in the A&M Report, "[t]he FEMS Technical Section Lieutenant received the MPD Officer's initial March 22 email and then forwarded the DCRA Community Outreach Specialist's Response to the MPD Officer's email without the PIR attachment to the FEMS Inspections Lieutenant. **By forwarding the DCRA response rather than the MPD Officer's original email with the PIR attachment, the FEMS Technical Section Lieutenant did not include the attached PIR including pertinent information regarding 708 Kennedy.**"

158.    Upon information and belief, the FEMS Technical Section Lieutenant referenced in the A&M Report is Defendant Barnes and the FEMS Inspections Lieutenant is FEMS John Doe Employee #1.

159.    FEMS' second critical misstep concerned FEMS' failure to follow up with Officer Davis concerning his March 22nd email. As stated in the A&M Report, "**[t]he FEMS Inspection Lieutenant in receipt of the MPD Officer's March 22 email (without the PIR attachment) made no attempt to follow-up with FEMS or MPD staff to verify complaints included in the email and did not effectively address the MPD Officer's complaints.**"

160.    Within the A&M Report, A&M stated that these nine aforementioned critical missteps within DCRA and FEMS "prevented remediation of the unsafe conditions at 708 Kennedy prior to the fire."

161.    In addition to the specific failings outlined above, A&M "**observed underlying issues which have contributed to or could contribute to failure to remedy unsafe buildings and unlicensed rentals**."

162.    The first of these "underlying issues," outlined in the A&M Report, concerned DCRA's, FEMS', and MPD's lack of "clear communications channels and processes for reporting, collaborating and following-up on reported code violations."

163.    Specifically, A&M found that "DCRA systems and policies in place at the time of the initial reporting and follow up on 708 Kennedy included no functionality or clear requirement to communicate with complainants to either verify the details of the complaint or inform complainants of status or resolution of their complaints."

164.    A&M stated that "[t]he channels through which information flows between the District Agencies [were] generally informal. Collaboration between officials across agencies [were] consistently relationship-based, no clear protocol existed to govern this communication, and centralized systems offered by [the Office of Unified Communications] were not consistently utilized."

165.    As stated in the A&M report, these communications failures "factored into DCRA's and FEMS's insufficient response to reports of unsafe conditions at 708 Kennedy."

166.    Additionally, A&M found a "[l]ack of responsibility and ownership of building safety issues across multiple agencies."

167.    A&M stated, "[t]he violations at 708 Kennedy which were identified in [Officer Davis'] PIR included issues in the jurisdiction of both DCRA Investigators and Fire Inspectors . . . . DC government [had] no specific code or authority which [provided] directions

or guidance on expectations for inspection of properties and mitigation of multi-jurisdictional

violations, or ownership of responsibility for these issues."

168.    Ultimately, A&M indicated that the District's unclear statutory/regulatory

directives concerning responsibilities among its agencies for unlawful and/or dangerous housing

conditions caused Officer Davis' concerns regarding 708 Kennedy to "go unremedied."

169.    Further, the A&M report details how DCRA management permitted a culture of

misuse of its internal records keeping systems concerning housing complaints.

170.    For example, the A&M Report describes how "DCRA staff continually used

informal methods outside the system of record to track the progress of investigations activities."

171.    Moreover, A&M found that although "only a few individuals were authorized to

close cases," DCRA opted to not implement "user roles configured to reflect these permissions"

in its Investigations Module.

172.    Compounding the disorganization and the utter lack of oversight at DCRA, A&M

discovered that "DCRA relied on personal inboxes for communications . . . ."

173.    Concerning FEMS, A&M found that inspectors would only enter complaints into

their internal tracking database "after they [had] visited the property." The procedures in place at

the time of the fire required "no record of the assignment [of an inspector] until after an inspector

[had] visited the property."

174.    A&M observed, "[t]his lack of a formal system for handling incoming complaints

and documenting decisions not to pursue complaints [at FEMS] reduced the accountability of

staff and limited visibility into the history of complaints and their handling."

175.    A&M additionally found that, at DCRA, the District failed to train its employees

in investigating code violations and even explicitly prohibited certain employees from

"attempting to inspect or investigate issues related to Housing Code." Specifically, A&M stated, "DCRA roles are compartmentalized between groups, so not all investigators have knowledge of Housing Code requirements or the systems used to track and assess adherence to these requirements."

176.    Moreover, A&M discovered that, although the "position of investigator within DCRA [was] critical to verifying that District businesses [were] operating within the specifications of their permits[, a] team of 12 investigators [was] tasked with monitoring compliance for the entire district."

177.    Additionally, A&M found that in lieu of formal training for these investigators, DCRA mandated that its inspectors take "an external training course through a third-party provider and learn through 'shadowing' and on-the-job training during as little as one investigation."

178.    Further, A&M found that DCRA lacked a "formal SOP [(standard operating procedure]) stating specific requirements for what steps [were] required for an investigator to appropriately follow-up on a complaint, or even mark a case as closed." Instead, it was the practice at DCRA to rely upon "the experience of the investigator and the trust and oversight of one program manager."

179.    A&M stated that, with respect to 708 Kennedy, DCRA's policy of not training its employees and/or limiting their roles led to (upon information and belief) Defendant Allen's investigating 708 Kennedy "without first accessing and reviewing the long history of property complaints against the property."

31

180.    A&M also found that "prior to the 708 Kenney Fire DCRA had no formal standards for escalating property investigations as urgent unless they [had] a clear reason to believe that the structure [posed] an immediate threat of collapse."

181.    In general, A&M found that missteps at DCRA "arose not only from individual failures, but from an overall lack of personal and organizational accountability within DCRA's Investigations Division. The work of investigators throughout the timeline of events leading up to the 708 Kennedy Fire was not consistently overseen by Program Managers, and in the course of managerial transitions, several opportunities to intervene in the case were missed. DCRA's Investigations required no standardized mandatory reporting of activities during investigations, and DCRA leadership had established no process for auditing, or even verifying completion of work associated with cases which have been marked as suspended or closed. The DCRA Program Officer (who had been in-position for less than six months when the 708 Kennedy Complaint was received) relied on personal trust of investigators to perform appropriate follow-up, rather than any enforcement standards, review of work product, or auditing of work performed. The DCRA Investigations Program Officer trusted that the DCRA 708 Investigator had appropriately attempted to contact the property owner, documented the investigation, and closed the case due to an inability to verify the complaint after taking reasonable steps to investigate . . . . Not only had the DCRA Investigations Program Officer not verified the completion of this investigation, but no program of sampling or review had been established at the time of the fire. Additionally, DCRA had no internal audit function as an organization. Without holding investigators to standards for due diligence and documentation, DCRA had no way of knowing whether properties like 708 Kennedy or other similar properties across the District had been appropriately investigated."

182.     In its investigation, A&M further uncovered serious issues concerning DCRA's policies for licensing rental units. Specifically, "[n]o Certificate of Occupancy or housing inspection [was] required for single family rental units. Under DCRA's [then] processes for receiving a BBL [(Basic Business License)] application, a landlord [could] receive a BBL by self-certifying compliance using the One Family Dwelling Basic Business License Self Certification Form . . . . DCRA's [then] process for inspecting or investigating properties for use outside of their CofO's [(Certificate of Occupancy's)] stated use [was] holly reliant on self-reporting by landlords, or complaints by tenants and members of the community. DCRA [did] not take active preventive measures to identify unlicensed rental units offered for lease [were] compliant with building code or other consumer protections."

183.     A&M additionally stated in its report that "[l]ike the CofO process for rental units . . . the business license process for commercial properties [placed] the onus on business owners to request an inspection when the use of their business change[d]. A business owner operating one business (for example, a pharmacy) [could] maintain a CofO for that business indefinitely with no recurring inspections . . . . DCRA relie[d] on complaints from neighbors, tenants, and members of the public as the primary check on the safety of small business establishments. Deterrents to the inappropriate use of buildings [were] clearly limited in their effectiveness, as the 'Walker Pharmacy' at 708 Kennedy was twice identified as an unlicensed rooming house prior to the 2019 sequence of events, and DCRA never shut down the business."

**The District's History of Failing to Address Dangerous Housing Conditions**

184.     Prior to the fire, the District had consistently failed to address dangerous hosing conditions within the District of Columbia.

185.     For example, in 2017, after reporting in The Washington Post and Washington City Paper of deplorable housing conditions at apartments managed by Sanford Capital, and various complaints from residents of rodent infestations and a lack of heat in the buildings, Mayor Muriel E. Bowser ordered DCRA to inspect various Sanford Capital apartments in the District of Columbia. Only after this public pressure, DCRA uncovered over 1,000 housing-code violations at the properties. At the time, District of Columbia council members criticized DCRA for failing to enforce housing code requirements and allowing violations to slip through the cracks.[6]

186.     Further, under circumstances strikingly similar to those discussed herein, two District of Columbia residents perished in a rowhouse fire near Dupont Circle on June 3, 2015. Hazards which contributed to this fire were not uncovered by District housing inspectors because the units were rented out illegally, and the District relied on complaints and self-reporting to ensure properties were properly inspected.[7]

187.     Following the Dupont Circle rowhouse fire in 2015, then DCRA Director Melinda Bolling said that the detection of illegal apartments depended upon reports from tenants, their

---

[6] https://www.washingtonpost.com/local/dc-politics/sanford-capital-faces-539500-in-fines-after-dc-inspects-its-buildings/2017/03/31/10237796-0f21-11e7-9d5a-a83e627dc120_story.html; https://www.washingtonpost.com/local/dc-politics/bowser-orders-review-of-all-properties-operated-by-controversial-dc-landlord/2017/03/01/8d86b4dc-fe00-11e6-99b4-9e613afeb09f_story.html.

[7] https://www.nbcwashington.com/news/local/illegal-apartments-can-go-unnoticed-dc-officials-say-after-2-deaths/1996722/.

neighbors, and the District's Advisory Neighborhood Commissions. She stated "We [(DCRA)] get information from those parties and we do compliance checks."[8]

188.     Additionally, on a date prior to the fire at the Property, a tenant lodged a complaint to DCRA regarding his landlord who the tenant believed was trying to force him out of his apartment via the use of housing code violations so that the tenant would leave and the landlord could redevelop the property. Upon investigating the tenant's report **DCRA ordered the tenant to vacate the property**, rather than remedying the unlawful conditions.[9]

189.     Over a year prior to the fire at the Property, during a D.C. Council Performance Oversight Hearing on March 8, 2018, witnesses testified to issues within DCRA, many of which persisted until the fire. Such issues included:

    a.  a lack of inspectors at DCRA (then, 14 or 15);

    b.  a lack of a robust code enforcement arm at DCRA;

    c.  a lack of follow-up with reinspections of properties;

    d.  a failure to ensure the removal of a dangerous structure, over two years after the structure was brought to the attention of DCRA and after the structure was deemed dangerous by DCRA; and,

    e.  a practice at DCRA wherein, when tenants complained of code violations, DCRA would encourage said tenants to pursue their claims in court, rather than DCRA enforcing the housing code.

190.     At the same March 3, 2018 D.C. Council Joint Oversight Hearing, a former DCRA employee, who had worked at the agency from 2010 to 2016, including in housing

---

[8] https://www.nbcwashington.com/news/local/dc-landlord-owes-families-15m-after-fire-killed-nina-brekelmans-michael-mcloughlin/48540/.

[9] https://www.wusa9.com/article/news/local/dc/head-of-troubled-dc-agency-out-after-wusa9-investigation/65-616096691.

inspections, testified that DCRA staff did not have the support of management and did not get the attention, education, and training that they needed.

191.     Moreover, during the D.C. Council Joint Oversight Hearing on November 18, 2019, DCRA Director Ernest Chrappah stated that, following the fire at the Property, DCRA **reopened 20 cases** which were improperly closed without proper documentation.

**Statutes, Housing Regulations, and Fire Code Provisions in Effect at The Time of The Fire**

192.     At all times relevant herein, the following statutes, regulations, and provisions of the 2013 District of Columbia Construction Codes ("the Construction Codes"), having the force of law, were in effect in the District of Columbia and enacted to prevent the type of harm suffered by Yafet.

193.     D.C. Code § 6–641.09, "Building permits; certificates of occupancy," subsection (a), provided, in pertinent part, "[i]t shall be unlawful to erect, construct, reconstruct, convert, or alter any building or structure or part thereof within the District of Columbia without obtaining a building permit from the Inspector of Buildings, and said Inspector shall not issue any permit for the erection, construction, reconstruction, conversion, or alteration of any building or structure, or any part thereof, unless the plans of and for the proposed erection, construction, reconstruction, conversion, or alteration fully conform to the provisions of this subchapter and of the regulations adopted under said sections. In the event that said regulations provide for the issuance of certificates of occupancy or other form of permit to use, it shall be unlawful to use any building, structure, or land until such certificate or permit be first obtained. It shall be unlawful to erect, construct, reconstruct, alter, convert, or maintain or to use any building, structure, or part thereof or any land within the District of Columbia in violation of the provisions of said sections or of any of the provisions of the regulations adopted under said sections."

194.   D.C. Code § 6–751.02, "Duty of owner to install smoke detectors," provided, "[t]he owner of each new and existing occupied dwelling unit shall be responsible for installing smoke detectors and carbon monoxide detectors in accordance with the Construction Codes."

195.   D.C. Mun. Regs. tit. 11 § 3202.1, provided, in pertinent part, "no person shall use any structure, land, or part of any structure or land for any purpose until a certificate of occupancy has been issued to that person stating that the use complies with the provisions of this title and the D.C. Construction Code, Title 12 DCMR."

196.   D.C. Mun. Regs. tit. 12A § 110.1, "General Requirement for Certificate of Occupancy," provided, in pertinent part, "no *person* shall use any *structure*, land, or part thereof for any purpose, and no change in use or load shall be made, until a Certificate of Occupancy has been issued stating that the use complies with the applicable *Zoning Regulations* and the *Construction Codes*, including related building, electrical, plumbing, mechanical and fire protection requirements."

197.   D.C. Mun. Regs. tit. 12A § 110.1.3, "Change in Use, Load, or Floor Layout," provided, in pertinent part, "[f]or changes in use, occupancy load or tenant floor layout, a new Certificate of Occupancy shall be required."

198.   D.C. Mun. Regs. tit. 14 § 200.3, "General Licensing Requirements," provided, in pertinent part, "[n]o person shall operate a housing business in any premises in the District of Columbia without first receiving a basic business license for the premises by the Department of Consumer and Regulatory Affairs (Department)."

199.   D.C Min. Regs. tit. 14 § 301.1, provided, "[t]here shall be deemed to be included in the terms of any lease or rental agreement covering a habitation an implied warranty that the owner will maintain the premises in compliance with this subtitle."

200.    D.C. Mun. Regs. tit. 14 § 400.3, provided, in pertinent part, "[n]o person shall rent or offer to rent any habitation . . .unless the habitation [is] in a . . . safe . . . condition."

201.    D.C. Mun. Regs. tit. 14 § 902.1, "Egress Facilities," provided, in pertinent part, "[i]t shall be the duty of the operator of each housing business to keep . . . stairways and other egress facilities in a good state of repair and free from obstruction."

202.    D.C. Mun. Regs. tit. 14 § 902.4, "Egress Facilities," provided, in pertinent part, "[t]he operator of each housing business shall keep all public and exit corridors free of obstructions."

203.    2013 District of Columbia Residential Code § R.310.1, "Emergency Escape and Rescue Required," provided, in pertinent part, "[b]asements . . . and every sleeping room shall have at least one operable emergency escape and rescue opening. Where basements contain one or more sleeping rooms, emergency egress and rescue openings shall be required in each sleeping room."

204.    2013 District of Columbia Residential Code § R.311.1, "Means of Egress," provided, in pertinent part, that the means of egress in all dwellings "shall provide a continuous and unobstructed path of vertical and horizontal egress travel from all portions of the dwelling to the exterior of the dwelling at the required egress door."

205.    2013 District of Columbia Residential Code § R.311.2, "Egress Door," provided, in pertinent part, "[e]gress doors shall be readily openable from inside the dwelling without the use of a key or special knowledge or effort."

206.    2013 District of Columbia Residential Code § R.314.3, provided, "[s]moke alarms shall be installed in the following locations: 1. In each sleeping room. 2. Outside each separate

sleeping area in the immediate vicinity of the bedrooms. 3. On each additional story of the dwelling, including basements."

### Statutory Duties Applicable to the District of Columbia and its Employees/Agents

207.    At all relevant times, the following statutes and regulations were in effect, applicable to the District and its employees/agents, and prescribed mandatory acts clearly for the protection of a particular class of persons (namely, the occupants of dangerous buildings or structures) rather than the public as a whole.

208.    D.C. Code § 6–801, "Unsafe structure or excavation – public safety," subsection (a), provided, in pertinent part, "[i]f any building or part of a building . . . is reported to the District government as unsafe, from any cause, the Mayor ***shall*** examine the structure or excavation" (emphasis added). In other words, this is a non-discretionary obligation.

209.    D.C. Code § 6–1405.01, "Administration of construction regulations," subsection (a)(3), provided, in pertinent part, "[t]he Building Code Official[10] shall seek to assure that all buildings, structures, and premises in the District are in full compliance with the Construction Codes adopted pursuant to this chapter . . . and regulations issued pursuant to the Construction Codes . . . ." This too, was non-discretionary.

210.    D.C. Mun. Regs. tit. 12A § 115.1, stated, "All *buildings* or other *structures* or existing equipment that are or hereafter become abandoned, deteriorated, unsafe, unsanitary, or deficient because of inadequate means of egress facilities, inadequate light and ventilation, or which constitute a fire hazard, or are otherwise dangerous to human life or the public welfare, or that involve illegal or improper use, or occupancy or inadequate maintenance, shall be deemed

---

[10] The term "Building Code Official" refers to "the Director of the Department of Consumer and Regulatory Affairs, or the Director's designee." D.C. Code § 6–1401.

an unsafe condition. Unsafe *structures* shall be taken down and removed or made safe and secure, as the *code official* deems necessary pursuant to this section or pursuant to other laws, including, but not limited to, D.C. Official Code §§ 42-3131.01 *et seq.* (2012 Repl.) or 42-3171.01 *et seq.* (2012 Repl.) and D.C. Official Code §§ 6-801 *et seq.* (2012 Repl.)." Again, these directives were non-discretionary.

211.    D.C. Mun. Regs. tit. 12A § 115.2, "Examination and Record of Damaged Structure," provided, in pertinent part, "The *code official*[11] ***shall*** examine every *premises* including any *building* or other *structure*, reported as dangerous, unsafe structurally, or constituting a fire hazard, and shall maintain a record of unsafe *premises*, including any *buildings* or other *structures*, stating the use of the *structure* and the nature and estimated amount of damages, if any, caused by collapse or failure" (emphasis added). This too, was non-discretionary.

212.    D.C. Mun. Regs. tit. 12A § 115.3, "Notice of Unsafe Structure or Equipment," provided, in pertinent part, "If any unsafe condition is found, the code official shall serve a written notice that describes the condition, identifies the structure or equipment deemed unsafe, and specifies the required repairs or improvements to be made to abate the unsafe condition or requires the unsafe structure to be taken down and removed within a stipulated time." This too, was non-discretionary.

---

[11] The term "code official" as used in the Construction Codes and Building Code Supplement generally refers to the Director of the Department of Consumer and Regulatory Affairs. *See* D.C. Mun. Regs. tit. 12A § 103.1. An exception to the foregoing is that, within the Fire Code, the term "code official" may also refer to the Chief of the Fire Department, depending on the specific Fire Code provision. *See id.* § 103.2

## COUNT I
### Wrongful Death – Negligence and Negligence *per se*
### Brought by Plaintiff as Personal Representative of the Estate of Yafet Solomen
### <u>Against Defendant Walker</u>

213.    All paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

214.    Plaintiff brings this claim for wrongful death against Defendant Walker as personal representative of decedent, Yafet Solomen, pursuant to D.C. Code § 16–2701 *et seq*.

215.    At all relevant times herein, Yafet was lawfully upon the premises of the Property.

216.    At all relevant times herein, Defendant Walker owned, controlled, and managed the Property, including the physical space where Plaintiff and Yafet resided at the time of the fire.

217.    At all relevant times herein, as the owner of the Property, Defendant Walker owed a duty to those lawfully upon the Property, including Yafet, to exercise reasonable care under the circumstances, including by exercising ordinary care under the circumstances to keep the premises reasonably safe and to avoid injuring those lawfully upon the Property.

218.    At all relevant times herein, Defendant Walker knew or should have known of dangerous conditions at the Property, including, but not limited to, conditions which created and/or exacerbated the danger to its occupants, including Yafet, in the event of a fire.

219.    Defendant Walker breached the aforesaid duties by, *inter alia*:

    a.    Creating and/or failing to identify dangerous conditions at the Property, including, but not limited to:

        i.    the obstruction of the means of egress between the basement and main level of the improvements,

      ii.  the keeping of an egress door which could not be opened without the use of a key or special knowledge or effort,

     iii.  the renting of a room to Yafet and Plaintiff with no means of emergency escape or rescue opening,

     iv.  the absence of a smoke alarm/detector anywhere in the basement level of the improvements Kennedy;

  b.  failing to rectify the aforesaid dangerous conditions at the Property when he knew or should have known of their existence; and,

  c.  failing to warn of such dangerous conditions at the Property.

220.    At all relevant times herein, Defendant Walker owed a duty to Yafet to comply with all statutes, regulations, and code provisions, which pertained to the maintenance of a residential property and the keeping of tenants.

221.    Defendant Walker breached the aforesaid duties through the following acts and violations of, *inter alia*, the following statutes, regulations, and code provisions:

  a.  altering the interior of the Property without obtaining a building permit (a violation of D.C. Code § 6–641.09);

  b.  failing to obtain an up-to-date Certificate of Occupancy for the Property (a violation of, *inter alia*, D.C. Code § 6–641.09, D.C. Mun. Regs. tit. 11 § 3202.1, D.C. Mun. Regs. tit. 12A § 110.1, and D.C. Mun. Regs. tit. 12A § 110.1.3);

  c.  failing to install smoke detectors in the basement level of the Property (a violation of D.C. Code § 6–751.02);

  d.  operating a seamstress shop out of the Property without first receiving a basic business license from DCRA (a violation of D.C. Mun. Regs. tit. 14 § 200.3);

  e.  operating a rental housing business out of the Property without first receiving a basic business license from DCRA (a violation of D.C. Mun. Regs. tit. 14 § 200.3);

  f.  renting the Property to tenants in an unsafe condition (a violation of D.C. Mun. Regs. tit. 14 § 400.3);

  g.  failing to keep egress facilities at the Property in a good state of repair and free from obstruction (a violation of D.C. Mun. Regs. tit. 14 § 902.1);

h.  failing to keep exit corridors at the Property free from obstruction (a violation of D.C. Mun. Regs. tit. 14 § 902.4);

i.  failing to provide an emergency escape, egress, and/or rescue opening in Plaintiff and Yafets' room (a violation of 2013 District of Columbia Residential Code § R.310.1);

j.  failing to provide a continuous and unobstructed path of vertical and horizontal egress travel from all portions of the improvements to the exterior of the improvements at the required egress door (a violation of 2013 District of Columbia Residential Code § R.311.1);

k.  failing to keep an egress door readily openable from the inside of the Property without the use of a key or special knowledge or effort (a violation of 2013 District of Columbia Residential Code § R.311.2);

l.  failing to install a smoke alarm in Plaintiff and Yafets' room (a violation of 2013 District of Columbia Residential Code § R.314.3);

m.  failing to install a smoke alarm outside the vicinity of Plaintiff and Yafets' room (a violation of 2013 District of Columbia Residential Code § R.314.3);

n.  failing to install a smoke alarm in the basement level of the Property (a violation of 2013 District of Columbia Residential Code § R.314.3); and,

o.  failing to maintain the premises of the Property in compliance with D.C. Mun. Regs. tit 14 (a violation of D.C Min. Regs. tit. 14 § 301.1).

222.    The aforesaid statutes, regulations, and code provisions were enacted to prevent the type of incident that occurred (and to protect persons such Yafet), and Defendant Walker cannot offer an explanation as to the violations of such statutes, regulations, and code provisions, thereby rendering Defendant Walker negligent *per se* (*i.e.*, as a matter of law).

223.    As a direct, foreseeable, and proximate result of Defendant Walker's aforesaid negligent acts and omissions, including his violations of the aforesaid statutes, regulations, and code provisions, Yafet died and, resultingly, his statutory beneficiaries have suffered, *inter alia*, financial loss, the loss of gifts, contributions, services, care, and support of Yafet, and expenses and other losses and damages, which shall be proven at trial.

43

224.    In carrying out the aforesaid negligent acts and omissions, including his violations of the aforesaid statutes, regulations, and code provisions, Defendant Walker acted in willful disregard for the rights of Yafet and his conduct was outrageous and/or reckless toward the safety of Yafet, thereby entitling Plaintiff to an award of punitive damages.

225.    Yafet acted properly in all respects and was free from negligence in connection with this incident.

**WHEREFORE**, Plaintiff, as personal and legal representative of decedent, Yafet Solomen, demands judgment against Defendant Walker, as follows: (1) for compensatory damages in the amount of not less than $50,000,000.00, which amount will be proven at trial; (2) for all costs associated with this action; (3) for punitive damages in the amount of $100,000,000.00; (4) for pre- and post-judgment interest as permitted by law; and (5) for such other and further relief as this Court may deem just and proper.

**COUNT II**
**Survival Action – Negligence and Negligence *per se***
**Brought by Plaintiff, as Personal Representative, on Behalf of the Estate of Yafet Solomen**
**Against Defendant Walker**

226.    All paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

227.    Plaintiff brings this survival action as personal representative of the decedent, Yafet Solomen, against Defendant Walker, pursuant to D.C. Code § 12–101, and on behalf of the decedent's estate. On, July 23, 2020, Plaintiff was appointed as the personal representative of the Estate of Yafet Solomen, for lawsuit purposes, by the Superior Court of the District of Columbia, Probate Division.

228.    At all relevant times herein, Yafet was lawfully upon the premises of the Property.

229.   At all relevant times herein, Defendant Walker owned, controlled, and managed the Property, including the physical space where Plaintiff and Yafet resided at the time of the fire.

230.   At all relevant times herein, as the owner of the Property, Defendant Walker owed a duty to those lawfully upon the Property, including Yafet, to exercise reasonable care under the circumstances, including by exercising ordinary care under the circumstances to keep the premises reasonably safe and to avoid injuring those lawfully upon the Property.

231.   At all relevant times herein, Defendant Walker knew or should have known of dangerous conditions at the Property, including, but not limited to, conditions which created and/or exacerbated the danger to its occupants, including Yafet, in the event of a fire.

232.   Defendant Walker breached the aforesaid duties by, *inter alia*:

   a.   Creating and/or failing to identify dangerous conditions at the Property, including, but not limited to:

      i.   the obstruction of the means of egress between the basement and main level of the improvements,

      ii.   the keeping of an egress door which could not be opened without the use of a key or special knowledge or effort,

      iii.   the renting of a room to Yafet and Plaintiff with no means of emergency escape or rescue opening,

      iv.   the absence of a smoke alarm/detector anywhere in the basement level of the improvements;

   b.   failing to rectify the aforesaid dangerous conditions at the Property when he knew or should have known of their existence; and,

   c.   failing to warn of such dangerous conditions at the Property.

233.   At all relevant times herein, Defendant Walker owed duty to Yafet to comply with all statutes, regulations, and code provisions, which pertained to the maintenance of a residential property and the keeping of tenants.

234.   Defendant Walker breached the aforesaid duties through the following acts and violations of, *inter alia*, the following statutes, regulations, and code provisions:

a.   altering the interior of the Property without obtaining a building permit (a violation of D.C. Code § 6–641.09);

b.   failing to obtain an up-to-date Certificate of Occupancy for the Property (a violation of, *inter alia*, D.C. Code § 6–641.09, D.C. Mun. Regs. tit. 11 § 3202.1, D.C. Mun. Regs. tit. 12A § 110.1, and D.C. Mun. Regs. tit. 12A § 110.1.3);

c.   failing to install smoke detectors in the basement level of the Property (a violation of D.C. Code § 6–751.02);

d.   operating a seamstress shop out of the Property without first receiving a basic business license from DCRA (a violation of D.C. Mun. Regs. tit. 14 § 200.3);

e.   operating a rental housing business out of the Property without first receiving a basic business license from DCRA (a violation of D.C. Mun. Regs. tit. 14 § 200.3);

f.   renting the Property to tenants in an unsafe condition (a violation of D.C. Mun. Regs. tit. 14 § 400.3);

g.   failing to keep egress facilities at the Property in a good state of repair and free from obstruction (a violation of D.C. Mun. Regs. tit. 14 § 902.1);

h.   failing to keep exit corridors at the Property free from obstruction (a violation of D.C. Mun. Regs. tit. 14 § 902.4);

i.   failing to provide an emergency escape, egress, and/or rescue opening in Plaintiff and Yafets' room (a violation of 2013 District of Columbia Residential Code § R.310.1);

j.   failing to provide a continuous and unobstructed path of vertical and horizontal egress travel from all portions of the improvements to the exterior of the improvements at the required egress door (a violation of 2013 District of Columbia Residential Code § R.311.1);

k.   failing to keep an egress door readily openable from the inside of the Property without the use of a key or special knowledge or effort (a violation of 2013 District of Columbia Residential Code § R.311.2);

l.   failing to install a smoke alarm in Plaintiff and Yafets' room (a violation of 2013 District of Columbia Residential Code § R.314.3);

m.   failing to install a smoke alarm outside the vicinity of Plaintiff and Yafets' room (a violation of 2013 District of Columbia Residential Code § R.314.3);

n.   failing to install a smoke alarm in the basement level of the Property (a violation of 2013 District of Columbia Residential Code § R.314.3); and,

o.   failing to maintain the premises of the Property in compliance with D.C. Mun. Regs. tit 14 (a violation of D.C Min. Regs. tit. 14 § 301.1).

235.   The aforesaid statutes, regulations, and code provisions were enacted to prevent the type of incident that occurred (and to protect persons such Yafet), and Defendant Walker cannot offer an explanation as to the violations of such statutes, regulations, and code provisions, thereby rendering Defendant Walker negligent *per se* (*i.e.*, as a matter of law).

236.   As a direct, foreseeable, and proximate result of Defendant Walker's aforesaid negligent acts and omissions, including his violations of the aforesaid statutes, regulations, and code provisions, Yafet Solomen suffered extreme conscious physical pain and bodily injury, disfigurement and/or deformity, physical and emotional suffering, inconvenience and discomfort, and mental anguish, and incurred medical and hospital expenses prior to his untimely and horrific death.

237.   As a further direct, foreseeable, and proximate result of Defendant Walker's aforesaid negligent acts and omissions, including his violations of the aforesaid statutes, regulations, and code provisions, Yafet Solomen, suffered future lost income, lost earnings, and loss of earning capacity.

238.    In carrying out the aforesaid negligent acts and omissions, including his violations of the aforesaid statutes, regulations, and code provisions, Defendant Walker acted in willful disregard for the rights of Yafet and his conduct was outrageous and/or reckless toward the safety of Yafet, thereby entitling Plaintiff to an award of punitive damages.

239.    Yafet acted properly in all respects and was free from negligence in connection with this incident.

**WHEREFORE**, Plaintiff, as personal and legal representative of decedent, Yafet Solomen, demands judgment against Defendant Walker, as follows: (1) for compensatory damages in the amount of not less than $50,000,000.00, which amount will be proven at trial; (2) for all costs associated with this action; (3) for punitive damages in the amount of $100,000,000.00; (4) for pre- and post-judgment interest as permitted by law; and (5) for such other and further relief as this Court may deem just and proper.

### COUNT III
**Wrongful Death – Negligence and Negligence *per se***
**Brought by Plaintiff as Personal Representative of the Estate of Yafet Solomen**
<u>**Against the District Defendants and the District of Columbia**</u>

240.    All paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

241.    Plaintiff brings this claim for wrongful death in her capacity as the personal representative of the decedent, Yafet, pursuant to D.C. Code § 16–2701 *et seq*., against each of the District Defendants individually, against the District individually, and against the District on a theory of vicarious liability.

242.    At all relevant times, the following statutes and regulations were in effect, applicable to the District and its employees/agents, and prescribed mandatory (and non-discretionary) acts clearly for the protection of a particular class of persons (namely, the

occupants of dangerous buildings or structures) rather than the public as a whole: D.C. Code §§ 6–801 & 6–1405.01 and D.C. Mun. Regs. tit. 12A §§ 115.1, 115.2 & 115.3.

243.    Upon Officer Davis' finding unsafe conditions and code violations at the Property, and his reporting of such unsafe conditions and code violations to DCRA and FEMS via the District Defendants, a special relationship existed between Yafet, the District, and the District Defendants by virtue of the aforementioned statutes and regulations.

244.    Due to the special relationship, the District and the District Defendants owed Yafet a duty to: (1) examine the Property; (2) assure that the Property was in full compliance with the Construction Codes and the regulations issued pursuant to the Construction Codes; (3) deem the Property in an unsafe condition and either take down the improvements or make the Property safe and secure; (4) maintain a record of the Property stating its use and the nature and estimated amount of damages, if any, caused by collapse or failure; and/or (5) serve a written notice upon Defendant Walker, Plaintiff, and/or Yafet, describing the condition of the Property, that it was deemed unsafe, and specifying the required repairs or improvements to be made to abate the unsafe conditions or requiring the improvements to be taken down and removed within a stipulated time.

245.    At all relevant times herein, Yafet justifiably relied on the District and the District Defendants to fulfill the aforementioned duties owed to him by virtue of the special relationship.

246.    Additionally, at all relevant times herein, the District and the District Defendants had a duty and were legally obligated to abide by all applicable statutes and regulations, *inter alia*, D.C. Code §§ 6–801 & 6–1405.01 and D.C. Mun. Regs. tit. 12A §§ 115.1, 115.2 & 115.3.

247.    The District Defendants breached the aforesaid duties of care and were negligent and/or negligent *per se* in the following ways, by, *inter alia*:

a.  Ms. Saki-Tay's forwarding Officer Davis' March 22nd email with the PIR to the
    DCRA Duty Officer, Mr. Gamboa, instead of sending it through the proper
    emergency channels, a mandatory and non-discretionary requirement;

b.  Mr. Gamboa's failure to read and take the mandatory required (and non-
    discretionary) action on Officer Davis' March 22nd email that Ms. Saki-Tay
    forwarded to him, including by failing to inspect or cause the inspection of the
    Property;

c.  Ms. Peterson's, Ms. Broadie's, Mr. Prather's and Ms. Saki-Tays' failure to enter
    Officer Davis' complaint from his March 22nd email into the DCRA Pilot CRM
    or any other DCRA system or log, in violation of their mandatory and non-
    discretionary duties;

d.  Ms. Williams's failure to take any action on Officer Davis' March 22nd email,
    including by failing to inspect the Property or causing the Property to be
    inspected, in violation of his/her mandatory and non-discretionary duties;

e.  Mr. Barnes' failure to ensure that the PIR detailing the dangerous conditions and
    code violations at the Property was attached when he forwarded Ms. Saki-Tay's
    reply to Officer Davis' March 22nd email to FEMS John Doe Employee #1;

f.  Mr. Barnes', Ms. Williams's, FEMS John Doe Employee #1's, and/or FEMS John
    Doe Employee #2's failure to follow up with Officer Davis on his report of
    "Serious Code Violations" when they discovered 5410 14th Street did not exist;

g.  Ms. Tibbs', Mr. Handy's, and Mr. Allen's failure to enter Officer Davis'
    complaint into the DCRA Pilot CRM, QuickBase or any other DCRA system or
    log, in violation of their mandatory and non-discretionary duties;

h.  Mr. Brooks' failure to record any investigation into the Property until his entry in
    the DCRA Investigations Module on June 12, 2019, in violation of his mandatory
    and non-discretionary duties;

i.  Mr. Allen's failure to attempt to obtain an administrative search warrant despite
    Officer Davis' report, the history of maintenance, safety, and unlicensed rooming
    house complaints at the Property documented in the Accela records system, and
    his inability to gain entry to the Property after three purported visits;

j.  Mr. Allen's failure to follow-up with Officer Davis, despite a specific request
    from Officer Davis;

k.  Mr. Books and Mr. Allens' tracking of the status of their investigation into the
    Property in an offline spreadsheet;

l.   Mr. Brooks and Mr. Allens' suspending and closing of the investigation into the Property without ever having an inspector examine the Property or even having gained entry into the interior of the Property, in violation of their mandatory and non-discretionary duties;

m.   all District Defendants' failure to assure that the Property was in full compliance with the Construction Codes and regulations issued pursuant to the Construction Codes, despite Officer Davis' report that the Property was not in compliance with the Construction Codes, in violation of their mandatory and non-discretionary duties;

n.   all District Defendants' failure to examine, inspect, or thoroughly investigate the Property, despite Officer Davis' reporting the Property as unsafe, dangerous, lacking adequate means of egress, a fire hazard, and out of compliance with the Construction Codes, nearly five months before the fire at the Property, in violation of their mandatory and non-discretionary duties;

o.   all District Defendants' failure to deem the Property unsafe due to it being unsafe, having inadequate means of egress, constituting a fire hazard, and/or otherwise being dangerous to human life after learning of the Property's dangerous conditions and code violations, in violation of their mandatory and non-discretionary duties;

p.   all District Defendants' failure to take down and remove the improvements, or make them safe and secure, due to the Property's dangerous conditions and code violations, in violation of their mandatory and non-discretionary duties; and,

q.   all District Defendants' failure to serve a written notice upon Defendant Walker, Plaintiff, and/or Yafet describing the condition of the Property, that it was deemed unsafe, and specifying the required repairs or improvements to be made to abate the unsafe conditions or requiring the improvements to be taken down and removed within a stipulated time, in violation of their mandatory and non-discretionary duties.

248.   Through the aforesaid acts and omissions of its employees (the District Defendants), the District breached its duties of care owed to Yafet.

249.   The aforesaid breaches constituted violations of *inter alia*, D.C. Code §§ 6–801 & 6–1405.01 and/or D.C. Mun. Regs. tit. 12A §§ 115.1, 115.2 & 115.3.

250.   D.C. Code §§ 6–801 & 6–1405.01 and D.C. Mun. Regs. tit. 12A §§ 115.1, 115.2 & 115.3. were enacted to prevent the type of incident that occurred (and to protect persons such

as Yafet), and neither the District nor the District Defendants can offer an explanation as to the violations of such statutes and regulations, thereby rendering the District and the District Defendants negligent *per se* (*i.e.*, as a matter of law).

251.    As a direct, foreseeable, and proximate result of the District's and each of the District Defendants' aforesaid negligent/negligent *per se* acts and omissions, Yafet died and, resultingly, his statutory beneficiaries have suffered, *inter alia*, financial loss, the loss of gifts, contributions, services, care, and support of Yafet, and expenses and other losses and damages, which shall be proven at trial.

252.    At all times relevant herein the District Defendants were each employees/agents of the District of Columbia.

253.    Each of the aforesaid negligent/negligent *per se* acts and/or omissions of the District Defendants were at least partially motivated by a desire to further the District's interests, thereby rendering the District vicariously liable for their negligent acts and/or omissions.

254.    Yafet acted properly in all respects and was free from negligence in connection with this incident.

255.    The negligent/negligent *per se* acts and omissions of the District and the District Defendants which constitute the basis of this Count were ministerial, involving the execution of policy.

**WHEREFORE**, Plaintiff, as personal and legal representative of decedent, Yafet Solomen, demands judgment against the District Defendants and the District, jointly and severally, as follows: (1) for compensatory damages in the amount of not less than $50,000,000.00, which amount will be proven at trial; (2) for all costs associated with this action;

(3) for pre- and post-judgment interest as permitted by law; and (4) for such other and further relief as this Court may deem just and proper.

**COUNT IV**
**Survival Action – Negligence**
**Brought by Plaintiff, as Personal Representative, on Behalf of the Estate of Yafet Solomen**
<u>**Against the District Defendants and the District**</u>

256.     All paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

257.     Plaintiff brings this survival action as personal representative of the decedent, Yafet Solomen, on behalf of the decedent's estate, pursuant to D.C. Code § 12–101. Plaintiff was appointed decedent's personal and legal representative on July 23, 2020. Plaintiff brings this count against each of the District Defendants individually, against the District individually, and against the District on a theory of vicarious liability.

258.     At all relevant times, the following statutes and regulations were in effect, applicable to the District and its employees/agents, and prescribed mandatory (and non-discretionary) acts clearly for the protection of a particular class of persons (namely, the occupants of dangerous buildings or structures) rather than the public as a whole: D.C. Code §§ 6–801 & 6–1405.01 and D.C. Mun. Regs. tit. 12A §§ 115.1, 115.2 & 115.3.

259.     Upon Officer Davis' finding unsafe conditions and code violations at the Property, and his reporting of such unsafe conditions and code violations to DCRA and FEMS via the District Defendants, a special relationship existed between Yafet, the District, and the District Defendants by virtue of the aforementioned statutes and regulations.

260.     Due to the special relationship, the District and the District Defendants owed Yafet a duty to: (1) examine the Property; (2) assure that the Property was in full compliance with the Construction Codes and the regulations issued pursuant to the Construction Codes; (3)

53

deem the Property in an unsafe condition and either take down the improvements or make the Property safe and secure; (4) maintain a record of the Property stating its use and the nature and estimated amount of damages, if any, caused by collapse or failure; and/or (5) serve a written notice upon Defendant Walker, Plaintiff, and/or Yafet, describing the condition of the Property, that it was deemed unsafe, and specifying the required repairs or improvements to be made to abate the unsafe conditions or requiring the improvements to be taken down and removed within a stipulated time.

261.    At all relevant times herein, Yafet justifiably relied on the District and the District Defendants to fulfill the aforementioned duties owed to him by virtue of the special relationship.

262.    Additionally, at all relevant times herein, the District and the District Defendants had a duty and were legally obligated to abide by all applicable statutes and regulations, *inter alia*, D.C. Code §§ 6–801 & 6–1405.01 and D.C. Mun. Regs. tit. 12A §§ 115.1, 115.2 & 115.3.

263.    The District Defendants breached the aforesaid duties of care and were negligent and/or negligent *per se* in the following ways, by, *inter alia*:

   a.  Ms. Saki-Tay's forwarding Officer Davis' March 22nd email with the PIR to the DCRA Duty Officer, Mr. Gamboa, instead of sending it through the proper emergency channels, a mandatory and non-discretionary requirement;

   b.  Mr. Gamboa's failure to read and take the mandatory required (and non-discretionary) action on Officer Davis' March 22nd email that Ms. Saki-Tay forwarded to him, including by failing to inspect or cause the inspection of the Property;

   c.  Ms. Peterson's, Ms. Broadie's, Mr. Prather's and Ms. Saki-Tays' failure to enter Officer Davis' complaint from his March 22nd email into the DCRA Pilot CRM or any other DCRA system or log, in violation of their mandatory and non-discretionary duties;

   d.  Ms. Williams's failure to take any action on Officer Davis' March 22nd email, including by failing to inspect the Property or causing the Property to be inspected, in violation of his/her mandatory and non-discretionary duties;

e.  Mr. Barnes' failure to ensure that the PIR detailing the dangerous conditions and code violations at the Property was attached when he forwarded Ms. Saki-Tay's reply to Officer Davis' March 22nd email to FEMS John Doe Employee #1;

f.  Mr. Barnes', Ms. Williams's, FEMS John Doe Employee #1's, and/or FEMS John Doe Employee #2's failure to follow up with Officer Davis on his report of "Serious Code Violations" when they discovered 5410 14th Street did not exist;

g.  Ms. Tibbs', Mr. Handy's, and Mr. Allen's failure to enter Officer Davis' complaint into the DCRA Pilot CRM, QuickBase or any other DCRA system or log, in violation of their mandatory and non-discretionary duties;

h.  Mr. Brooks' failure to record any investigation into the Property until his entry in the DCRA Investigations Module on June 12, 2019, in violation of his mandatory and non-discretionary duties;

i.  Mr. Allen's failure to attempt to obtain an administrative search warrant despite Officer Davis' report, the history of maintenance, safety, and unlicensed rooming house complaints at the Property documented in the Accela records system, and his inability to gain entry to the Property after three purported visits;

j.  Mr. Allen's failure to follow-up with Officer Davis, despite a specific request from Officer Davis;

k.  Mr. Books and Mr. Allens' tracking of the status of their investigation into the Property in an offline spreadsheet;

l.  Mr. Brooks and Mr. Allens' suspending and closing of the investigation into the Property without ever having an inspector examine the Property or even having gained entry into the interior of the Property, in violation of their mandatory and non-discretionary duties;

m.  all District Defendants' failure to assure that the Property was in full compliance with the Construction Codes and regulations issued pursuant to the Construction Codes, despite Officer Davis' report that the Property was not in compliance with the Construction Codes, in violation of their mandatory and non-discretionary duties;

n.  all District Defendants' failure to examine, inspect, or thoroughly investigate the Property, despite Officer Davis' reporting the Property as unsafe, dangerous, lacking adequate means of egress, a fire hazard, and out of compliance with the Construction Codes, nearly five months before the fire at the Property, in violation of their mandatory and non-discretionary duties;

o.  all District Defendants' failure to deem the Property unsafe due to it being unsafe, having inadequate means of egress, constituting a fire hazard, and/or otherwise

being dangerous to human life after learning of the Property's dangerous conditions and code violations, in violation of their mandatory and non-discretionary duties;

p.    all District Defendants' failure to take down and remove the improvements, or make them safe and secure, due to the Property's dangerous conditions and code violations, in violation of their mandatory and non-discretionary duties; and,

q.    all District Defendants' failure to serve a written notice upon Defendant Walker, Plaintiff, and/or Yafet describing the condition of the Property, that it was deemed unsafe, and specifying the required repairs or improvements to be made to abate the unsafe conditions or requiring the improvements to be taken down and removed within a stipulated time, in violation of their mandatory and non-discretionary duties.

264.    Through the aforesaid acts and omissions of its employees (the District Defendants), the District breached its duties of care owed to Yafet.

265.    The aforesaid breaches constituted violations of *inter alia*, D.C. Code §§ 6–801 & 6–1405.01 and/or D.C. Mun. Regs. tit. 12A §§ 115.1, 115.2 & 115.3.

266.    D.C. Code §§ 6–801 & 6–1405.01 and D.C. Mun. Regs. tit. 12A §§ 115.1, 115.2 & 115.3. were enacted to prevent the type of incident that occurred (and to protect persons such as Yafet), and neither the District nor the District Defendants can offer an explanation as to the violations of such statutes and regulations, thereby rendering the District and the District Defendants negligent *per se* (*i.e.*, as a matter of law).

267.    As a direct, foreseeable, and proximate result of the District's and each of the District Defendants' aforesaid negligent/negligent *per se* acts and omissions, Yafet Solomen suffered extreme conscious physical pain and bodily injury, disfigurement and/or deformity, physical and emotional suffering, inconvenience and discomfort, and mental anguish, and incurred medical and hospital expenses prior to his untimely and horrific death.

268.    As a further direct, foreseeable, and proximate result of the District's and each of the District Defendants' aforesaid negligent/negligent *per se* acts and/or omissions, Yafet Solomen suffered future lost income, lost earnings, and loss of earning capacity.

269.    At all times relevant herein the District Defendants were each employees/agents of the District of Columbia.

270.    Each of the aforesaid negligent/negligent *per se* acts and/or omissions of the District Defendants were at least partially motivated by a desire to further the District's interests, thereby rendering the District vicariously liable for their negligent acts and/or omissions.

271.    Yafet acted properly in all respects and was free from negligence in connection with this incident.

272.    The negligent/negligent *per se* acts and omissions of the District and the District Defendants which constitute the basis of this Count were ministerial, involving the execution of policy.

**WHEREFORE**, Plaintiff, as personal and legal representative of decedent, Yafet Solomen, demands judgment against the District Defendants and the District, jointly and severally, as follows: (1) for compensatory damages in the amount of not less than $50,000,000.00, which amount will be proven at trial; (2) for all costs associated with this action; (3) for pre- and post-judgment interest as permitted by law; and (4) for such other and further relief as this Court may deem just and proper.

**COUNT V**
**Violation of 42 U.S.C. § 1983**
**Brought by Plaintiff, as Personal Representative, on Behalf of the Estate of Yafet Solomen**
<u>**Against the District**</u>

273.    All paragraphs of this Complaint are hereby incorporated by reference as if fully set forth herein.

274.     This Count arises under 42 U.S.C. § 1983 and the Fifth and Fourteenth Amendments to the United States Constitution and is alleged against the District. The basis for the claim asserted in this Count is the District's unconstitutional customs, policies, and/or practices with respect to, among other things, addressing complaints of dangerous and/or unlawful conditions at rental properties and its failure to train its employees to properly investigate said complaints.

275.     The District's unconstitutional customs, policies, and/or practices, and its failure to train its employees, as described above and below, were implemented, mandated, and/or maintained by the District's policymakers and/or by those whose edicts or acts may fairly be said to represent official policy.

276.     As evinced by A&M's findings in the A&M Report, media reporting, the public statements of District employees, policymakers, and residents, and the actions of the District Defendants (as laid out above and incorporated herein), the District, through the edicts or acts of its policymakers, maintained (explicitly and/or implicitly) the following customs, policies, and/or practices:

a. failing to implement clear channels of communication between its agencies, including, DCRA, FEMS, and MPD, and processes for reporting complaints of unlawful and/or dangerous conditions at rental properties;

b. maintaining unclear statutory and/or regulatory directives concerning the responsibilities and jurisdiction of DCRA and FEMS in addressing unlawful and/or dangerous conditions at rental properties;

c. failing to provide internal records keeping and investigations tracking systems at DCRA with the ability limit user access so that only authorized individuals had the ability to close investigations;

d. permitting the use of informal methods of communication, records keeping, and investigations tracking at DCRA, such as offline spreadsheets and personal email inboxes, in lieu of the formal systems available at the time of the fire;

e.  failing to implement procedures at FEMS that required FEMS employees to create a record of a complaint regarding unlawful and/or dangerous conditions at rental properties upon their receipt of such a complaint;

f.  failing to train DCRA employees who were tasked with handling and/or investigating complaints of unlawful and/or dangerous conditions at rental properties in District Construction Code requirements and the systems used to track property complaints and Code noncompliance;

g.  failing to train its essential DCRA investigators, and/or offering insufficient training via the use of external, third-party training courses and extremely brief on-the-job shadowing sessions;

h.  failing to implement formal standard operating procedures at DCRA which stated the specific requirements for following-up on complaints of unlawful and/or dangerous conditions at rental properties and/or marking such complaints as closed;

i.  failing to implement a process at DCRA by which urgent complaints of unlawful and/or dangerous conditions at rental properties were elevated among DCRA staff;

j.  relying on the oversight of DCRA Program Managers in investigating unlawful and/or dangerous conditions at rental properties, in lieu of requiring investigators to formally report their investigatory activities;

k.  maintaining procedures at DCRA for grating Basic Business Licenses and/or Certificates of Occupancy that relied upon property owners' self-certification of compliance with Construction Code requirements and/or that clearly and obviously created the opportunity for property owners/landlords to circumvent Construction Code requirements at their rental properties; and,

l.  relying on self-reporting by landlords', and/or district residents' and tenants' complaints, to identify dangerous, unlawful, and/or unlicensed buildings and rental units.

277.   Based on the findings of the A&M Report, media reports, and the public

statements of District employees, policymakers, and residents, Plaintiff is informed and believes,

and therefore alleges, that prior to the fire, the District, maintained similar customs, policies,

and/or practices as described in the foregoing paragraph which caused depravations of other

District of Columbia resident's constitutionally protected rights who were similarly situated as Yafet.

278.     Based on the findings of the A&M Report, media reports, and the public statements of District employees, policymakers, and residents, Plaintiff is informed and believes, and therefore alleges, that prior to the fire, the District, by and through its policymakers, was deliberately indifferent to, or in the exercise of reasonable care, should have known of, this pattern or practice of unconstitutional violations, or the existence of facts which created the potential for unconstitutional acts, and the District had a duty to train and instruct its employees to prevent similar acts against other District of Columbia residents, but failed to take steps to properly train its employees to investigate reports of unlawful and/or dangerous conditions at rental properties, and implement procedures to ensure such reports were properly addressed.

279.     Through its unconstitutional customs, policies, and/or practices, and its failure in training its employees, the District foreseeably created and/or amplified the risk to occupants of dangerous and/or unlawful rental properties, including Yafet, evincing its deliberate indifference to Yafet's rights protected by virtue of the Fifth and Fourteenth Amendments to the United States Constitution, including his rights to life, safety, and personal security. In this way, the District's actions were shocking and outrageous.

280.     The District's customs, policies, and/or practices, were a moving force and legal cause of Yafet's injuries, including, but not limited to his death and immense pain and suffering, and deprived Yafet of his rights, privileges, and immunities secured by the Fifth and Fourteenth Amendments of the United States Constitution, including the rights to life, safety, and personal security.

281.    By virtue of the District's awareness of dangerous and unlawful conditions at the Property, and/or statutes and regulations which laid out mandatory, non-discretionary actions for the District with respect to addressing such conditions upon the District's notice of same (*e.g.*, D.C. Code §§ 6–801 & 6–1405.01 and D.C. Mun. Regs. tit. 12A §§ 115.1, 115.2 & 115.3), a special relationship existed between the District and the tenants of the Property, including Yafet.

**WHEREFORE**, Plaintiff, as personal and legal representative of decedent, Yafet Solomen, demands judgment against the District as follows: (1) for compensatory damages in the amount of not less than $50,000,000.00, which amount will be proven at trial; (2) for reasonable costs of this suit and attorney's fees pursuant to 42 U.S.C. § 1988; (3) for pre- and post-judgment interest as permitted by law; and (4) for such other and further relief as this Court may deem just and proper.

## JURY TRIAL REQUESTED

Plaintiff respectfully requests a jury trial in this action to the maximum extent permitted by law.

Respectfully submitted,

HELEN A. KASAY

By:    Peter C. Grenier, D.C. Bar #418570
GRENIER LAW GROUP PLLC
1920 L Street, N.W., Suite 750
Washington, D.C. 20036
pgrenier@grenierlawgroup.com
Tel: (202) 768-9600
Fax: (202) 768-9604


John E. Antishin, D.C. Bar #1725116
GRENIER LAW GROUP PLLC
1920 L Street, N.W., Suite 750
Washington, D.C. 20036
jantishin@grenierlawgroup.com
Tel: (202) 768-9600
Fax: (202) 768-9604

Dated:  August 13, 2021

# Superior Court of the District of Columbia

CIVIL DIVISION- CIVIL ACTIONS BRANCH
INFORMATION SHEET

Helen A. Kasay, as Personal Representative
of the Estate of Yafet Solomen, deceased

Case Number: __2021 CA 002836 B__

vs

Date: __8/13/2021__

James Walker, et al.

☐ One of the defendants is being sued
in their official capacity.

| | |
|---|---|
| Name: *(Please Print)*<br>Peter C. Grenier<br>Firm Name:<br>Grenier Law Group, PLLC<br>Telephone No.:          Six digit Unified Bar No.:<br>202-768-9600                    418570 | Relationship to Lawsuit<br>☑ Attorney for Plaintiff<br>☐ Self (Pro Se)<br>☐ Other: _____ |

TYPE OF CASE:  ☐ Non-Jury      ☑ 6 Person Jury          ☐ 12 Person Jury
Demand: $ 150,000,000.00                          Other: _____

PENDING CASE(S) RELATED TO THE ACTION BEING FILED

Case No.:_____      Judge: _____      Calendar #:_____

Case No.:_____      Judge: _____      Calendar#:_____

---

NATURE OF SUIT:      *(Check One Box Only)*

**A. CONTRACTS**                                    **COLLECTION CASES**

☐ 01 Breach of Contract          ☐ 14 Under $25,000 Pltf. Grants Consent    ☐ 16 Under $25,000 Consent Denied
☐ 02 Breach of Warranty          ☐ 17 OVER $25,000 Pltf. Grants Consent    ☐ 18 OVER $25,000 Consent Denied
☐ 06 Negotiable Instrument       ☐ 27 Insurance/Subrogation                         ☐ 26 Insurance/Subrogation
☐ 07 Personal Property                  Over $25,000 Pltf. Grants Consent           Over $25,000 Consent Denied
☐ 13 Employment Discrimination  ☐ 07 Insurance/Subrogation                         ☐ 34 Insurance/Subrogation
☐ 15 Special Education Fees            Under $25,000 Pltf. Grants Consent           Under $25,000 Consent Denied
                                                     ☐ 28 Motion to Confirm Arbitration
                                                          Award (Collection Cases Only)

**B. PROPERTY TORTS**

☐ 01 Automobile                    ☐ 03 Destruction of Private Property       ☐ 05 Trespass
☐ 02 Conversion                    ☐ 04 Property Damage
☐ 07 Shoplifting, D.C. Code § 27-102 (a)

**C. PERSONAL TORTS**

☐ 01 Abuse of Process              ☐ 10 Invasion of Privacy               ☐ 17 Personal Injury- (Not Automobile,
☐ 02 Alienation of Affection       ☐ 11 Libel and Slander                        Not Malpractice)
☐ 03 Assault and Battery           ☐ 12 Malicious Interference             ☑ 18 Wrongful Death (Not Malpractice)
☐ 04 Automobile- Personal Injury   ☐ 13 Malicious Prosecution             ☐ 19 Wrongful Eviction
☐ 05 Deceit (Misrepresentation)    ☐ 14 Malpractice Legal                 ☐ 20 Friendly Suit
☐ 06 False Accusation              ☐ 15 Malpractice Medical (Including Wrongful Death)  ☐ 21 Asbestos
☐ 07 False Arrest                  ☐ 16 Negligence- (Not Automobile,      ☐ 22 Toxic/Mass Torts
☐ 08 Fraud                                Not Malpractice)                 ☐ 23 Tobacco
                                                                          ☐ 24 Lead Paint

SEE REVERSE SIDE AND CHECK HERE          IF USED

CV-496/June 2015

# Information Sheet, Continued

**C. OTHERS**

☐ 01 Accounting
☐ 02 Att. Before Judgment
☐ 05 Ejectment
☐ 09 Special Writ/Warrants
    (DC Code § 11-941)
☐ 10 Traffic Adjudication
☐ 11 Writ of Replevin
☐ 12 Enforce Mechanics Lien
☐ 16 Declaratory Judgment

☐ 17 Merit Personnel Act (OEA)
    (D.C. Code Title 1, Chapter 6)
☐ 18 Product Liability

☐ 24 Application to Confirm, Modify,
    Vacate Arbitration Award (DC Code § 16-4401)
☐ 29 Merit Personnel Act (OHR)
☐ 31 Housing Code Regulations
☐ 32 Qui Tam
☐ 33 Whistleblower

**II.**

☐ 03 Change of Name
☐ 06 Foreign Judgment/Domestic
☐ 08 Foreign Judgment/International
☐ 13 Correction of Birth Certificate
☐ 14 Correction of Marriage
    Certificate
☐ 26 Petition for Civil Asset Forfeiture (Vehicle)
☐ 27 Petition for Civil Asset Forfeiture (Currency)
☐ 28 Petition for Civil Asset Forfeiture (Other)

☐ 15 Libel of Information
☐ 19 Enter Administrative Order as
    Judgment [ D.C. Code §
    2-1802.03 (h) or 32-151 9 (a)]
☐ 20 Master Meter (D.C. Code §
    42-3301, et seq.)

☐ 21 Petition for Subpoena
    [Rule 28-I (b)]
☐ 22 Release Mechanics Lien
☐ 23 Rule 27(a)(1)
    (Perpetuate Testimony)
☐ 24 Petition for Structured Settlement
☐ 25 Petition for Liquidation

**D. REAL PROPERTY**

☐ 09 Real Property-Real Estate
☐ 12 Specific Performance
☐ 04 Condemnation (Eminent Domain)
☐ 10 Mortgage Foreclosure/Judicial Sale
☐ 11 Petition for Civil Asset Forfeiture (RP)

☐ 08 Quiet Title
☐ 25 Liens: Tax / Water Consent Granted
☐ 30 Liens: Tax / Water Consent Denied
☐ 31 Tax Lien Bid Off Certificate Consent Granted

_____
Attorney's Signature

8/13/2021
_____
Date

CV-496/ June 2015

EXHIBIT 1



# Review and Investigation of Code Enforcement Policies, Procedures, and Inter-Agency Communications Between DCRA, FEMS, and MPD

## October 25, 2019

PRIVILEGED AND CONFIDENTIAL

ATTORNEY WORK PRODUCT

Submitted To:

Rashad M. Young

City Administrator

Office of the City Administrator

1350 Pennsylvania Ave, Suite 513

Washington, DC  20004

Submitted By:

Alvarez & Marsal Disputes & Investigations, LLC

655 15th St, NW, Suite 600

Washington, DC 20005

© 2019 Alvarez & Marsal.  All rights reserved.

BETWEEN DCRA, FEMS, AND MPD

# Table of Contents

I.    Executive Summary ............................................................................................................ 2

   A.   Key Roles ...................................................................................................................... 2

   B.   Findings ......................................................................................................................... 4

   C.   Observations ................................................................................................................. 6

II.   Background ....................................................................................................................... 8

   A.   Parties and Roles ......................................................................................................... 9

   B.   Scope ........................................................................................................................... 11

III.  Approach ......................................................................................................................... 13

   A.   Introduction ................................................................................................................. 13

   B.   Policies and Procedures ............................................................................................. 13

   C.   Interviews .................................................................................................................... 23

   D.   Communications and Document Review ..................................................................... 27

IV.   Findings & Observations ................................................................................................. 30

   A.   Introduction ................................................................................................................. 30

   B.   Key Findings ............................................................................................................... 30

   C.   Observations ............................................................................................................... 39

V.    Recommendations ........................................................................................................... 50

   A.   Introduction ................................................................................................................. 50

   B.   Relevant Improvements Made by District Agencies To-Date ...................................... 50

   C.   Recommendations to Address Key Findings ............................................................... 51

   D.   Recommendations to Address Observations .............................................................. 59

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

## I.   EXECUTIVE SUMMARY

In March 2019, an officer with District of Columbia Metropolitan Police Department ("MPD") reported code violations to both the Department of Consumer and Regulatory Affairs ("DCRA") and District of Columbia Fire and Emergency Medical Services ("FEMS") regarding unsafe conditions in an unlicensed rooming house located at 708 Kennedy Street NW ("708 Kennedy"). Nearly five months after the reporting officer ("MPD Officer") initially reported this unsafe property to DCRA and FEMS, a fire occurred at the property causing the deaths of two tenants.

In the aftermath of the fire at 708 Kennedy ("708 Kennedy Fire"), the Office of the City Administrator ("OCA") engaged Alvarez & Marsal ("A&M") to conduct an independent review and investigation into the code enforcement process and communication procedures between DCRA, FEMS, and MPD (collectively, "District Agencies").

Over a period of five weeks, A&M reviewed code enforcement policies and procedures, email communications, systems data, and activity logs.  A&M researched best practices and conducted over 25 interviews of key staff to present a report detailing findings and observations regarding:

(1) actions taken by District Agencies to address reported violations at 708 Kennedy ("708 Kennedy Complaint") prior to the fire,
(2) identification of gaps in code, policies, and procedures related to the handling of reported violations at 708 Kennedy in advance of the fire,
(3) recommendations to improve policies and procedures and communications within and across the agencies.

As a result of this review and investigation, A&M has identified key findings ("Findings") which constitute the most critical missteps which, if handled differently, could have reduced the likelihood of loss in the case of the 708 Kennedy Fire. In this report, A&M has also outlined several observations which reflect underlying issues which have contributed to or could contribute to failure by the District Agencies to remedy unsafe buildings ("Observations").

### A.   Key Roles

The Findings reference many roles across DCRA, FEMS, and MPD.  For ease of reading the below Findings, A&M has included the following table which lists the key individuals and responsibilities relative to Findings.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

### Table 1 - Key Roles

| Agency | Position | Description of Role | As Referenced Within Report |
|---|---|---|---|
| MPD | MPD Police Officer | Officer who reported the 708 Kennedy Complaint | MPD Officer |
| DCRA | Community Outreach Specialist, Office of Communications | Part of an account management team tasked with handling escalated customer servicer issues for strategic accounts | DCRA Community Outreach Specialist |
| DCRA | Program Manager, Housing Inspections / Duty Officer | Program Manager - manages housing inspection assignments; Duty Officer - available for emergency response on a 24-hour basis as the primary agency contact for after hour emergency incidents | DCRA Duty Officer |
| DCRA | Program Analyst, Regulatory Investigation Section | Processes investigations intake after Program Manager or Program Officer assign investigator to a case | DCRA Investigations Intake Analyst |
| DCRA | Program Manager, Regulatory Investigation Section | Also referred to as Chief Compliance Officer. Oversees the activities of the Regulatory Investigation Section | DCRA Investigations Program Manager |
| DCRA | Program Officer, Regulatory Investigation Section | Supervises caseload of investigators.  When the Investigations Program Manager left DCRA approx. June 2019, the Investigations Program Officer took over the Program Manager's responsibilities on an interim basis | DCRA Investigations Program Officer |
| DCRA | Investigator, Regulatory Investigation Section | Investigator assigned to 708 Kennedy Complaint | DCRA 708 Investigator |
| FEMS | Lieutenant - Technical Section | Lieutenant in FEMS Technical Section | FEMS Technical Section Lieutenant |
| FEMS | Lieutenant - Administrative Officer | Administrative Officer at FEMS responsible for assignment of Fire Inspectors | FEMS Inspections Lieutenant |

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

### B.    Findings

The findings below are organized by Agency, for a chronological series of events, please review the *Key Findings* section of this report.

**Table 2 - Key Findings**

| Finding | Description |
|---|---|
| **Seven Critical Missteps within DCRA** | 1) March 22, 2019 – The DCRA Community Outreach Specialist was one of four DCRA employees who received the initial email from the MPD Officer that reported the violations at 708 Kennedy. Within 15 minutes of receipt of the email, the DCRA Community Outreach Specialist forwarded the email to the DCRA Duty Officer with the Public Incident Report ("PIR") attached and then immediately replied via email to all individuals on the initial email indicating that the email was forwarded to the DCRA Duty Officer. However, the Community Outreach Specialist communicated with the DCRA Duty Officer using non-standard communication protocol, having emailed the MPD Officer's communication, which included the information of urgent and unsafe conditions rather than following standard operating procedures ("SOPs"), which required contact via the Homeland Security and Emergency Management Agency ("HSEMA") by telephone. **The DCRA Community Outreach Specialist followed improper protocol by communicating an urgent complaint to the DCRA Duty Officer via email.** <br><br> 2) March 22, 2019 - The DCRA Duty Officer (a trained inspector and the Inspections Program Manager) did not respond to the initial 708 Kennedy Complaint forwarded by the DCRA Community Outreach Specialist via email and did not ensure that the complaint was assigned to the appropriate individual(s). **The DCRA Duty Officer did not address the 708 Complaint immediately as an unsafe building or route the complaint appropriately for inspection or investigation.** <br><br> 3) April 24, 2019 – The MPD Officer emailed the DCRA Investigations Intake Analyst on April 24, requesting that a DCRA investigator be sent to 708 Kennedy. The DCRA Intake Analyst followed the normal intake process of first routing the complaint to the DCRA Investigations Program Officer and DCRA Investigations Program Manager for assignment. **Neither the DCRA Investigations Program Officer nor the DCRA Investigations Program Manager assigned the 708 Kennedy Complaint to an investigator.** |

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

| | |
|---|---|
| | 4) May 21-24, 2019 – After a third follow-up email from the MPD Officer on May 21 regarding the 708 Kennedy Complaint, the DCRA Program Manager assigned the investigation of 708 Kennedy ("708 Kennedy Investigation") to the DCRA 708 Investigator. The DCRA Investigations Intake Analyst notified the MPD Officer of the assignment. **The DCRA 708 Investigator performed a limited investigation (reporting that the DCRA 708 Investigator visited, but did not enter the property, on three occasions - May 22, May 23, and May 24 - and did not evaluate the rear of the property) and failed to adequately document investigations activities and findings.** |
| | 5) June – July 2019 – After a fourth email from the MPD Officer on June 3, this one sent directly to the DCRA 708 Investigator and the DCRA Investigations Intake Analyst, and a reminder to the DCRA 708 Investigator from the DCRA Investigations Intake Analyst on June 11, the DCRA 708 Investigator took no further action on the property in June or July. **Due, in part, to the reassignment of the DCRA 708 Investigator, the DCRA Investigations Program Officer marked the case as "suspended" in the Program Officer's log by July 26[1] without any case file or record of activities.** |
| | 6) August 16, 2019 –The DCRA 708 Investigator never reached out to the MPD Officer, DCRA maintained no case file, and the closure of the case was not evidenced by a signature of approval. **The DCRA Investigations Program Officer closed the 708 Kennedy case without any further investigation nearly three months after the DCRA 708 Investigator's reported attempted visits in May.** |
| | 7) March 22 – August 18, 2019 – Over the 5 months that transpired and the multiple follow-up emails sent to DCRA by the MPD Officer between the initial report of the 708 Kennedy Complaint and the date of the 708 Kennedy Fire, **none of the nine DCRA employee that were aware of the 708 Kennedy Complaint or included on related communications, entered it into the pilot Customer Relationship Management database[2] ("Pilot CRM"), a tool launched by DCRA in February 2019 and utilized to track customer requests and complaints.** |

---

[1] The Program Officer maintained an offline version of the QuickBase Investigations log, because of this, the exact dates of actions such as suspension or closure of cases are not consistently recorded in QuickBase.

[2] DCRA communicated to A&M that the CRM was a pilot at this time pending replacement by an enterprise CRM system. The Pilot CRM system, rolled out by DCRA in February 2019, was launched to help DCRA streamline the way it responded to customer inquiries and to ensure that such responses were done in a timely manner.

---

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

| | |
|---|---|
| **Two Critical Missteps within FEMS** | 1) March 23, 2019 – The FEMS Technical Section Lieutenant received the MPD Officer's initial March 22 email and then forwarded the DCRA Community Outreach Specialist's Response to the MPD Officer's email without the PIR attachment to the FEMS Inspections Lieutenant. **By forwarding the DCRA response rather than the MPD Officer's original email with the PIR attachment, the FEMS Technical Section Lieutenant did not include the attached PIR including pertinent information regarding 708 Kennedy.** |
| | 2) March 23, 2019 -**The FEMS Inspection Lieutenant in receipt of the MPD Officer's March 22 email (without the PIR attachment) made no attempt to follow-up with FEMS or MPD staff to verify complaints included in the email and did not effectively address the MPD Officer's complaints.** |
| **No Critical Missteps within MPD** | 1) The MPD Officer's initial email on March 22 did not include the exact address for 708 Kennedy – the property address was not referenced in the body of the email and the attached PIR referenced the 700 Block of Kennedy Street NW.  However, had either agency followed-up with the MPD Officer, DCRA or FEMS could have easily overcome any information gaps left by the MPD Officer's initial report. |
| | The MPD Officer's diligence, evidenced through repeated follow-ups with DCRA, provided DCRA with multiple opportunities to address the unsafe building conditions at 708 Kennedy. **The findings related to DCRA and FEMS outlined above prevented remediation of the unsafe conditions at 708 Kennedy prior to the fire.** |

The findings outlined above identify **nine critical missteps by DCRA and FEMS which contributed to the lack of action to remediate the violations reported at 708 Kennedy.** Each of these points, if repeated, could contribute to future events like the 708 Kennedy Fire.

### C.   Observations

Many factors contributed to the failure of DC agencies to remedy the concerns identified by the MPD Officer. **In addition to the agency-specific findings outlined above, A&M observed underlying issues which have contributed to or could contribute to failure to remedy unsafe buildings.** Note that the Observations identified below are based on DCRA systems and processes as they existed prior to the 708 Kennedy Fire.

These eleven observations are outlined below across four categories: Communications and Coordination Across Agencies, Systems Maturity and Utilization, DCRA Investigations Management, and Unlicensed Property Oversight.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

## Communications and Coordination Across Agencies

1. **DCRA, FEMS, and MPD lack clear and well understood communication channels and processes for reporting, collaborating, and following-up on reported code violations**

2. **Lack of responsibility for and ownership of building safety issues across multiple agencies**

## Systems Maturity and Utilization

3. **DCRA's Pilot CRM and Investigations Module are inconsistently used and lack functionality to enhance accountability**

4. **FEMS use of the Zoll system does not support transparency and accountability for the handling of complaints**

5. **Systems access is limited within and across District Agencies**

6. **Audit log unavailable for DCRA complaint and investigations tracking applications**

## DCRA Investigations Management

7. **Lack of continuity of DCRA Investigations management personnel allowed the 708 Kennedy case to remain unresolved**

8. **Limited formal training or job requirements for investigators**

9. **No process for prioritizing properties for investigation**

10. **Oversight and accountability over investigations is limited**

## Unlicensed Property Oversight

11. **District Agencies have limited resources and authority to investigate unlicensed rental properties**

The District Agencies have introduced significant reforms in response to the 708 Kennedy Fire. A&M also notes that DCRA leadership recognized and understood many of the underlying issues prior to the Kennedy Fire and, as a result, is in the process of taking steps to change the culture, systems, and policies and procedures of the agency.

To mitigate the risk of future incidents like the Kennedy Fire, we recommend that **District Agencies take immediate action to remedy these identified issues**. Our recommendations for corrective action and relevant improvements made by the District Agencies to-date are outlined in the *Recommendations* section of the report.

---

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

Between DCRA, FEMS, and MPD

## II.    Background

On August 18, 2019, a fire occurred in the basement of the building at 708 Kennedy Street in Northwest DC. The property was being used as an unlicensed rooming house and did not meet the District's building or fire codes. The unlicensed rooming house had no working smoke detectors, no lighted exit signs or fire exit, one fire extinguisher that was not tagged, and makeshift doors with padlocks that would not allow occupants to exit in an emergency. The 708 Kennedy Fire caused the death of two residents, including a 9-year-old boy, who were trapped inside the building during the fire.

Five months earlier, an MPD Officer reported to FEMS and DCRA several apparent code violations and observed that 708 Kennedy was being used as an unlicensed rooming house. In the MPD Officer's PIR dated March 22, 2019, serious code violations were outlined in detail, emphasizing that both DCRA and FEMS should send inspectors to the location. The report was sent via email to two FEMS employees and four DCRA employees. Neither FEMS nor DCRA followed-up appropriately on the initial inquiry.

Over the next three months, the MPD Officer followed-up regarding the status of the request for investigation of 708 Kennedy with three different DCRA employees on four separate occasions. It was only after the MPD Officer's third follow-up request in May 2019 – two months after the initial complaint – that DCRA assigned an investigator to follow up.

The DCRA 708 Investigator reported attempting to gain access to the interior of the building and speak to the tenants on three separate occasions in May 2019 in order to investigate the reported code violations. The DCRA 708 Investigator documented only the first attempt with photos of the front of the building. The DCRA 708 Investigator never spoke with the property owner or any tenants, never visited the rear of the property, and never gained access to the interior of the building. Ultimately, no action was taken by DCRA or FEMS to abate the potential code violations. The case was suspended and later closed just two days before the fire at 708 Kennedy.

Figure 1 below provides a visual representation of the timeline of events from the date of the initial report by the MPD Officer to the date of the 708 Kennedy Fire.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

**Figure 1: Critical Events Related to 708 Kennedy Fire**



A. **Parties and Roles**

A&M's review and investigation of the District's code enforcement process and inter-agency communications focused on three governmental agencies: DCRA, FEMS, and MPD. Each of the three District Agencies played a key role in the events leading up to the 708 Kennedy Fire.

*1. DCRA*

DCRA is responsible for the regulation of construction and business activity in the District of Columbia. DCRA provides a multitude of services to the District, including issuance of business & professional licenses, inspection and abatement of housing code violations related to construction activity, buildings, and rental housing, operation of the permit intake center, and review of construction compliance with building codes and zoning regulations. DCRA consists of the following divisions:

- Business and Professional Licensing Administration (BPLA) – comprises eight divisions including Business Licensing, Corporations, Consumer Protection, Professional Licensing, Regulatory Investigations Section ("RIS")[3], Small Business Resource Center, Vending & Special Events, and Weights & Measures.

---

[3] RIS was merged into the Consumer Protection Unit ("CPU") in 2019.

---

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

- o RIS investigates complaints and proactively reviews business license applications to ensure businesses are operating in compliance with applicable licensing, zoning and corporation regulations and statutes.

- Inspection and Compliance – conducts construction inspections, house code inspections, illegal construction investigations, and certifies third party inspection agencies.

- Permit Operations Division – reviews applications for and issue Building Permits, Postcard Permits, Supplemental Permits, Certificates of Occupancy, and Home Occupation Permits.

- Regulatory Enforcement Administration – identifies and accounts for unoccupied property, conducts inspections of residential housing complaints that violate DC Housing code regulations.

- Surveyors – maintains records of all land plats and subdivisions of private and District government property.

- Zoning Administration – reviews applications for conformance with DC Zoning Regulations.

DCRA investigators within RIS investigate complaints against businesses providing services in and/or to the District of Columbia and issue Notices of Infraction for violations.  DCRA Housing inspectors inspect buildings to ensure that they are in safe, habitable condition in compliance with the DC Housing Code.

### 2. FEMS

FEMS is responsible for the health and safety of the public through pre-hospital treatment and transportation, fire prevention, fire suppression and rescue activities, and homeland security awareness. FEMS is responsible for Fire Code enforcement in residential apartment buildings and commercial properties. The Property Maintenance Code has fire safety requirements for residential properties that are enforced by DCRA. FEMS and DCRA communicate to determine jurisdiction and coordinate response efforts. Within FEMS, the Assistant Fire Chief of Technical Services supervises the Fire Prevention Division. The Fire Prevention Division ("FPD") is divided into four major branches:

- Administrative Support Services Branch – provides administrative support to FPD such as procurement, accounting of user fees, processing of fines issued, and compilation of monthly reports.

- Code Enforcement Branch – assigns Fire inspectors at all eight wards of the District. Fire inspectors' responsibilities include routine maintenance inspections, investigation of fire code complaints, annual license renewal inspections, inspection of DC public schools, fire security for the President, fire safety inspection at large public gatherings, and public assembly inspections at nightclubs.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

- Technical Inspections Plans and Permits Branch – performs specialized inspections required by operational permits specified in the ICC International Fire Code, as amended by the DC Municipal Regulations Fire Code ("DCMR").

- Fire Investigations Branch – performs fire origin and cause investigations, arson investigations, and the juvenile fire setter's intervention program.

### 3.   MPD

MPD is the primary law enforcement agency for the District of Columbia. MPD is divided into seven districts determined by geographic location. MPD officers have a duty to report any violation of housing, building, or health codes that is encountered[4] on the job to the appropriate District Agency. MPD officers also assist DCRA with contacting home and business owners to obtain information necessary to the code enforcement process.

### B.   Scope

A&M conducted a comprehensive review and investigation of the District's code enforcement process – specifically focusing on the licensing and inspections process – and communications between DCRA, FEMS, and MPD related to the code enforcement process. Under the Statement of Work ("SOW"), the goal of A&M's investigation is to determine what District Agencies did in the time leading up to the fire; what they should have done pursuant to the relevant District law or policy; and what policies and protocols need to be implemented to prevent future incidents similar to the 708 Kennedy Fire. Key activities performed by A&M included:

- Reviewing protocols, authorities, and practices for licensing homes, inspecting, and investigating properties for code enforcement compliance including communications between District Agencies.

- Recommending procedures to be implemented to improve the communications between District Agencies for reporting the violations and follow-up procedures.

- Reviewing the processes and communications that transpired between District Agencies in relationship to the Kennedy Fire.

- Documenting the procedures utilized regarding 708 Kennedy including the reporting of the violations by MPD to FEMS and DCRA and the follow-up procedures as they relate to the violations reported.

---

[4] Section V, Article 22 of General Order 201.26

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

- Determining the breakdown in communications between MPD, FEMS, and DCRA when reporting and enforcing code violations and making recommendations for improvement.

- Interviewing agency directors at DCRA and FEMS including staff that are involved with processing license, code violation inspection, as well as those individuals who were responsible for investigating the code violation inspection at 708 Kennedy.

A&M's approach, findings and observations, and recommendations are described in detail within the report below.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

Page | 12

Between DCRA, FEMS, and MPD

## III.   Approach

### A.   Introduction

In order to appropriately assess the actions taken by DCRA and FEMS in response to the violations reported by the MPD Officer at 708 Kennedy and to provide comprehensive recommendations regarding the policies and procedures for each of the District Agencies related to the licensing, inspection, and investigation of properties for code enforcement compliance, A&M did the following:

- Obtained and reviewed all relevant policies and procedures, including SOPs that were effective as of March 22, 2019, when the violations at 708 Kennedy were first reported to DCRA and FEMS, and any subsequent updates

- Reviewed email communications regarding the violations identified at 708 Kennedy and the actions taken leading up to the 708 Kennedy Fire

- Conducted fact-finding and investigative interviews of personnel at DCRA, FEMS, and MPD including agency leaders, staff involved with code violation inspections and regulatory investigations, as well as those individuals who had knowledge of and/or were specifically responsible for investigating the code violations reported at 708 Kennedy

- Researched practices in corresponding agencies in other metropolitan areas to inform recommendations

A&M then analyzed the information sources described above to 1) assess the actions taken by DCRA and FEMS in response to the reported violations, 2) identify gaps in the relevant policies and procedures that could leave the District and its residents vulnerable to future incidents similar to the 708 Kennedy Fire, and 3) provide recommendations to address the gaps identified.

### B.   Policies and Procedures

Given the focus of the SOW on how District Agencies respond to reported code violations, A&M's priority was to obtain and review guidance available under general District law as well as District Agencies' policies and procedures regarding reported code violations. While District of Columbia Code ("DC Code") and the District of Columbia Municipal Regulations ("DCMR") establish the relevant laws and regulations of the District, each agency establishes its own policies and procedures that enable it to carry out its mission in compliance with those laws and regulations.

The policies and procedures reflected in the tables below are listed chronologically. All policies and procedures issued subsequent to the 708 Kennedy Fire have been shaded grey. Please note that the policies and procedures are those that were provided by District Agencies in response to our data requests.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

### 1.   FEMS

FEMS issues General Orders affecting the permanent policy of the agency. The table below reflects those FEMS policies that are relevant to the identification and reporting of code violations.

**Table 3 - FEMS Policies and Procedures Re: Code Violations**

| Ref. | Agency | Title | Summary | Date of Issue |
|------|--------|-------|---------|---------------|
| 1 | FEMS | Administrative Search Warrant Handout | DC officials may apply for Administrative Search Warrant upon tenant refusal or after reasonable efforts to gain access on at least two documented occasions. Reference to D.C. SCR-Civil Rule 204 (2008). | 4/2/1990 |
| 2 | FEMS | GO 501 - Right to Entry | General Order - Members shall request permission to enter non-public areas and contact supervisor to seek an administrative search warrant upon refusal. A non-public area may be entered without consent or warrant when the member reasonably believes that exigent circumstances exist - life threatening conditions requiring immediate attention to prevent harm or death. Exigent conditions are those that are highly likely to cause fire or serious injury within minutes or hours. | 10/1/2009 |
| 3 | FEMS | GO 505 - Referral Procedures | General Order - Inspector shall determine the issue, document the issue (pictures, notes, reports, etc.), complete referral form (FEMS Form 29) and submit to supervisor, and send referral to appropriate agency after review. All referrals must have documentation to the fact that they have been transmitted and received by the other agency (fax confirmation, email confirmation). | 10/1/2009 |
| 4 | FEMS | GO 503 - Fire Inspection Procedures | General Order - Fire inspectors shall schedule all fire inspections in Zoll system within 72 hours of issuance from supervisor (complaint inspections shall be scheduled and completed on same date of receipt from supervisor) and complete a minimum of 6 fire inspections daily. Provides entry procedures, inspection and documentation procedures, and violation documentation and reporting procedures. All notices and orders are sent by certified mail. | 4/1/2018 |

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

| Ref. | Agency | Title | Summary | Date of Issue |
|---|---|---|---|---|
| 5 | FEMS | GO 506 - Administrative Search Warrant Procedures | General Order - Administrative Search Warrant can be obtained if consent to inspect is refused after two attempts to gain access or if the information provided is enough to believe that an offense has been committed and proof is documented. Affidavit for administrative search warrant must be reviewed by the Fire Prevention Division Supervisor and signed by an Office of the Attorney General ("OAG") attorney. | 6/24/2018 |
| 6 | FEMS | GO 503 - Fire Inspection Procedures | General Order – States that Fire inspectors shall schedule all fire inspections in the Zoll system within 72 hours of issuance from supervisor (complaint inspections shall be scheduled and completed on same date of receipt from supervisor). Provides entry procedures, inspection and documentation procedures, and violation documentation and reporting procedures. All notices and orders must be sent by certified mail. For all building inspections, Fire inspectors shall note in the comment section of the record that they have reviewed the building's fire protection records. | 10/1/2018 |
| 7 | FEMS | GO 505 - Referral Procedures | General Order - Inspector shall determine the issue, document the issue (pictures, notes, reports, etc.), complete referral form (FEMS Form 29) and submit to Inspections Supervisor for review and signature of approval, send referral to appropriate agency after review. All referrals must have documentation to the fact that they have been transmitted and received by the other agency (fax confirmation, email confirmation). The Inspection Supervisor will follow-up with the receiving agency within 2 hours to identify actions and findings and ensure the referral information is entered into Fire Records Management System. If there is immediate need for a representative from DCRA, Fire inspectors shall contact HSEMA. | 8/23/2019 |

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

| Ref. | Agency | Title | Summary | Date of Issue |
|---|---|---|---|---|
| 8 | FEMS | GO 502 - Complaint Procedures | General Order - Complaints will be forwarded to Administrative Assistant for logging/assignment and copied to Fire Marshal and Assistant Fire Marshal. The Administrative Assistant logs the complaint, assigns a tracking number, and forwards to Division Inspections Supervisor for inspector assignment. inspector must speak with complainant or inspect location within 24 hours or the next business day. Administrative assistant shall log completed report and forward copy to Fire Marshal / Assistant Fire Marshal. | 8/23/2019 |
| 9 | FEMS | GO 501 - Right of Entry | General Order - Members shall request permission to enter non-public areas and contact supervisor to seek an administrative search warrant upon refusal (GO 506). A non-public area may be entered without consent or warrant when the member reasonably believes that exigent circumstances exist - life threatening conditions requiring immediate attention to prevent harm or death. Exigent conditions are highly likely to cause fire or serious injury within minutes or hours. The Inspections Supervisor shall be notified of unsafe conditions. | 9/22/2019 |

Prior to the Kennedy Fire, FEMS had several General Orders in effect that addressed the handling and referral of code violations including the right of entry to a property, fire inspection procedures, referral procedures, and administrative search warrant procedures. However, there were no General Orders that outlined how code violations should be managed by the agency.

In the weeks subsequent to the Kennedy Fire, FEMS revised three of its General Orders to provide more clarity and created a new General Order to address procedures around complaint processing.

## 2.    MPD

The MPD issues written directives referred to as General Orders which include statements of policy and interpretations of policy. The table below reflects those MPD policies and procedures relevant to the identification and reporting of code violations. The MPD only has two policies that address the identification and reporting of code violations. The first is a General Order with an issue date of April 5, 2011, and the second is an Executive Order issued on September 3, 2019 (i.e., subsequent to the Kennedy Fire).

---

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

**Table 4 - MPD Policies and Procedures Re: Code Violations**

| Ref. | Agency | Title | Summary | Date of Issue |
|------|--------|-------|---------|---------------|
| 1 | MPD | GO 201.26 Article 22 | General Order - MPD members must report to the appropriate government agency any violations of plumbing, building, or health codes encountered. | 4/5/2011 |
| 2 | MPD | EO 19-005 | Executive Order - Effective immediately, when a member observes a serious fire code violation, immediately notify a supervisor who shall respond to the scene. The on-scene supervisor will notify FEMS Fire Liaison Officer through the Office of Unified Communications ("OUC") of the location and threat. Member shall send email to dcra@dc.gov, copying mpdcic@dc.gov, prior to end of shift and complete the appropriate field report. | 9/3/2019 |

Prior to the Kennedy Fire, MPD's policies and procedures around the identification and reporting of code violations were vague. The guidance in effect on March 22, 2018, when MPD reported the violations to DCRA and FEMS, was General Order 201.26 (Duties, Responsibilities and Conduct of Members of the Department) issued on April 25, 2011.

Section V, Article 22 of General Order 201.26 outlines the roles of responsibilities of officers and states that MPD officers are to:

> *Report to the appropriate government agency any incidentals such as street lights out, traffic signs down, broken fire hydrants or dangerous roadway or sidewalk conditions.*
>
> *a. Report any violations of plumbing, building or health codes to the appropriate agency.*
>
> *b. Should the member be unable to identify the correct agency, he/she shall request that a notification be made to the Mayor's Command Center through the Command Information Center (CIC) or the OUC.*

On September 3, 2019, in an effort to clarify the actions that an MPD officer should take when violations are identified, the MPD issued Executive Order 19-005 (Fire Code Violations) which also notes that the MPD is currently working with FEMS and DCRA on a new protocol for reporting and responding to potential fire code violations. The Executive Order further notes that, in the interim, members shall adhere to the new procedures contained in the order.

---

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

Executive Order 19-005 notes the following:

> *Effective immediately, when a member observes what appears to be a serious fire code violation (i.e., conditions that appear to present a serious hazard or possible life-safety threat), he or she shall notify a supervisor who shall respond to the scene.*
>
> *A.     The on-scene supervisor shall notify the FEMS Fire Liaison Officer (FLO) through the OUC of the location and potential life-safety threat.*
>
> *B.     The member shall send an email to dcra@dc.gov, copying mpdcic@dc.gov, prior to the end of his or her shift that includes the location's address, an explanation of the alleged violation, and the associated CCN.*
>
> *C.     In all cases, the member shall complete the appropriate field report and document notifications made in the internal narrative.*

FEMS leadership has noted to A&M that it has asked MPD to add the Fire Prevention Department inbox (fems.fireprevention@dc.gov) as a location to which MPD officers should also send complaints.

### 3.     DCRA

A&M requested and received formalized policies and procedures from DCRA related to investigation and inspection of property code violations.  The materials provided by DCRA also included informal procedures related to regulatory investigations that were communicated via emails to investigators. The table below reflects those DCRA policies and procedures (both formal and informal) relevant to the identification and reporting of code violations.

**Table 5 - DCRA Polices & Procedures Re: Code Violations**

| Ref. | Agency | Title | Summary | Date of Issue |
|---|---|---|---|---|
| 1 | DCRA | Standard Operating Procedures: Generating Property Maintenance NOV and NOI | SOP establishes standards for generating Notice of Violation ("NOV") and Notice of Infraction ("NOI") for housing code violations, including NOV preparation by administrative staff, documentation, and approval. | 10/25/2018 |
| 2 | DCRA | Title 11, DCMR Zoning Regulations, Subtitle U-251 | Provides a listing of uses permitted as home occupations. A Home Occupancy Permit (HOP) shall be required prior to the practice of a home occupation and shall comply with | 10/26/2018 |

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

| Ref. | Agency | Title | Summary | Date of Issue |
|---|---|---|---|---|
| | | | conditions and requirements. Provides a listing of uses prohibited as home occupations. | |
| 3 | DCRA | OCI FY2019 | DCRA performance goals for FY2019 including benchmarks related to NOI reviewer efficiency, NOI service & record keeping, collections, FOIA, and professional development. | 11/14/2018 |
| 4 | DCRA | Investigative Report Submission Process | The report submission process will be streamlined via computer. All reports, photographs, complaints, etc. are uploaded to the computer and submitted for review via email. All reports will be reviewed within an hour of submission. The printing, signing, and submission of the final report should be done COB of the day the report was initially submitted for review. | 12/17/2018 |
| 5 | DCRA | New Forms | New forms related to witness statements for cases that involve an NOI and tenant statements related to rent paid for illegal rentals. | 12/28/2018 |
| 6 | DCRA | Email for Report Submission | The report submission process will be streamlined via computer. All reports, photographs, complaints, etc. are uploaded to the computer and submitted for review via email. All reports will be reviewed within an hour of submission. The printing, signing, and submission of the final report should be done by close of business of the day the report was initially submitted for review. | 1/8/2019 |
| 7 | DCRA | Habitability Customer Service Emergency Process | All correspondence involving emergencies (no heat, no utilities, flooding) must be assigned in the CRM to the appropriate email address. Emergency cases should be assigned to inspectors in time for inspectors to conduct inspection and return to office by 6pm. All after hours calls will be given to the DCRA Duty Officer to triage. Process provides criteria to determine if call qualifies as an emergency. | 3/7/2019 |

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

| Ref. | Agency | Title | Summary | Date of Issue |
|------|--------|-------|---------|---------------|
| 8 | DCRA | Standard Operating Procedures: Scheduling and Conducting Inspections | SOP for scheduling property maintenance inspections, preparing and conducting property maintenance inspections, processing property maintenance NOVs, and preparation and movement of NOIs. | 4/29/2019 |
| 9 | DCRA | Standard Operating Procedures: Property Maintenance Unit Scheduling Initial Inspection v1 | SOP providing detailed instructions for scheduling initial inspections as it relates to customer service and administrative staff receiving and triaging complaints. Inspections should be scheduled within 15 days, but no later than 30 business days. | 5/1/2019 |
| 10 | DCRA | Standard Operating Procedures: Property Maintenance Unit Scheduling Initial Inspection v2 | SOP providing detailed instructions for scheduling initial inspections as it relates to customer service and administrative staff receiving and triaging complaints, as well as closing CRM tickets. Inspections should be scheduled within 15 days, but no later than 30 business days. Establishes procedures on evidentiary packet and closing CRMs. | 8/13/2019 |
| 11 | DCRA | Office of Consumer Protection Closure Letters | Prior to closure letters for Office of Consumer Protection ("OCP") cases, notify the complainant that the case is being closed, send an email to the complainant with the formal closure letter and place correspondence in file, place a sticky note on the case file to inform the DCRA Investigations Intake Analyst that the letter is enclosed, and the DCRA Investigations Intake Analyst will mail the letter to the complainant. | 8/16/2019 |
| 12 | DCRA | Rental Property Complaints | Complaints are entered by the complainant in QuickBase or received by DCRA and immediately logged into QuickBase Consumer Complaints System. Once complaint is assigned to investigator, the investigator must gather all pertinent information about location, owner, and tenants prior to visiting the property. investigator should document the visit, front and rear, speak with neighbors, attempt to get a signed statement from the tenant, and leave business card. Upon the | 8/26/2019 |

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

| Ref. | Agency | Title | Summary | Date of Issue |
|---|---|---|---|---|
| | | | determination that the unit is being rented, the case should be referred to DCRA Inspections and Compliance Division for an inspection of the premises. | |
| 13 | DCRA | Rental Property Complaints | Complaints are entered by the complainant in QuickBase or received by DCRA and immediately logged into QuickBase Consumer Complaints System. Once complaint is assigned to investigator, the investigator must gather all pertinent information about location, owner, and tenants prior to visiting the property. investigator should document the visit, front and rear, speak with neighbors, attempt to get a signed statement from the tenant, and leave business card. Upon the determination that the unit is being rented, the case should be referred to DCRA Inspections and Compliance Division for an inspection of the premises. | 8/26/2019 |
| 14 | DCRA | Standard Operating Procedures: Office of Civil Infractions | SOP establishing standards for reviewing NOIs, ensuring proper retention of records, filing NOIs, billing of special assessments, placement of liens for fines, and payment processing of fines and special assessments. | 8/29/2019 |
| 15 | DCRA | Standard Operating Procedures: Property Maintenance Unit Scheduling Initial Inspection v3 | SOP providing detailed instructions for scheduling initial inspections as it relates to customer service and administrative staff receiving and triaging complaints, as well as closing CRMs. Inspections should be scheduled within 15 days, but no later than 30 business days. SOP has been updated to include a step requiring processing team member to search ACCELA records to determine if property is a licensed rental property. | 9/3/2019 |
| 16 | DCRA | Process | All IR ("Investigations Request") complaints must be submitted through QuickBase, with attachments included. Once the documents have been uploaded to QuickBase, the status should be updated to "ready for review" and an email | 9/10/2019 |

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

| Ref. | Agency | Title | Summary | Date of Issue |
|---|---|---|---|---|
| | | | should be sent to the Program Officer notifying him that the IR is in QB. | |
| 17 | DCRA | Closing Cases in QB | Once the investigation report has been submitted for review, the case should NOT be closed in QuickBase. Only DCRA Intake Investigations Intake Analyst and DCRA Intake Investigator have the authority to close cases in QuickBase. | 9/10/2019 |
| 18 | DCRA | Standard Operating Procedures: Consumer Protection Unit | SOP for complaint intake, case assignment, investigation and case closure, pre-license and license referrals, residential property complaints, and quality control. | 9/13/2019 |
| 19 | DCRA | Duty Officer: Closing Units/Displacing Tenants | After a unit/building is closed and tenants are displaced due to DCRA actions, the Administrative Officer is responsible for sending an after-action report to the director informing of actions taken, justification of actions, and the outcome. | 9/16/2019 |
| 20 | DCRA | Update to Scheduling Process | When scheduling an inspection where a tenant is involved, all administrators must first search ACCELA, DCRA's permitting and licensing system for an active BBL to confirm that an inspection has occurred. If there are no inspections under the address, that is an indication that the property is not licensed. | 9/17/2019 |
| 21 | DCRA | Standard Operating Procedures: Regulatory Investigations Section | SOP providing detailed instructions for receiving complaints about licensed, unlicensed businesses, investigating complaints about businesses, conducting background investigations, surveys, personal service, and enforcing the rules and regulations of the District. | Not Formally Distributed |
| 22 | DCRA | Standard Operating Procedures: Inspections and Compliance Administration/Duty Officer | SOP establishing consistent process for DCRA Duty Officers when responding, detailing that DCRA Duty Officers should be contacted through HSEMA 24-hour operations center, but may be dispatched by DCRA senior management. Duty Officers should notify Deputy Chief Building Officer ("CBO") that they are responding to the incident, fully document the conditions found, and have abatement occur as early as 24 | Not Formally Distributed |

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

| Ref. | Agency | Title | Summary | Date of Issue |
|------|--------|-------|---------|---------------|
|      |        |       | hours or at a maximum of 72 hours. The DCRA Duty Officer is responsible to ensure that appropriate follow up actions occur. |               |

DCRA began formalizing the inspection and investigation procedures around code violations in late 2018. Over the course of the following year, DCRA attempted to standardize many of its processes through formal SOPs and informal memos.  Many of the documents provided by DCRA were not drafted or distributed until after the Kennedy Fire.

## C.    Interviews

In accordance with the SOW, A&M interviewed agency leaders at DCRA, FEMS, and MPD.  In addition, A&M identified individuals at each of the agencies that could speak to the policies and procedures in place as of the date of the 708 Kennedy Complaint through the date of the 708 Kennedy Fire.  A&M also interviewed DCRA, FEMS, and MPD personnel who were directly involved with the response to the reported violations at 708 Kennedy. In total, A&M interviewed 26 DCRA, FEMS, and MPD personnel.

### 1.    FEMS

The table below reflects the positions of the FEMS personnel interviewed by A&M.

**Table 6 - FEMS Interview List**

| Ref | Agency | Title |
|-----|--------|-------|
| 1 | FEMS | Chief |
| 2 | FEMS | Chief of Staff |
| 3 | FEMS | Deputy Fire Chief/ Fire Marshal |
| 4 | FEMS | Assistant Fire Chief, Technical Services |
| 5 | FEMS | Lieutenant - Technical Section |
| 6 | FEMS | Lieutenant - Administrative Officer |

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

A&M interviewed the relevant individuals, as identified by FEMS, who could speak to FEMS policies and procedures regarding reported code violations. A&M discussed policies and procedures utilized by FEMS in tracking and responding to complaints received as well as communications with other agencies.

A&M also interviewed two individuals currently placed on administrative leave who were directly involved in the handing of the reported violations at 708 Kennedy – a Lieutenant in FEMS Technical Section who was included on the original March 22 email sent by the MPD Officer and the FEMS Inspections Lieutenant to whom the email was forwarded for assignment to a Fire inspector. A&M utilized these interviews to gain further understanding of the policies and procedures as understood by these employees and to gain further understanding of FEMS' response to the violations reported at 708 Kennedy.

### 2.   MPD

The table below reflects the positions of the MPD personnel interviewed by A&M.

**Table 7 - MPD Interview List**

| Ref | Agency | Title |
|-----|--------|-------|
| 1 | MPD | Chief of Staff |
| 2 | MPD | MPD Director of Strategic Change |
| 3 | MPD | Fourth District Commander |
| 4 | MPD | MPD Officer - 4th District |

Given that MPD does not have responsibility for responding to code violations, A&M interviewed MPD personnel to gain an understanding of the role of the MPD in the identification of code violations and communications with the respective District agencies and to understand MPD's expectations regarding follow-up from those agencies.

A&M also interviewed the MPD Officer who reported the violations to various personnel within DCRA and FEMS to gain a further understanding of the events that resulted in responding to 708 Kennedy, how the individuals at DCRA and FEMS to whom the March 22, 2019 email was sent were identified, and any subsequent follow-up made to or received from the agencies.

### 3.   DCRA

Given the nature of the violations and the several attempts by the MPD Officer to interface with DCRA that went unanswered, A&M interviewed many more personal at DCRA than other District Agencies.  The table below reflects the DCRA personnel interviewed by A&M.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

**Table 8 - DCRA Interview List**

| Ref | Agency | Title |
|-----|--------|-------|
| 1 | DCRA | DCRA Director |
| 2 | DCRA | DCRA Deputy Director |
| 3 | DCRA | Chief Administrative Officer |
| 4 | DCRA | Senior Policy Advisor |
| 5 | DCRA | Interim Chief Building Official |
| 6 | DCRA | Program Officer, Regulatory Investigations Section |
| 7 | DCRA | Administrative Officer, Chief Building Official |
| 8 | DCRA | Program Manager, Civil Infractions |
| 9 | DCRA | Program Analyst, Regulatory Investigations Section |
| 10 | DCRA | Program Manager - Inspections |
| 11 | DCRA | Investigator, Regulatory Investigations Section |
| 12 | DCRA | Deputy Zoning Administrator |
| 13 | DCRA | Chief Information Officer |
| 14 | DCRA | Community Outreach Specialist |
| 15 | DCRA | Investigator, Regulatory Investigations Section |
| 16 | DCRA | Investigator, Regulatory Investigations Section |

We conducted these interviews to gain an understanding of the policies and procedures in place at the time the incident was first reported on March 22, 2019 and any changes made subsequent to that date including changes made as a result of the 708 Kennedy Fire.  Many on the DCRA leadership team including the Director, Deputy Director, and Chief Administrative Officer have been with DCRA less than one year

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

Page | 25

BETWEEN DCRA, FEMS, AND MPD

and were in the process of making significant changes to the way DCRA operated prior to the 708 Kennedy Fire.

A&M spoke to individuals who were included on the March 22, 2019 email from the reporting MPD Officer, the DCRA Duty Officer to whom that email was forwarded (currently on administrative leave), and the individuals with whom the MPD Officer followed up on multiple occasions over the course of three months including the DCRA 708 Investigator (currently on administrative leave).  A&M's goal was to gain further understanding of the reason for the actions taken/not taken by each of these employees as well as to gain an understanding of the official and unofficial policies and procedures in use by DCRA.

A&M also interviewed individuals at DCRA who could speak about the systems used by licensing, investigations, and inspections teams and received a walkthrough of each of these systems including the ACCELA[5] database and two QuickBase applications - the Pilot CRM and the Consumer Complaints Database ("Investigations Module"). [6]  Finally, given the fact that many of the procedures followed by investigators prior to the 708 Kennedy Fire were distributed through informal means, A&M interviewed two additional investigators to verify and confirm the understanding of the investigations process described by the DCRA 708 Investigator who was assigned to the 708 Kennedy complaint.

### 4.    OCTO

In addition to the District Agency interviews outlined above, A&M met with Office of the Chief Technology Officer ("OCTO") personnel to gain access to information about systems and communications.

**Table 9 - OCTO Interview List**

| Ref | Agency | Title |
|-----|--------|-------|
| 1 | OCTO | Citywide Messaging Architect |
| 2 | OCTO | Director |
| 3 | OCTO | OCTO General Counsel |
| 4 | OCTO | OCTO Telecommunications Governance Manager |
| 5 | OCTO | Messaging Specialist |

---

[5]    DCRA's permitting and licensing system.

[6]    The Investigations Module is utilized by the Investigations team to track investigation progress.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

### D.   Communications and Document Review

In addition to performing interviews of key personnel, A&M obtained and reviewed documents and communications from each of the District Agencies related to the code enforcement process and the events leading up to the 708 Kennedy Fire. Additionally, some of the requests to the District Agencies were satisfied by documents provided to A&M via the OCA and OCTO.

#### 1.   Email Communications

A&M obtained emails related to 708 Kennedy from the District Agencies with assistance from OCTO. OCTO is the central technology organization of the DC Government, responsible for establishing technology polices for the District and providing technology services and support for the District Agencies.

A&M received multiple email productions based on targeted searches across DCRA, FEMS and MPD email accounts initiated by various parties within the District Agencies and other DC Government agencies attempting to gain an understanding of the events leading up to the 708 Kennedy Fire.

#### 2.   FEMS

A&M requested the following documents and communications from FEMS:

- All versions (originals and updates/modifications) of relevant FEMS policies, procedures, rules, and regulations in place related to the fire incident at 708 Kennedy Street in place from March 2019 to present day.
- Communications to FEMS staff regarding new policies and/or required trainings
- All investigation reports prepared by and supporting data collected by FEMS related to 708 Kennedy.
- All communications regarding 708 Kennedy from March 1, 2019, to August 22, 2019, sent or received by all FEMS employees.
- All communications regarding code violations from March 1, 2019, to August 22, 2019, sent or received by key FEMS personnel associated with 708 Kennedy.
- Any "lessons learned" documentation or investigation reports related to 708 Kennedy.

#### 3.   MPD

A&M requested the following documents and communications from MPD:

- All versions (originals and updates/modifications) of relevant MPD policies, procedures, rules, and regulations in place related to the fire incident at 708 Kennedy Street in place from March 2019 to present day.
- Communications to MPD staff regarding new policies and/or required trainings.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

- All investigation reports prepared by and supporting data collected by MPD related to 708 Kennedy.
- All communications regarding 708 Kennedy from March 1, 2019, to August 22, 2019, sent or received by all MPD employees.
- All communications from March 1, 2019, to August 22, 2019, sent or received by the reporting officer.
- Any "lessons learned" documentation or investigation reports related to 708 Kennedy.
- MPD data related to the initial request for service on March 22, 2019.
- 708 Kennedy PIR dated March 22, 2019.
- Body-worn camera (BWC) footage from the reporting officer's initial visit to 708 Kennedy on March 21, 2019.

### 4.    DCRA

A&M requested the following documents and communications from DCRA:

- All versions (originals and updates/modifications) of relevant DCRA policies, procedures, rules, and regulations in place related to the fire incident at 708 Kennedy Street in place from March 2019 to present day.
- Communications to DCRA staff regarding new policies and/or required trainings.
- All investigation reports prepared by and supporting data collected by DCRA related to 708 Kennedy.
- All communications regarding 708 Kennedy from March 1, 2019, to August 22, 2019, sent or received by all DCRA employees.
- All communications regarding code violations from March 1, 2019, to August 22, 2019, sent or received by key DCRA personnel associated with 708 Kennedy.
- Any "lessons learned" documentation or investigation reports related to 708 Kennedy.
- DCRA data, documents, communications, photos, memos, and records related to property inspections at 708 Kennedy.
- Job descriptions for all personnel who should have had a role in the handling of violations at 708 Kennedy.
- DCRA timeline that demonstrates the order of operations for emergency and standard inspection requests.
- Data regarding the number of new inspections and investigations reported to and addressed by DCRA on a monthly basis.
- Data regarding the number of inspections vs. investigations completed by DCRA, including the resulting outcome.
- Any Inspector General reports on the operations of DCRA within the previous five years.

---

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

- Statistics on the number of housing units and businesses within DCRA's jurisdiction.
- Any performance improvement initiatives/reports completed over the previous five years.
- All photos of 708 Kennedy taken by the assigned DCRA 708 Investigator.
- The audit log of activities associated with 708 Kennedy within the 3 IT systems (Pilot CRM, Investigations module, and ACCELA).
- Text Messages of DCRA 708 Investigator.

### 5.   *Missing or Unavailable Documents*

The District Agencies were not able to produce all documents requested by A&M related to A&M's review and investigation of the code enforcement process and events leading up to the 708 Kennedy Fire. Based on discussions with employees of the District Agencies, the documents were not produced because they either do not exist or reportedly existed but cannot be located. A&M was not able to obtain and review the following documents as part of our review and investigation of the District's Code Enforcement Process:

- *DCRA data, documents, communications, memos, and records related to property inspections at 708 Kennedy* - DCRA reported to A&M that these records do not exist as an inspector never visited 708 Kennedy in response to the 708 Kennedy Complaint.
- *The audit log of activities associated with 708 Kennedy within DCRA's Pilot CRM and Investigations module* - This item does not exist as DCRA's Pilot CRM and Investigations Modules do not have the functionality to provide an audit log.  OCTO provided data reflecting the first and last changes made in these systems regarding the 708 Kennedy property.
- *All investigation reports prepared by and supporting data collected by DCRA related to the fire at 708 Kennedy* - DCRA reported to A&M that these items do not exist.
- *Body-worn camera (BWC) footage from the MPD Officer's initial visit to 708 Kennedy on March 21, 2019* – OCA and MPD were unable to provide the BWC footage as it is part of an ongoing criminal investigation.
- *Text Messages of DCRA 708 Investigator* - DCRA reported to A&M that it attempted to, but was unable to retrieve, these messages from the DCRA 708 Investigator's government-issued cell phone.

DCRA has only been able to provide limited documentation related to the investigation of reported code violations at 708 Kennedy (including photos of the front of the property taken on May 22). **A&M has not received any communications, reports, memos, or other documentation corroborating the investigation performed by the DCRA 708 Investigator into the reported code violations at 708 Kennedy.** DCRA reported to A&M that all available information has been provided. The DCRA 708 Investigator reported to A&M that some of these items did exist in hardcopy form but were lost during an office move.

---

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

Between DCRA, FEMS, and MPD

## IV.   Findings & Observations

### A.  Introduction

The following section outlines A&M's Key Findings and Observations related to the series of events and communications leading up to the 708 Kennedy Fire. The *Key Findings* section highlights nine instances in which District Agencies did not properly execute the responsibilities, procedures, or policies associated with key roles. These Key Findings constitute the most critical violations, that, if handled differently, could have impacted the likelihood of the 708 Kennedy Fire. The *Observations* section details underlying issues which have contributed to or could contribute to failure to remedy unsafe buildings. A&M has identified recommended actions to address the listed Key Findings and Observations later in the *Recommendations* section.

### B.  Key Findings

A&M has identified Key Findings related to the 708 Kennedy Fire, and integrated the identified failure points in chronological order on the timeline of events below.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

Page | 30

BETWEEN DCRA, FEMS, AND MPD



**Figure 2: Critical Events Related to 708 Kennedy Fire with Key Findings**

*1. March 22, 2019 – DCRA Community Outreach Specialist uses improper communication channel to contact the DCRA Duty Officer. As a result, the DCRA Duty Officer never responds to the scene. DCRA does not enter reported code violations into the Pilot CRM.*

On the night of March 22, 2019, the MPD Officer sent an email with subject line "Serious Code Violations" to two employees of FEMS and four employees of DCRA. The MPD Officer attached to the email the PIR related to 708 Kennedy which was completed the previous night on March 21, 2019. Upon receipt of the email, the DCRA Community Outreach Specialist forwarded the message to the on-duty DCRA Duty Officer and replied to the MPD Officer's email, with all other recipients copied, stating that the request had been forwarded to the Duty Officer. The Duty Officer is DCRA's primary agency contact responsible for responding to after hour and weekend urgent incidents.

---

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

According to interviews with the CBO and review of the SOP for the Duty Officer, it is outside of the SOP for a Duty Officer to receive emergency requests via written requests. This expectation is found in Section III, Policy B of the SOP for the Duty Officer which states that, "All emergency requests for after-hours DCRA assistance should be routed through the Homeland Security and Emergency Management Agency 24-hour Operations Center." DCRA protocol requires that all Duty Officer schedules and phone numbers are shared with the HSEMA team and Duty Officers are not provided a separate email account to monitor.

The DCRA Duty Officer at the time was therefore not monitoring the email traffic associated with normal work email when the DCRA Duty Officer received the request from the DCRA Community Outreach Specialist close to midnight on March 22, 2019. As described further in Finding 9, the DCRA Community Outreach Specialist and three other DCRA employees included on the initial email from the MPD Officer failed to enter the complaint into DCRA's Pilot CRM or record the need for action in any system or log.

**The DCRA Community Outreach Specialist's failure to route the information via HSEMA for an urgent request was DCRA's first failure to properly report, respond to, and address the unlicensed rooming house and unsafe conditions reported at 708 Kennedy.**

### 2. Post-March 22, 2019 – DCRA Duty Officer never responds to request for investigation of 708 Kennedy.

As described above, the DCRA Duty Officer on call on the evening of March 22, 2019 did not see the email that was forwarded by the DCRA Community Outreach Specialist. Per the SOP, the Duty Officer is expected to respond to phone call requests from HSEMA and is not expected to monitor email traffic for emergencies.

Although in accordance with Duty Officer SOPs, the DCRA Duty Officer was not expected to respond to emails outside of normal working hours, the DCRA Duty Officer (also the DCRA Housing Inspection Program Manager) failed to react to the request on Monday, March 25, 2019, or any date after that, when the DCRA Duty Officer resumed the regular duties of DCRA Housing Inspection Program Manager. Any DCRA inspector, including the Housing Inspection Program Manager, has a duty under DCMR[7] to respond

---

[7]    12A DCMR § 115.2: Examination and Record of Damaged Structure.  The code official shall examine every premises, including any building or other structure, reported as dangerous, unsafe structurally, or constituting a fire hazard, and shall maintain a record of unsafe premises, including any buildings or other structures, stating the use of the structure, and the nature and estimated amount of damages, if any, caused by collapse or failure.

12A DCMR § 115.3: Notice of Unsafe Structure or Equipment.  If any unsafe condition is found, the code official shall serve a written notice that describes the condition, identifies the structure or equipment deemed unsafe, and specifies the required repairs or improvements to be made to abate the unsafe condition or requires the unsafe structure to be taken down and removed within a stipulated time.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

to any building reported as dangerous. In an interview with A&M, the DCRA Duty Officer did not recall receiving the email from the DCRA Community Outreach Specialist, seeing it for the first time after the fire occurred. According to the DCRA Duty Officer, the high volume of email requests received prevented response to the request made by the MPD Officer.  The DCRA Duty Officer also stated that the email that was forwarded did not indicate that there was an urgent issue to respond to and was outside of the realm of responsibilities because it dealt with the business licenses associated with that property, which is an Investigations issue. A&M's review found the complaint to meet the criteria outlined by DCMR requiring inspection by DCRA.

**The DCRA Duty Officer's failure to act on a report that indicated 708 Kennedy was unsafe, and failure to route the provided information into DCRA's system for review was DCRA's second failure to properly report, respond to, and address the unlicensed rooming house and unsafe conditions reported at 708 Kennedy.**

   *3. March 23, 2019 – FEMS Technical Section Lieutenant fails to include the attachment from reporting MPD Officer when forwarding to FEMS Inspection Lieutenant*

On the night of March 22, 2019, the FEMS Technical Section Lieutenant received the initial outreach request from the MPD Officer. On the morning of March 23, 2019, the FEMS Technical Section Lieutenant forwarded the email reply from the DCRA Community Outreach Specialist to the FEMS Inspection Lieutenant. Because the FEMS Technical Section Lieutenant forwarded the reply from the DCRA Community Outreach Specialist, rather than forwarding the original email from the MPD Officer, the PIR was not included in the forwarded email to the FEMS Inspection Lieutenant.

As a result, the forwarded email received by the FEMS Inspection Lieutenant only referenced information regarding the potential of an unlicensed rooming house at "5410 14[th] Street."[8] The FEMS Inspection Lieutenant then assigned only the "5410 14[th] Street" property referenced in the body of the email to an inspector.

---

[8]   Note: MPD Officer's initial report to DCRA and FEMS was communicated via email, which identified "Serious Code Violations" as the subject – the body of the email identified the address "5410 14[th] Street" and included an attached MPD incident Report which included details of violations in the 700 block of Kennedy, including: "violations by Fire Code and DCRA housing code violations"… "No Lighted Exited Signs; Fire Exit and the one Fire extinguisher was not tagged; no working smoke detectors. There are too many make shift doors with locks which would make it difficult to exit in an emergency." This email included a typo on the address of 5410 14th Street, this address was later determined to have been 5310 14th Street, NW.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

**The FEMS Technical Section Lieutenant's failure to forward the original email with PIR attached was FEMS' first failure to properly report, respond to, and address the unlicensed rooming house and unsafe conditions reported at 708 Kennedy.**

> *4. Post March 23, 2019– FEMS Inspection Lieutenant fails to follow-up with FEMS Technical Section Lieutenant or MPD Officer on complaint. Ultimately takes no action to resolve complaint until after the 708 Kennedy Fire.*

When the FEMS Inspection Lieutenant received the forwarded email from the FEMS Technical Section Lieutenant, the only information included (due to the omission of the attachment) referenced a reported rooming house with no Certificate of Occupancy ("CofO") at "5410 14th Street." The FEMS Inspection Lieutenant could not recall whether or not a FEMS inspector reported to the property. Neither the FEMS Inspection Lieutenant nor any FEMS inspector took further action on the matter. FEMS did not contact the complainant (the MPD Officer) or the FEMS Technical Section Lieutenant who forwarded the complaint to verify details of the complaint. FEMS was unable to demonstrate any further action taken until after the 708 Kennedy Fire.

Though the forwarded email received by the FEMS Inspection Lieutenant did not have the PIR attached, the text of the email implied that there were multiple locations that required attention. The subject of the email reads "Serious Code Violations" and the text of the email reads "I also need an inspection of a dwelling residence located at 5410 14th Street...", implying that there was at least one other property needing the attention of FEMS.

In the aftermath of the 708 Kennedy Fire, the FEMS Inspection Lieutenant acknowledged that if FEMS had followed up with the MPD Officer regarding the "5410 14th Street" report, they may have identified and appropriately addressed fire safety concerns at 708 Kennedy.

An additional consideration related to this finding: The FEMS requirement for documentation of inspection activity stipulates that inspection activity is logged upon inspection completion. Because 708 Kennedy and 5410 14th Street were never inspected, the FEMS Inspection Lieutenant could provide no documentation demonstrating the complaint was assigned to a FEMS inspector or any inspection files, or evidence that an inspection was ever conducted or completed. Therefore, A&M was unable to determine whether an FEMS inspector had been assigned.

**The FEMS Inspection Lieutenant's failure to follow-up with either the reporting MPD Officer or the FEMS Technical Section Lieutenant was FEMS' second failure to properly report, respond to, and address the unlicensed rooming house and unsafe conditions reported at 708 Kennedy.**

---

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

### 5. April 24, 2019 – DCRA fails to assign case to a DCRA Investigator or enter the investigation into QuickBase

On April 24, 2019, the MPD Officer sent a second request to the DCRA Program Analyst asking for an investigation of the properties located at 708 Kennedy and 5410 14th Street. In the email with subject: "Investigator", the MPD Officer indicated that both properties had issues related to Certificates of Occupancy. The MPD Officer also requested an update on the two properties once the investigations were concluded. Upon receipt of the email, the DCRA Investigations Intake Analyst conducted a search of the Investigation Module and found that there were no open investigations for either address.

Shortly after receiving the request from the MPD Officer, the DCRA Investigations Intake Analyst forwarded the request to the DCRA Investigations Program Officer and DCRA Investigations Program Manager[9] so that the cases could be assigned to an investigator. At this time, there is no evidence that either the DCRA Investigations Program Manager or DCRA Investigations Program Officer replied to this information and no investigator was assigned. Between April 24, 2019 and May 22, 2019 there was no action taken on 708 Kennedy.

**The DCRA Investigations Program Officer's and DCRA Investigations Program Manager's failure to monitor and respond to the April 24, 2019 investigation request was DCRA's third failure to properly report, respond to, and address the unlicensed rooming house and unsafe conditions reported at 708 Kennedy.**

### 6. May 22 – 24, 2019 – DCRA 708 Investigator performs limited investigation of 708 Kennedy with inadequate documentation of work performed

On May 21, 2019, the DCRA Investigations Program Manager assigned the DCRA 708 Investigator via email to investigate 708 Kennedy after the MPD Officer followed up for a third time. The DCRA 708 Investigator failed to adequately investigate or document the case in line with DCRA best practices:

- The DCRA 708 Investigator stated that the DCRA 708 Investigator attempted to traveled to 708 Kennedy on three consecutive days (May 22, May 23, and May 24, 2019) and failed to gain access to the property. The DCRA 708 Investigator took pictures during the first visit on May 22, 2019 but could not provide documentation demonstrating that the attempts access the property on the other stated dates.
- The pictures taken of 708 Kennedy on May 22, 2019 depict the front of the house. Conversations with other DCRA investigators indicated that it is a best practice to take photos of all publicly-

---

[9]     When forwarding this request, the Program Analyst communicated the corrected address of 5310 14th street NW.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

accessible portions of a property including the rear facing side of a property and of any specific evidence that would indicate a violation of any kind.

- At no point prior to, during, or after the investigation did the DCRA 708 Investigator attempt to contact the MPD Officer who generated the PIR. The DCRA 708 Investigator failed to follow up with the MPD Officer despite a specific request from the MPD Officer on June 3, 2019, and a follow-up email on June 11, 2019 from the DCRA Investigations Intake Analyst reminding him to follow up with the MPD Officer.

- The DCRA 708 Investigator stated that the DCRA 708 Investigator created a case file for 708 Kennedy but that the case file was lost when parts of DCRA physically moved office spaces in August of 2019.

- The DCRA 708 Investigator failed to create a record of 708 Kennedy in the Pilot CRM or QuickBase System despite clear instructions to use the system beginning in February 2019.

- The DCRA 708 Investigator failed to note any observations regarding 708 Kennedy in the QuickBase System and the property was not tracked in the Investigations Module until June 12th when it was entered into the system by the DCRA Investigations Program Officer.

- The DCRA 708 Investigator made no attempt to obtain an administrative search warrant for 708 Kennedy despite the firsthand account provided by the MPD Officer in the PIR and history of maintenance, safety, and unlicensed rooming house complaints at 708 Kennedy provided in ACCELA.[10]

- In an interview with A&M, the DCRA 708 Investigator stated that the DCRA 708 Investigator sent a letter to the owner and left a business card on the door of 708 Kennedy. However, there is no evidence that the DCRA 708 Investigator made these attempts in DCRA's systems of record and no evidence that the DCRA 708 Investigator was able to contact the tenants living on the property or nearby neighbors.

**The DCRA 708 Investigator's failure to properly conduct and document the investigation into the unlicensed housing complaint related to 708 Kennedy was DCRA's fourth failure to properly report, respond to, and address the unlicensed rooming house and unsafe conditions reported at 708 Kennedy.**

*7. July 26, 2019 – DCRA suspends the investigation into 708 Kennedy by July 26, 2019, without appropriate documentation and approval. DCRA does not consider the investigation into 708 Kennedy an active investigation as of August 2, 2019*

In June 2019, the DCRA Investigations Program Officer was promoted to act as DCRA Investigations Program Manager. According to the DCRA Investigations Program Officer, the workload of the new position was so overwhelming that the DCRA Investigations Program Officer asked the DCRA 708

---

[10]   A&M has included a summary of the ACCELA event history for 708 Kennedy in *Appendix A*.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

Between DCRA, FEMS, and MPD

Investigator to assist with the administration of investigations, promoting the DCRA 708 Investigator to "Lead Investigator." The created Lead Investigator position is not an official position within DCRA and did not have an SOP at the time of the 708 Kennedy Fire. There is not an SOP for the Lead Investigator position in DCRA's new Consumer Protection Agency SOP released on September 24, 2019. As a result of the new duties associated with the Lead Investigator role, the DCRA 708 Investigator was not actively investigating 708 Kennedy. During this time, the DCRA Investigations Program Officer and DCRA 708 Investigator tracked investigations in an offline spreadsheet, allowing the DCRA Investigations Program Officer and DCRA 708 Investigator to suspend and close cases without oversight.

On July 26, 2019, the DCRA Investigations Program Officer and DCRA 708 Investigator agreed to suspend the investigation into 708 Kennedy without any documentation of approval or the reason for suspension. One week later, on August 2, 2019, the DCRA Investigations Program Officer identified the investigation of 708 Kennedy as an investigation that should not be included in the count of open investigations for DCRA's report of open consumer complaints, effectively counting the investigation as closed in performance metrics without authorization or documentation.

**DCRA's actions to mark an open case as suspended without meeting any criteria for documentation or approval allowed the 708 Kennedy issue to go unaddressed from at least July 26 until August 16, 2019. The suspension of the investigation into 708 Kennedy was DCRA's fifth failure to properly report, respond to, and address the unlicensed rooming house and unsafe conditions reported at 708 Kennedy.**

### 8.  *August 16, 2019 – DCRA closes investigation case into 708 Kennedy without a case file and without a signature of approval*

According to the DCRA Investigations Program Officer, on August 16, 2019 the 708 Kennedy Investigation was closed by the DCRA 708 Investigator overseeing the case, despite the issues highlighted in *Finding 6*. The DCRA 708 Investigator, and the DCRA Investigations Program Officer overseeing the case at the time, agreed (verbally) to close the case despite a lack of a case file and any supporting evidence gathered during the investigation, as required by internal documents.[11]

**The DCRA 708 Investigator's failure to properly document the investigation of 708 Kennedy, and the DCRA Investigations Program Officer's failure to appropriately review and validate completion of the investigation was DCRA's sixth failure to properly report, respond to, and address the unlicensed rooming house located at 708 Kennedy.**

---

[11]   Per DCRA memo dated December 17, 2018 titled "Investigative Report Submission Process" outlined a detailed process for documenting all reports.

---

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

9. *Despite the MPD Officer's persistence, contacting six different DCRA employees on five occasions over the course of three months, no DCRA employee ever entered the case into the Pilot CRM*

On February 14, 2019, DCRA rolled out its new Pilot CRM system. With the rollout of the new system, DCRA communicated the expectation that all customer inquiries and complaints would be tracked through the centralized system to ensure expedient response and accountability throughout the agency. DCRA did not instruct employees to use redundant recording/communications methods to ensure continuity and, as such, designated the Pilot CRM as the system of record. Prior to the 708 Kennedy Fire, DCRA staff were unclear on the expectations or requirements associated with using the Pilot CRM. As a reflection of this lack of clarity, even the Community Outreach Specialist (who was named in rollout communications as a member of the "account management team" responsible for routing inquiries through the system) failed use the system to log the complaint related to 708 Kennedy.

Between March 22, 2019, and June 3, 2019, the MPD Officer communicated via email five times with six different members of DCRA requesting that investigators be sent to 708 Kennedy. Please see the details of those calls below:

- March 22, 2019: MPD Officer emails DCRA staff with email subject: "Serious Code Violations." DCRA Staff recipients include: a DCRA Business Licensing Specialist, a DCRA Program Manager, a DCRA Business License Manager, and the DCRA Community Outreach Specialist. None of the emailed DCRA staff member enters the request for an investigation at either property into the Pilot CRM.
- April 18, 2019: MPD Officer emails a DCRA investigator (not the DCRA 708 Investigator) requesting that investigators be sent to 708 Kennedy and 5410 14th Street. The MPD Officer makes this request after first requesting business license information related to multiple businesses in the District. Though the DCRA investigator states that the MPD Officer should direct this request to the intake officer, the DCRA investigator does not enter the request into the Pilot CRM.
- April 24, 2019: MPD Officer emails the DCRA Investigations Intake Analyst requesting that an investigator respond to 708 Kennedy and 5410 14th Street. Though the DCRA Investigations Intake Analyst checks to see if there are open cases at the two properties and forwards the request to the DCRA Investigations Program Officer and DCRA Investigations Program Manager, the DCRA Investigations Intake Analyst does not enter it into the Pilot CRM. The DCRA Investigations Program Manager and DCRA Investigations Program Officer also do not enter the request into the Pilot CRM.
- May 21, 2019: MPD Officer emails the DCRA Investigations Intake Analyst to follow up on the initial request for an investigation at 708 Kennedy and 5410 14th Street. Though the DCRA Investigations Intake Analyst follows up with the DCRA Investigations Program Officer and DCRA Investigations Program Manager, which leads to the case being assigned to the DCRA 708

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

Investigator, the DCRA Investigations Analyst does not enter it into the Pilot CRM. Neither the DCRA Investigations Program Manager, the DCRA Investigations Program Officer, or the assigned DCRA 708 Investigator enter the request into the Pilot CRM.

- June 3, 2019: After receiving confirmation that the 708 Kennedy case has been assigned, the MPD Officer requests that the DCRA 708 Investigator follow up once the case is closed. The DCRA 708 Investigator does not enter the case into the Pilot CRM. The DCRA Investigations Intake Analyst, who is also copied on this email, does not enter the case into the Pilot CRM.

In addition to these specific requests from the MPD Officer, there were multiple intra-agency communications. Ultimately nine DCRA employees were made aware of the request for an inspection/investigation at 708 Kennedy Street and 5410 14th Street between March 22, 2019 and June 3, 2019. Despite the DCRA requirement that all complaints be entered in the Pilot CRM, neither case was ever entered in the Pilot CRM. Failure to use the designated system for tracking customer complaints resulted in multiple opportunities for human error – in each of these opportunities for error in appropriately tasking and following-up on the complaint related to 708 Kennedy, human error prevented interventions.

The Pilot CRM system is pending replacement by a new enterprise CRM system, however, DCRA had communicated the expectation that it be used as the system of record for all incoming customer communications, including investigations. All nine employees failed to use the specified system of record to record customer inquiries or complaints about 708 Kennedy.

**The failure of nine individual DCRA employees to enter the request for investigation at 708 Kennedy into the Pilot CRM is the seventh DCRA failure to properly report, respond to, and address the unlicensed rooming house located at 708 Kennedy.**

### C.    Observations

Many factors contributed to the failure of the District Agencies to remedy the concerns identified by the MPD Officer. **In addition to the findings outlined above, A&M observed underlying issues which have contributed to or could contribute to failure to remedy unsafe buildings and unlicensed rentals.** These observations are outlined below across four categories: 1) Communications and Coordination Across Agencies, 2) Systems Maturity and Utilization, 3) DCRA Investigations Management, and 4) Unlicensed Property Oversight.

---

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

## Communications and Coordination Across Agencies

### 1.  DCRA, FEMS, and MPD lack clear communication channels and processes for reporting, collaborating and following-up on reported code violations

The channels through which information flows between the District Agencies are generally informal. Collaboration between officials across agencies is consistently relationship-based, no clear protocol existed to govern this communication, and centralized systems offered by the OUC were not consistently utilized. Specifically, in communications from the MPD Officer to DCRA and FEMS, the use of informal communications via email to individuals not directly responsible for responding to code violations contributed to several communication failures which factored into DCRA's and FEMS's insufficient response to reports of unsafe conditions at 708 Kennedy. For example:

- Initial communications from the MPD Officer on March 22, 2019 only addressed the findings at 708 Kennedy in the PIR attached to the email.  However, the PIR only referenced the 700 Block of Kennedy Street, so the specific address of 708 Kennedy was not mentioned in either the body of the email or the attachment.
- Follow-up email communications from the MPD Officer to DCRA employees did not communicate directly that unsafe conditions required immediate action.
- There is no evidence that the DCRA 708 Investigator communicated with the MPD Officer about the reported violations at 708 Kennedy to either clarify details of the PIR or to provide feedback regarding the findings.
- None of the communications from the MPD Officer to DCRA or FEMS mentioned the bodycam footage that the MPD Officer took of the interior of the property.

Recipients of the email from the MPD Officer were unaware as to why they were included on the March 22, 2019 email.  Many DCRA personnel interviewed consistently pointed to a failure of MPD to follow the appropriate channels as a contributing factor to DCRA's failure to recognize and address the severity of conditions at 708 Kennedy. However, MPD had no clear policies on how these issues should be communicated to sister agencies and DCRA was unable to point to any communications, memorandum, or policy which communicated the "appropriate channels" to outside agency partners. DCRA systems and policies in place at the time of the initial reporting and follow-up on 708 Kennedy included no functionality or clear requirement to communicate with complainants to either verify the details of the complaint or inform complainants of status or resolution of their complaints. This lack of "feedback loop" functionality provided insufficient information to key partner agencies and contributed to a lack of accountability regarding the appropriate conduct and finalization of investigations.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

### 2. Lack of responsibility and ownership of building safety issues across multiple agencies

In interactions between DC government agencies related to building safety issues, protocols around task ownership are unclear and not well-understood by agency employees. As a result, inquiries and requests for investigation can go unaddressed, as in the case of 708 Kennedy. The 708 Kennedy response was an example of a complex situation with aspects that could be addressed by either FEMS or DCRA. However, DC code is not written to clearly outline what should happen in cases where jurisdiction over a matter is unclear.

Under 12A DCMR § 115.2 / 115.3 of the Building Code – DCRA is obligated to inspect the premises of any building reported as dangerous. In the case of 708 Kennedy, DCRA failed to verify that the premises had been inspected and the dangerous building remained occupied. FEMS is responsible for the administration of the Fire Protection Code (Under DCMR 12H), except approval, inspection, and testing of new and existing fire protection systems. The violations at 708 Kennedy which were identified in the MPD Officer's PIR included issues in the jurisdiction of both DCRA Investigators and Fire Inspectors. F-108.2 is the only section within the Fire Protection Code specifying coordination of inspections and stipulates that code enforcement officers must seek to minimize the number of visits by code officers:

> If more than one code official is required to enforce any provision of the Fire Prevention Code or another code or ordinance, it shall be their collective duty to coordinate their inspections and administrative orders as fully practicable so the owners and occupants of the structure shall not be subjected to visits by numerous Inspectors nor multiple or conflicting orders.

It goes on to stipulate that, "Whenever an Inspector from any agency or department observes an apparent or actual violation of a provision of a law, ordinance or code of the District of Columbia not within the Inspector's authority to enforce, the Inspector shall report the findings to the code official having jurisdiction." [12] DC government has no specific code or authority which provides directions or guidance on expectations for inspection of properties and mitigation of multi-jurisdictional violations, or ownership of responsibility for these issues.

The initial report of the serious code violations at 708 Kennedy sent by the MPD Officer via email to DCRA and FEMS employees included several findings of violations related to the safety of the building, in areas related to both building code and fire code. When the initial complaint from the MPD Officer was sent on March 22, 2019, it was received by both DCRA and FEMS, and recipients at each organization (DCRA

---

[12]  https://os.dc.gov/sites/default/files/dc/sites/os/publication/attachments/OS_DCMR_12H_Fire_Code_Supplement.pdf

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

Community Outreach Specialist and FEMS Technical Section Lieutenant) forwarded the email on and performed no additional follow-up. In both instances, the initial point of contact in receipt of the complaint assumed no further responsibility after forwarding the email. Neither DCRA nor FEMS took proactive steps to ensure that the complaint was appropriately registered, assigned, or resolved, nor did they receive confirmation of receipt of the forwarded request for investigation. In both examples, an unclear assignment of ownership over incoming complaints let the issue go unremedied. Had it not been for the MPD Officer's persistence, the issue would have never been reviewed any further by either FEMS or DCRA.

## Systems Maturity and Utilization

### 3. DCRA's Pilot CRM and Investigations Module are inconsistently used, and lack functionality to enhance accountability

Over the last year, DCRA has been developing a set of tools to support its staff, including the Investigations team, in the execution of their responsibilities.  These tools include a pilot CRM system through which all customer complaints are intended to be logged, routed, and tracked to completion and a module within the QuickBase system for investigators, the Investigations Module, which records the status of each case and serves as the system of record for cases like 708 Kennedy. DCRA has invested significantly in developing the Pilot CRM which is currently in place as a central source of communication for incoming customer interaction requiring follow-up. Treating the current system as a pilot program, soon to be replaced by a more robust system, DCRA has secured a vendor to build an Enterprise CRM which will have significant functionality beyond the pilot version currently utilized. This Enterprise System, when fully implemented, is intended to seamlessly integrate with the Investigations Module to convert leads into cases with minimum manual effort.

DCRA management has indicated that the Pilot CRM system was rolled out in early 2019, and shared documentation demonstrating DCRA-wide implementation in February 2019. This pilot system was implemented prior to the initial 708 Complaint; however, interviews with staff reflect their understanding that the Pilot CRM system was not fully-implemented at this time and was not used to track the case. With no central reporting system, reporting and assignments associated with 708 Kennedy were routed informally, via email, with no official log of the complaint or subsequent actions, and no process in place to require follow-up with the original complainant. This lack of systematized tracking contributed to DCRA's failure to act on the report of 708 Kennedy for over a month until the MPD Officer reached out to follow-up on the initial complaint. If not for the MPD Officer's continued outreach, the 708 Kennedy complaint would not have been reviewed or acted upon.

Despite the case assignment on May 21, 2019, the complaint was not entered into the Investigations module of QuickBase until June 12, 2019. DCRA's system for tracking the progress of investigations was

---

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

not kept up-to-date with the most recent activities, but rather, a copy of this log exported to the DCRA Investigation Program Officer's desktop known as the "Regulatory Investigation Database" was used to maintain status until the system was updated. Throughout the process of responding to the 708 Complaint, DCRA staff continually used informal methods outside the system of record to track the progress of investigations activities. Not only does this mean that at no time during the investigation could leaders within DCRA directly access the current status of the case, but it also means that important points of documentation such as the dates of visits and communications were not included in the systems of record for communications (Pilot CRM) or investigations (Investigations Module).

DCRA staff indicated that though only a few individuals were authorized to close cases, the Investigations Module does not have user roles configured to reflect these permissions. In its current configuration, the QuickBase system allows any user with access to the Investigations Module to update case status to any status, including "suspended" or "closed." This lack of user controls over systems weakens DCRA's ability to oversee investigations and appropriately control case status.

In addition to the limitations associated with the use of the Pilot CRM and Investigations Module, DCRA's practices in use of common workplace tools like email are not best aligned to supporting responsiveness and accountability. At the time of the initial 708 Complaint, DCRA relied on personal inboxes for communications which could be better served by a shared in-box with "around the clock" monitoring responsibilities. Designating a shared method of contact for inter-agency and external referrals can increase visibility and accountability.

### 4. FEMS use of the Zoll system does not support transparency and accountability for the handling of complaints

Like DCRA, the Fire Inspection Service of FEMS receives many incoming calls and emails which require coordination between multiple personnel and leaders, and which often reflect urgent and potentially life-threatening conditions in buildings across the District. To track these reported violations, FEMS uses its Zoll inspection tracking system.  However, interviews with FEMS employees reveal that the inspections are only updated in the system by the FEMS inspectors after they have visited the property.  Once a complaint is received by a FEMS employee, it is typically forwarded to the Administrative Officer in charge of Fire inspector assignments, who then assigns cases to FEMS inspectors. However, current procedures require no record of the assignment until after an inspector has visited the property.  FEMS leadership communicated a clear expectation throughout the organization that complaints related to building safety need to be evaluated, in-person within 24 hours of receipt, but without clear and centralized documentation of intake, there is no way to verify that this metric is being met. In the case of 708 Kennedy, upon initial receipt of the complaint on March 22, 2019, two FEMS recipients forwarded the email without the attachment to the FEMS Inspections Lieutenant. Given that 708 Kennedy was only referenced in the attachment, the FEMS Inspection Lieutenant did not have necessary information to be aware of or to

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

Page | 43

BETWEEN DCRA, FEMS, AND MPD

assign an inspector to visit that property.  Prior to the fire, FEMS only logged complaints once a FEMS inspector visited the site related to the complaint. An immediate decision not to follow-up on a complaint resulted in no record of the complaint being recorded and led to no further action being taken on the complaint. This lack of a formal system for handling incoming complaints and documenting decisions not to pursue complaints reduced the accountability of staff and limited visibility into the history of complaints and their handling. Without a process to track all complaints received, and the action in response to those complaints, FEMS Fire Inspection Service leaders had limited visibility or oversight into decision-making of individual complaint recipients. Note: Effective August 23, 2019, FEMS' implemented GO 502 (Complaint Procedures), establishing level of review and approval required for complaints and referrals, documentation required, follow-up protocol with appropriate agency, and emergency procedures.

### 5.   Systems access is limited within and across District Agencies

During A&M's interviews at DCRA, employees maintained a strong awareness of the narrow scope of control ascribed to their role within DCRA and the organization's role in the code enforcement process. Particularly, DCRA investigators communicated that they were explicitly prohibited from attempting to inspect or investigate issues related to Housing Code, which would need to be addressed by DCRA inspectors. DCRA roles are compartmentalized between groups, so not all investigators have knowledge of Housing Code requirements or the systems used to track and assess adherence to these requirements.

Although specialization in these roles can support the development of expertise in a domain of knowledge, the division between roles at DCRA has contributed to a lack of communication, ownership over responding to and referring complaints, and resource sharing between inspectors and investigators. The systems of record for inspections (ACCELA) and investigations (Investigations Module) both could serve as resources to all inspectors and investigators at DCRA, however, inspectors have no access to investigative systems and not all investigators, as a matter of procedure, access DCRA inspections records.

In the case of 708 Kennedy, the DCRA 708 Investigation performed an investigation at 708 Kennedy without first accessing and reviewing the long history of property complaints against the property. Additionally, despite a wealth of data in ACCELA which could be useful to public safety officers, neither FEMS nor MPD has access to the system.

External to DCRA no formal cross-training on issues of zoning and building code exists for the staff of other agencies who regularly access the District's residences and businesses. As a result, many MPD and FEMS first responders are not empowered to assist DCRA. In the case of 708 Kennedy, the MPD Officer who identified and reported the code violations had been enrolled in a discontinued 2003 cross-enforcement training program that trained the officer to identify and report code violations. This training is not common among MPD and FEMS first responders in the District.

---

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

Between DCRA, FEMS, and MPD

Additionally, several DCRA staff and leaders suggested that the lack of adherence by internal staff and external agency partners (MPD Officer) to the DCRA Duty Officer SOP contributed to DCRA's lack of appropriate response to complaints and inquiries. However, on review of communications documentation, DCRA leaders were unable to identify widespread distribution or communication of these procedures or related expectations.

### 6. *Audit log unavailable for DCRA complaint and investigations tracking applications*

A&M reviewed records of complaints, inspections, and investigations throughout DCRA's systems. Using ACCELA, A&M was able to clearly understand the permitting and inspection history for the property at 708 Kennedy and view a detailed list of activities and status changes as recorded in the system dating back over 25 years. This detailed log, which included timestamps and user identification for each entry and status change was easily accessed and shared by DCRA staff in response to A&M's initial data request. The level of detail of these records, and ease of access reflects a mature IT system which supports accountability and auditability and allows DCRA employees to readily access relevant information in line with best practices for IT systems. The A&M team requested similar logs for all events and activities in the QuickBase system, which includes both the Customer Relationship Management and Investigations Modules. Despite several requests over the course of our investigation, DCRA was unable to produce any activity log or other serviceable record of either Pilot CRM or investigations activity in QuickBase. The absence of detailed, auditable logs of activity can hinder the ability of an organization like DCRA to manage employee workloads and impedes the ability of internal or external auditors to evaluate organizational effectiveness. Without this timestamped log, A&M had to rely upon unofficial offline versions of the logs which were exported and emailed between DCRA staff as a record of status changes. Not only does this lack of auditable log limit backward-looking transparency, but it makes it impossible to verify that employees are only taking actions that they are appropriately authorized to make.

In interviews, the A&M team learned that not only does the Investigations Module lack an accessible audit log, but it includes no user-role based controls, which are used in IT systems to permit only appropriately authorized individuals to take certain actions.

## DCRA Investigations Management

### 7. *Lack of continuity of DCRA Investigations management personnel allowed the 708 Kennedy case to remain unresolved*

DCRA's Investigations unit's management team was in transition during the events leading up to the 708 Kennedy Fire. When the DCRA Investigations Program Manager was removed from the role in June 2019, the DCRA Investigations Program Officer was promoted to act as the program manager. The DCRA

---

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

Investigations Program Officer made a concerted effort to improve systems and processes, but the workload assumed by DCRA Investigations Program Officer responsibilities was overwhelming, so much so that the DCRA Investigations Program Officer asked the DCRA 708 Investigator to step into a new role supporting him as Lead Investigator. Through this interim assignment of assisting the DCRA Investigations Program Officer with the administration of investigations, the DCRA 708 Investigator was pulled off field work and the DCRA 708 Investigator's open investigations were put in a "suspended" status, meaning they were not being actively worked by an investigator.

During this transition, both the DCRA Investigations Program Officer and DCRA 708 Investigator acknowledged being too busy with administrative duties to invest any additional time in the 708 Kennedy Investigation. Further, no specific leadership training or support was offered to either employee as they took on additional responsibilities without transitioning out of old responsibilities. DCRA did not proactively plan to ensure continuity through leadership changes and did not provide the additional resources or oversight necessary to aid the transition of the leadership of the Investigations Division or ensure that the workload of the new group leaders was sufficiently addressed before pulling them away from the line. Additionally, this difficult transition was exacerbated by the absence of the DCRA Investigations Program Officer due to pre-planned vacation shortly after assuming the new role. A lack of continuity in the leadership of the Investigations Division contributed to several shortfalls in accountability, oversight, and follow-up on the 708 Kennedy case in the months leading up to the fire.

### 8. Limited formal training or job requirements for investigators

The position of investigator within DCRA is critical to verifying that District businesses are operating within the specifications of their permits. A small team of 12 investigators is tasked with monitoring compliance for the entire District. However, during interviews and document review, A&M learned that, at the time of the 708 Kennedy Fire, no formal training specific to the requirements of the District or inspections background was required for investigators. New hires take an external training course through a third-party provider and learn through "shadowing" and on-the-job training during as little as one investigation.

Not only does this this lack of formal, DC-specific training significantly increase the risk for error in day-to-day work, it leaves investigators with varying expectations on the extent of their responsibility and authority. This limited training period does not empower investigators to support other DCRA missions, such as verifying code compliance or identifying illegal construction. In addition to a lack of formal training, DCRA Investigations had no formal SOP stating specific requirements for what steps are required for an investigator to appropriately follow-up on a complaint, or even mark as case as closed. This process relies on the experience of the investigator and the trust and oversight of one program manager. Without formal expectations, investigators may err on the side of leniency in areas where they are unclear on legal requirements, they may fail to perform activities consistently due to the lack of clear requirements, and

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

Page | 46

BETWEEN DCRA, FEMS, AND MPD

they may not perform and document all investigations to the level of service required to fulfill the agency's mandate.

### 9. No process for prioritizing properties for investigation

At the time that DCRA received the 708 Complaint from the MPD Officer, DCRA had no clear process or approach for prioritizing properties for investigation or inspection. The 708 Complaint filed by the MPD Officer reflected that the building was being used outside of its authorized use, serving as a rooming house rather than a pharmacy, and noted violations of both DC Housing and Fire Codes. The details of this initial report were severe enough to necessitate inspection for both housing and fire code violations and investigation of building use. Additionally, a review of the history of issues at 708 Kennedy identified that the building had several past issues and reports, including:

- Several cases of unsafe conditions at the rear of the building related to:
  - Unsafe shed structure
  - Trash and debris
- Complaints that the building was being used as an unlicensed rooming house in 2003 and 2004, both of which were followed up with attempted enforcement action in 2008.

**For additional information on the history of issues at 708 Kennedy, refer to *Appendix A*.**

By the time that DCRA registered the most recent complaints from MPD (April 2019) the property had been the subject of several violations and infractions and had generated enough concern that an MPD Officer reached out several times on the property. Despite a history of problematic reports, and a police report and subsequent follow-up which communicated risks, this property was not prioritized by investigators. In interviews with DCRA employees, A&M confirmed that prior to the 708 Kennedy Fire DCRA had no formal standards for escalating property investigations as urgent unless they have a clear reason to believe that the structure poses an immediate threat of collapse.

### 10. Oversight and accountability over investigations is limited

The missteps outlined in the *Findings* section above arose not only from individual failures, but from an overall lack of personal and organizational accountability within DCRA's Investigations Division. The work of investigators throughout the timeline of events leading up to the 708 Kennedy Fire was not consistently overseen by Program Managers, and in the course of managerial transitions, several opportunities to intervene in the case were missed. DCRA's Investigations Division required no standardized mandatory reporting of activities during investigations, and DCRA leadership had established no process for auditing, or even verifying completion of work associated with cases which have been marked as suspended or closed. The DCRA Investigations Program Officer (who had been in-position for less than six months when the 708 Kennedy Complaint was received) relied on personal trust of investigators to perform appropriate follow-up, rather than any enforcement of standards, review of work product, or auditing of work

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

performed. In the case of 708 Kennedy, the DCRA Investigations Program Officer trusted that the DCRA 708 Investigator had appropriately attempted to contact the property owner, documented the investigation, and closed the case due to an inability to verify the complaint after taking reasonable steps to investigate. Upon later review, the DCRA 708 Investigator could provide only photos of the front of the building from one visit and had no record of visiting the property multiple times or checking at other points of entry. The DCRA 708 Investigator never visited the back side of the property and was unable to provide any record of the subsequent visits or attempts at communication. Not only had the DCRA Investigations Program Officer not verified completion of this investigation, but no program of sampling or review had been established at the time of the fire. Additionally, DCRA had no internal audit function as an organization. Without holding investigators to standards for due diligence and documentation, DCRA had no way of knowing whether properties like 708 Kennedy or other similar properties across the District had been appropriately investigated. The absence of an internal audit function within DCRA elevates the risk that process failures could go unchecked within the Investigations Division or elsewhere.

## Unlicensed Property Oversight

### 11. District Agencies have limited resources and authority related to unlicensed rental properties

DCRA has very limited ability to investigate or inspect commercial or residential properties which are suspected to be used outside of their licensure. No Certificate of Occupancy or housing inspection is required for single family rental units. Under DCRA's current processes for receiving a BBL application, a landlord can receive a BBL by self-certifying compliance using the One Family Dwelling Basic Business License Self Certification Form. The responsibility to ensure the safety of the property rests entirely on the owner. In instances where an owner is operating a rental unit which is not in compliance with DC Housing Code, owners may opt not to request an inspection. DCRA's process for inspecting or investigating properties for use outside of their CofO's stated use is wholly reliant on self-reporting by landlords, or complaints by tenants and members of the community. DCRA does not take active preventive measures to identify unlicensed rental units offered for lease are compliant with building code or other consumer protections.

Like the CofO process for rental units, which relies on owners of single-family rental units to ensure the safety of their property, the business license process for commercial properties places the onus on business owners to request an inspection when the use of their business changes. A business owner operating one business (for example, a pharmacy) can maintain a CofO for that business indefinitely with no recurring inspections. In the case of 708 Kennedy Street, the CofO for a Pharmacy, and later for Cigarette sales stood for over 25 years while the business was converted to serve as a seamstress shop and unlicensed rooming house. This system of self-reporting for businesses puts DC residents and customers at risk of unsafe properties and leaves a significant accountability gap for DC property owners

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

who seek to change their business offering and/or building configuration. DCRA relies on complaints from neighbors, tenants, and members of the public as the primary check on the safety of small business establishments. Deterrents to the inappropriate use of buildings are clearly limited in their effectiveness, as the "Walker Pharmacy" at 708 Kennedy was twice identified as an unlicensed rooming house prior to the 2019 sequence of events, and DCRA never shut down the business.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

## V.    RECOMMENDATIONS

### A.    Introduction

In accordance with the SOW, A&M has developed recommendations to address the underlying issues identified in Section IV (Findings and Observations) of this report. These recommendations have been informed by best practices utilized by corresponding agencies in other metropolitan cities.

A&M has also noted that the District Agencies have made a number of changes that should address, in part, many of A&M's recommendations provided below.  A&M has not reviewed the effectiveness of these changes but describes them in further detail in the following paragraphs.

### B.    Relevant Improvements Made by District Agencies To-Date

Through changes to policies and procedures, training, and systems, the District Agencies have taken a number of steps which address, in part, many of the underlying issues noted in A&M's Observations.

The District Agencies will need to continuously assess the extent to which the steps taken to-date will address the accountability gaps.

#### 1.    MPD

Subsequent to the Kennedy Fire, on September 3, 2019, the MPD issued the EO 19-005 to immediately standardize the MPD's process for communicating reports of code violations to FEMS and DCRA.  The Executive Order requires MPD Officers to immediately notify a supervisor who is then required to respond to the scene. The on-scene supervisor will notify the FEMS Fire Liaison Officer via OUC of the location and threat. The MPD Officer is also required to send an email to dcra@dc.gov, copying mpdcic@dc.gov, prior to end of shift and to complete the appropriate field report.

#### 2.    FEMS

FEMS has updated its General Orders and, shortly after the Kennedy Fire, on August 23, 2019, FEMS issued a GO 502 (Complaint Procedures) which lays out a formal process for handling reported complaints, noting that that complaints will be forwarded to Administrative Assistant for logging/assignment and copied to Fire Marshal and Assistant Fire Marshal. The Administrative Assistant will log the complaint, assign a tracking number, and forward to Division Inspections Supervisor for inspector assignment. Inspector must speak with complainant or inspect location within 24 hours or the next business day. Administrative assistant shall log completed report and forward copy to Fire Marshal/Assistant Fire Marshal.

---

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

### 3.    DCRA

A&M noted that, prior to the Kennedy Fire, DCRA had already taken steps to change its culture, including the way in which the agency communicates internally and with its customers.  Such changes include the following:

- Implementation of an eLearning system, launched in March 2019, to facilitate staff training and the socialization of SOPs
- Migration of the offline version of the Regulatory Investigation database into the Investigations Module.  This database provides reports on aging cases and a more centralized process for tracking investigations.
- Issuance of an RFP in July 2019 for the Enterprise CRM making it easier to find information across the agency.  The Enterprise CRM contract has been awarded to a vendor and systems development has begun.
- Issuance of an RFP in February 2018 aimed at changing the culture at DCRA ("Culture Change RFP").  The RFP was recently awarded to a vendor with a contract start date of September 12, 2019.
- Establishment of an internal audit function. A contractor was hired in summer 2019 to set up an internal audit function for DCRA.  In December 2018 and October 2019, DCRA approved job descriptions for a Compliance Specialist and Program Manager, respectively, to support the Internal Audit function.

Though no Investigation SOPs were issued prior to the 708 Kennedy Fire, the RIS team created guidance in December 2018 regarding the investigative report submission and approval. This information was disseminated to investigators in January 2019.   Prior to the 708 Kennedy Fire, DCRA was also in the process of creating SOPs for various roles within the organization and has subsequently issued a number of them including the CPU SOP issued on September 13, 2019.

### C.    Recommendations to Address Key Findings

The following table lists A&M's recommendations to address the Key Findings identified. This section, combined with the District Agency Recommendations to Address Observations below, should be used as a foundation to create an action plan for the District Agencies. Please note, the findings above are organized by the agency in which critical missteps occurs, however the recommendations below are directed towards the all of the District Agencies which could benefit from implementation of the recommendation.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

**Table 10 - Recommendations to Address Key Findings**

| # | Applicable Agency | Category | Description | Recommendation |
|---|---|---|---|---|
| F.1 | District Agencies | Systems | Improper Communication Channel Used to Contact Duty Officer | a) Systemize circulation of SOPs and require signatures acknowledging receipt and understanding. <br> b) Create single point of intake for customer inquiries for each agency |
| F.2 | District Agencies | Systems | DCRA Duty Officer does not respond to request for investigation | a) System must support CRM case generation from email <br> b) Update SOPs to provide guidance on expectations around receipt of emails <br> c) Single inbox per agency |
| F.3 | District Agencies | Training | FEMS does not include PIR in forwarded email | a) Train employees to be more diligent in the forwarding of complaints to ensure that key information is not lost <br> b) Require that relevant employees attempt to follow up with complainants to ensure that they have obtained a full understanding of the issue reported prior to acting |
| F.4 | FEMS | Systems | FEMS does not act or follow up on complaint | a) Configure FEMS tracking system to start tracking at complaint intake to increase accountability <br> b) Refine SOP to clarify that follow up with complainant is required <br> c) Systemize circulation of SOPs and require signatures acknowledging receipt and understanding. |
| F.5 | DCRA | Systems | DCRA fails to assign case to DCRA investigator or log case into QuickBase | a) System must support CRM case generation from email (note: repeated from F.2a above) <br> b) Case Assignment should occur via the Pilot CRM, not via email |
| F.6 | DCRA | Systems | DCRA 708 Investigator performs limited investigation | a) Create required field in Investigations Module in QuickBase |

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

| # | Applicable Agency | Category | Description | Recommendation |
|---|---|---|---|---|
| | | | | b) Update DCRA Investigator SOP to establish higher standards of minimum required evidence/work per case<br>c) Require investigator, manager, and program analyst e-signature prior to suspension or closure of case |
| F.7 | DCRA | Systems | DCRA suspends case without documentation or approval | a) Require investigator, manager, and program analyst e-signature prior to suspension or closure of case<br>b) Institute user-role based permissions which allow only the appropriate supervisors to close cases |
| F.8 | DCRA | Systems | DCRA closes case without case file or signature of approval | a) Require investigator, manager, and program analyst e-signature prior to suspension or closure of case<br>b) Institute user-role based permissions which allow only the appropriate supervisors to close cases |
| F.9 | DCRA | Systems | DCRA Employees fail to enter case into Pilot CRM despite multiple outreach attempts from MPD Officer | a) Configure CRM system to support automated generation of CRM inquiries via email (note: repeated from F.2a and F.5a above)<br>b) Evaluate Training provided to DCRA employees around expectations of use of CRM |

*F.1 District Agencies should establish a process to share and train staff on policies and procedures to ensure agency-wide adherence to policies.*

During the 708 Kennedy response, DCRA lacked the formal channels necessary to ensure understanding of essential policies and procedures by all agency staff. The lack of internal controls regarding the dissemination of the Duty Officer SOP prevented DCRA staff from utilizing the requisite reporting channels in the case of 708 Kennedy. A&M recommends:

   a. DCRA should implement a clear process for drafting, reviewing, and publishing SOPs, and training staff on those SOPs. DCRA should also require that staff receive training on long-standing SOPS that do not require updates. In addition to receiving training on current and new SOPs, DCRA

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

Page | 53

BETWEEN DCRA, FEMS, AND MPD

should require signatures from staff acknowledging receipt and understanding of new policies and procedures. In addition to the SOPs that DCRA is currently revising or creating, the agency should ensure that all current SOPs dealing with emergency situations are shared within the agency. Where appropriate, as in the case of the Duty Officer SOP, DCRA should consider sharing the SOP with partner organizations such as MPD and FEMS.

**Note:** DCRA has updated its SOP template and formalized the SOP approval process in January 2019, prior to the fire. All SOPs are currently available to staff members on DCRA's intranet site. DCRA has also indicated that staff members are trained on SOPs via the third-party eLearning platform.

b. District Agencies should develop a single point of intake for customer inquiries to prevent emergency requests going unaddressed. In addition to creating this system, agencies should collaborate to ensure that the single points of intake are clear across organizations to allow for referrals, requests for support, and support coordination efforts. To support this system, District Agencies should discourage employees from relying upon informal relationships to make requests to ensure that information is funneled through a single source.

**Note:** DCRA has established a customer referral phone line and online on-demand customer relationship management form (via the Pilot CRM System) which the public can use to directly submit complaints. However, A&M discovered in interviews that many DCRA employees receive a high volume of informal and formal requests via email. Prior to October 2019, DCRA's current Pilot CRM system did not support the automated creation of CRM records from an email. DCRA has improved the Pilot CRM system to address this system and indicated that the new Enterprise CRM system is in development and will eventually be able to automatically convert an email to a CRM record without human intervention.

### *F.2 District Agencies should automate the creation of customer inquiry/complaint intake through designated shared resources to reduce the potential for human error.*

DCRA does not have sufficient internal controls to ensure that every request made via email to DCRA employees is seen, triaged, replied to, and acted upon. This lack of controls creates possible scenarios where emergency requests sent via email could go unaddressed. A&M recommends:

a. DCRA should adopt a system that can automatically generate CRM records from email records. Currently, DCRA employees read emails and then manually enter case information into the Pilot CRM. A&M learned from various administrators in interviews that between high workloads and high volume of communications, that it is possible to overlook urgent requests. DCRA has recently awarded a contract for the implementation of a new Enterprise CRM. A&M recommends that the new enterprise system has the capability to automatically generate CRM records from emails.

---

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

Page | 54

BETWEEN DCRA, FEMS, AND MPD

b.  DCRA should update SOPs for all its employees to provide guidance on the minimum level of service expectation regarding all forms of communication (i.e., expectations regarding responding to phone calls, referring information to internal and external parties, receiving case information, and email communication).

**Note:** In September 2019, DCRA published a new CPU SOP that provides in-depth expectations and timelines for DCRA employees around case intake, communication with the complainant, receiving and sending referrals to other agencies, and general processes for case investigations.

c.  District Agencies and other DC Government Agencies should adopt a single intake inbox to ensure that all received requests are appropriately responded to, triaged, and acted upon in a timely manner. In addition, District Agencies should inform the general public and other DC Government Agencies on the most efficient way to route complaints – through a central email or direct entry into an online tracking system – in order to reduce the reliance upon informal communication (email) within DCRA.

**Note:** Currently, all District Agencies have single intake inboxes established. However, A&M found during its email review and interview process that employees were not aware of that a single inbox for each agency existed. There was also no evidence that employees were referring requests through the single inbox for each Agency to control the flow of information and request.

### *F.3 District Agencies should train employees on best practices regarding information sharing and complainant follow up to ensure that all case information is made available.*

Prior to the 708 Kennedy Fire, DCRA and FEMS did not require that employees responsible for intake, triage, assignment, investigation, or inspection of cases to follow up with the complainant. In the case of 708 Kennedy, the lack of follow up with the complainant delayed the investigation of the case. In addition, this issue created an information gap where the DCRA 708 Investigator performed an investigation without all available information.  A&M recommends:

a.  District Agencies and other DC Government Agencies should implement training for all employees to ensure that key information is not lost in the intake, referral, or case assignment process.

b.  District Agencies should edit SOPs to require that employees follow up with complainants in every case within specific time requirements to ensure that all information is available during the follow up District Agency action and to create accountability to the customer.

**Note:** DCRA published a new CPU SOP in September 2019 that provides in-depth expectations and timelines for DCRA employees around case intake and communication, follow-up, and close out processes with the complainant.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

### *F.4 FEMS should implement a new CRM system that begins tracking a new case as soon as a complaint is received.*

Prior to the 708 Kennedy Fire, FEMS did not start tracking cases at the time a complaint was received. Instead, FEMS employees were instructed to start tracking cases once inspectors conducted an action at a property site. This system creates risk due to a lack of case oversight between the time a complaint is received and the first time an action is taken by an FEMS employee to address that complaint. A&M recommends:

a. FEMs should configure its internal systems to begin tracking complaints when they are reported. In addition, the complaint intake system should integrate fully with the FEMS scheduling and case tracking systems.

   **Note:** Effective August 23, 2019, FEMS' implemented GO 502 (Complaint Procedures), establishing level of review and approval required for complaints and referrals, documentation required, follow-up protocol with appropriate agency, and emergency procedures. GO 502 lays out a formal process for handling complaints which includes recording the complaint prior to assignment to an inspector.

b. FEMS should write and incorporate SOPs to require that FEMS employees follow up with complainants in every case within specific time requirements.

c. FEMS should implement a clear process for drafting, reviewing, and publishing SOPs, and training staff on those SOPs. In addition to receiving training on new SOPs, FEMS should require signatures from staff acknowledging receipt and understanding of new policies and procedures. Where appropriate, FEMS should consider sharing the SOP with partner organizations such as MPD and DCRA.

### *F.5 DCRA systems should automate the creation of CRM records to reduce the potential for human error.*

Between March and August 2019, DCRA employees failed to either log the 708 Kennedy case in the Pilot CRM or into the Investigations Module despite multiple communications with the MPD Officer. The failure to input the case into the systems prevented DCRA managers from tracking the formal progress of 708 Kennedy. In addition, the DCRA 708 Investigator never received a systems-based notification stating that a case had been assigned. Without systems guiding case workflow, further room for human error is created. A&M recommends:

a. DCRA should adopt a system that can automatically generate CRM records from email records. Currently, DCRA employees who receive written requests are required to manually enter cases into the CRM. Due to the volume of email traffic received by DCRA employees, this additional step

---

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

creates room for human error. DCRA has indicated that, in October 2019, the Pilot CRM was configured to generate a CRM record with the touch of a button.  DCRA has recently awarded a contract for the implementation of a new Enterprise CRM. A&M recommends that Enterprise CRM system have the capability to automatically generate CRM records from emails. (**note**: this recommendation is repeated from F.2a)

b.  DCRA Case Assignments should occur via CRM notifications that are prompted after a case has been created in CRM. DCRA Case Assignments should not be communicated via email.

### *F.6 DCRA systems should be updated to provide additional levels of accountability over and visibility into case management.*

DCRA systems lack oversight capabilities over the case investigation process. This lack of oversight can lead to improper or incomplete investigations being conducted, such as the case at 708 Kennedy. A&M recommends:

a.  DCRA should create required fields in the Consumer Complaints module in QuickBase to ensure that a minimum level of documentation, notes, and other evidence (photos, research, etc.) are provided for each case.

b.  DCRA should update the DCRA Investigator SOP to define the baseline requirements of a DCRA investigator for every case that she/he is assigned. These baseline requirements should inform the established required fields in QuickBase.

c.  DCRA should configure its systems to require e-signatures from the investigator, program manager or officer, and program analyst in the case file prior to the suspension or closure of an investigation.

### *F.7 DCRA should require appropriate signatures and proper documentation prior to the <u>suspension</u> of an investigation.*

DCRA lacks formal policies and procedures to govern the process by which an investigation can be suspended. For example, there are not clear criteria to define the situation in which a case suspension should be permitted or what type of evidence is necessary to finalize a suspension. A&M recommends:

a.  DCRA should configure its systems to require e-signatures from the investigator, program manager or officer, and program analyst in the case file prior to the suspension or closure of an investigation.

b.  DCRA should implement user-based permissions in the Investigations Module of QuickBase to ensure that cases are being closed appropriately in accordance with the designed workflow (i.e., Program Analyst closes all cases after receiving signature from Program Manager and

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

Page | 57

BETWEEN DCRA, FEMS, AND MPD

investigator.) The user-based permissions should limit the type of role that can close a case (i.e., DCRA investigators should be not permitted to close their own case in the Investigations Module).

### F.8 DCRA should require various signatures and proper documentation prior to the closure of an investigation.

DCRA lacks formal policies and procedures to govern the process by which an investigation can be closed. For example, there are not clear criteria to define the situation in which a case closure should be permitted or what type of evidence is necessary to finalize a closure. A&M recommends:

a. DCRA should configure its systems to require e-signatures from the investigator, program manager or officer, and program analyst in the case file prior to the suspension or closure of an investigation.

b. DCRA should implement user-based permissions in the Investigations Module to ensure that cases are being closed appropriately in accordance with the designed workflow (i.e., program analyst closes all cases after receiving signature from program manager and investigator.) The user-based permissions should limit the type of role that can close a case (i.e., DCRA investigators should be not permitted to close their own case in QuickBase).

### F.9 DCRA systems should automate the creation of CRM records to reduce the potential for human error.

Despite various announcements, memos, and in-person trainings, the Pilot CRM was not properly used by multiple DCRA employees after various communications with the MPD Officer. To eliminate the potential for human error, DCRA should implement a system that maximizes the automation of CRM cases from written complaints while also evaluating the training provided to DCRA employees around expectations of the use of the CRM. A&M recommends:

a. DCRA should adopt a system that can automatically generate CRM records from email records. Currently, DCRA employees who receive written requests are required to manually enter cases into the CRM. Due to the volume of email traffic received by DCRA employees, this additional step creates room for human error. DCRA has recently awarded a contract for the implementation of a new Enterprise CRM. A&M recommends that the new enterprise system have the capability to automatically generate CRM records from emails. (**note**: this recommendation is repeated from F.2a and F.5a)

**Note:** Based on discussions with the DCRA Director, it is evident that this is a long-term goal of the Enterprise CRM being implemented but that, in the short-term, the Pilot CRM will not have this capability.

---

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

b. DCRA should review and evaluate the training and messaging provided to DCRA employees around the expectations of using the CRM. If DCRA determines that there are gaps in the training provided, DCRA should develop an action plan to ensure that all DCRA employees are familiar with and comfortable executing the necessary steps to maintain an agency-wide CRM.

### D.    Recommendations to Address Observations

The following table lists A&M's recommendations to address the Observations identified in Section IV.C of this report.  This section combined with the Agency Recommendations to Address Key Findings above can be used as a foundation to create an action plan for District Agencies (DCRA, FEMS, MPD). Additionally, broader reforms which may require District-wide collaboration, or legislative reform have been identified as recommendations to "DC Government".

**Table 11 - Recommendations to Address Observations**

| # | Applicable Agency | Category | Description | Recommendation |
|---|---|---|---|---|
| O.1 | District Agencies | Communications and Coordination | DCRA, FEMS and MPD lack clear communication channels and processes for reporting, collaborating and following-up on reported code violation | a) Establish policies which require consistent communications<br>b) Implement basic housing and fire code training at FEMS and DCRA<br>c) Implement basic code training at MPD<br>d) Establish a complainant feedback loop at DCRA and FEMS |
| O.2 | District Agencies | Communications and Coordination | Lack of responsibility and ownership of building safety issues across multiple agencies | a) Provide MPD and FEMS access to the central online database<br>b) Generate a cross-agency reference guide of common violations in the District<br>c) Consider implementing a policy requiring the initial complaint recipient immediately register the complaint. |
| O.3 | DCRA | Systems Maturity and Utilization | DCRA's Pilot CRM and Investigations Module are inconsistently used and lack | a) Establish reporting protocol within DCRA related to receipt of complaints<br>b) Inform the public and other agencies regarding most |

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

Page | 59

BETWEEN DCRA, FEMS, AND MPD

| # | Applicable Agency | Category | Description | Recommendation |
|---|---|---|---|---|
| | | | functionality to enhance accountability | efficient communication methods for complaints |
| O.4 | FEMS | Systems Maturity and Utilization | FEMS use of the Zoll system does not support transparency and accountability for the handling of complaints | a) Establish reporting protocol within FEMS related to receipt of complaints b) Inform the public and other agencies regarding most efficient communication methods |
| O.5 | District Agencies | Systems Maturity and Utilization | Systems access is limited within and across agencies | a) Develop a central online database accessible by DCRA investigators and inspectors b) Provide MPD and FEMS access to DCRA's central online database c) Explore the use of combination inspectors/investigators within DCRA d) Implement basic code training and establish reporting protocol for MPD and FEMS employees |
| O.6 | DCRA | Systems Maturity and Utilization | Audit log unavailable for DCRA complaint and investigations tracking applications | a) Ensure that an audit log capability is available and easily-accessible for all systems used b) Implement user-based controls for all systems used |
| O.7 | DCRA | DCRA Investigations Management | Poor continuity of DCRA Investigations management personnel allowed the 708 Kennedy case to remain unresolved | a) Consider performing a benchmark analysis against other metropolitan governments b) Mandate that all employees use the intended IT systems |
| O.8 | DCRA | DCRA Investigations Management | Limited formal training or job requirements for investigators | a) Develop and distribute SOP for investigators b) Implement a robust onboarding training and compliance program for investigators |

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

| # | Applicable Agency | Category | Description | Recommendation |
|---|---|---|---|---|
| | | | | c) Require above-the-minimum continuing education for all DCRA investigators |
| O.9 | DCRA | DCRA Investigations Management | No process for prioritizing properties for investigation | a) Establish policies and procedures for addressing high-priority issues in short time periods. <br> b) Require mandatory fields in CRM and QuickBase systems <br> c) Require inspectors and investigators to evaluate property history in case report <br> d) Develop the CRM/QuickBase systems to assign ownership of cases to multiple parties |
| O.10 | DCRA | DCRA Investigations Management | Oversight and accountability over investigations is limited | a) Create mandatory progress report updates in QuickBase modules <br> b) Require mandatory fields in investigation and inspection reports <br> c) Establish an internal audit function |
| O.11 | DC Government | Unlicensed Property Oversight | District agencies have limited resources related to unlicensed rental properties | a) Explore opportunities to improve building safety and use standards as a requirement to receive and maintain a BBL and/or CofO. <br> b) Consider pursuing legislative and administrative reforms to empower the District to require recurring inspections on all rental properties and licensed businesses to confirm compliance with building, zoning, and fire code |

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

| # | Applicable Agency | Category | Description | Recommendation |
|---|---|---|---|---|
| | | | | c)  Consider improving proactive efforts to identify unlicensed rentals |

## Communications and Coordination

### *O.1. District Agencies should collaborate to create formal, consistent, and effective communications.*

DCRA, FEMS, and MPD lack formal policies and procedures to govern communications across agencies, leading to a lack of clear coordination channels among the District Agencies. A&M recommends:

a.  District Agencies should collaborate to develop consistent policies and procedures regarding how District Agencies should communicate and follow-up on reported code violations. Specifically, the agencies should establish clear lines of communication based on the urgency and nature of the communication.

   **Note:** Related to the planning and coordination of emergency response efforts, the District does use OUC and HSEMA. Additionally, DCRA has created, but not yet distributed, an SOP for Duty Officers, establishing that DCRA employees contact the DCRA Duty Officer through HSEMA's 24-hour operations center. A&M recommends DCRA distribute the SOP to all DCRA employees.

b.  FEMS and DCRA should implement basic housing and fire code training for all field employees to ensure investigators and inspectors are knowledgeable regarding common code violations.

c.  Basic code training should be extended to other agencies, including MPD, that routinely access properties and can encounter, identify, and report obvious code violations to the appropriate District Agency.

d.  FEMS and DCRA should develop/utilize a system that automatically provides feedback to complainants. At the time of the fire, FEMS did not have systems in place to update the complainants on the status of cases.

   **Note:** Effective August 23, 2019, FEMS implemented GO 502 (Complaint Procedures), establishing level of review and approval required for complaints and referrals, documentation required, follow-up protocol with appropriate agency, and emergency procedures. While DCRA has the Pilot CRM system which has this functionality, the Pilot CRM system is not consistently utilized. This feedback loop for complaints will allow for an additional level of oversight.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

### *O.2. DCRA and FEMS should Establish cross-agency code enforcement policies and procedures to ensure coordinated response efforts and accountability across District Agencies.*

Protocols and task ownership among District Agencies regarding response to code violations are unclear and not well understood by agency employees, resulting in inefficient processes and unaddressed complaints. The only document providing guidance on distribution of responsibilities between DCRA and FEMS is the MOA signed September 15, 2000. The primary concern of MOA "is to ensure that the necessary fire protection and inspection services crucial to public safety and welfare are provided to District residents and businesses." Although DCRA shared the MOA with A&M, interviews with DCRA and FEMS staff indicated a lack of awareness of the MOA and its requirements.[13]

Due to the lack of responsibility and ownership of issues across District Agencies, A&M provides the following recommendations:

a. DCRA should provide MPD and FEMS access to the central reporting system, allowing MPD and FEMS to verify if DCRA has received a complaint and performed an investigation.

b. District Agencies should collaborate to develop a cross-agency reference guide identifying the most common violations in the District and identifying the responsible agency. This guide could also establish the appropriate contact point within each District Agency, based on the urgency and nature of the violation.

   **Note:** A&M recognizes that the District Agencies have recently issued procedures that provide guidance on communication with other District Agencies. FEMS' implementation of GO 502 (Complaint Procedures), effective August 23, 2019, establishes procedures for complaint referral to the appropriate agency. MPD EO 19-005, effective September 3, 2019, establishes procedures for reporting serious fire code violations to FEMS through OUC and subsequently to DCRA via email.

c. The District Agencies and other DC Government agencies should consider implementing a policy requiring that the initial recipient of any compliant immediately register the complaint in the respective Agency's central tracking database, subsequently following up with the designated contact of the appropriate District Agency.

   **Note:** DCRA implemented the CPU SOP, effective September 13, 2019, requiring that the Program Analyst log the complaint in the QuickBase Investigations Module within one business

---

[13]   DCRA leadership has noted that the next update to the DC Building Code (currently in process) will make the MOA redundant.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

day or allowing the complainant to directly enter the complaint into the CRM Module of the QuickBase System.

## Systems Maturity and Utilization

### *O.3. DCRA should ensure appropriate use of systems across the agency.*

DCRA employees rely on informal communications, via email, to route and track the process of investigation activities. DCRA has piloted a CRM system that is currently not being used effectively or to its full capabilities agency-wide. Due to the limited use and functionality of DCRA's systems, A&M recommends:

a. DCRA should establish reporting protocol requiring that all DCRA employees immediately enter complaints received into CRM upon receipt of the complaint, subsequently forwarding the complaints to a centralized mailbox for a second check by DCRA's customer service department.

b. DCRA should proactively inform the general public, FEMS, MPD, and other partner organizations on the most efficient way to route complaints – through a central email or direct entry into the CRM online tracking system – in order to reduce the reliance upon informal communication (email) within DCRA.

**Note:** DCRA has made effort to ensure the appropriate use of systems across the agency. DCRA provided documentation demonstrating a DCRA-wide implementation of the Pilot CRM system in February 2019. DCRA staff communicated their understanding that the CRM was not fully implemented at this time and was not consistently used to track cases.

### *O.4. FEMS should adopt procedures establishing appropriate systems use to support transparency and accountability.*

FEMS uses Zoll inspection tracking system to track and coordinate complaints of violations and the related inspections. Currently, the Zoll inspection tracking system is only updated after an inspector has visited the property and there is no process to track complaints received but not responded to or inspected, leading to limited visibility and oversight. A&M recommends:

a. FEMS should establish procedures requiring that all FEMS employees immediately enter complaints received into the Zoll tracking system upon receipt of the complaint (prior to inspector visiting the property), subsequently forwarding the complaints to a centralized email for a second check by the Administrative Officer for assignment.

**Note:** Effective August 23, 2019, FEMS' implemented GO 502 (Complaint Procedures), establishing level of review and approval required for complaints and referrals, documentation required, follow-up protocol with appropriate agency, and emergency procedures.

---

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

b. FEMS should inform the general public, DCRA, MPD, and other DC Government agencies of the most efficient way to route complaints – through a central email or direct entry into an online tracking system – in order to reduce the reliance upon informal communication (email) at FEMS.

*O.5. District Agencies should increase systems access and training within and across the agencies.*

Communication, information, and systems access related to reported code violations are compartmentalized between groups within and across the District Agencies. Due to the lack of systems access, A&M recommends:

a. DCRA should develop a central reporting system that both DCRA investigators and DCRA inspectors can access, allowing the groups to track code violations, inspections, and investigations at each address. DCRA should establish policies requiring that all investigators and inspectors review DCRA records prior to traveling to an address for inspection or investigation.

**Note:** Effective September 3, 2019, DCRA implemented the Property Maintenance Inspection SOP, requiring processing team members to search ACCELA records to determine if the property is a licensed rental property.  It is also A&M's understanding that the Enterprise CRM, when fully implemented, will be able to pull information from all DCRA systems onto a single dashboard that would enable the user to view all information across the agency that is relevant to a particular property.

b. DCRA should provide MPD and FEMS viewing access to the central reporting system, allowing MPD and FEMS to determine whether DCRA has received a complaint and performed an investigation.

c. DCRA should explore the use of combination inspectors, inspectors that are trained in multiple disciplines and empowered to support inspections and investigations.

d. MPD and FEMS should implement basic code training for the employees that routinely access properties and can encounter, identify, and report obvious code violations to the respective District Agency. This basic code training should establish reporting policies and procedures based on the urgency and nature of the code violation, as well as the required follow-up procedures.

*O.6. DCRA should establish an audit log and user-based controls for CRM and QuickBase to increase transparency, oversight, and accountability.*

DCRA's systems currently lack an audit log and user-based controls. The absence of an audit log inhibits DCRA's ability to evaluate organizational effectiveness, manage employees and their workloads, and identify actions previously taken. The absence of user-based controls within DCRA could allow DCRA

---

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

employees to circumvent policies, procedures, and lines of authority established by leadership. Due to the absence of key IT controls, A&M recommends:

a. DCRA should ensure that an audit log capability is available for all systems used to increase transparency and accountability within the organization.

b. DCRA should implement user-based controls within all systems used, establishing lines of authority and level of approval required for each task, increasing management's oversight of day-to-day operations.

**Note:** DCRA's new policies and procedures implemented on September 10, 2019 detail the documentation required to close cases and identify two DCRA employees with authority to close cases in the Investigations Module. A&M recommends DCRA implement automated user-based controls related to the two employees with authority to close cases in the Investigations Module.

## DCRA Investigations Management

### *O.7. DCRA should evaluate staffing needs at all levels and adopt policies establishing training requirements for all administrative and management personnel.*

Lack of continuity of DCRA investigations management personnel was a contributing factor that allowed 708 Kennedy to remain unresolved. Many personnel reported being overwhelmed with the workload or too busy with administrative tasks. Due to the lack of continuity of investigations personnel, A&M recommends:

a. DCRA should consider performing a benchmark analysis against other metropolitan government agencies to determine where DCRA is understaffed.

b. DCRA should mandate that all employees and investigators use the intended IT systems to open, track, manage, and close cases based on the appropriate level of authority.

### *O.8. DCRA should implement a robust formal training program for investigators.*

DCRA has stated that it provides required trainings to all investigators based upon best practices for investigations, standard operating procedures, and issues identified through Program Manager / Program Officer review of investigative reports. Interviews with multiple DCRA investigators indicated that, at the time of the 708 Kennedy Fire, DCRA investigators had not received this type of comprehensive training but that they have subsequently received additional training through DCRA's eLearning service provider. To build upon the progress that DCRA has made in training its investigators, A&M recommends:

a. DCRA should develop and distribute an SOP for investigators, documenting specific requirements and steps for performing investigations of code violations, reporting investigations of code

---

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

violations, documenting investigations of code violations, requirements & approval necessary for suspending investigations, and requirements & approval necessary for closing investigations.

b.  DCRA should implement a robust onboarding training and compliance program for investigators in order to standardize the investigations process, including requiring sufficient code knowledge and training prior to provisional registration of inspectors.

**Note:** DCRA implemented new policies and procedures via the Rental Property Complaints SOP, effective August 26, 2019, which establishes required investigation procedures including contacting the complainant, researching the owner and address, documenting the investigation, reporting the investigation, and completing the investigative report.

c.  DCRA should implement and require above-the-minimum continuing education for all DCRA investigators. DCRA should consider continuing education for all DCRA employees.

### O.9. DCRA should adopt a prioritization protocol for triaging and responding to complaints.

DCRA did not have clear processes in place for prioritizing properties for investigation or inspection. DCRA does not have formal standards for identifying high-priority complaints unless the structure poses immediate threat of collapse. Due to the informal processes related to the prioritization of complaints, A&M recommends:

a.  DCRA should establish policies and procedures to address priority issues within short time periods, and then meet basic Service-Level Agreements ("SLAs") for all other low-priority cases.

b.  DCRA should require mandatory fields in CRM and QuickBase systems to provide additional detail on the complainant of each case (e.g., MPD Officer, ANC Commission, Resident, etc.), allowing DCRA to leverage the additional information to establish case priority.

c.  DCRA should establish procedures requiring investigators and inspectors to review and summarize the property history of complaints in case report templates to ensure that the pattern of complaints and inspections at the property is considered when investing the complaint.

d.  DCRA should further develop CRM and QuickBase systems to assign ownership of high-priority cases and complaints to multiple parties (investigators, inspectors, Fire inspectors, etc.).

### O.10. DCRA should establish an internal audit function to track adherence to standardized mandatory reporting requirements.

DCRA has no internal audit function to oversee DCRA's Investigations Division and no standardized reporting requirements. The lack of oversight over DCRA's Investigations Division elevates the risk of

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

BETWEEN DCRA, FEMS, AND MPD

additional unresolved complaints. In order to track adherence to reporting requirements and increase management oversight, A&M recommends.

a. DCRA should implement procedures establishing mandatory progress report updates in the QuickBase module to ensure DCRA employees are investigating cases in a timely matter with the appropriate level of service and documentation. The mandatory progress reports provide additional oversight and monitoring for DCRA management.

**Note:** DCRA's RIS team established an Investigative Report Submission Process, effective December 17, 2018, requiring that DCRA investigators extensively document investigations performed and establishing various levels of review prior to final report submission, increasing accountability and oversight.  Though the establishment of this process was communicated to the DCRA investigators prior to the 708 Kennedy complaint, the DCRA 708 Investigator did not adhere to the outlined procedures.  A&M recommends that DCRA strengthen the monitoring and accountability functions of the DCRA Program Manager and DCRA Program Officer to support the requirements outlined in the Investigative Report Submission Process.

b. DCRA should establish mandatory fields in the investigation and inspection reports to ensure DCRA employees include consistent documentation in report submissions.

c. DCRA should establish an internal audit function to monitor DCRA's Investigations Division and randomly sample cases to ensure proper adherence to SOPs and SLAs. DCRA's internal audit function should verify all inspectors are appropriately performing and documenting cases. DCRA's internal audit function will provide another level of oversight to identify unaddressed cases.

## Unlicensed Property Oversight

*O.11. DC Government should explore implementing new licensing standards requiring recurring inspections to proactively assist the code enforcement process.*

DCRA relies heavily on landlords, neighbors, tenants, and members of the public to report complaints related to small business establishments. The system of self-reporting businesses puts DC residents and customers at risk and allows business owners to change their business offering or building configuration without a DCRA certification or inspection. As a result of the risk associated with a self-reporting code enforcement environment, A&M recommendations:

a. DC Government should explore opportunities to improve the BBL process through a combination of improved internal controls and integrated systems. DC Government should consider requiring verification of a CofO prior to the approval of a BBL.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

Page | 68

BETWEEN DCRA, FEMS, AND MPD

b. DC Government should consider pursuing legislative reform to empower DCRA to require mandatory inspections of any property issued a CofO or BBL every five-ten years. This process could be automatically triggered by DCRA's system of record.

c. DCRA should consider improving its proactive efforts to identify unlicensed rentals, including community outreach, data mining, and analytics to generate leads for RIS investigations. Consider treating other licensing, investigations, or zoning activities as "triggers" for reinspection of business properties.

Use, duplication, or disclosure is subject to restrictions stated in Contract CW74333 with Alvarez & Marsal.

REVIEW AND INVESTIGATION OF CODE ENFORCMENET
POLICIES, PROCEDURES, AND INTER-AGENCY COMMUNICATIONS
BETWEEN DCRA, FEMS, and MPD
*Exhibit 4 - 708 Kennedy ACCELA Records*

PRIVILEGED & CONFIDENTIAL
ATTORNEY WORK PRODUCT

### Compliance & Enforcement

| CAP ID | ACCELA CAP Type | Description of Work / Request Comment | Date Filed | Inspection Action | Inspection Status | Case Status | Status Date | Comments |
|---|---|---|---|---|---|---|---|---|
| CFS1900028 | Enforce/Compliance/Construction/Fire Safety | Fire safety inspection | 9/18/2019 | Insp Cancelled | Issue Citation | Inspection Scheduled | 9/18/2019 | See Appended Inspection Report |
| 09-01344 | Enforce/Compliance/Infraction/NA | CASE RECEIVED 9-21-09, PROCESS BY [NAME REDACTED] ON 9-22-09, VIOLATIONS TRASH AND WEEDS IN REAR YEARD***FINE AMOUNT $1,000.00 | 9/22/2009 | n/a | n/a | Case Canceled | 4/1/2019 | Via Script. This NOI is also defective because no time of the infraction was stated on the NOI. The time of the infraction must be entered on the NOI. |
| CTB0901546 | Enforce/Compliance/Housing/Trash and Debris | Excessive grass, trash and debris, front and/or rear years. Insp. Pick-up from Fix-It on 8/27/09 Insp [name redacted] | 8/31/2009 | Insp Completed | Not Abated | Case too old | 9/15/2010 | Inspection reveals the following. The weeds are greater than 10 inches in height along with trash and debris in the rear yard of this building that creates a harborage for rodents. Attached to this case is a photo of the existing violation. Attempt personal service at 1412 Whittier PL NW, no response. Recommend that this case be sent by certificate of mailing.

Reinspection reveals the following. Items (1) and (2) have not been abated. Attached to this case is a photo of the existing violation. Recommend that this case be forwarded for assessment. |
| CTB0900627 | Enforce/Compliance/Housing/Trash and Debris | Trash and debris - Occupants moved out, left backyard full of trash and debris | 3/24/2009 | Insp Completed | Cause | Cause for action | 3/27/2009 | An inspection of the premises revealed that this is an accumulation of trash and debris in the rear of this property a notice of violations has bee prepared for mailing. |
| CRM080923 | Enforce/Compliance/Housing/Routine Maintenance | MAYOR'S WALKTHROUGH - shed/garage in rear. Unsafe & dilapidated. Debris | 9/19/2008 | Insp Completed | Abated | NOV Served by Mail | | A reinspection of the premises was conducted on 11/25/08. It revealed the following: 10/7/2008 all items pending have been abated, no items remain. I recommend that this case is closed. |
| CRM080905 | Enforce/Compliance/Housing/Routine Maintenance | MAYOR'S WALKTHROUGH - DEFECTIVE SHED AND DEBRIS REAR | 9/18/2008 | Insp Completed | No Cause | No Cause | 9/26/2008 | duplicate inspection request. |
| CRM080683 | Enforce/Compliance/Housing/Routine Maintenance | MAYOR'S WALKTHROUGH - DEBRIS, SHED, ROUTING MAINTENANCE | 8/28/2008 | Insp Completed | No Cause | No Cause | 9/2/2008 | An inspection of the premises conducted on 8/29/08 reveals the following: no violations found at this time. No cause for action. |
| ECC147412 | Enforce/Compliance/Construction/Fire Safety | Gret Streets: Inspect for building code violations and violations within 360 degrees from property. Take pictures of code violations and forward to [name redacted] for downloading and return report to [name | 7/3/2006 | Insp Completed | Cause | Disapproved | | unlicense truck dilapidating shed trash in rear of bldg. *JH8 |
| ECC58246 | Enforce/Compliance/Construction/Zoning | Rooming w/o C of O | 3/12/2004 | Insp Completed | Failed to Inspect | Disapproved | | No one home. |
| ECC31321 | Enforce/Compliance/Construction/Zoning | rooming house | 6/25/2003 | Insp Completed | Cause | Approved | | c/n enter |

### Licensing

| CAP ID | ACCELA CAP Type | Description | Date Filed | Inspection Action | Inspection Status | Case Status | Status Date | Comments |
|---|---|---|---|---|---|---|---|---|
| LAPP18003170 | Licenses/Business License Application/NA/NA | | 1/30/2018 | n/a | n/a | Approved | 1/30/2018 | |
| 400318000782 | Licenses/Business License/General Business/General Business Licenses | | 1/30/2018 | n/a | n/a | Active | 1/30/2018 | |
| HO1800336 | Building/Home Occupation/NA/NA | ONLINE SALES | 1/29/2018 | n/a | n/a | Permit Approved | | 1/29/2018 MU-4 ZONING DISTRICT. ZONING HOP APPROVAL FOR ONLINE SALES. |
| LAPP68003045 | Licenses/Business License Application/NA/NA | Cigarette Retail | 5/8/2008 | n/a | n/a | Approved | 9/26/2010 | Updated by Script |
| 68003045 | Licenses/Business License/General Sales/Cigarette Retail | Cigarette Retail | 5/8/2008 | n/a | n/a | Expired | 9/26/2010 | |
| 39501280 | Licenses/Business License /Public Health Food Establish | Delicatessen | 10/30/1999 | n/a | n/a | Expired | 9/24/2010 | |
| LAPP39501280 | Licenses/Business License Application/NA/NA | Delicatessen | 10/30/1999 | n/a | n/a | Expired | 9/24/2010 | Updated by Script |

| 39209304 | Licenses/Business License /Public Health Food Establish | Food Products | 3/31/1992 | n/a | n/a | Expired | 10/2/2010 |
| LAPP39209304 | Licenses/Business License Application/NA/NA | Food Products | 3/31/1992 | n/a | n/a | Approved | 10/2/2010 Updated by Script |
| LAPP39209305 | Licenses/Business License Application/NA/NA | Cigarette Retail | 1/1/1992 | n/a | n/a | Approved | 10/3/2010 Updated by Script |
| 39209305 | Licenses/Business License/General Sales/Cigarette Retail | Cigarette Retail | 1/1/1992 | n/a | n/a | Expired | 10/3/2010 |

*Note: A&M created this document using the ACCELA records for 708 Kennedy Street provided by DCRA. The ACCELA report was generated by DCRA on 9/23/2019. All name references have been removed.*

Superior Court of the District of Columbia
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Helen A. Kasay, as Personal Representative of the Estate of Yafet Solomen, deceased
_____
Plaintiff

vs.

Case Number   2021 CA 002836 B

Anette Tibbs
_____
Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Peter C. Grenier
_____
Name of Plaintiff's Attorney

1920 L Street NW, Suite 750
_____
Address
Washington, DC 20036

202-769-9600
_____
Telephone

_Clerk of the Court_

By _____
Deputy Clerk

Date   08/16/2021

如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주십시오     የትርጉም እርዳታ ከፈለጉ (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                                 Super. Ct. Civ. R. 4

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Helen A. Kasay, as Personal Representative of the Estate of Yafet Solomen, deceased
Plaintiff

vs.

Case Number  **2021 CA 002836 B**

Anthony Prather
Defendant

**SUMMONS**

To the above named Defendant:

    You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

    You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Peter C. Grenier
_____
Name of Plaintiff's Attorney

1920 L Street NW, Suite 750
_____
Address
Washington, DC 20036
_____

202-769-9600
_____
Telephone

*Clerk of the Court*

By _____
Deputy Clerk

Date _____ **08/16/2021**

如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202)879-4828로 전화주십시오    ለትርጉም ከፈለጉ ወደ (202) 879-4828 ይደውሉ

    IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

    If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Helen A. Kasay, as Personal Representative of the Estate of Yafet Solomen, deceased
_____
Plaintiff

vs.

Case Number _____

District of Columbia
_____
Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Peter C. Grenier
_____
Name of Plaintiff's Attorney

1920 L Street NW, Suite 750
_____
Address
Washington, DC 20036

202-769-9600
_____
Telephone

_Clerk of the Court_

By _____

Date _____

如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202)879-4828로 전화주십시오     የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                                                          Super. Ct. Civ. R. 4

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Helen A. Kasay, as Personal Representative of the Estate of Yafet Solomen, deceased
_____
Plaintiff

vs.

Case Number  2021 CA 002836 B

Inez Saki-Tay
_____
Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Peter C. Grenier
_____
Name of Plaintiff's Attorney

1920 L Street NW, Suite 750
_____
Address

Washington, DC 20036

202-769-9600
_____
Telephone

_Clerk of the Court_

By _____
Deputy Clerk

Date         08/16/2021

如需翻译,请打电话 (202) 879-4828          Veuillez appeler au (202) 879-4828 pour une traduction          Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202)879-4828로 전화주십시오          ያማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                                                    Super. Ct. Civ. R. 4

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Helen A. Kasay, as Personal Representative of the Estate of Yafet Solomen, deceased
_____
Plaintiff

vs.

Case Number   2021 CA 002836 B

Louise Peterson
_____
Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Peter C. Grenier
_____
Name of Plaintiff's Attorney

1920 L Street NW, Suite 750
_____
Address
Washington, DC 20036

_____
202-769-9600
Telephone

By _____

_Clerk of the Court_

Deputy Clerk

Date   08/16/2021

如需翻译,请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주십시오       የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                                 Super. Ct. Civ. R. 4

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Helen A. Kasay, as Personal Representative of the Estate of Yafet Solomen, deceased
_____
Plaintiff

vs.

Case Number    2021 CA 002836 B

Ferdinand Gamboa
_____
Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Peter C. Grenier
_____
Name of Plaintiff's Attorney

1920 L Street NW, Suite 750
_____
Address

Washington, DC 20036

_____
202-769-9600
Telephone

_Clerk of the Court_

By _____
                                    Deputy Clerk

Date _____ 08/16/2021

如需翻译，请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주세요    የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                                    Super. Ct. Civ. R. 4

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Helen A. Kasay, as Personal Representative of the Estate of Yafet Solomen, deceased
Plaintiff

vs.

Case Number  2021 CA 002836 B

Derek Brooks
Defendant

<b>SUMMONS</b>

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Peter C. Grenier
_____
Name of Plaintiff's Attorney

1920 L Street NW, Suite 750
_____
Address
Washington, DC 20036

202-769-9600
_____
Telephone

*Clerk of the Court*

By _____
Deputy Clerk

Date    08/16/2021

如需翻译，请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202)879-4828로 전화주십시오     የአማርኛ ትርጉም ለማግኘት፣ (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, *DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME.*

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Helen A. Kasay, as Personal Representative of the Estate of Yafet Solomen, deceased
_____
Plaintiff

vs.

Case Number    2021 CA 002836 B

Timothy Handy
_____
Defendant

## SUMMONS

To the above named Defendant:

    You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

    You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Peter C. Grenier
_____
Name of Plaintiff's Attorney

1920 L Street NW, Suite 750
_____
Address
Washington, DC 20036

_____
202-769-9600
_____
Telephone

_Clerk of the Court_

By _____
Deputy Clerk

Date    08/16/2021

如需翻译,请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828
번역을 원하시면, (202)879-4828로 전화주십시요      የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

    IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

    If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                                        Super. Ct. Civ. R. 4

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Helen A. Kasay, as Personal Representative of the Estate of Yafet Solomen, deceased
_____
Plaintiff

vs.

Case Number  2021 CA 002836 B

Steven Allen
_____
Defendant

## SUMMONS

To the above named Defendant:

    You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

    You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Peter C. Grenier
_____
Name of Plaintiff's Attorney

1920 L Street NW, Suite 750
_____
Address
Washington, DC 20036

_____
202-769-9600
_____
Telephone

_Clerk of the Court_

By _____
Deputy Clerk

Date    08/16/2021

如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202)879-4828로 전화주십시오    ናይምኘማ ትርጉም ለማግኘት፡ (202) 879-4828 ይደውሉ

    IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

    If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Helen A. Kasay, as Personal Representative of the Estate of Yafet Solomen, deceased
_____
Plaintiff

vs.

Case Number ___2021 CA 002836 B___

John Barnes Jr.
_____
Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Peter C. Grenier
_____
Name of Plaintiff's Attorney

1920 L Street NW, Suite 750
_____
Address

Washington, DC 20036

202-769-9600
_____
Telephone

_Clerk of the Court_

By _____
Deputy Clerk

Date ___08/16/2021___

如需翻译,请打电话 (202) 879-4828     Veuillez appeler au (202) 879-4828 pour une traduction     Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주세요      የሚተረጐም ከፈለጉ ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Helen A. Kasay, as Personal Representative of the Estate of Yafet Solomen, deceased
_____
Plaintiff

vs.

Case Number  2021 CA 002836 B

Shawnte Williams
_____
Defendant

## SUMMONS

To the above named Defendant:

    You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

    You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Peter C. Grenier
_____
Name of Plaintiff's Attorney

1920 L Street NW, Suite 750
_____
Address
Washington, DC 20036

202-769-9600
_____
Telephone

_Clerk of the Court_

By _____
Deputy Clerk

Date  08/16/2021

如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202)879-4828로 전화주십시오     የአማርኛ ተርጓሚ ለማግኘት (202) 879-4828 ይደውሉ

    IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

    If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                            Super. Ct. Civ. R. 4

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Helen A. Kasay, as Personal Representative of the Estate of Yafet Solomen, deceased
_____
Plaintiff

vs.

Case Number    2021 CA 002836 B

James Walker
_____
Defendant

## SUMMONS

To the above named Defendant:

    You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

    You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Peter C. Grenier
_____
Name of Plaintiff's Attorney

1920 L Street NW, Suite 750
_____
Address

Washington, DC 20036

_____

202-769-9600
_____
Telephone

_Clerk of the Court_

By _____
Deputy Clerk

Date _____08/16/2021_____

如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주십시오     የአማርኛ ትርጉም ለማግኘት፣ (202) 879-4828 ይደውሉ

    IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

    If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                                          Super. Ct. Civ. R. 4

**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001**
**Telephone: (202) 879-1133 Website: www.dccourts.gov**

Helen A. Kasay, as Personal Representative of the Estate of Yafet Solomen, deceased
_____
Plaintiff

vs.

Case Number    2021 CA 002836 B

Harriett A. Broadie
_____
Defendant

### SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Peter C. Grenier
_____
Name of Plaintiff's Attorney

1920 L Street NW, Suite 750
_____
Address

Washington, DC 20036

_____
202-769-9600
_____
Telephone

_Clerk of the Court_

By _____
Deputy Clerk

Date _____ 08/16/2021

如需翻译,请打电话 (202) 879-4828      Veuillez appeler au (202) 879-4828 pour une traduction      Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주십시오     የአማርኛ ትርጉም ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

CV-3110 [Rev. June 2017]                                                      Super. Ct. Civ. R. 4

**SUPERIOR COURT OF THE DISTRICT OF COLUMBIA**
**CIVIL DIVISION Civil Actions Branch**
**500 Indiana Avenue, N.W., Suite 5000, Washington, D.C. 20001**
**Telephone: (202) 879-1133 • Website: www.dccourts.gov**

HELEN A. KASAY
Vs.                                                                    C.A. No.        2021 CA 002836 B
THE DISTRICT OF COLUMBIA et al

## INITIAL ORDER AND ADDENDUM

**Pursuant to D.C. Code § 11-906 and District of Columbia Superior Court Rule of Civil Procedure ("Super. Ct. Civ. R.") 40-I, it is hereby** ORDERED **as follows:**

(1) This case is assigned to the judge and calendar designated below. All future filings in this case shall bear the calendar number and the judge's name beneath the case number in the caption.

(2) Within 60 days of the filing of the complaint, plaintiff must file proof of service on each defendant of copies of (a) the summons, (b) the complaint, and (c) this Initial Order and Addendum. The court will dismiss the claims against any defendant for whom such proof of service has not been filed by this deadline, unless the court extended the time for service under Rule 4(m).

(3) Within 21 days of service (unless otherwise provided in Rule 12), each defendant must respond to the complaint by filing an answer or other responsive pleading. The court may enter a default and a default judgment against any defendant who does not meet this deadline, unless the court extended the deadline under Rule 55(a).

(4) At the time stated below, all counsel and unrepresented parties shall participate in a remote hearing to establish a schedule and discuss the possibilities of settlement. Counsel shall discuss with their clients **before** the hearing whether the clients are agreeable to binding or non-binding arbitration. **This order is the only notice that parties and counsel will receive concerning this hearing.**

(5) If the date or time is inconvenient for any party or counsel, the Civil Actions Branch may continue the Conference **once**, with the consent of all parties, to either of the two succeeding Fridays. To reschedule the hearing, a party or lawyer may call the Branch at (202) 879-1133. Any such request must be made at least seven business days before the scheduled date.
No other continuance of the conference will be granted except upon motion for good cause shown.

(6) Parties are responsible for obtaining and complying with all requirements of the General Order for Civil cases, each judge's Supplement to the General Order and the General Mediation Order. Copies of these orders are available in the Courtroom and on the Court's website http://www.dccourts.gov/.

**Chief Judge Anita M. Josey-Herring**

Case Assigned to: Judge JOSE M LOPEZ
Date:        August 16, 2021
Initial Conference: **REMOTE HEARING - DO NOT COME TO COURTHOUSE**
**SEE REMOTE HEARING INSTRUCTIONS ATTACHED TO INITIAL ORDER**

9:30 am, Friday, November 12, 2021
Location:   Courtroom 212
                500 Indiana Avenue N.W.
                WASHINGTON, DC 20001

CAIO-60

## ADDENDUM TO INITIAL ORDER AFFECTING
## ALL MEDICAL MALPRACTICE CASES

D.C. Code § 16-2821, which part of the Medical Malpractice Proceedings Act of 2006, provides,   "[a]fter action is filed in the court against a healthcare provider alleging medical malpractice, the court shall require the parties to enter into mediation, without discovery or, if all parties agree[,] with only limited discovery that will not interfere with the completion of mediation within 30 days of the Initial Scheduling and Settlement Conference ('ISSC'"), prior to any further litigation in an effort to reach a settlement agreement.  The early mediation schedule shall be included in the Scheduling Order following the ISSC.  Unless all parties agree, the stay of discovery shall not be more than 30 days after the ISSC."

To ensure compliance with this legislation, on or before the date of the ISSC, the Court will notify all attorneys and *pro se* parties of the date and time of the early mediation session and the name of the assigned mediator.  Information about the early mediation date also is available over the internet at https://www.dccourts.gov/pa/.  To facilitate this process, all counsel and *pro se* parties in every medical malpractice case are required to confer, jointly complete and sign an EARLY MEDIATION FORM, which must be filed no later than ten (10) calendar days prior to the ISSC.  D.C. Code § 16-2825 Two separate Early Mediation Forms are available.   Both forms may be obtained at www.dccourts.gov/medmalmediation.  One form is to be used for early mediation with a mediator from the multi-door medical malpractice mediator roster; the second form is to be used for early mediation with a private mediator.  Plaintiff's counsel is responsible for eFiling the form and is required to e-mail a courtesy copy to earlymedmal@dcsc.gov.  Unrepresented plaintiffs who elect not to eFile must either mail the form to the Multi-Door Dispute Resolution Office at, Suite 2900, 410 E Street, N.W., Washington, DC 20001, or deliver if in person if the Office is open for in-person visits.

A roster of medical malpractice mediators available through the Court's Multi-Door Dispute Resolution Division, with biographical information about each mediator, can be found at www.dccourts.gov/medmalmediation/mediatorprofiles.  All individuals on the roster are judges or lawyers with at least 10 years of significant experience in medical malpractice litigation.  D.C. Code § 16-2823(a).  If the parties cannot agree on a mediator, the Court will appoint one.  D.C. Code § 16-2823(b).

The following people are required by D.C. Code § 16-2824 to attend personally the Early Mediation Conference: (1) all parties; (2) for parties that are not individuals, a representative with settlement authority; (3) in cases involving an insurance company, a representative of the company with settlement authority; and (4) attorneys representing each party with primary responsibility for the case.

No later than ten (10) days after the early mediation session has terminated, Plaintiff must eFile with the Court a report prepared by the mediator, including a private mediator, regarding: (1) attendance; (2) whether a settlement was reached; or, (3) if a settlement was not reached, any agreements to narrow the scope of the dispute, limit discovery, facilitate future settlement, hold another mediation session, or otherwise reduce the cost and time of trial preparation.  D.C. Code§ 16-2826.  Any Plaintiff who is unrepresented may mail the form to the Civil Actions Branch at [address] or deliver it in person if the Branch is open for in-person visits. The forms to be used for early mediation reports are available at www.dccourts.gov/medmalmediation.

Chief Judge Anita M. Josey-Herring

CAIO-60

**Civil Remote Hearing Instructions for Participants**

The following instructions are for participants who are scheduled to have cases heard before a Civil Judge in a **Remote Courtroom**


**Option1:**  **(AUDIO ONLY/Dial-in by Phone):**

**Toll 1 (844) 992-4762 or (202) 860-2110, enter the Meeting ID from the attachment followed by #, press again to enter session.**

> ※ *Please call in no sooner than 5 minutes before your scheduled hearing time. Once you have joined the session, please place your phone on mute until directed otherwise. If you should happen to get disconnected from the call, please call back in using the phone number and access number provided and the courtroom clerk will mute your call until the appropriate time.*

If you select **Option 2** or **Option 3** use the Audio Alternative

**Option 2: (LAPTOP/ DESKTOP USERS 1):**

> Open Web Browser in Google Chrome and copy and paste following address from the next page:
> https://dccourts.webex.com/meet/XXXXXXXXX


**Option 3: (LAPTOP/ DESKTOP USERS 2):**

> Open Web Browser in Google Chrome and copy and paste following address
> https://dccourts.webex.com   Select **Join**, enter the Meeting ID from the next page


AUDIO ALTERNATIVE**:**  Instead of automatically using **USE COMPUTER FOR AUDIO**, select **CALL-IN** and follow the **CALL-IN** prompt window.  Use a cell phone or desk phone. You will be heard clearer if you **do not** place your phone on SPEAKER. It is very important that you enter the **ACCESS ID #** so that your audio is matched with your video.



**Option 4: (Ipad/SMART PHONE/TABLET):**

- Go to App Store, Download WebEx App (Cisco WebEx Meetings)
- Sign into the App with your Name and Email Address
- Select Join Meeting
- Enter address from the next page: https://dccourts.webex.com/meet/XXXXXXXXX
- Click join and make sure your microphone is muted and your video is unmuted (if you need to be
- seen). If you only need to speak and do not need to be seen, use the audio only option.
- When you are ready click "Join Meeting". If the host has not yet started the meeting, you will be placed in the lobby until the meeting begins.

**For Technical Questions or issues Call: (202) 879-1928, Option #2**

Superior Court of the District of Columbia
Public Access for Remote Court Hearings
(Effective August 24, 2020)

**The current telephone numbers for all remote hearings are: 202-860-2110 (local) or 844-992-4726 (toll free).** After dialing the number, enter the WebEx Meeting ID as shown below for the courtroom. Please click a WebEx Direct URL link below to join the hearing online.

Audio and video recording; taking pictures of remote hearings; and sharing the live or recorded remote hearing by rebroadcasting, live-streaming or otherwise are not allowed

| Division | Courtroom | Types of Hearings Scheduled in Courtroom | Public Access via WebEx | |
|---|---|---|---|---|
| | | | **WebEx Direct URL** | **WebEx Meeting ID** |
| Auditor Master | 206 | Auditor Master Hearings | https://dccourts.webex.com/meet/ctbaudmaster | 129 648 5606 |
| Civil | 100 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb100 | 129 846 4145 |
| | 205 | Foreclosure Matters | https://dccourts.webex.com/meet/ctb205 | 129 814 7399 |
| | 212 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb212 | 129 440 9070 |
| | 214 | Title 47 Tax Liens; and Foreclosure Hearings | https://dccourts.webex.com/meet/ctb214 | 129 942 2620 |
| | 219 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb219 | 129 315 2924 |
| | 221 | Civil 1 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb221 | 129 493 5162 |
| | 318 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb318 | 129 801 7169 |
| | 320 | | https://dccourts.webex.com/meet/ctb320 | 129 226 9879 |

| 400 | Judge in Chambers Matters including Temporary Restraining Orders, Preliminary Injunctions and Name Changes | https://dccourts.webex.com/meet/ctb400 | 129 339 7379 |
|---|---|---|---|
| 415 | Civil 2 Scheduling Conferences; Status, Motion and Evidentiary Hearings including Bench Trials | https://dccourts.webex.com/meet/ctb415 | 129 314 3475 |
| 516 | | https://dccourts.webex.com/meet/ctb516 | 129 776 4396 |
| 517 | | https://dccourts.webex.com/meet/ctb517 | 129 911 6415 |
| 518 | | https://dccourts.webex.com/meet/ctb518 | 129 685 3445 |
| 519 | | https://dccourts.webex.com/meet/ctb519 | 129 705 0412 |
| JM-4 | | https://dccourts.webex.com/meet/ctbjm4 | 129 797 7557 |
| A-47 | Housing Conditions Matters | https://dccourts.webex.com/meet/ctba47 | 129 906 2065 |
| B-52 | Debt Collection and Landlord and Tenant Trials | https://dccourts.webex.com/meet/ctbb52 | 129 793 4102 |
| B-53 | Landlord and Tenant Matters including Lease Violation Hearings and Post Judgment Motions | https://dccourts.webex.com/meet/ctbb53 | 129 913 3728 |
| B-109 | Landlord and Tenant Matters | https://dccourts.webex.com/meet/ctbb109 | 129 127 9276 |
| B-119 | Small Claims Hearings and Trials | https://dccourts.webex.com/meet/ctbb119 | 129 230 4882 |



**Superior Court of the District of Columbia**
**CIVIL DIVISION**
**Civil Actions Branch**
500 Indiana Avenue, N.W., Suite 5000 Washington, D.C. 20001
Telephone: (202) 879-1133 Website: www.dccourts.gov

D.C. Superior Court
09/10/2021 17:17PM
Clerk of the Court

Helen A. Kasay, as Personal Representative of the Estate of Yafet Solomen, deceased
_____
Plaintiff

vs.

Case Number    2021 CA 002836 B
_____

The District of Columbia
_____
Defendant

## SUMMONS

To the above named Defendant:

You are hereby summoned and required to serve an Answer to the attached Complaint, either personally or through an attorney, within twenty one (21) days after service of this summons upon you, exclusive of the day of service. If you are being sued as an officer or agency of the United States Government or the District of Columbia Government, you have sixty (60) days after service of this summons to serve your Answer. A copy of the Answer must be mailed to the attorney for the plaintiff who is suing you. The attorney's name and address appear below. If plaintiff has no attorney, a copy of the Answer must be mailed to the plaintiff at the address stated on this Summons.

You are also required to file the original Answer with the Court in Suite 5000 at 500 Indiana Avenue, N.W., between 8:30 a.m. and 5:00 p.m., Mondays through Fridays or between 9:00 a.m. and 12:00 noon on Saturdays. You may file the original Answer with the Court either before you serve a copy of the Answer on the plaintiff or within seven (7) days after you have served the plaintiff. If you fail to file an Answer, judgment by default may be entered against you for the relief demanded in the complaint.

Peter C. Grenier
_____
Name of Plaintiff's Attorney

1920 L Street NW, Suite 750
_____
Address
Washington, DC 20036
_____

202-769-9600
_____
Telephone

_Clerk of the Court_

By _____
Deputy Clerk

Date _____

如需翻译,请打电话 (202) 879-4828    Veuillez appeler au (202) 879-4828 pour une traduction    Để có một bài dịch, hãy gọi (202) 879-4828

번역을 원하시면, (202) 879-4828로 전화주십시오    የትርጉም ተርጓሚ ለማግኘት (202) 879-4828 ይደውሉ

IMPORTANT: IF YOU FAIL TO FILE AN ANSWER WITHIN THE TIME STATED ABOVE, OR IF, AFTER YOU ANSWER, YOU FAIL TO APPEAR AT ANY TIME THE COURT NOTIFIES YOU TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE MONEY DAMAGES OR OTHER RELIEF DEMANDED IN THE COMPLAINT. IF THIS OCCURS, YOUR WAGES MAY BE ATTACHED OR WITHHELD OR PERSONAL PROPERTY OR REAL ESTATE YOU OWN MAY BE TAKEN AND SOLD TO PAY THE JUDGMENT. IF YOU INTEND TO OPPOSE THIS ACTION, _DO NOT FAIL TO ANSWER WITHIN THE REQUIRED TIME._

If you wish to talk to a lawyer and feel that you cannot afford to pay a fee to a lawyer, promptly contact one of the offices of the Legal Aid Society (202-628-1161) or the Neighborhood Legal Services (202-279-5100) for help or come to Suite 5000 at 500 Indiana Avenue, N.W., for more information concerning places where you may ask for such help.

See reverse side for Spanish translation
Vea al dorso la traducción al español

D.C. Superior Court
09/24/2021 08:36AM
Clerk of the Court

AFFIDAVIT OF SERVICE

| Case: 2021 CA 002836 B | Court: Superior Court of the District of Columbia-Civil Division-Civil Actions Branch | County: District of Columbia, DC | Job: 6109178 |
|---|---|---|---|

**Plaintiff / Petitioner:**
Helen A. Kasay, as Personal Representative of the Estate of Yafet Solomen, deceased

**Defendant / Respondent:**
James Walker

**Received by:**
CPI - Columbia Process and Investigative Services LLC

**For:**
Grenier Law Group, PLLC

**To be served upon:**
James Walker

I, Marquis Harris, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein.

**Recipient Name / Address:** James Walker, 1412 Whittier Place NW, Washington, DC 20012
**Manner of Service:** Substitute Service
**Documents:** Summons, Complaint, Information Sheet, Exhibits, Initial Order and Addendum, Addendum To Initial Order Affecting All Medical Malpractice Cases

**Additional Comments:**
On September 18, 2021 at 3:25 PM, I served the Defendant, James Walker, the referenced documents at the referenced address via service upon a female Co - Occupant at the referenced address. The female Co -Occupant would not disclose her name. The female Co-Occupant was of suitable age and discretion to accept service on behalf of the Defendant.

The female Co - Occupant was a black Female with black/grey hair. The Co - Occupant was approximately 5'4", 150 pounds, and in her 50's.

I do solemnly declare and affirm under the penalty of perjury that the contents of the foregoing paper are true to the best of my knowledge, information, and belief.

_____     9-23-21
Marquis Harris                Date

CPI - Columbia Process and Investigative Services LLC
5406 Connecticut Avenue, N.W. Suite 108

Subscribed and sworn to before me by the affiant who is personally known to me.

_____
Notary Public

_____     _____
Date                Commission Expires

JAYNA E KUCIK
Notary Public - State of Maryland
Harford County
My Commission Expires Aug 20, 2025

D.C. Superior Court
10/07/2021 14:30PM
Clerk of the Court

### THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
#### Civil Division

| | |
|---|---|
| HELEN A. KASAY | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| | ) |
| v. | )   Civil Action No. 2021 CA 002836 B |
| | ) |
| JAMES WALKER *et al.* | ) |
| | ) |
| **Defendants.** | ) |

### AFFIDAVIT OF SERVICE

I, John E. Antishin, Esquire, an attorney licensed to practice in the District of Columbia (D.C. Bar #17525116), being duly sworn, depose and say:

Pursuant to the District of Columbia Office of the Attorney General Office Order No. 2020-10 (attached hereto as **Exhibit 1**), on September 15, 2021, at 7:12 p.m., I served a copy of the Complaint, Summons, and the Court's Initial Order and Addendum in the above captioned matter upon Defendant The District of Columbia by emailing same to Mr. Chad Copeland, Ms. Stephanie Litos, and Ms. Tonia Robinson.

On September 20, 2021, at 11:12 a.m., Ms. Robinson acknowledged receipt of the Complaint, Summons, and the Court's Initial Order and Addendum via email.

I solemnly affirm under the penalties of perjury and upon personal knowledge that the

contents of this document are true.

_John E. Antishin   October 7, 2021_

John E. Antishin (D.C. Bar #17525116)
Grenier Law Group PLLC
1920 L Street, NW, Suite 750
Washington, D.C. 20036
Phone: (202) 768-9614
Fax:    (202) 768-9604
jantishin@grenierlawgroup.com
*Counsel for Plaintiff Helen A. Kasay*


*Subscribed and sworn to before me by the*
*affiant who is personally known to me*

_Peter C. Grenier   October 7, 2021_

Notary Public

*My commission expires December 14, 2025*



D.C. Superior Court
10/08/2021 15:46PM
Clerk of the Court

## THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
### Civil Division

HELEN A. KASAY, as Personal Representative )
of the Estate of Yafet Solomen, deceased )
        Plaintiff, )
    )
    )
v.     )     Civil Action No. 2021 CA 002836 B
    )
JAMES WALKER, *et al.*,     )
    )
    Defendants. )

## CERTIFICATE REGARDING DISCOVERY

THE UNDERSIGNED HEREBY CERTIFY that, on the 8th day of October, true and

correct copies of Plaintiff' First Set of Interrogatories to Defendant The District of Columbia

were served via electronic and/or first-class mail upon the following:

### VIA ELECTRONIC AND FIRST-CLASS MAIL

Steven Rubenstein, Esq.
Mathew Trout, Esq.
Brendan Health, Esq.
Office of the Attorney General for the District of Columbia
Civil Litigation Division, Section Two
400 6th Street, NW
Washington, D.C. 20001
Steven.Rubenstein3@dc.gov
Matthew.Trout1@dc.gov
Brendan.Heath@dc.gov
*Counsel for Defendant The District of Columbia*

### VIA FIRST CLASS MAIL

James Walker
1412 Whittier Place NW
Washington, D.C. 20012

-and-

Timothy Handy
2400 S. Glebe Road, Apt. 626
Arlington, VA 22206

The undersigned will retain the original of this document in their possession, without alteration, until the case is concluded in this Court, the time for noting an appeal has expired and any appeal noted has been concluded.

Respectfully submitted,

HELEN A. KASAY,
AS PERSONAL REPRESENTATIVE OF THE
ESTATE OF YAFET SOLOMEN

Peter C. Grenier, D.C. Bar #418570
GRENIER LAW GROUP PLLC
1920 L Street, N.W., Suite 750
Washington, D.C. 20036
pgrenier@grenierlawgroup.com
Tel: (202) 768-9600
Fax: (202) 768-9604
*Counsel for Plaintiff Helen A. Kasay*

John E. Antishin, D.C. Bar #1725116
GRENIER LAW GROUP PLLC
1920 L Street, N.W., Suite 750
Washington, D.C. 20036
jantishin@grenierlawgroup.com
Tel: (202) 768-9600
Fax: (202) 768-9604
*Counsel for Plaintiff Helen A. Kasay*

2

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 8th day of October, 2021, I caused a true and correct

copy of the foregoing Certificate Regarding Discovery to be served via electronic and/or first-

class mail upon the following:

## VIA ELECTRONIC AND FIRST-CLASS MAIL

Steven Rubenstein, Esq.
Mathew Trout, Esq.
Brendan Health, Esq.
Office of the Attorney General for the District of Columbia
Civil Litigation Division, Section Two
400 6th Street, NW
Washington, D.C. 20001
Steven.Rubenstein3@dc.gov
Matthew.Trout1@dc.gov
Brendan.Heath@dc.gov
*Counsel for Defendant The District of Columbia*

## VIA FIRST CLASS MAIL

James Walker
1412 Whittier Place NW
Washington, D.C. 20012

-and-

Timothy Handy
2400 S. Glebe Road, Apt. 626
Arlington, VA 22206

John E. Antishin

3

THE SUPERIOR COURT FOR THE DISTRICT OF COLUMBIA
Civil Division

HELEN A. KESAY, as Personal Representative
of the Estate of Yafet Solomon, deceased
1414 Upshur Street, N.W
Apt #304
Washington D.C 20011

Plaintiff

v.                                        Civil Action No. 2021 CA 002836 B

JAMES WALKER
~~1412 Whittier Place, N.W~~
~~Washington, D.C 20012~~

305 Timothy Ave, #13
Auburndale, FL 33823

-and-

THE DISTRICT OF COLUMBIA

SERVE:

Muriel Bowser
Mayor of the District of Columbia
John A. Wilson Building
1350 Pennsylvania Avenue, N.W
Washington, D.C 20004

-and-

Karl A. Racine
Attorney General of the District of Columbia
400 6th Street, N.W
Washington, D.C 20001

-and-

INEZ SAKI-TAY, LOUIS PETERSON,
HARRIET A. BROADIE,
ANTHONY PRATHER, FERDINAND
GAMBOA, ANNETTE TIBBS,
DEREK BROOKS, TIMOTHY HANDY,
AND STEVEN ALLEN,
1140 4th Street, S.W
Washington, D.C 20024
     Individually, and as employees/agents of
     Defendant District of Columbia
-and-

JOHN BARNES JR., SHAWNEE WILLIAMS,
AND FIRE AND EMERGENCY MEDICAL
SERVICES JOHN DOE EMPLOYEES #s 1 & 2
2000 14th Street, N.W., 5th Floor
Washington, D.C 20009
     Individually, and as employees/agents of
     Defendant District of Columbia

-and-

DISTRICT OF COLUMBIA JOHN DOE
EMPLOYEES #1-10
c/o Karl A. Racine
Attorney General of the District of Columbia
400 6th Street, N.W
Washington, D.C 20001
     Individually, and as employees/agents of
     Defendant District of Columbia

     Defendants.

## DEFENDANT JAMES WALKER'S MOTION TO QUASH DUE TO INSUFFICIENCY OF SERVICE OF PROCESS

     Comes Now, Defendant, James Walker by and through undersigned counsel, Leonard L. Long, Jr. (whose appearance is limited to address this matter only), acting pursuant to Rules 4 and 12(b)(5) of the District of Columbia Superior Court Rules of Civil Procedure and hereby

2

moves this Court to Quash the Service of Process which was purportedly served upon Defendant in this matter on or about September 18, 2021. As grounds and in support of this Motion to Quash, Defendant, through Counsel submits the following:

## INSUFFICIENT AFFIDAVIT OF SERVICE

On or about 9/18/2021 an Affidavit of Service was filed in this matter which purports that service of process was affected upon Defendant Walker in accordance with District of Columbia Superior Court Rule 4(e)(2)(B), which permits "serving an individual (other than a minor) within the United States by leaving a copy of each (Summons and Complaint) at the individuals dwelling place or usual place of abode with someone of suitable age and discretion who resides there."

According to the Affidavit of Service, service in this matter was affected by substitute service and the manner of service as described therein, which provided that:

**"On September 18, 2021 at 3:25 pm, I served the Defendant, James Walker, the referenced documents at the referenced address via service upon a female Co-Occupant at the referenced address. The female Co-Occupant would not disclose her name. The female Co-Occupant was of suitable age and discretion to accept service on behalf of the Defendant. The female Co-Occupant was a black female with black/grey hair/ the Co-Occupant was approximately 5'4', 150 pounds, and in her 50s (See Exhibit A attached hereto)."**

Pursuant to D.C Superior Court Rules 4(e)(2)(B), the Affidavit of Service fails to set forth that the Summons, Complaint, and Initial Order was delivered by leaving a copy of each at Defendant Walker's dwelling or usual place of abode with someone of suitable age and discretion that resides there. Merely stating that Defendant James Walker was served at the referenced address via service upon a female co-occupant at the referenced address does not provide the Court pursuant to District of Columbia Superior Court Rule 4(1)(2)(A)(V) specific facts from which the Court can determine that the person to whom process was delivered meets the appropriate qualifications for receipt of process, i.e., whether the person upon whom service was delivered actually resides at the place in question in order to be deemed appropriately qualified to receive service as set forth in Rule 4 (e)-(J). Moreover, the Affidavit of Service fails

to state specific facts from which the Court can determine that the place where process was delivered meets the appropriate qualifications for receipt of process as Defendant's <u>dwelling place</u> or <u>usual place of abode</u>. (See Affidavit of Francis Weekes attached hereto as Exhibit B). Additionally, the Affidavit of Service referring to a female, co-occupant, as the person served, does not provide the Court with specific information upon which to make a determination that the address upon which the service was purportedly delivered was actually Defendant's <u>dwelling</u> or <u>usual place of abode</u>.

**Wherefore, because the Affidavit of Service filed in this matter specifically fails to establish that the service summons was served at Defendant's dwelling or usual place of abode upon a person of suitable age who resides at Defendants purported dwelling or usual place of abode, it is respectfully requested that the Service of Summons and Complaint in this matter be quashed. Defendant through undersigned counsel respectfully requests that the Court set a hearing in this matter.**

Respectfully Submitted,

Leonard L. Long, Jr.
*Attorney for Defendant*
Bar No.: 385311
2028 4th Street NE
Washington D.C 20002
P: 202-747-3591
F: 202-635-0057
AttorneyLLong@aol.com

## CERTIFICATE OF SERVICE

I hereby give notice that the Defendant James Walker's Motion to Quash Due to Insufficiency of Service of Process was efiled on this the ____ day of October 2021, by mailing a copy of same, postage pre-paid, first-class to:

Peter C. Grenier, Esq.
Grenier Law Group PLLC
1920 L Street, N.W Suite 750
Washington, D.C 20036

4

John Antishin, Esq.
Grenier Law Group PLLC
1920 L Street, N.W Suite 750
Washington, D.C 20036

Leonard L. Long, Jr.

D.C. Superior Court
09/24/2021 08:36AM
Clerk of the Court

## AFFIDAVIT OF SERVICE

| Case: 2021 CA 002896 B | Court: Superior Court of the District of Columbia-Civil Division-Civil Actions Branch | County: District of Columbia, DC | Job: 6109178 |
|---|---|---|---|
| Plaintiff / Petitioner: Helen A. Kasay, as Personal Representative of the Estate of Yafet Solomen, deceased | | Defendant / Respondent: James Walker | |
| Received by: CPI - Columbia Process and Investigative Services LLC | | For: Grenier Law Group, PLLC | |
| To be served upon: James Walker | | | |

I, Marquis Harris, being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

Recipient Name / Address:    James Walker, 1412 Whittier Place NW, Washington, DC 20012

Manner of Service:    Substitute Service

Documents:    Summons, Complaint, Information Sheet, Exhibits, Initial Order and Addendum, Addendum To Initial Order Affecting All Medical Malpractice Cases

Additional Comments:
On September 18, 2021 at 3:25 PM, I served the Defendant, James Walker, the referenced documents at the referenced address via service upon a female Co - Occupant at the referenced address. The female Co -Occupant would not disclose her name. The female Co- Occupant was of suitable age and discretion to accept service on behalf of the Defendant.

The female Co - Occupant was a black Female with black/grey hair.  The Co - Occupant was approximately 5'4", 150 pounds, and in her 50's.

I do solemnly declare and affirm under the penalty of perjury that the contents of the foregoing paper are true  to the best of my knowledge, information, and belief.

_____                9-23-21
Marquis Harris                                Date

CPI - Columbia Process and Investigative Services LLC
3406 Connecticut Avenue, N.W. Suite 106

Subscribed and sworn to before me by the affiant who is personally known to me

_____

_____                _____
Date                                Commission Expires

JAYNA E KUCIK
Notary Public - State of Maryland
Harford County
My Commission Expires Aug 20, 2025

9

Exhibit A

October 7, 2021

Affidavit

To: Whom it may concern

Re: D.C. Superior Court Case 2021CA 002836B

From: Fannie Weekes

My name is Fannie Weekes.  On September 18, 2021, I was at 1412 Whittier Place,
N.W., Washington, D.C. I answered the door and a gentleman asked for James Walker.  I
informed the gentleman that James Walker does not reside at the address.  He did not ask
my name or who I am, or if I live at the residence.  He indicated that he was serving Mr.
Walker and I stated that he could not because he does not live at this residence and he
could not leave the document.  He stated that the document pertained to the house and I
stated again that Mr. Walker does not reside at this address and he could not leave the
document.  He placed the document on the porch steps.  He did not place the document in
my hand and he saw me leave it on the step and close the door.  I do not live at the
address and I am not authorized to accept service of process for James Walker or anyone
else.


_____              _10-7-21_____
Fannie Weekes                          Date


_____
Notary

```
ELIZABETH O BEORGOH LEWIS
Notary Public - State of Maryland
     Prince George's County
My Commission Expires May 24, 2025
```

Exhibit B

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

Helen A. Kesay, Personal Representative
of the Estate of Yafet Solomon, deceased

      Plaintiff

      v.                             Case No. 2021 CA 002836 B

James Walker, et al.

      Defendants

## ORDER

Before the court is Defendant James Walker's Motion to Quash due to Insufficient Service of Process pursuant to Sup. Ct. Civ. R 4 and; Sup. Ct. Civ. R 12(b)(5). In his Motion Defendant Walker seeks an Order to Quash Service of Process contending that the purported service on him on 9/18/2021 was insufficient.

In consideration of Defendant Walker's Motion to Quash due to Insufficient Service of Process, Plaintiff's opposition/non-opposition thereto, good and sufficient cause having been shown, and based on the record herein, it is this ___ day of _____ 2021, hereby

**ORDERED**, that Defendant James Walker's Motion to Quash due to Insufficient Service of Process is **GRANTED**, it is further

**ORDERED**, Service of Process purportedly made on September 18, 2021, is hereby quashed

**IT IS SO ORDERED.**

_____
Associate Judge
District of Columbia Superior Court

Copies to:

Leonard L. Long, Jr., Esq.
_Via CaseFileXpress_
_Counsel for Defendant_

Peter C. Grenier, Esq.
Grenier Law Group PLLC
1920 L Street, N.W Suite 750
Washington, D.C 20036

John Antishin, Esq.
Grenier Law Group PLLC
1920 L Street, N.W Suite 750
Washington, D.C 20036

## AFFIDAVIT OF SERVICE

**D.C. Superior Court**
**10/08/2021 13:20PM**
**Clerk of the Court**

| Case: 2021 CA 002836 B | Court: Superior Court of the District of Columbia-Civil Division-Civil Actions Branch | County: District of Columbia, DC | Job: 6160143 |
|---|---|---|---|

**Plaintiff / Petitioner:**
Helen A. Kasay, as Personal Representative of the Estate of Yafet Solomen, deceased

**Defendant / Respondent:**
James Walker, et al.

**Received by:**
CPI - Columbia Process and Investigative Services LLC

**For:**
Grenier Law Group, PLLC

**To be served upon:**
Timothy Handy

I, Marquis Harris , being duly sworn, depose and say: I am over the age of 18 years and not a party to this action, and that within the boundaries of the state where service was effected, I was authorized by law to make service of the documents and informed said person of the contents herein

**Recipient Name / Address:**  Timothy Handy, 2400 S. Glebe Road, Unit 626, Arlington, VA 22206
**Manner of Service:**  Personal
**Documents:**  Summons, Complaint and Jury Demand, Initial Order and Addendum, Civil Remote Hearing Instructions

**Additional Comments:**
On September 30, 2021 at 9:54 AM, I served the Defendant, Timothy Handy, the referenced documents at the referenced address.

Timothy Handy is a Black Male with a bald head.  Mr. Handy is approximately 6'2", 240 pounds, and in his 40's.

I do solemnly declare and affirm under the penalty of perjury that the contents of the foregoing paper are true to the best of my knowledge, information, and belief.

Marquis Harris                     Date 10 - 7 - 2021

CPI - Columbia Process and Investigative Services LLC
5406 Connecticut Avenue, N.W. Suite 108
Washington, DC 20015

Subscribed and sworn to before me by the affiant who is personally known to me.

Notary Public

Date 10/7/2021                     Commission Expires

JAYNA E KUCIK
Notary Public - State of Maryland
Harford County
My Commission Expires Aug 20, 2025